IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

Imperial Pacific International (CNMI) LLC,

Plaintiff,

v.

Commonwealth of the Northern Mariana Islands, Arnold Palacios, governor of CNMI, in his official and personal capacities; Edward C. Deleon Guerrero, Chairman of CCC, in his official and personal capacities; Rafael S. Demapan, Vice Chairman of CCC, in his official and personal capacities; Mariano Taitano, Commissioner of CCC, in his official and personal capacities; Martin Mendiola, Commissioner of CCC, in his official and personal capacities; Ramon M. Dela Cruz, Commissioner of CCC, in his official and personal capacities; Andrew Yeom, Executive Director of CCC, in his official and personal capacities;

Defendants.

Case No. 1:24-cv-00001

MEMORANDUM DECISION DENYING PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

On February 23, 2024, Plaintiff Imperial Pacific International (CNMI), LLC ("IPI"), brought this civil action against Defendants Commonwealth of the Northern Mariana Islands ("CNMI"), Governor Arnold Palacios, Commonwealth Casino Commission ("CCC" or "Commission") Chairman Edward Deleon Guerrero, CCC Vice Chairman Rafael Demapan, CCC Commissioner Mariano Taitano, CCC Commissioner Martin Mendiola, CCC Commissioner

Ramon Dela Cruz, and CCC Executive Director Andrew Yeom in their official and personal capacities (collectively, "Defendants"). (Compl., ECF No. 1.) Three days later, IPI filed a motion for temporary restraining order ("TRO") ("Mot.," ECF No. 2) supported by Plaintiff's Points and Authorities (ECF No. 3), affidavits of Howyo Chi (ECF No. 3-2) and Michael Chen (ECF No. 3-1), supplemental affidavit of Howyo Chi (ECF No.7), and various exhibits (ECF Nos. 3-3–3-17). IPI sought a TRO and preliminary injunction restraining Defendants from conducting a revocation hearing regarding IPI's exclusive casino gaming license scheduled for February 28, 2024. (Mot. 1.) On February 27, 2024, the matter came before the Court for a hearing. (Mins., ECF No. 8.) During which time, after hearing arguments from both parties, the Court DENIED the motion. (*Id.*) The Court memorializes its reasons as follows.

## I. BACKGROUND

In 2014, the CNMI sought to issue its first exclusive casino gaming license. Decision & Order, *Best Sunshine Int'l LTD (BVI) v. Commonwealth Casino Commission*, No. 1:22-cv-00007 (D. N. Mar. I. Oct. 6, 2023) ECF No. 52 at 2. Later that same year, Best Sunshine International Limited (BVI) ("Best Sunshine") was selected to be the licensee, the Commonwealth License Agreement ("CLA") was prepared, and Best Sunshine formed IPI to enter into the CLA with the CNMI. (*Id.*) Although the original authority over granting the exclusive casino license was vested in the Commonwealth Lottery Commission, Public Law 18-63 and the CLA expressly ended that authority upon issuance of the license. (CLA 2, ECF No. 1-1.) The CCC thereafter, among other things, possessed the power to suspend and revoke IPI's license in accordance with the CNMI's

Administrative Procedure Act where violations occurred. (*Id.*) Additionally, upon IPI's material breach of the CLA, the CLA also grants the CNMI powers to suspend and revoke IPI's license. (*Id.* at 20.)

Under the CLA, IPI was to pay $15 million in an annual casino license fee. (*Id.* at 6.) On December 4, 2015, the CNMI promulgated Public Law 19-24, imposing a $3 million annual regulatory fee on IPI. 4 CMC § 2309. Pursuant to 4 CMC § 2309, the regulatory fee covers costs such as

> those associated with the licensing, testing certification, auditing and approval of all casino slots and other gaming machines, casino table games and all other casino gaming activities conducted by the exclusive casino licensee at the licensed casino and regulated by the Commission as well as the costs of all applications, including their review, renewal and all related investigations, for licensing or permit or consent for casino employee licensees, casino key employee licenses.

