# EXHIBIT
# D



E-FILED
CNMI SUPERIOR COURT
E-filed: Mar 15 2022 03:53PM
Clerk Review: Mar 15 2022 03:59PM
Filing ID: 67465913
Case Number: 21-0173-CV
Nitnick V Diaz

**IN THE SUPERIOR COURT**
**FOR THE**
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| In re: ) | **CIVIL CASE NO. 21-0173** |
| ) | |
| **Commission Order No: 2021-002; Final** ) | |
| **Order for Enforcement 20-001 and 20-003** ) | |
| **(Consolidated),** ) | **ORDER AFFIRMING THE CASINO** |
| ) | **COMMISSION'S SUSPENSION OF** |
| **COMMONWEALTH CASINO** ) | **PETITIONER'S EXCLUSIVE CASINO** |
| **COMMISSION,** ) | **LICENSE AND MONETARY PENALTIES** |
| ) | |
| **Agency,** ) | |
| ) | |
| **IMPERIAL PACIFIC INTERNATIONAL** ) | |
| **(CNMI) LLC,** ) | |
| ) | |
| **Petitioner.** ) | |

## I. INTRODUCTION

Before the Court is a Petition for Judicial Review filed by Imperial Pacific International (CNMI) LLC's ("IPI or Petitioner") seeking relief from the Commonwealth Casino Commission's ("Casino Commission") April 22, 2021 Commission Order No. 2021-002 suspending Petitioner's Exclusive Casino License and imposing other penalties.[1]  For the reasons set out below, Commission Order No. 2021-002 is hereby **AFFIRMED**.

## II. FACTS

1. Gambling is prohibited in the Northern Mariana Islands except as provided by Commonwealth law.  N.M.I. Const. art. XXI, § 1.

---

[1] Based on the record before the Court and the legal counsels' written arguments, the Court issues this ruling based on the submission of the briefs and without oral argument as authorized by NMI Rules of Procedure for Administrative Appeals. *See* NMI. R. P. ADMIN. APP. 6(b) (the trial court may on its own motion *issue a ruling on the petition without oral argument*) (emphasis added).

By order of the Court, Associate Judge Wesley M. Bogdan

2. On March 3, 2014, the 18th Northern Marianas Commonwealth Legislature enacted Public Law 18-38 ("PL 18-38") to authorize, establish and provide for casino gambling through the issuance of an Exclusive Gaming License.

3. The Findings and Purposes section of PL 18-38 explains that the CNMI was in "dire need" of revenue to honor its financial obligations to the Commonwealth's retirees and the need to increase tourism and created the Commonwealth Casino Regulatory Commission to carry out the purposes of the new law.

4. In his signing and transmittal letter to the Legislature, then-Governor Eloy S. Inos explained that he was approving the legislation with reservation because of "shortcomings" in the law based on the assurances given that by the Commonwealth Legislature to enact agreed upon amendments that will address the various concerns that he saw.

5. Three weeks later, on March 26, 2014, the political-exchange between the Executive and Legislative Branches resulted in the enactment of Public Law 18-43 ("PL 18-43") to address the shortcomings identified by the former Governor.

6. PL 18-43 was then signed into law by Governor Inos on April 1, 2014.  In his signing and transmittal letter to the Legislature, he thanked both houses of the Commonwealth Legislature and explained:

> This joint effort between the Legislative and Executive branches of government in the establishment of this important public policy is to be commended.

7. PL 18-43 clarified the Exclusive Casino License application process and made clear that granting of the license was solely within the discretion of the Commonwealth Lottery Commission.

8. PL 18-43 also renamed the Commonwealth Casino Regulatory Commission to what it is referred as to today, the "Commonwealth Casino Commission", and explained that the Casino Commission's regulatory jurisdiction was limited to the island of Saipan and that that body was only to be empowered to promulgate such rules and regulations to fulfill the intent, policies, and purposes of the new public law.

9. As set out by statute, the Casino Commission was originally set up only to regulate the gaming activities, key casino employees, vendor licensees, service providers, junket operators, et. cetera, and not actually issue the Exclusive Casino License itself.

10. A short time later, in July 2014, the CNMI Legislature enacted Public Law 18-56 ("PL 18-56"), the third Legislative effort enacted in approximately four months intending to establish the lawful process to allow gambling in the CNMI and control over the authorization, granting and regulation of an exclusive license that was still to be issued.

11. The Findings and Purposes section of PL 18-56 explained that although the prior laws had established the necessary framework for the casino industry, there still existed "ambiguities and conflicts."

12. For example, PL 18-56 clarified that while the CNMI Legislature had previously granted the Commonwealth Lottery Commission the power to review applications and issue the Exclusive Casino License, PL 18-56 was necessary to clarify that the Lottery Commission "could carry out" an investigation on its own (if the Commonwealth Casino Commission was not actually operational by the time the applications were received).

13. PL 18-56 also sought to once-again try and clarify the overlapping, but differing grants of authority the CNMI Legislature bestowed upon the Lottery Commission, as compared to the Casino Commission.

14. For example, PL 18-56 confirmed that the granting of the Exclusive Casino License was within the discretion of the Commonwealth Lottery Commission through an amendment to 4 CMC § 2317(a)(1)(i)(A):

> . . . After approving an application for the exclusive license, the Commonwealth Lottery Commission may negotiate the terms of the exclusive license before it is issued. The license shall be subject to such conditions as the Commonwealth Lottery Commission deems necessary to assure compliance with this chapter, including timelines for construction, commencing operations, and achieving the minimum initial investment requirements. The issuance of the license by the Commonwealth Lottery Commission shall not be subject to judicial review.

15. PL 18-56 also provided that after the issuance of the license, the Lottery Commission may amend, by regulation, the requirements set out in statutory law (4 CMC § 2317(a)(1)(iv)) as it deems to be in the best interest of the Commonwealth.

16. With respect to the actual oversight and regulation of casino operations (and gaming activities including the hiring key employees and licensing vendors and approving junket operators, et cetera), PL 18-56 again clarified that those responsibilities were to be the exclusive area of work for the newly renamed Casino Commission including, without limitation, the responsibility:

> (a) To conduct hearings pertaining to the violation of this chapter or regulations promulgated hereto; including hearings for the purpose of approving casino licenses [employee, vendors and junket operators et cetera] and other business allowed under this chapter.

> (b) To promulgate such rules and regulations, as may be necessary to fulfill the intent, policies and purposes of this chapter. The Commission may use such rules and regulations to interpret, enlarge upon, except provisions defining the authority and powers of the Commission, or define, or any provision of this chapter to the extent that such provision is not specifically defined by this chapter. The rules and regulations shall, at a minimum, provide for the following:

>> (1) A code of ethics for the members of the Commission and its officers and employees.

(2) Supervision, monitoring and investigation or other means to ensure the suitability and compliance with the legal, statutory and contractual obligations of owners, operators, and employees of casinos and other persons licensed under this chapter.