After making payments for the first few years, IPI was unable to make payments as required for the annual regulatory fee, annual license fees, and Community Benefit Fund for a few years. (Compl. ¶ 23.) As such, in 2020 the CCC Executive Director filed complaints against IPI with the CCC for failure to pay the annual license fee, accounts payable, and the regulatory fee for 2020 and for failure to make Community Benefit Contributions and maintain a requisite amount of cash reserves. Decision & Order 2, *Best Sunshine Int'l LTD (BVI)*. On April 22, 2021, the CCC held a hearing on these complaints and ultimately suspended IPI's gaming license, ordered IPI to pay $18.65 million that was due, and imposed $6.6 million in penalties. (Compl. ¶ 28.)

Thereafter, IPI appealed the CCC's ruling with the Superior Court of the CNMI. (*Id.* ¶ 29.) The Superior Court affirmed the CCC's ruling, and IPI appealed. (*Id.* ¶¶ 29-30.) The CNMI Supreme Court affirmed the Superior Court's ruling in-part and reversed in-part. (*Id.* ¶ 32.) Upon the CNMI Supreme Court's ruling, the CCC was to decide a reasonable deadline for IPI to pay the annual license fee for 2020 and the following years, and the CCC set a deadline of thirty days. (*Id.* ¶¶ 32-33.)

In September 2021, Executive Director Andrew Yeom of the CCC filed five complaints against IPI with the CCC for: (1) failure to pay annual license fee for the year 2020; (2) failure to maintain minimal capital requirements; (3) failure to pay annual regulatory fee for the year 2020; (4) failure to pay annual license fee for the year 2021; and (5) failure to pay annual regulatory fee for the year 2021. (*Id.* ¶ 34.)

A day before the CCC's scheduled revocation hearing, on May 23, 2022, IPI filed a civil action seeking an injunction in aid of arbitration, an order compelling arbitration, an order appointing an arbitrator, and a TRO. Decision & Order 3, *Best Sunshine Int'l LTD (BVI)*. The Court granted the TRO that same day, directed IPI to post a $100,000 security bond within two days, and set a hearing to determine IPI's motion for an injunction to continue the enjoinment of the CCC revocation hearing and to compel arbitration. *Id.* The CCC filed an appeal, and the Ninth Circuit reversed this Court's decision. *Id.*

Subsequently, the CCC scheduled a revocation hearing against IPI for February 28, 2024. (Mot. 3.) IPI now seeks in its motion a TRO restraining Defendants from conducting the revocation hearing. (*Id.*)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs TROs. "The standard for issuing a TRO is the same as that for issuing a preliminary injunction . . . ." *Blain v. Cal. Dep't of Transp.*, 616 F. Supp. 3d 952, 956 (N.D. Cal. 2022). A "preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). "[It] is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). Courts apply a four-factor test to determine whether to grant a preliminary injunction or TRO. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. This is the same for TROs. *Blain*, 616 F. Supp. 3d at 956.

"Alternatively, the court may issue a preliminary injunction if the plaintiff demonstrates that 'serious questions going to the merits' have been raised and 'the balance of hardships tips sharply in the plaintiff's favor' in addition to satisfying the other *Winter* factors." *Cmmw. Utils. Corp. v. Johnson*, 218 F. Supp. 3d 1136, 1142 (D. N. Mar. I. 2016) (citing *All. for the Wild Rockies*

*v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)). This approach is commonly called the "serious questions test": "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. "Serious questions" are questions that "cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions . . . by altering the status quo." *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)). Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

### III. DISCUSSION

After consideration of the *Winter* factors, the Court found that IPI had not met its burden; in particular, IPI did not demonstrate that it is likely to succeed on the merits nor that the public interest tips in its favor.

#### A. <u>Likelihood of Success on the Merits</u>

IPI asserted four substantive causes of action alleging (1) unconstitutional impairment of contract and violation of the contract clauses of the U.S. and CNMI Constitutions, (2) violation of the Due Process Clauses of the U.S. and CNMI Constitutions, (3) violation of Article IV of the

CNMI Constitution, and (4) breach of the CLA. (Compl. 1.) In neither briefing nor oral arguments did IPI demonstrate likelihood of success on any of these claims.[1]

### 1. Unconstitutional Impairment of Contract and Violation of the Contract Clauses of the U.S. and CNMI Constitutions

For IPI's first cause of action, IPI does not specifically contend in its Complaint that the imposition of the $3 million annual regulatory fee pursuant to 4 CMC § 2309(a) impaired the financial obligations of the parties established under the CLA. (*See* Compl.) However, liberally construing the Complaint, the Court concludes IPI alleged sufficient facts to argue this point.