(3) The examination, supervision and monitoring of the continuing fiscal and financial capability of casino owners, operators, concessionaires and other parties with any direct relation to the sole casino and to protect the public in the event that such capability is significantly diminished.

(4) To collaborate in the definition, coordination and execution of the economic policies for the operations of the casino games of fortune and other ways of gaming, pari-mutuels, wagering and casino gaming activities offered to the public.

(5) To authorize and certify all the equipment and utensils used by the operations of the concessionaires approved in the respective concessions.

(6) To issue licenses for "junket" promoters of casino games of fortune or other casino gaming activities.

(7) To examine, supervise and monitor the eligibility of the single or collective junket promoter(s), their partners and principal employees.

(8) To examine, supervise and monitor the activities and promotions of the junket promoters in relation to their compliance with legal, statutory, and contractual obligations, and other responsibilities stipulated in the applicable legislation and contracts.

(9) To investigate and penalize any administrative infractions practiced according to the appropriate substantial and procedural legislations.

(10) To ensure that the relationship of the licensed gaming operators with the government and the public is in compliance with the Commission's regulations and provides the highest interest to Commonwealth.

(11) The exclusion and removal of undesirable persons from the sole casino.

(12) Civil penalties for the violation of provision's or regulations imposed under this chapter.

- 5 -

(13) Penalties for the late payment of applicable fines, or fees.

(c) To levy fines and penalties for the violation of provisions of this chapter and the regulation promulgated by the Commission.

(d) To require and demand access to and inspect, examine, photocopy, and audit all papers, books and records of the casino operator on its premises or elsewhere as practical, including inspecting the gross income produced by the casino operators, gaming business and verification of their income, and all other matters affecting the enforcement of the Commission's policy or as required pursuant to this chapter.

(e) For the types of gaming and games to be covered by the casino license and their structure.

(f) The Commission shall also regulate sports betting, pari-mutuel betting, and other wagering which relies on events occurring within or without the casinos regulated by the Commission.

(g) The Commission shall not regulate betting or wagering associated with cockfighting.

18. Subsection (h) expressly emphasized once again, in amending 4 CMC § 2314(h), that the Casino Commission shall not have the authority to issue the exclusive gaming license to the sole Casino Operator, and instead, that the power to issue such a license was vested with the Commonwealth Lottery Commission.

19. Accordingly, on August 14, 2014—after swift completion of the vetting process—the Commonwealth Lottery Commission awarded IPI the CNMI's Exclusive Casino License with the signing of a Casino License Agreement ("CLA").

20. The CLA contains various provisions which seem to extend, or at least in some degree differ from legislative directives set out in PL 18-56.

21. For example, Section 2 of the Casino License Agreement (entitled "Authority for Enforcement of this License Agreement") provides in whole:

Under the terms of PL 18-56, the Commonwealth Lottery Commission ("Lottery Commission") was granted authority to issue an exclusive Casino License for gaming facilities on the island of Saipan and attach terms and

- 6 -

conditions for issuance of the Casino License. Upon issuance of the Casino License the authority of the Lottery Commission over this License shall cease and the Office of the Governor shall have authority for enforcement of the terms and conditions of this License Agreement except for the elements specifically identified for control by the Casino Commission, as identified in section 3 below.

22. Likewise, Section 3 of the Casino License Agreement (entitled "Authority of the Commonwealth Casino Commission") provides, among other provisions, that:

> The authority of the Casino Commission includes the ability to suspend or revoke the Casino License, in accordance with the requirements of the Commonwealth Administrative Procedure Act, for violation of the Rules.

23. The Casino License Agreement contains a *Force Majeure* clause in Section 25 which provides:

> Licensee shall not be in default for any failure or delay in the performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee ("*Force Majeure* Event"). Invocation of *force majeure* by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.

> Where such *Force Majeure* Event results in failure in the performance or delay exceeding six (6) months of the performance due under this License Agreement, the Licensee may terminate this License Agreement forthwith provided that the Licensee shall not be excused from any payment obligations to the Commonwealth where the grounds and/or purpose for such payments have already accrued.

> A change in law which prohibits performance of this agreement or makes such performance illegal shall result in a suspension of the performance of both Parties under this License Agreement until such prohibition no longer exists, provided that the Licensee shall have the option to terminate this License Agreement upon the adoption of the change in law pursuant to this section 25 as if such change in law is a *Force Majeure* Event.

24. Following the award of the Exclusive Casino License, the CNMI Legislature enacted two additional Public Laws concerning governance and oversight over the Exclusive Casino

- 7 -

License; **_and_** the Lottery Commission subsequently amended the Casino License Agreement nine (9) times.

25. The first amendment was in November 2014 and allowed Petitioner to offer outside investors a minority percentage of ownership of the issued share capital of IPI without triggering the prohibition against such transfers without prior approval.

26. The second amendment was in March 2015 and allowed Petitioner to open and operate a Temporary Live Training on the First Floor of the T Galleria in Garapan, Saipan.

27. Thereafter, in November 2015, the 19th Northern Marianas Commonwealth Legislature enacted Public Law 19-24, clarifying—among other provisions—previous legislative instructions with respect to the allocation of the monies collected from the Annual License Fees; providing annual funding of the Casino Commission as an autonomous public agency of the Commonwealth government ("the Casino Regulatory Fee"); and to yet once again attempting to clarify the specific duties, responsibilities, and authorities of the Casino Commission.

28. Of particular note is Section 10 of Public Law 19-24 ("PL 19-24") wherein the 19th Legislature expressly provided that the Casino Commission could not suspend or revoke the Exclusive Casino License absent a finding of clear and convincing evidence during a hearing pursuant to 1 CMC § 9101 *et. seq*. by unanimous vote of the Casino Commission and, provided that any decision of the Commission to revoke the Exclusive Casino License shall be submitted to the legislature for approval by a majority of the members of each house through a joint resolution.

29. In his signing and transmittal letter to the Legislature, Governor Ralph DLG. Torres explained that although he agreed with the fundamental purpose of the legislation, with respect to Exclusive Casino License oversight and the power to revoke the Exclusive

Casino License—Governor Torres disagreed and therefore vetoed the statutory provision included in the new Public Law requiring prior "legislative approval" of any Casino Commission decision to revoke Petitioner's Exclusive Casino License.

30. Thereafter, a third amendment to the Casino License Agreement was made to by the Lottery Commission in April 2017 which among other provisions: (i) extended the period of time that Petitioner was allowed operate the Temporary Live Training Facility; (ii) extended the period of time given and required for Petitioner to complete construction and begin operations of the Initial Gaming Facility and delay paying $10,000,000.00 into the Community Benefit Program; (iii) extended the period of time given and required to complete construction and begin operations of Phase One of the Integrated Resort (as required by the CLA); and (iv) clarified and corrected certain language contained in the CLA to reflect the formation of the Development Plan Advisory Committee ("DPAC").

31. The Casino License Agreement was amended a fourth time in June 2017 and in effect allowed Petitioner to relocate and operate the Temporary Live Training Facility from the T Galleria to the unfinished casino portion of the Initial Gaming Facility (also referred to as the Imperial Pacific Resort and Hotel ("IPR")).