For an impairment of contract claim, "[g]enerally [the Ninth Circuit asks] whether the change in state law has 'operated as a substantial impairment of a contractual relationship.'" *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (citations omitted). "This inquiry has three components: [1] whether there is a contractual relationship, [2] whether a change in law impairs that contractual relationship, and [3] whether the impairment is substantial." *Id.* at 1109.

Here, it is clear there is a contractual relationship between the CNMI and IPI. This Court has recognized this in its Memorandum Decision in *Best Sunshine International LTD (BVI)*:

> The Commonwealth License Agreement was prepared, and Best Sunshine formed IPI to enter into the CLA with the CNMI. On August 12, 2014, Ms. Cai Ling Li, director of IPI, executed the CLA on behalf of IPI, and the Commonwealth Lottery Commission executed the CLA on behalf of the CNMI, which was approved by Gilbert Birnbrich, Acting Attorney General of the CNMI.

---

[1] The Court need not address Defendants' affirmative defense of res judicata raised at oral arguments because IPI has not met its burden to establish likelihood of success on the merits.

Memorandum Decision 2, *Best Sunshine Int'l LTD (BVI) v. Commonwealth Casino Commission*, No. 1:22-cv-00007 (D. N. Mar. I. Sept. 26, 2023) ECF No. 32 at 2-3. However, IPI does not allege, nor is there a clear contractual relationship between IPI and the listed Defendants—besides the CNMI—that IPI also seeks a TRO and preliminary injunction against. As to the second element, there does appear to be a change in law imposing obligations on IPI to pay an additional $3 million dollars annually for a regulatory fee pursuant to 4 CMC §2309. (Compl. ¶ 20 ("On December 4, 2015[,] CNMI promulgated Public Law 19-24, which imposes a new obligation on IPI to pay CCC an annual 'Casino Regulatory Fee' of three million dollars ($3,000,000.00) on or before October 1 of each year beginning October 1, 2015 ('Regulatory Fee Statute').").)

As to the final prong of analysis—whether the impairment is substantial—"[a]n impairment of a contract is substantial if it deprives a private party of an important right, thwarts performance of an essential term, defeats the expectations of the parties, or alters a financial term." *HRPT Props. Tr. v. Lingle*, 715 F. Supp. 2d 1115, 1136 (D. Haw. 2010) (citing *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003)). "A court must focus on 'the importance of the term which is impaired, not the dollar amount,' when determining substantiality. Thus, if a law completely destroys contractual expectations, a severe impairment exists, but if a law only restricts a party to gains it reasonably expected from the contract, no substantial impairment exists." *Id.* (citations omitted).

A court must also consider "whether the industry the complaining party has entered has been regulated in the past." *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1098 (9th Cir.

17-18.) IPI's behavior of paying the regulatory fee after its enactment under 4 CMC § 2309 is inconsistent with the Court finding that its enactment "completely destroy[ed] contractual expectations," as IPI now argues. See *HRPT Props. Tr.*, 715 F. Supp. 2d at 1136.

Therefore, because IPI has not demonstrated a contractual relationship between IPI and the other defendants, other than the CNMI, the Court concludes that IPI is unlikely to succeed on the merits. As to IPI's allegation of CNMI's contractual impairment, the Court also finds it is unlikely to succeed on the merits for the reasons stated above.

The Court does not find that 4 CMC § 2314 nullifies the CLA that the CNMI and IPI entered into, nor does the statute substantially impair IPI's contractual relationship. The CLA already grants the CNMI and the CCC many different rights. The CLA permits the CCC to "establish separate rules and regulations as to gaming operations which shall have additional procedures for license suspension or revocation." (CLA 20, ECF No. 1-1.) It appears that IPI's main contention in the CNMI's enactment of 4 CMC § 2314, is that the statute "imposes completely unexpected and new liabilities and limitations on the operation of IPI." (Pl.'s Points & Authorities 18.) However, IPI ignores powers already conferred to the CCC by the CLA. As such, the Court finds that the enactment of 4 CMC § 2314 constitutionally impairing IPI's contract rights is not likely to succeed.