32. IPR remains unfinished (at this time of this writing) and no announcements or information have been made available as to when it might be completed.

33. The Casino License Agreement was amended a fifth time in July 2017. This amendment extended the time period for which IPI was to make a $10,000,000.00 Community Benefit Payment and was required to complete construction and begin operations of Phase One and Phase Two of the Integrated Resort *and* also to address safety items raised by the community and government regulatory agencies—including matters related to the Initial Gaming Facility structure and facilities related to IPI's total compliance obligations.

- 9 -

34. The Casino License Agreement was amended a sixth time in August 2018 extending again the deadline to complete construction and begin operations of the Initial Gaming Facility hotel (and related facility operations) given work stoppages for various reasons and worker shortages.

35. This Amendment required IPI to: (i) submit a Construction Milestone Schedule ("CMS") and quarterly reports to the Lottery Commission with detailed explanations of Petitioner's progress which may (or, may not) have allowed for the holding of public hearings; (ii) work with the CNMI Department of Public Works' participation in the Occupational Safety and Health Administration ("OSHA") compliance process and occupancy permits; and (iii) pay liquidated damages for future delays and also make a $500,000.00 donation to the Commonwealth Healthcare Corporation ("CHCC") for the purchase of medical equipment as determined by CHCC.

36. The Casino License Agreement was amended a seventh time in September 2018 to specifically authorize IPI to operate a less than four to five-star existing facility, namely the resort previously operated by Kan Pacific Saipan, Ltd. (better known as the Marianas Resort and Spa).

37. The Casino License Agreement was amended an eighth time in May 2019 in order to decrease the Minimum Shareholder Restriction provision requiring Inventive Star Limited to maintain at least fifty one percent (51%) shares in the capital of IPI; to change the License Agreement to provide the flexibility needed to invite third party investors (and/or partners to provide the high-end amenities in the Integrated Resort); as well as to ensure proper capital exists for successful completion of the Integrated Resort project.

38. In January 2020—and approximately simultaneously to the first reported news stories of the beginning of the COVID-19 epidemic outbreak in Wuhan, China and the World Health

Organization's classification of COVID-19 as a Public Health Emergency of International Concern—the Commonwealth Casino Commission began formal oversight and enforcement actions against Petitioner which culminated in, among other provisions, the temporary suspension of IPI's authority to conduct gaming activities in the CNMI.

39. Specifically, the Casino Commission initiated five complaints against IPI, later consolidated into Enforcement Action 2020-001 (encompassing actions 2020-001 and 2020-002) and Enforcement Action 2020-003 (encompassing actions 2020-003, 2020-004 and 2020-005).

40. Enforcement Action 2020-001 contains two claims. Claim one alleged that Petitioner committed a violation of the Casino License Agreement by failing to make Community Benefit Fund contributions required by Amendment No. Three to that Agreement in violation of §175-10.1-675(b)(1), and committed a violation of §175-10.1-1805(b)(15) by breaching a contract by failing to make the required contributions. Claim Two alleged that is that IPI committed a violation of the Casino License Agreement by failing to make Community Benefit Fund contributions required by Amendment No. Five in violation of §175-10.1-675(b)(1), and committed a violation of §175-10.1-1805(b)(15) by breaching a contract by failing to make the required contributions.

41. Enforcement Action 2020-002 contains four claims. Claim one alleged that IPI violated Commonwealth law, specifically 4 CMC §2306(b) by failing to pay the Annual License Fee when due on August 12, 2020. Claim Two alleged that is that Petitioner violated the Casino License Agreement by failing to make the required Annual License Fee payment in violation of §175-10.1-610(b). Claim Three alleged that IPI violated §175-10.1-1805(b)(15) by breaching a contract by failing to make the required Annual License Fee payment. Claim Four seeks an Order declaring that Petitioner's failure to pay the Annual

1    License Fee in full when due is an unsuitable method of operation and requiring IPI to pay

2    the Annual License Fee immediately upon the effective date of the Commission's Order.

3    42. Enforcement Action 2020-003 has four claims. Claim One alleged that Petitioner violated

4    Commission Order 2020-003 by not maintaining the required cash or cash equivalents in

5    a restricted account in a bank in the Commonwealth of the Northern Mariana Islands or

6    United States of America. Claim Two alleged that petitioner violated Commission Order

7    2020-003 when its highest-ranking executives failed to detail the means by which it would

8    comply with the Order. Claim Three requests an Order declaring that IPI's failure to

9    comply with the minimum capital requirements of Commission Order 2020-003 and

10   failure to make the required explanations amount to unsuitable methods of operation and

11   requiring immediate compliance. Claim Four requests an Order declaring that IPI's fiscal

12   and financial capability as owner and operator of the casino has significantly diminished

13   such that the public interest is no longer protected, and requiring Petitioner to immediately

14   obtain financial capability sufficient to pay all debts as they become due so the public

15   interest is sufficiently protected.

16   43. Enforcement Action 2020-004 has four claims. Claim One alleged that IPI violated

17   Commission Order 2020-004 by not paying accounts payable that were over 89 days old

18   as ordered by the Commission. Claim Two alleged that IPI violated Commission Order

19   2020-004 by not making the required certifications as ordered by the Commission. Claim

20   Three requests an Order declaring that IPI's failure to comply with the payment and

21   certification requirements of Commission Order 2020-004 are unsuitable methods of

22   operation and requiring the casino licensee to pay all amounts required by Commission

23   Order 2020-004 immediately upon the effective date of the Order. Claim Four seeks an

24   Order declaring that: the IPI is not a "going concern" as that phrase is commonly used in

the area of financial accounting; Petitioner, as a business entity, is not "solvent" as that word is commonly used in the area of financial accounting as of the date of the Order; Petitioner lacks the present ability to pay debts as they mature and become due; Petitioner lacks the present ability to pay to public and private entities all payments required by contract; and Petitioner lacks the present ability to fully construct the entirety of the Initial Gaming Facility located in Garapan, Saipan, CNMI in accordance with all applicable laws, regulations and codes.

44. Enforcement Action 2020-005 has four claims. Claim One alleged that IPI violated Commonwealth law, specifically 4 CMC § 2309 by failing to pay the Casino Regulatory Fee in full when due. Claim Two alleged that IPI violated Regulation § 175-10.1-1225 by failing to pay the Casino Regulatory Fee in full when due. Claim Three alleged that IPI breached a contract by failing to pay the casino license fee in full when due. Claim Four seeks a declaration that Petitioner's failure to pay the casino regulatory fee in full when due amounts to an unsuitable method of operation and requiring the casino licensee to pay the casino regulatory fee in full immediately upon the effective date of the Order.

45. On or about March 17, 2020, IPI closed its operations.

46. After the Casino Enforcement actions were first initiated, but before their ultimate resolution, the Casino License Agreement was amended a ninth time by the Casino Lottery Commission on December 1, 2020 to provide Petitioner with additional time to fulfill payment obligations imposed by Section 16 of the Exclusive License Agreement that had come due and not been paid.