### 2. Violation of the Due Process Clauses of the U.S. and CNMI Constitutions

A claim for violation of due process must have three elements: "(1) a property interest protected by the Constitution; (2) a deprivation of the interest by the government; and a (3) lack

of required process." *Deleon Guerrero v. CNMI State Bd. of Educ.*, 18-CV-00006, 2018 WL 2437582, at *3 (D. N. Mar. I. May 30, 2018) (citing *Ulrich v. City and Cnty. of San Francisco*, 308 F.3d 968, 974 (9th Cir. 2002). The property interest is established by "an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* (internal quotation marks and citation omitted); *see Braswell v. Shoreline Fire Dept.*, 622 F.3d 1099, 1102 (9th Cir. 2010).

IPI maintains that the CCC is acting in a judicial or quasi-judicial role in which the decision makers have a financial interest in the outcome of the case and a conflict arises from decision makers' roles in earlier proceedings. (Pl.'s Points & Authorities 21.) IPI makes broad statements that the decisionmakers have a financial outcome in the case without identifying who the decisionmakers are. Further, IPI asserts the Commissioners and the Executive Director of the CCC are paid "from the annual regulatory fees and fines and penalties collected from IPI." (*Id.*) IPI does not clarify the role each Defendant plays in the revocation hearings. Pursuant to NMIAC § 175-10.1-1410, at contested case hearings, the Chairman may designate a member of the CCC to serve as hearing commissioner. NMIAC also dictates other discretionary choices in proceedings. Due to this, it is unclear the role that each Defendant plays in the revocation proceeding scheduled for February 28, 2024, and thus, difficult for the Court to determine if there is conflict.

The Due Process Clause does entitle "a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

> The requirement of neutrality has been jealously guarded by this Court. In *Tumey v. Ohio, supra*, the Court reversed convictions rendered by the mayor of a town when the mayor's salary was paid in part by fees and costs levied by him acting in a judicial capacity. The Court stated that the Due Process Clause would not permit any "procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused."

*Id.* at 243 (citation omitted).

IPI contends that these principles compel the conclusion that the conflict of interest violates the Due Process Clauses of the U.S. and CNMI Constitutions. However, it is unclear from the pleadings who exactly would have this conflict. In *Marshall*, the Supreme Court found that an individual who was bestowed with the authority to assess whether there has been a statutory violation was akin to a prosecutor or civil plaintiff and not that of a judicial or quasi-judicial role. 446 U.S. at 247. Although some of the named Defendants likely serve in a judicial or quasi-judicial role, it is not clear from the pleadings that they all do. In fact, IPI states that Executive Director Andrew Yeom filed motions with the CCC and requested a revocation hearing. (Pl.'s Points & Authorities 13.) This would appear to fulfill more of the role of a civil plaintiff or prosecutor than a judicial or quasi-judicial role. The Court emphasizes IPI's burden to demonstrate and elaborate on this conflict in order to establish likelihood of success on the merits.

As to IPI's second claim that decision makers are conflicted because of their involvement in an earlier proceeding, IPI cites to *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009).

First, IPI does not identify the parties that are overlapping between the proceedings scheduled for the February 28, 2024, revocation hearing and the proceedings from the past.

Second, *Caperton* is not on point as to the facts of this action. In particular, the case discusses criminal contempt cases in which a judge had no pecuniary interest in the case but determined in an earlier proceeding if criminal charges should be brought and then proceeded to try to convict the petitioners. *Id.* at 871. The court in that case "noted that circumstances of the case and the prior relationship required recusal." *Id.* However, this case does not involve criminal defendants, and therefore "the rule that 'a defendant in criminal contempt proceedings should be [tried] before a judge other than one reviled by the contemnor'" is inapplicable to this case. *See id.* (citation omitted). The moving party bears the burden of persuasion and must make a clear showing that they are entitled to relief. *Winter*, 555 U.S. at 22. IPI's broad statements that conflicts exist between CCC decisionmakers and IPI are insufficient and thus the Court finds that it has not established a likelihood of success on this claim.