47. Amendment No. Nine explains that additional amendments are necessary because Petitioner is currently the subject of both administrative and legal proceedings based on its failure to fulfill current and past payment obligations in 2018, 2019, and 2020,

including the five Complaints noted above which were, at that time, still under consideration by the Commonwealth Casino Commission.

48. Amendment No. Nine also reports, rather ambiguously, that although the Lottery Commission does not have authority over the enforcement of the License Agreement, and does not intend by this action to interfere with the administrative review and deciding of the Administrative Complaints currently pending before the Commonwealth Casino Commission: the Lottery Commission is nonetheless revising payment date requirements *set out in Section 16 of the CLA by deferring the community benefit program payments past due and delinquent for 2018 and 2019 until October 1, 2025; and deferring the community benefit program payment past due for 2020 until October 1, 2023*. (Emphasis added.)

49. With respect to community benefit program payments due after 2020, the Lottery Commission then created in Amendment No. Nine an entirely new subsection within Section 16 of the CLA deferring those subsequent multi-million dollar annual contributions until no later than sixty (60) after the completion of the Initial Gaming Facility (when that might be remains unclear).

50. However, Amendment No. Nine makes no mention of current and past due Annual License Fees; IPI's failure to: maintain at least $4.2 million in cash or cash equivalents in a bank in the CNMI or the United States (or, for IPI's failure to explain or detail the means by which they would comply with that requirement); IPI's failure to pay accounts payable within 90 days (or, make required certifications); or, its failure to pay the Casino Regulatory Fee.

51. Then, just days later, the 21st Legislature of the Commonwealth of the Northern Mariana Islands on December 10, 2020 enacted Public Law 21-38 ("PL 21-38") in an effort to once

- 14 -

again clarify the powers of the Commonwealth Casino Commission and to make needed changes to the Commonwealth Code given the "unique" regulatory oversight of the casino industry in the Commonwealth.

52. PL 21-38 was signed into law by Governor Torres on January 7, 2021 and allows the Casino Commission, not the Finance Secretary, to maintain the CCC Regulatory Fee Fund that is separate from the Commonwealth Government's General Fund; determine its own staffing levels and also granted the Casino Commission the authority to issue a casino license, a power that was previously vested with the CNMI Lottery Commission.

53. Four months later, on April 22, 2021, the Casino Commission issued its final Order No. 2021-002 (which is the subject of the instant Petition).

54. Prior to voting at that meeting, questions were asked by the Casino Commission and responses given by two IPI representatives about a report entitled, *Annual Results for the Year Ended 31 December 2020 (the Annual Report))* issued by IPI's Hong Kong-based parent company, Imperial Pacific International Holdings Ltd ("IPI Holdings").

55. Commission Order: 2020-002 ("Order") explains that it was issued for "good cause" as determined during the February 25, 2021 and March 02, 2021 evidentiary hearings conducted by the Casino Commission.

56. The Order provides that the Casino Commission's Executive Director established by "clear and convincing" evidence through the admissions, stipulations, exhibits admitted into evidence, and matters officially noticed that IPI violated the applicable laws and regulations and breached the applicable contract as alleged in Enforcement Action 2020-001 with respect to failing to pay Community Benefit Fund payments when due.

57. The Order reported that IPI offered "no defense" to the claims alleged in Enforcement Action 2020-001 and that the Casino Commission found, by clear and convincing

evidence, that IPI committed the two violations alleged in Claim One and Claim Two of Enforcement Action 2020-001, and that they were major violations under the Casino Commission Regulations. *See generally* Northern Marianas Administrative Code, Title 175-10.1 *et. seq*., *Commonwealth Casino Commission Regulations*.

58. The Order further reported that the Casino Commission found by clear and convincing evidence, as to the allegations in Enforcement Action 2020-001, that: the violations were actions of omission; IPI did not self-report all the facts concerning the violations; IPI did not promptly accept responsibility for the offenses; and that IPI has numerous actions pending in the courts of the United States of America and the Commonwealth.

59. IPI was fined $50,000.00 and its Exclusive Casino License was suspended for six months for the violations alleged in Claim One and fined $50,000.00; and it was fined $50,000.00 and its Exclusive Casino License suspended for six months for the violations alleged in Claim Two of Enforcement Action 2020-001.

60. With respect to the Claims raised in Enforcement Action 2020-002, the Order provided that, for "good cause" as determined during the February 25, 2021 and March 02, 2021 evidentiary hearings undertaken by the Casino Commission—and by clear and convincing evidence through admissions, stipulations, exhibits, and matters officially noticed—that IPI failed to pay the Annual License Fees in full when due.

61. IPI offered in defense that the <u>*Annual License Fee*</u> was subject to the *force majeure* clause of the Casino License Agreement.

62. The Casino Commission considered, but then ruled that the *force majeure* clause does not, as a matter of law, apply to the payment of the Annual License Fee, as the time for payment was set by statute, and the Lottery Commission could not amend an act of the Legislature.

63. Alternatively, the Casino Commission found, by clear and convincing evidence, that even if the *force majeure* clause of the Casino License Agreement could toll the requirement to pay the Annual License Fee, IPI had not established that its failure to make the required Annual License Fee payments when due was related to a *force majeure* reason.

64. Accordingly, the Casino Commission found, by clear and convincing evidence, that IPI committed one initial violation of Claim One of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty-nine violations for that claim; one initial violation of Claim Two of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty-nine violations for that claim; one initial violation of Claim Three of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty-nine violations for that claim.

65. The Order reports further that the Casino Commission found, by clear and convincing evidence, that all violations were major violations as to the allegations in Claims One, Two, and Three in Enforcement Action 2020-002 and that IPI's Exclusive Casino License to conduct gaming activities should be suspended indefinitely from the effective date of the Order until such time as IPI has paid the Annual License Fee in full, and that IPI should pay penalties amounting to one million five hundred thousand dollars ($1,500,000) in total.

66. With respect to the alleged violations set forth in Enforcement Actions 2020-003, 2020-004, and 2020-005—IPI offered no defense.

67. Accordingly, the Order reported that the Casino Commission found by "clear and convincing" evidence through the admissions, stipulations, exhibits admitted into

evidence, and matters officially noticed that IPI had committed the following "major" violations:

- In Enforcement Action 2020-003: Claim One, for separate violations from January 8, 2020 through March 1, 2020; and Claim Two, for separate violations every day from January 8, 2020 through March 1, 2020;

- In Enforcement Action 2020-004: For Claim One, for separate violations from January 8, 2020 through March 1, 2020; and for Claim Two, for separate violations from January 8, 2020 through March 1, 2020;

- In Enforcement Action 2020-005: For Claims One and Two, for all 53 violations.

68. The Order reported further that IPI had not self-reported all the facts concerning the violations; did not promptly accept responsibility for the offenses; had numerous actions pending in the courts of the United States of America and the Commonwealth and before the Commission; the relative harm suffered by the Commonwealth is moderate to great in that the public's confidence in general and the gaming public specifically, had been greatly harmed by IPI violations.