### 3. Violation of Article IV of the CNMI Constitution (Separation of Powers)

IPI argues that pursuant to Article IV of the CNMI Constitution, the judicial power of the Commonwealth shall be vested in the judiciary of the Northern Mariana Islands and "[t]he Commonwealth superior court shall have original jurisdiction in all cases in equity and at law." CNMI Constitution, Art. IV, Section 2. However, there are only three cases in which CNMI courts cite to this portion of the CNMI Constitution and none prove helpful in the article's interpretation. Thus, this is a matter of first impression. Further, the one case that IPI cites to, *Marine*

*Revitalization Corp. v. Department of Land & Natural Resources*, 2010 MP 18, does not support its contention. Rather, that case involved, as to Article IV of the CNMI Constitution, what the Superior Court may do, and not the delegation or separation of powers. IPI's argument as to this point is cursory such that the Courts find that this factor does not support the issuance of a TRO.

### 4. Breach of CLA

For the breach of CLA claim, the Complaint asserts that the "CNMI breached the CLA by bestowing powers upon CCC to function as a judicial office to interpret the terms of the CLA" and CCC's function "as a judicial or quasi-judicial entity to interpret the CLA and adjudicate claims arising out of the CLA constitutes a breach of the CLA." (Compl. ¶¶ 77, 82.) However, in its motion, IPI asserts that it has a likelihood of success on the merits for the breach of the CLA claim because it raises defenses to the revocation proceeding that are "question[s] to the forum selection clause," which are distinct from the pending revocation proceedings. (Pl.'s Points & Authorities 22-24.) IPI's argument for breach of the CLA as outlined in the motion is untethered to its claim as defined in the Complaint. Nevertheless, the Court address the breach of CLA claim as asserted in both the Complaint and the Motion.

First, addressing the breach of CLA argument outlined in the Complaint, the CLA states that CCC's authority "includes the ability to suspend or revoke the Casino License, in accordance with the requirements of the Commonwealth Administrative Procedure Act, for violation of the Rules." (CLA ¶ 3.) Thus, the plain language of the CLA grants the CCC the authority to conduct

revocation proceedings; there is no breach of contract, rather the CCC is acting within its powers as outlined by the CLA.[2]

Second, in its Motion, IPI asserts that the forum selection clause is implicated. The CLA's forum selection clause provides that the CLA "is to be interpreted under the laws of the Commonwealth of the Northern Mariana Islands and the exclusive jurisdiction of the courts thereof." (CLA ¶ 33.) It appears that IPI's argument is that it is raising defenses to purported bases for revocation such as the annual regulatory fee and minimum capital level. (Pl.'s Points & Authorities 24.) The annual regulatory fee is mandated by both CNMI statute, 4 CMC § 2309, and CCC regulation, NMIAC §175-10.1-1225(b). The CLA provides that "[t]he continuing validity of this License is conditional upon the Licensee's compliance with applicable laws, rules, and regulations of the Commonwealth." (CLA ¶ 17.) Thus, IPI is obligated to comply with CNMI statutes, including 4 CMC § 2309, which requires payment of the annual regulatory fee. Further, the CLA requires the Commission to "establish separate rules and regulations as to gaming operations which shall have additional procedures of license suspension or revocation." (CLA ¶

---

[2] The CLA also provides that "[u]pon the occurrence of a Material Breach, the *Commonwealth* may, but shall not be required to: (i) suspend or revoke this License Agreement and or cancel all associated duties and obligations; or (ii) pursue any other remedy available at law or in equity." (CLA ¶ 31 (emphasis added).) Thus, it appears that the Commonwealth, not just the Commission, has the ability to suspend and revoke the CLA. Thus, the authority to suspend and revoke the CLA are bestowed upon both the Commission and the CNMI. This interpretation is further buttressed by the following paragraph to the Commonwealth's ability to suspend or revoke the CLA, which states that the Commission "shall establish separate rules and regulations as to gaming operations which shall have additional procedures of license suspension or revocation." (*Id.*)

31.) Thus, the CLA authorizes CCC regulation, NMIAC §175-10.1-1225(b), which requires payment of the annual regulatory fee. The minimum capital level is also outlined by CCC regulation, NMIAC § 175-10.1-560. As just stated, the CLA authorizes the Commission to create such rules and regulations. Thus, the Court rejects IPI's arguments that there are issues that a CNMI court should resolve before the CCC holds its revocation proceedings.

Therefore, the Court concludes that IPI has not met its burden to demonstrate likelihood of success on the merits for its claim of breach of the CLA, or any of the other claims.