69. The Casino Commission unanimously determined that IPI's Casino License to conduct gaming activities should be suspended indefinitely from effective date of the Order until such time the casino licensee is in complete compliance with Commission Order 2020-003, and that IPI should pay penalties amounting to one million five hundred thousand dollars ($1,500,000).

70. With respect to the violations set out in Enforcement Action 2020-004, the Order provided that as for Claims One and Two that IPI's Casino License Agreement was suspended indefinitely from effective date of that Order until such time as IPI is in complete compliance with Commission Order 2020-004.

- 18 -

71. IPI was also ordered to pay penalties amounting to two million dollars ($2,000,000) and ordered to come into compliance immediately upon the effective date of the Order.

72. The Order reported that the Casino Commission also determined that IPI as a business entity, was not "solvent" as that word is commonly used in the area of financial accounting as of the date of the Order; the casino licensee lacked the present ability to pay debts as they mature and become due; the casino licensee lacked the present ability to pay to public and private entities all payments required by contract; and the casino licensee lacked the present ability to fully construct the entirety of the Initial Gaming Facility located in Garapan, Saipan, CNMI.

73. And finally, with respect to the violations of Claims One, Two, and Three of Enforcement Action 2020-005, the Order concluded that IPI's Exclusive Casino License to conduct gaming activities was suspended indefinitely from the effective date of the Order and that IPI shall pay penalties amounting to one million five hundred thousand dollars ($1,500,000) in total within months of the effective date of the Order.

74. Approximately one month later, IPI filed its Petition for Judicial Review with this Court on May 21, 2021.

### III. LEGAL STANDARD

The Commonwealth Rules of Procedure for Administrative Appeals govern the procedures and process to be used in the Superior Court for judicial review of final orders or decisions from an agency in contested cases that are governed by the Administrative Procedures Act, 1 CMC §§ 9101-15. *See generally* NMI R. P. ADMIN. APP.  Under these Rules, this Court may order any remedy provided for in 1 CMC § 9112; or, order any other remedy appropriate to the facts and circumstances of a particular appeal, including but not limited to remanding the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired

1    by a material error in procedure or a failure to follow prescribed procedure and the error cannot be

2    corrected in the trial court proceedings. *See* NMI R. P. ADMIN. APP. Rule 6(e).

3                                    **IV. DISCUSSION**

4         **a.    Issue Presented: Whether the Casino Commission Erred by Denying**
              **Petitioner's *Force Majeure* Defense**

5
6         Petitioner argues first that the Casino Commission's suspension of its Exclusive Casino

     License failed to recognize and apply the doctrine of *force majeure* to the Enforcement Actions set
7
     out in Commission Order No. 2021-002 despite the presence of a *force majeure* provision in the
8
     Casino License Agreement.  Petitioner proposes that despite the clear and severe impacts a *force*
9
     *majeure* event—i.e. the COVID-19 pandemic—had on Petitioner's ability to comply with its
10
     monetary obligations, the Casino Commission improperly ruled that the *force majeure* clause did not
11
     apply.
12
          In its briefings before this Court, Petitioner also now emphasizes that in addition to the
13
     COVID-19 pandemic, this Court should also consider (1) Super Typhoons Soudelor and Yutu; and
14
     (2) unanticipated changes in federal labor law as contributing and/or supporting factors that the *force*
15
     *majeure* clause applied.  Moreover, in support, Petitioner argues that in December 2020, IPI and the
16
     CNMI—represented by the CNMI Governor and the CNMI Lottery Commission—entered into CLA
17
     Amendment No. Nine, which recognized the extraordinary impact of the COVID-19 pandemic, as
18
     well as other natural disasters and changes in immigration law that were beyond IPI's control.
19
          In essence, Petitioner's primary argument is this Court should set aside Commission Order
20
     No. 2021-002 in its entirety for the reasons explained in Casino License Agreement Amendment No.
21
     Nine.
22
          The Casino Commission counters in effect that the doctrine of *force majeure* could not toll
23
     the non-contractual/statutory law requirement to pay the Annual License Fee because those payments
24

1    were established and created by the Commonwealth Legislature via Public Laws—not its Casino

2    License Agreement—which is something the Casino Commission now suggests the Lottery

3    Commission could not, and cannot, amend. The Casino Commission argues further that even if the

4    *force majeure* clause did apply, IPI did not offer any evidence in its defense at either of the two

5    evidentiary hearings which preceded the vote to suspend Petitioner's Exclusive Casino License that

6    support a *force majeure* defense.

7            **b.      The Casino Commission's Order Was _Not_ Arbitrary, Capricious, an
                Abuse of Discretion (or, not in Accordance with Law); Contrary to

8                Constitutional Right; In Excess of Statutory Jurisdiction or Rights;
                Without Observance of Due Process Procedures Required by Law; or

9                Unsupported by Substantial Evidence**

10           Under the arbitrary and capricious standard of review set out in 1 CMC § 9112(f)(2)(i), courts

11   should hold as unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of

12   discretion, or otherwise not in accordance with law." *J.G. Sablan Rock Quarry, Inc. v. Dep't of Pub.*

13   *Lands*, 2012 MP 2. Under this standard, an agency action is arbitrary and capricious if the agency has

14   entirely failed to consider an important aspect of the problem. *Id*, ¶ 45.

15           An arbitrary and capricious action is also defined as willful and unreasonable action without

16   consideration or in disregard of facts or without determining principle.  *Id*. (citing *In re Blankenship*,

17   3 NMI 209, 217 (1992) (quoting Black's Law Dict. (5th ed. 1979)); *see also Marsh v. Ore. Natural*

18   *Res. Council*, 490 U.S. 360, 378 (1989) (in evaluating agency actions under the arbitrary and

19   capricious standard, courts "must consider whether the [agency's] decision was based on a

20   consideration of the relevant factors and whether there has been a clear error of judgment."). The

21   scope of review under this standard is "narrow and a court is not to substitute its judgment for that of

22   the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

23           Here, the Casino Commission's Order was based on consideration of the relevant operative

24   facts and evidence generated during the evidentiary hearings (in which IPI admitted the underlying

1  facts, was represented by legal counsel, and offered no defense other than *force majeure*) and

2  therefore the Court cannot find that there has been a clear error of judgment with regards to the

3  suspension of Petitioner's Exclusive Casino License. *See* Exhibit A, Transcript, February 22, 2021

4  Evidentiary Hearing, p. 18 lines 15-19 (the Casino Commission's recitation of the facts are

5  foundational to its case-in-chief and are admitted); Exhibit B, Transcript March 2, 2021 Evidentiary

6  Hearing, p. 9, lines 7-8 (Petitioner does not dispute the charges against itself).

7  Moreover, during the April 22, 2021 Casino Commission hearing, the members of the Casino

8  Commission lawfully voted unanimously to adopt Commission Order 2021-002 suspending

9  Petitioner's Exclusive Casino License for a minimum duration of six months and also requiring IPI

10 to pay certain penalties and make various declarations regarding IPI's operations within six months.