## B. Irreparable Harm

A plaintiff seeking a preliminary injunction or a TRO must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *See Winter*, 555 U.S. at 22 (rejecting the "possibility of harm" standard as too lenient). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). However, the element of harm must be grounded in evidence, rather than conclusory statements about harm that the petitioner might suffer. *Id.* Moreover, a "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d

668, 674 (9th Cir. 1988) (citing *Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984)).

The Court concludes that IPI has demonstrated irreparable harm if a TRO is not issued. IPI speculates on two fronts, but the most significant is the backing out of Kyosei Bank Group's ("Kyosei") anticipatory infusion of money. (Pl.'s Points & Authorities 26.) Imperial Pacific International Holdings Limited and Kyosei have signed a memorandum of understanding (ECF No. 3-15) where the latter agreed to invest $300 million to the former's subsidiary, Plaintiff IPI. (ECF No. 3-2.) Kyosei has already provided $20 million. (ECF No. 3-2 ¶ 34.) For the full investment, IPI needs to "hold[] a valid exclusive and sole gaming license in CNMI." (ECF No. 3-15 ¶ 3(4).) Additionally, the "initial investment of $150 million [will be infused] after the suspension of IPI gaming license has been lifted." (*Id.* ¶ 2(2).) Thus, if the TRO is not granted such that the revocation hearing is held and the gaming license is revoked, IPI could suffer irreparable harm in the form of a lost investor. This Court has ordered IPI to "immediately halt any and all work related to the construction and development of the IPI casino in Garapan, Saipan." Order Finding Civil Contempt and Imposing a Stop Work Order, *Acosta v. IPI*, 1:19-cv-00007 (D. N. Mar. I. Jan. 21, 2021), ECF No. 19.[3] However, as this Court has explained, "the Stop Work Order may be lifted by Court order upon" the satisfaction of multiple requirements, including

---

[3] The stop-work order is still in effect. *See* Order, *Acosta v. IPI*, 1:19-cv-00007 (D. N. Mar. I. Jan. 21, 2021), ECF No. 37 ("The stop-work order originally imposed on January 21, 2021 (ECF No. 19) shall continue until further order by the Court.").

several cash prerequisites. Order Continuing Civil Contempt Proceedings and Stop-Work Order, *Acosta v. IPI*, 1:19-cv-00007 (D. N. Mar. I. Feb. 1, 2021), ECF No. 27. Thus, this cash infusion from Kyosei could be a basis to lift the stop work order such that IPI could function again. As such, the Court finds that this factor does support the issuance of a TRO.

### C. Balancing of the Equities

Upon first blush, it appears that the harm to the Defendants if the TRO was granted is minimal since the Commission has already granted several continuances of the revocation proceeding from January 2024 to February 28, 2024. On the other hand, as outlined above, the harm would be great for IPI if the TRO were not granted and the revocation hearing proceeded and concluded with the revocation of the license. However, the Court emphasizes that IPI has not demonstrated likelihood of success on the merits such that issuance of the TRO would be harmful to Defendants. Therefore, this factor weighs against granting the TRO.

### D. Public Interest

IPI's argument that the Court's issuance of a TRO and preliminary injunction would serve the public interest because of the public's purported interest in the enforcement of the CLA's forum selection clause is unconvincing because the CLA permits the CCC to initiate suspension or revocation of the CLA license. (*See* CLA 20.) Further, the CNMI also is conferred rights under the CLA with regards to suspension of the CLA or revocation. (*Id.*) Thus, the argument that this supports public interest is unfounded in the contractual language of the CLA.

As to IPI's other argument, although preserving jobs and preventing significant negative impact on the local economy, is of public interest in general, these reasons do not support IPI's position. IPI currently has lawsuits against them from many employees in the federal and local court. Moreover, IPI does not support its statement that jobs will be preserved other than through speculation that IPI will be able to reopen. As such, the Court finds that the public interest is not served through the issuance of a TRO or preliminary injunction.

### IV. CONCLUSION

Based on the foregoing, the Court finds that IPI has not met its burden such that the Court denies its emergency motion for a temporary restraining order.

IT IS SO ORDERED this 29th day of February 2024.

_____
David O. Carter
Designated Judge