11 The vote was recorded and made upon clear and convincing evidence and the list of violations were

12 well-itemized and accurately set out in Enforcement Actions 2020-001, 2020-002, 2020-003, 2020-

13 004 and 2020-005 described above.

14 Again, and for whatever reasons, Petitioner did not actually contest or challenge (i.e., did not

15 present any witnesses or submit evidence in support of its case before the Casino Commission) during

16 either of the February 25, 2021 or March 2, 2021 Evidentiary Hearings.

17 Instead, before the Casino Commission, the record reveals that Petitioner presented and

18 argued in total that the *force majeure* clause was its defense for its failure to remit Community Benefit

19 Fund payments. To be clear, during the February 22, 2021 Evidentiary Hearing, IPI did try to argue

20 broadly, without calling any witnesses, that the *force majeure* clause could be applied toward the

21 Community Benefit Fund *and* Casino License Fee payments.

22 However, during rebuttal questioning, IPI—through legal counsel—acknowledged that *force*

23 *majeure* had not been raised in its Answers to the Complaints (or, Enforcement Actions) that had

24 been filed against it and that the nonpayment of the Community Benefit Funds raised in Enforcement

1   Action 2020-001 actually accrued years before the start of the COVID-19 pandemic and did not apply

2   to that cause of action.  Feb. 25, 2021 Evidentiary Hearing Tr. at 26-27.

3          More importantly, both parties to this administrative appeal fail to acknowledge that,

4   ultimately, the Casino Commission's suspension of Petitioner's license was made was for material

5   and major violations other than solely for the non-payment of the Community Benefit Fund and

6   Annual License Fee payment requirements. The Court views this as a fatal flaw to Petitioner's *force*

7   *majeure* defense. Put differently, the basis for Petitioner's Exclusive Casino License suspension was

8   made upon multiple grounds separate and distinct from its failure to pay make Community Benefit

9   Fund payments and the Annual License Fee.

10         Specifically, in Enforcement Action 2020-005, the primary legal basis upon which the Casino

11  Commission suspended Petitioner's Exclusive Casino License indefinitely and for which Petitioner

12  was fined $1,500,000, was the nonpayment of the ***Casino Regulatory Fees*** as set out in Claims One

13  and Two of that Enforcement Action.

14         In Enforcement Action 2020-004, the primary legal basis upon which the Casino Commission

15  suspended Petitioner's Exclusive Casino License indefinitely and for which it was fined $2,000,000

16  was for ***not paying accounts payable*** in Claim One of that Enforcement Action and for ***not making***

17  ***the required corporate certifications***, in Claim Two.

18         In Enforcement Action 2020-003, the primary legal basis upon which the Casino Commission

19  suspended Petitioner's Exclusive Casino License indefinitely and for which it was fined $1,500,000

20  was for not maintaining the required amount of cash or cash equivalents ***in a restricted account in a***

21  ***bank in the Commonwealth*** (or, United States of America) in Claim One; and for the ***failure of its***

22  ***highest-ranking corporate executives to explain*** in detail the means by which IPI would comply with

23  that requirement in Claim Two; and for its ***failure to comply with the minimum capital***

24  ***requirements***—in Claim Three—of that Enforcement Action.

- 23 -

1    Ultimately, the Casino Commission's decision with respect to ***these*** violations is not

2    connected to the *force majeure* defense Petitioner raised before the Casino Commission.  Therefore,

3    in short, the Casino Commission's decision was not arbitrary, capricious, an abuse of discretion or,

4    not in accordance with law. This conclusion finds support aside from nonpayment of the Community

5    Benefit Fund and Annual License Fee payments, as there were equally critical determinations made

6    on the record—which Petitioner did not contest—concerning Petitioner's viability as an on-going

7    business and the very real question of whether the unfinished gambling facility in Garapan will ever

8    be completed.

9    To be absolutely clear, Petitioner initially offered the *force majeure* defense with respect to

10   its nonpayment of the Community Benefit Fund requirements as set out in Enforcement Action 2020-

11   001.  It now suggests it also applies to the nonpayment of Casino License Fees. Therefore, even

12   assuming *arguendo* that the Casino Commission erred in its decision concerning the applicability and

13   application of the *force majeure* defense, that would not mean that the Casino Commission's

14   suspension of the Exclusive Casino License for: (i) Petitioner's nonpayment of the Casino Regulatory

15   Fees; (ii) nonpayment of accounts payable; (iii) failure to make the required corporate and banking

16   certifications; (iv) failure to maintain the required amount of cash in a CNMI (or, US) banking

17   institution; (v) failure to maintain the minimum capital requirements; or (vi) for its corporate

18   executive's failure to detail the means by which the company would comply with all these

19   requirements—was in error.

20   In sum, Petitioner argument now that the *force majeure* defense should be interpreted by this

21   Court to excuse all of its violations of the applicable terms and conditions of its Exclusive Casino

22   License and that this Court should set aside Commission Order No. 2021-002 in its entirety is not at

23   all well-taken. Petitioner did not argue this when this matter was before the Casino Commission.

24   There, Petitioner's reliance on the doctrine of *force majeure* was limited and—again, as discussed

- 24 -

1   above, Petitioner offered **_no defense_** and did not contest any of the claims alleged in Enforcement

2   Actions 2020-003, 2020-004 or 2020-005, which are not related to the Annual License Fee or

3   Community Benefit Fund monetary requirements.

4       Accordingly, and without actually determining whether the lawful scope and application of

5   the _force majeure_ clause set out in the Casino License Agreement can amend the statutorily-created

6   Annual Casino License Fee payment (_about which the Court has serious concerns_) and/or postpone

7   the Community Benefit Fund payments until no later than sixty days after the completion of the Initial

8   Gaming Facility, this Court can affirm the Casino Commission's final determination to suspend and

9   penalize Petitioner's Exclusive Casino License because of the issues of Petitioner's insolvency,

10  ability to clear its accounts payable, make the required corporate and banking certifications (and

11  maintain minimum capital and cash in an approved bank and for its corporate executive's failure to

12  address these concerns properly raised and adjudicated by the Casino Commission through proper

13  the administrative law process.

14      This same conclusion is also relevant and applicable to Petitioner's arguments in regards to

15  Casino License Agreement No. Nine. While the Court notes that Amendment No. Nine could be

16  broadly construed as some kind-of overall grant to Petitioner of 'additional time' to fulfill all of its

17  payment obligations, it nonetheless simultaneously appears to be explicitly limited to Petitioner's

18  payment obligations under Section 16 of the CLA (concerning Community Benefit Fund payments).

19  In other words, without deciding whether the Lottery Commission could once again amend the Casino

20  License Agreement and unilaterally grant Petitioner another opportunity to meet all its payment

21  obligations and thereby in effect amend or cancel-out statutory law, the Casino Commission's

22  determination that Petitioner was insolvent and unable to complete the Initial Gaming Facility (or,

23  meet its accounts payable et cetera) are material breaches of the Casino Licensing Agreement in and

24  of itself.

- 25 -

1    As outlined in detail above, a careful and full review of the record suggests that the

2 aforementioned legal grounds—at least in part or in conjunction with each other—are distinct from

3 Petitioner's failure to pay the Annual License Fee and Community Benefit Fund payments, and

4 together ultimately served as the basis for the Casino Commission suspending Petitioner's Exclusive

5 Casino License for an indefinite period of time and ordering millions of dollars in penalties.  Article

6 Three of the CLA expressly provides that the lawful "authority of the Casino Commission includes

7 the ability to suspend or revoke the Casino License, in accordance with the requirements of the

8 Commonwealth Administrative Procedure Act, for violation of the Rules."  Moreover, Section 175-

9 10.1-601 of the Commonwealth Casino Commission Regulations provides that IPI's failure to

10 comply with the requirements as set forth in the Casino License Agreement, and all amendments

11 made thereto, is an unsuitable method of operation and are major offenses subject to _penalty_. Under

12 the Administrative Procedures Act's arbitrary and capricious standard of review and as set out above,

13 this Court finds no error in the Casino Commission's issuance of Commission Order 2021-002.

14    **d.    Due Process and the Annual Report for the Year Ended 31 December 2020 issued by IPI's Hong Kong-based parent company, Imperial Pacific**

15 **International Holdings Ltd.**

16    Petitioner argues next that the Casino Commission relied on materials within the "Annual

17 Report" (issued by Petitioner's Hong Kong-based parent company, Imperial Pacific International

18 Holdings Ltd.) not admitted into the evidentiary record when making its decision, thereby depriving

19 Petitioner of the opportunity to challenge, examine, or rebut under due process considerations the

20 Casino Commission's conclusions drawn from that evidence.  The Casino Commission replies that

21 even if it relied on the Annual Report, which it claims it did not, any such reliance would not be

22 relevant to an outcome-dispositive issue and that this Court could just disregard this evidence without

23 requiring the setting aside of Order No. 2021-002 in its totality. _See_ Opposition Brief, at 15-16.

24

1       Exactly how the Annual Report was introduced and (briefly) discussed, along with many

2   subjects revealing Petitioner's poor state of affairs, is set out in Exhibit G. *See Exhibit G*, April 22,

3   2021 Casino Commission Hearing Transcript.  As explained in the Court's findings of facts above,

4   before the Casino Commission voted on Commission Order 2020-002, the Chairman of the Casino

5   Commission opened the floor for public comments and asked to hear from Petitioner on the status of

6   construction work on the casino.  Mr. Tao Xing as a licensed IPI Representative, responded that a

7   federal 'no work' order on the casino order was still in place. Apr. 22, 2021 Hearing Tr. at 25, lines

8   17-18.

9       The Chairman then asked what was the status of the federal receivership that was created by

10  the United States District Court for the Northern Mariana Islands on March 10, 2021. Apr. 22, 2021

11  Hearing Tr. at 26, lines 9-10. Mr. Tao responded that Petitioner may have reached a settlement and

12  the receivership was on hold with respect to the actions by the United States Department of Labor

13  ("USDOL"). *Id*., lines 16-17.  The Chairman then asked if Petitioner was prepared if the receivership

14  moved forward—and Mr. Tao responded 'yes, definitely' (*Id*., Line 17), but that Petitioner's plan

15  was to make sure the settlement was achieved so that Petitioner did not get to the receivership stage.

16  Apr. 22, 2021 Hearing Tr. at 28, lines 7-8.

17      The next line of questioning dealt with IPI personnel, status of employee unpaid payroll, and

18  severance pay for employees who had already left the NMI.  *Id*., lines 16-19.   A representative for

19  Petitioner's Human Resources department, Ms. Redie Dela Cruz, appeared remotely via the internet

20  and answered those specific questions.  Apr. 22, 2021 Hearing Tr. at 30-31.  She responded in short

21  that with respect to unpaid payroll, severance pay, unpaid time-off, unused hours and

22  reimbursements, outbound assistance and such, that Petitioner had not been able to pay those benefits

23  due to lack of funding following the casino's closure in March 2020.  Apr. 22, 2021 Hearing Tr. at

24

- 27 -

1  31-32.  The Casino Commission Chairman then asked the total number of such employees and when

2  would Petitioner be able to make those payments.  Apr. 22, 2021 Hearing Tr. at 32, lines 11-13.

3        Ms. Dela Cruz responded in essence that Petitioner did not have an idea at that time, but that

4  it was working on a possible installment plan which was connected to USDOL matters and a five-

5  year extension Petitioner had submitted, and that once all those issues had been decided and final

6  corporate approval had been obtained, Petitioner would share those details and the list of employees

7  with the Casino Commission. Apr. 22, 2021 Hearing Tr. at 32-34.  Mr. Tao then added that the plan

8  and list of employees would be shared with the Casino Commission next week and that the names of

9  the corporate officials are those in Hong Kong and listed in the *annual report*.[2]  Apr. 22, 2021 Hearing

10  Tr. at 34, lines 6-8. The Chairman then followed-up with respect to corporate approval; asking from

11  who that corporate approval would come, referencing a previous meeting with IPI Chairwoman Cui

12  Li Jie and her responses of no knowledge or involvement with corporate decisions.  Apr. 22, 2021

13  Hearing Tr. at 35, lines 5-17.

14        Mr. Tao's response then referenced different corporate roles for the chairman and directors,

15  but, again, that the list of officials could be found in the *annual report*.[3]  Apr. 22, 2021 Hearing Tr.

16  at 36, lines 6-8.  The discussion then continued onto the numbers of employees who had departed the

17  NMI and those that were still on-island and had not yet been paid. Chairman Guerrero asked follow-

18  up questions about repatriation of Taiwanese and Turkish employees—who apparently had refused

19  to leave. However, some departed after signing waivers of claims against Petitioner in exchange for

20  a small amount of cash. Apr. 22, 2021 Hearing Tr. at 37-42.

21

22  _____

23  [2] Mr. Tao's reference to the *annual report* during the question and answer portion of the Hearing and is the first time the report was mentioned on April 22, 2021 (and actually opened the door to further discussion of report).

24  [3] This is the second time the *annual report* is mentioned during the Hearing.

1    The questions then turned to Petitioner's financial status. Apr. 22, 2021 Hearing Tr. at 46,

2  lines 12-13. Mr. Tao reported that there was no good news.  Apr. 22, 2021 Hearing Tr. at 47, lines

3  4-6.  Additionally, the Chairman asked about a local audit that was to be completed. *Id*., lines 11-13.

4  Mr. Tao responded that he had just checked, and that the *<u>annual report</u>* had not yet been published—

5  so he assumed it was still under review. *Id*., lines 14-16.  (This is the third time during the Hearing

6  that IPI brought up the subject of the annual report.)   The Chairman then asked Mr. Tao to please

7  check because there was a deadline for the submission of that audit and that the Casino Commission

8  had already received a copy the audit for the corporation.   Apr. 22, 2021 Hearing Tr. at 47-48.

9    It was at this point during the April 22, 2021 Hearing, when the Casino Commission was

10  trying to find out answers with respect to employees who had not been paid, that Chairman Guerrero

11  said:

12         We have received the audit [of the annual report] for [IPI Holdings]. And it
           continues to make reference about the 500 million loan facility, and it
13         continues to make reference that 350 million of that, IPI have access to that
           money to pay what it needs to pay. Can you find out why your audit from
14         the parent company is saying you have access to 350 million to use? Why
           are you not using this to pay your people you owe including the license fee,
15         the regulatory fee, the orders to preserve payroll? I don't understand how
           you are diverged, falling over the cliff, and that seems to be the salvation.
16         And the other report says you have access to 350 million to use for the
           Saipan project. Why are they not using it?
17
18  Apr. 22, 2021 Hearing Tr. at 48-49. Mr. Taitano, the Commission's Treasurer, supplemented this line

    of questioning by also mentioning the Annual Report, and stating:
19
20         Page 17 [of the Annual Report], letter [(iii) says] 'The company will draw
           down the unutilized credit when necessary.' [It] seems like IPI believes or
21         have this perception that what's happening here it's not necessary for them
           to act. And I just wonder when is the time for us to see any movement of
22         payments for all the obligations that must be by made by IPI here locally. I
           just thought I'll mention that to you because it's mentioned here 350 million
23         unutilized funds.

24  Apr. 22, 2021 Hearing Tr. at 55-56.

- 29 -

1    In response to Chairman Guerrero's comments, Mr. Tao explained that he did not have all the

2    details, [but] that there must be some [corporate] requirement attached to [those funds].   Apr. 22, 2021

3    Hearing Tr. At 48.   Mr. Tao was asked if he had read the corporate report, to which he responded in

4    the affirmative ("part of it, yes").   Apr. 22, 2021 Hearing Tr. at 49.   The Casino Commission's

5    comments and questions to Petitioner continued to cover a wide range of topics concerning Petitioner's

6    finances and Mr. Tao was then asked "is there anything else, sir, that you want to tell the Commission,

7    uh, in reference to IPI and its financial position?"  Apr. 22, 2021 Hearing Tr. at 54.  Mr. Tao's response

8    was "not particularly on the complaint because we have had legal representation."  *Id*.

9    Taken out of the context, and wholly ignoring the admissions, stipulations, exhibits admitted

10   into evidence, and matters officially noticed, Petitioner's claim of a possible due process violation

11   based on the two statements noted above could be somewhat plausible.   However, the assertion that

12   Petitioner did not have notice of the grounds for the suspension of its Exclusive Casino License or an

13   opportunity to respond is simply not true upon review of the entire record. During the actual hearing

14   on April 22, 2021 wherein the Annual Report was mentioned, two IPI representatives were present

15   answering the legitimate questions raised by the Casino Commission prior to taking a vote on the

16   matter.   Moreover, IPI had been represented by *legal counsel*, by its own admission the Court notes,

17   *through all stages of the Enforcement Actions*.

18   Petitioner relies on a series of Hawaii cases finding prejudicial procedural error where

19   agencies received and considered evidence which a party to a contested hearing did not have the

20   opportunity to rebut. In *Town v. Land Use Commission*, the underlying agency's decision was

21   reversed due to the fact that agency's vice chairman conducted a "field investigation" without notice

22   to the parties. 524 P.2d 84, 91-92 (Haw. 1974). In *Waikiki Shore, Inc. v. Zoning Board of Appeals*,

23   one of the parties sent an *ex parte* communication to the agency. 625 P.2d 1044, 1045 (Haw. 1981).

24   During a later public meeting, one of the board members of the agency stated that the letter had

"clarified a lot of questions we had in our mind." *Id.* Lastly, in *Korean Buddhist Dae Won Sa Temple v. Sullivan*, the court distinguished the case before it from *Town* and *Waikiki Shore*, stating:

> In both *Town* and *Waikiki Shore*, the prejudice flowed from (1) *ex parte* arguments of the appellant's adversary, which the appellant had not had an opportunity to rebut, (2) *ex parte* "field investigations," (3) introduction of evidence that was *relevant* to the outcome-dispositive issue, and (4) no opportunity for rebuttal. By contrast, in the case at bar, the "off-the-record" material that was called to the Director's attention was wholly irrelevant to the proceedings.

953 P.2d 1315, 1339 n. 27 (Haw. 1998).

The Court finds that finds that the agencies' actions in *Town* and *Waikiki Shore*, are easily distinguishable from the case at hand. There, the agencies relied on evidence inappropriately obtained and outside the bounds of its normal course of action: a self-initiated "field inspection" and *ex parte* communications, respectively. Here, the Casino Commission, in its Order, relied on admissions, stipulations, exhibits admitted into evidence, and matters officially noticed in reaching its decision and other information provided by Petitioner.

Further, the Court must also note that the comments made by the Casino Commission Chairman and Treasurer were made an ordinary Casino Commission meeting, and *not* an evidentiary hearing. A distinction Petitioner even acknowledges in its brief. *Petitioner's Brief in Support of Petition for Judicial Review* at pg. 20. Such discussion of an Annual Report at a meeting is to be expected, given the powers and duties of the Casino Commission. *See generally* 4 CMC § 2314 (listing the powers and duties of the Commission, including review and inspection of financial records and fiscal capability of a casino licensee). In other words, the Casino Commission is lawfully charged with asking those exact types of questions and their comments in passing were not in error or prejudicial.

At the risk of sounding repetitive, Petitioner provided no defense whatsoever to Enforcement Actions 2020-003, 004, and 005 and pinned, as it would seem, their entire opposition to the entirety

1   of the Casino Commission's case against it on the doctrine of *force majeure* – which, as discussed

2   extensively above, has no possible application as to the substantive charges involving nonpayment of

3   the Casino Regulatory Fees; nonpayment of accounts payable; failure to make the required corporate

4   and banking certifications; failure to maintain the required amount of cash in a CNMI (or, US)

5   banking institution; failure to maintain the minimum capital requirements challenging their very

6   viability as an on-going business; or for the executive officer's failure to detail the means by which

7   the company would comply with all these requirements et cetera.

8        All of these substantive violations are not even mentioned in IPI's petition and it appears to

9   the Court that Petitioner contends these two isolated statements by the Casino Commission's

10  Chairman and Treasurer alone are enough to set aside Order 2021-002, despite the overwhelming

11  amount of evidence relied upon and the administrative process the Casino Commission followed in

12  reaching its decision. It cannot be said that Petitioner's due process rights were violated.

13                          **V. CONCLUSION**

14       For the aforementioned reasons, Casino Commission Order 2021-002 is **<u>AFFIRMED</u>**. This

15  administrative appeal is hereby **<u>DISMISSED</u>**.

16

17       **IT IS SO ORDERED** this 15th day of MARCH, 2022.

18

19                          **/s/** _____
                            **WESLEY M. BOGDAN, Associate Judge**
20

21

22

23

24

- 32 -