# EXHIBIT

# M

1
2
3
4
5
6
7

Stephen J. Nutting
Law Office of Stephen J. Nutting
6th Floor Marianas Business Plaza
P.O. Box 5093 Saipan, MP 96950
Michael Chen
Michael Chen Law Offices
7330 Edna Ave.
Las Vegas, NV 89117

*Attorneys for Respondent Imperial Pacific International (CNMI) LLC*

## BEFORE THE COMMONWEALTH CASINO COMMISSION

8
9
10
11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| ANDREW YEOM, in his official capacity as Executive Director of the Commonwealth Casino Commission, | Complaint: 2021-002, 2021-003 |
| Petitioner, | **RESPONDENT'S  MOTION FOR DISQUALIFICTION OF COMMISSIONERS AS HEARING COMMISSIONERS AND VOTING COMMISSIONERS FOR REVOCATION HEARING** |
| v. | |
| Imperial Pacific International (CNMI) LLC | |
| Respondent. | **RESPONDENT'S MOTION FOR ORDER TO DISREGARD OUT OF HEARING STATEMENT AND DECLARE THE REVOCATION HEARING INVALID** |

21      Respondent Imperial Pacific International (CNMI) LLC, (hereinafter referred to as

22   "IPI") , through the undersigned and pursuant to 1 CMC § 9109 (e) (2), moves the Commission

23   to declare the revocation hearing conducted between February 28, 2024 and March 1, 2024

24   invalid due to violation of IPI's due process rights, and order all five commissioners ( Edward C.

25   Deleon Guerrero, Chairman of CCC , Rafael S. Demapan, Vice and Acting Chairman of CCC;

26   Ramon M. Dela Cruz, Commissioner and Secretary of CCC; Mariano Taitano, Commissioner

27   and Treasurer of CCC; Martin T. Mendiola, Commissioner and Public Affairs of CCC) to

28   disqualify themselves from deliberating and voting for the revocation hearing.

1

This motion is based upon the files, records, transcripts, documents related to this matter, Memorandum of Points and Authorities, and the concurrently filed affidavit of Howyo Chi in support thereof.

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF RELEVANT FACTS

**From 2014 to 2020**

On or about August 12, 2014, IPI entered into a Casino License Agreement (CLA) with the Commonwealth Lottery Commission. CLA has a force majeure clause which would excuse IPI from default for any failure or delay in the performance of its obligation under the CLA in the event of force majeure.

Under the CLA, among other obligations, IPI would pay a fifteen million dollar ($15,000.000.00) annual Casino License Fee. IPI dutifully paid the annual license fee each year between 2014 and 2019.

On July 11, 2014, CNMI promulgated Public Law 18-56, which created CCC. Public Law 18-56 granted certain powers and duties to CCC and it was codified as 4 CMC § 2314.

On December 4, 2015, CNMI promulgated Public Law 19-24, which imposes a new obligation on IPI to pay CCC an annual "Casino Regulatory Fee" $3 million dollars on or before October 1 of each year beginning October 1, 2015 ("Regulatory Fee Statute"). Notably, that fee is due to CCC "regardless of the actual costs incurred by the [CCC]." 4 C.M.C. Section 2309 (a). IPI paid the Casino Regulatory Fee each year from 2015 through 2019.

By the operation of PL 19-24, CCC itself is entirely funded from this annual regulatory fee from IPI and its affiliates.

On or about October 28, 2016, CCC issued the Commonwealth Casino Commission Rules and Regulation, which are codified as NMIAC § 175 -10.1.

Due to several *force majeure* events and the suspension of the casino license by CCC, IPI has been unable to make the payment for the annual regulatory fee, annual license fees and Community Benefit Fund contribution for a few years.

Pursuant to NMIAC § 175 -10.1-601, failure to comply with the requirements set forth in the CLA is deemed to be an unsuitable method of operation and a major offense subject to penalty, including but not limited to license revocation.

Pursuant to NMIAC § 175 -10.1-105, CCC has the "sole authority to amend or revoke the license granted to" IPI for "operating in an unsuitable manner due to violations of law, breaches of the license or violations of the regulations promulgated by the Commission, as well as any other reason for revocation or termination stated in the License."

## 2020 CCC ENFORCEMENT ACTIONS

The Executive Director of the CCC initiated five complaints against IPI in 2020. Later consolidated into Enforcement Action 2020-001 (encompassing actions 2020-001 and 2020-002) and Enforcement Action 2020-003 (encompassing actions 2020-003, 2020-004 and 2020-005), as follows:

Complaint 2020-001 included claims for violations of the CLA based on IPI's failure to make Community Benefit Contributions; Compliant 2020-002 included claims for violations of Commonwealth law and the CLA based on IPTs failure to pay the Annual License Fee for 2020; Complaint 2020-003 included claims for violation of a prior CCC order (2020-003) requiring IPI to maintain at least $4.2 million in cash or cash equivalents in a bank in the CNMI or United States and for IPI's executives to detail the means by which they would comply with that order; Complaint 2020-004 included claims for violations of a prior CCC order (2020-004) requiring IPI to pay accounts payable over 89 days old and to certify compliance with that order; Complaint 2020-005 included claims for violation of Commonwealth law and the CLA for IPI's failure to pay the Casino Regulatory Fee of $3,150,000.00 for 2020.

On April 22, 2021, CCC held a hearing on these enforcement actions and issued Order No: 2021-002. In the Order, CCC assumed the jurisdiction to interpret and adjudicate the claims filed by the Executive Director of CCC, and made the finding that IPI violated the CLA.

The Order suspended IPI's gaming license, ordering IPI to pay a total of $18.65 million that it found was due under the CLA's Annual License Fee and Annual Regulatory Fee, and imposing a total of $6.6 million in penalties against IPI. The Order also required IPI to comply with previous Orders issued by the CCC.

On Nov. 5, 2021, IPI appealed the CCC's Order in the Superior Court for the Commonwealth of the Northern Mariana Islands, arguing that the CCC's Order was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and unwarranted by the facts. IPI's primary argument was that the CCC failed to recognize the doctrine of *force majeure* despite the presence of the *force majeure* provision in the CLA and the clear, severe impact of a *force majeure* event, the COVID-19 pandemic, on IPI's ability to comply with its obligations.

On March 15, 2022, the Superior Court of CNMI affirmed the CCC's order, applying a very deferential standard of review.

On April 11, 2022, IPI appealed the Order issued by the Superior Court of CNMI to the Supreme Court of CNMI.

On September 25, 2023, the CNMI Supreme Court affirmed the trial court's ruling in part and reversed it in part, and asked CCC to "decide on a reasonable deadline for IPI to pay" the annual license fees for 2020 and the following years. The CNMI Supreme Court remanded the matter back to the Commission for further proceedings consistent with the opinion.

On October 16, 2023, CNMI Superior Court thus issued its order "return[ing] this matter to CCC for proceedings consistent with the CNMI Supreme Court's" order.

On November 30, 2023, without any further hearing or proceedings, CCC issued a "Notice of Payment Deadline" and unilaterally determined that a "reasonable deadline" for IPI to pay the $62,010.280.00 is "30 days from receipt of this notice."

## 2021 ENFORCEMENT ACTIONS

On or about September 17, 2021, Andrew Yeom, in his official capacity as Executive Director of CCC, filed five complaints against IPI with CCC.

Complaint No. 2021-001 alleges breach of the CLA by IPI for its failure to pay the annual license fee for year 2020 under the CLA. Complaint No. 2021-002 alleges that IPI failed to maintain minimum capital requirements set by CCC. Complaint No. 2021-003 alleges that IPI failed to pay the annual regulatory fee for year 2020.Complaint No. 2021-004 alleges breach of the CLA by IPI for its failure to pay the annual license fee for year 2021 under the CLA. Complaint No. 2021-005 alleges that IPI failed to pay the annual regulatory fee for year 2021.

Proceedings for Complaints No. 2021-001 to 2021-005 were stayed on May 23, 2022, because the federal District Court issued a TRO and a preliminary injunction. The stay was later lifted due to the reversal by the United States Court of Appeals for the Ninth Circuit.

For Case 22-16630, IPI filed a petition for a writ of certiorari with the U.S. Supreme Court on November 20, 2023, with a case number of 23-522. The U.S. Supreme Court did not grant the petition for a writ of certiorari.

## 2023 LEGAL PROCEEDINGS

On or about December 13, 2023, Andrew Yeom, in his official capacity as Executive Director of CCC filed a motion with CCC and requested CCC to issue an order setting a Revocation Hearing for Complaints No. 2021-002 and 2021-003.

Complaint No. 2021-002 sought to enforce Commission Order 2020-003, which was ordered on June 25, 2020. Commission Order 2020-003 was signed by Chairman Edward Deleon Guerrero of CCC. When Commission Order 2020-003 was ordered, CCC was constituted with the following commissioners: Edward C. Deleon Guerrero, Rafael Demapan, Ramon M. Dela Cruz, Mariano Taitano, and Diego M. Songao. See **¶29 of Decl. of Chi.** Other than the fact Chairman Guerrero signed the Commission Order 2020-003, what roles the other commissioners played in issuing Commission Order 2020-003 was unclear at this point. See **Exhibit A of Decl. of Chi.**

Complaint No. 2021-003 sought to enforce Commission Order 2021-002, which was ordered on April 22, 2021 by Chairman Edward C. Deleon Guerrero and Vice Chairman Rafael S. Demapan. When Commission Order 2021-002 was ordered, CCC was constituted with the following commissioners: Edward C. DeLeon Guerrero, Rafael Demapan, Ramon M. Dela Cruz, Mariano Taitano, and Diego M. Songao. Based upon the record, all five commissioners unanimously voted for Commission Order 2021-002. See **Exhibit B of Decl. of Chi.**

**2024 LEGAL PROCEEDINGS**

After a few court battles, the revocation hearing started on February 28, 2024 and stretched three days from February 28, 2024, to March 1, 2024.

At the revocation hearing, Executive Director of CCC, Andrew Yeom, was represented by Assistant Attorney General of CNMI, Keisha Blaise and Alison Nelson; IPI was represented by Michael Chen. The presiding hearing commissioner was Vice Chairman Rafael S. Demapan, who was also the Acting Chairman of CCC due to the absence of Chairman Guerrero from the island. In addition to Vice/Acting Chairman Demapan, the other three commissioners, Commissioners Cruz, Taitano and Mendiola all functioned as the hearing commissioners at the revocation hearing. Chairman Guerrero participated at the revocation hearing remotely as "citizen Guerrero" at the hearing. Media was permitted to attend the hearing throughout and a number of news articles about the proceeding were posted online and in print in CNMI.

During the revocation hearing, attorney Michael Chen made four oral motions to disqualify the four hearing commissioners and gave the following reasons for the motion for disqualifications:

1. All four hearing commissioners are paid by CCC, which is financed exclusively by the regulatory fee, a major defense by IPI is the constitutionality of the underlying regulatory fee statue and regulations, it would be "professional suicide" for the commissioners to rule that the underlying regulatory fee statue is unconstitutional.

2. Based upon the testimony produced at the hearing, all five commissioners, through the official monthly CCC public meetings and private communication with the

executive director of CCC, had prior knowledge about the underlying claims, i.e. the alleged failure of IPI to maintain the minimum capital requirement and the failure to pay the regulatory fees in year 2020.

3. All five commissioners[1] were involved in issuing Commission Orders 2020-003 and 2021-002. The current complaints before the Commission are seeking to enforce Commission Orders 2020-003 and 2021-002. The Commissioners are asked to self-affirm decisions they made earlier.

4. The disqualification of the five commissioners would not cripple the Commission, as provided by the regulation and cited by the Memorandum Decision for the TRO, (which became available in the midst of the revocation hearing), the commissioners could appoint a non-commissioner hearing officer to conduct the revocation hearing, which is a quasi-judicial proceeding.

The oral motions to disqualify the commissioners were brought at least three times, once when the grounds for disqualification became clear, once at the closing argument for each complaint. Commissioners did not make a ruling on the motions to disqualify during the proceeding and continue to proceed with the revocation hearing until it was adjourned on March 1, 2024.

Shortly after the conclusion of the revocation hearing, Governor Arnold I. Palacios caused to publish an article on local newspapers. In the article, Mr. Palacios made remarks to contradict the testimony of IPI's witness, Mr. Howyo Chi. See **Exhibit C of Decl. of Chi.**

## LEGAL ARGUMENT

A. THE FOUR HEARING COMMISSIONERS HAVE PERSONAL INTERESTS IN THE OUTCOME OF THE HEARING

Under 1 CMC § 9109 (e) (2), "[t]he function of persons presiding at hearings and of persons participating in orders or decisions in accordance with this chapter shall be conducted in an impartial manner."

---

[1] Attorney Chen misspoke at the hearing about the involvement of Commissioner Martin Mendiola of the two commission orders. Commissioner Mendiola was not involved in Commission Order 2020-003 and 2021-002.

IPI has a right to resolve in an impartial, disinterested, and competent forum whether the $3 million annual regulatory fee statute (upon which the revocation effort is based) is constitutional, and whether force majeure would be a valid defense for its failure to make the annual regulatory fee payment in year 2020.

The revocation hearing conducted by CCC from February 28 to March 1, 2024, where four of the five commissioners sat through the proceeding as the hearing commissioners, despite four oral motions for disqualification raised by IPI during the revocation proceeding. The four hearing commissioners have significant, direct, pecuniary and arguably personal interests in the outcome of the proceeding, as such, the proceeding took place in the past has already violated IPI's constitutional due process rights.

Under 4 CMC § 2314 (h), suspension and revocation of casino license, unanimous vote of all commissioners is required. The deliberation process to be conducted by CCC on April 9, 2024, where all five commissioners will be the decisionmakers to decide on the revocation of IPI's casino license, if the five commissioners proceed with the deliberation and decision currently scheduled for April 9th, 2024, the revocation of IPI's license would be a virtual certainty because it would be "professional suicide" for the five commissioners to decide otherwise. IPI's fundamental rights guaranteed by the constitution will suffer irreversible harm.

The Due Process Clause requires that the decision to deprive a person of a protected interest be entrusted to an impartial decision maker. This rule applies to both criminal and civil cases. The Supreme Court of the United States has explained that the neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law and preserves both the appearance and reality of fairness . . . by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him. See *Marshall v. Jerrico*, 446 U.S. 238, 242 (1980).

"The requirement of neutrality has been jealously guarded" by this Court. In *Tumey v. Ohio*, 273 U.S. 510 (1927),  the Court reversed convictions rendered by the mayor of a town when the mayor's salary was paid in part by fees and costs levied by him acting in a judicial

capacity. The Court stated that the Due Process Clause would not permit any "procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused." *273 U.S., at 532*." See *Marshall* at 242.

"That officers acting in a judicial or quasi judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule." See *Tumey v. Ohio*, 273 U.S. 510, 522 (1927). The *Tumey* court went on to say: "All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion. *Wheeling v. Black*, 25 W. Va. 266, 270 (W. Virginia, 1884). But it certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." *Id*. 523.

Here, CCC is acting in a judicial or quasi-judicial capacity when conducting an evidentiary hearing on a contested matter. The question is whether the five commissioners have a direct, substantial, arguably personal, pecuniary interest in finding IPI in violation of the CLA and CNMI statute and regulations.

The hearing for a contested case, such as the revocation hearing took place between February 28 to March 1, 2024, is judicial or quasi judicial in nature. CCC's hearing must be conducted in compliance with 1 CMC§ 9109, which is the CNMI's version of APA.

Under 1 CMC§ 9109, "the function of persons presiding at hearing and of persons participating in order or decisions in accordance with this chapter shall be conducted in an impartial manner," and "[t]he hearing officers could disqualify himself or herself at any time."

At the revocation hearing, IPI alleged force majeure as an affirmative defense to both charges; IPI pointed out that the executive director has not produced any evidence to substantiate his charge of IPI's failure to maintain a minimum capital; IPI challenged the constitutionality of

the $3M regulatory fees statue; IPI also made the argument that the suspension of its license would excuse itself from making the regulatory fee payment for lack of consideration under the CLA.

It would be against their self-interests for the four hearing commissioners and all five voting commissioners to accept the constitutionality defense raised by IPI. By doing so, they are voting for the financial demise of CCC and forfeiting the probability of receiving compensation for their past and future services rendered to CCC.

Based upon the reports filed by CCC, the board of commissioners were paid $313,774.00 in year 2018, $324,996.00 in year 2019, $316,871.00 in year 2020, $322,234.00 in year 2021, $272,461.00 in year 2022.

Although it is unknown to IPI yet whether and how much the commissioners were paid in year 2023, but it is clear that the likelihood that they will get paid for their services for CCC in the past and future would diminish greatly should they agree with IPI that the regulatory fee statue and regulations are unconstitutional.

Under 4 CMC §2309 (a), CCC derives most of its revenue from the annual $3 million dollar plus regulatory fee that IPI is challenging as unconstitutional. There is an inherent conflict of interest that raises a significant due process concern. The four hearing commissioners and the five voting commissioners (including the four hearing commissioners) received significant payment for their services as the commissioners of CCC in the past and are expecting more in the future, their self-interests conflict with their duty as impartial hearing officers and decision makers for the revocation hearing.

As for the force majeure defense raised by IPI, although CNMI Supreme Court has ruled Covid 19 does qualify as a force majeure event, and that force majeure would excuse IPI from the default, but not from making the payment. However, CNMI Supreme Court did not address the issue whether the suspension of IPI's license would excuse IPI from making the regulatory fee payment for lack of consideration under the CLA. It would be against the self-interests of the commissioners to rule that the force majeure event would excuse or postpone the regulatory fee

payment; it would also be against the self-interests of the commissioners to rule that IPI was excused from making the regulatory fee payment while its license was suspended.

B. THE FIVE VOTING COMMISSIONERS ALSO HAVE PERSONAL INTERESTS IN THE OUTCOME OF THE REVOATING HEARING

Unlike conducting an evidentiary hearing at CCC, where the commissioners may delegate the duty to a hearing officer, CCC regulation does not envision the scenario where the commissioners may delegate the power to vote on a hearing to a third impartial party. Past CCC's practice indicates that it would be safe to assume that the revocation hearing will be voted by at least three of the five commissioners as a quorum under NMIAC § 175.10.1-101 (i).

Commissioners of CCC may recognize that killing IPI – the proverbial goose that lays gold eggs – would not benefit CCC and CNMI in the long run, however, by wielding the power to revoke IPI's license, the five commissioners and the executive director of CCC, are gaining undue influence and unfair leverage over IPI in the ongoing settlement negotiations.

That is the "circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable.'" *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 877 (2009).

"This concern with conflicts resulting from financial incentives was elaborated in *Ward v. Monroeville*, 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972),  which invalidated a conviction in another mayor's court. In *Monroeville*, unlike in *Tumey*, the mayor received no money; instead, the fines the mayor assessed went to the town's general fisc. The Court held that "[t]he fact that the mayor [in *Tumey*] shared directly in the fees and costs did not define the limits of the principle." 409 U.S., at 60, 93 S. Ct. 80, 34 L. Ed. 2d 267. The principle, instead, turned on the "possible temptation" the mayor might face; the mayor's "executive responsibilities for village finances may make him partisan to maintain the high level of contribution [to those finances] from the mayor's court." *Ibid*. As the Court reiterated in another case that Term, "the [judge's] financial stake need not be as direct or positive as it appeared to be in Tumey. *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973).

Based upon information and belief, CCC is operating on funds borrowed from CNMI treasury, the question is whether there is "possible temptation" the commissioners might face to revoke IPI's license blindly in order to set the table for a more favorable license reinstatement discussion in the post revocation negotiation with IPI, in order to repay the loan borrowed from CNMI treasury.

"The Due Process Clause has been implemented by objective standards that do not require proof of actual bias. See *Tumey*, 273 U.S., at 532, *Mayberry, supra*, at 465-466, 91 S. Ct. 499, 27 L. Ed. 2d 532; *Lavoie*, 475 U. S., at 825. In defining these standards, the question is whether, under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. *Withrow*, 421 U.S., at 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712" *Caperton* at 883-884. (Internal citation and quotation omitted).

IPI is not required to prove actual bias of the commissioners, and it would be very difficult for it to do so; IPI can only present the scenario and ask the Commission to evaluate whether the risk of actual bias or prejudgment by the hearing and voting commissioners is constitutionally tolerable, given their personal and pecuniary interests in the outcome of the revocation hearing, as well as their conducts and behaviors observed at the revocation hearing.

C.  FOUR COMMISSIONERS [Guerrero, Demapan, Cruz, Taitano ] WERE
PERSONALLY INVOLVED IN RELATED PRIOR ACTIONS

Complaint No. 2021-002 sought to enforce Commission Order 2020-003, which was ordered on June 25, 2020. Commission Order 2020-003 was signed by Chairman Edward Deleon Guerrero of CCC. When Commission Order 2020-003 was ordered, CCC was constituted with the following commissioners: Edward C. Deleon Guerrero, Rafael Demapan, Ramon M. Dela Cruz, Mariano Taitano, and Diego M. Songao.

Complaint No. 2021-003 sought to enforce Commission Order 2021-002, which was ordered on April 22, 2021 by Chairman Edward C. Deleon Guerrero and Vice Chairman Rafael S. Demapan. When Commission Order 2021-002 was ordered, CCC was constituted with the following commissioners: Edward C. DeLeon Guerrero, Rafael Demapan, Ramon M. Dela Cruz,

Mariano Taitano, and Diego M. Songao. Based upon the record, all five commissioners unanimously voted for Commission Order 2021-002.

Four Commissioners (Edward C. Deleon Guerrero, Rafael Demapan, Ramon M. Dela Cruz, Mariano Taitano) were personally involved in the issuance of Commission Order 2020-003 and 2021-002, to the extent that the current revocation hearing requires reconfirmation of prior commission orders made by the four commissioners, the four commissioner shall disqualify themselves from participating in the revocation hearing.

D.  OUT OF HEARING PROCEEDING STATEMENT MUST BE DISREGARDED AND NEW HEARING SHALL BE CONDUCTED DUE TO ITS PREJUDICIAL EFFECT.

Under 1 CMC§ 9109 (l), "[f]indings of fact shall be based exclusively on the evidence and on matters officially noticed.

The statement made by Governor Palacios was not introduced as evidence at the hearing and was not officially noticed, therefore, the statement made by Governor shall be excluded when the Commission reaches its findings of facts.

Because the out of hearing statement made by Governor Palacios calls the credibility of Mr. Chi as the testifying witness of IPI into question, and such statement has a strong prejudicial effect against IPI, given the influential political power of the Governor, IPI moves the Commission to declare the hearing invalid. See *U.S. v. Hagege*, 437 F.3d 943 (9th Cir. 2006).

## **RELIEF REQUESTED**

IPI is entitled to due process and have its claims and defenses heard before a disinterested and impartial trier of fact as guaranteed by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and the due process clause of the constitution of CNMI. This is a compelling case where the conflicts are acute and apparent, and, therefore, IPI moves the Commission to declare the revocation hearing conducted between February 28, 2024, and March 1, 2024 invalid.

The prejudicial statement made by the Governor outside the revocation hearing on the credibility of IPI's sole testifying witness, Howyo Chi, also tainted the minds of any decision makers, therefore, it serves as an additional ground to declare the hearing invalid.

As stated above, all five commissioners have personal, direct and pecuniary interests in the outcome of the revocation hearing, IPI moves the Commission to order the five commissioners to disqualify themselves from participating in the deliberation and voting on the revocation hearing, that is currently scheduled for April 9, 2024.

Dated:        April 8, 2024                    Respectfully submitted,
               Las Vegas, Nevada

By:/s/ Stephen Nutting
Stephen Nutting
Michael Chen
By: /s/ Michael Chen

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 2975 Huntington Dr. Ste 101, San Marino, CA 91108. On **April 7, 2024**, I served:

**RESPONDENT IPI'S MOTION TO DISQUALIFY AND REQUEST TO DISREGARD**

on all interested parties:

| Commonwealth Casino Commission Executive Director Andrew Yeom | |
|---|---|

__ X  By Email:

| Andrew Yeom Yeom.andrew@gmail.com | |
|---|---|

Executed on **April 7, 2024,** at Las Vegas, Nevada. I declare under the penalty of perjury under the laws of the State of California that the above is true and correct.

*/S/  Wen Jiang*
Wen Jiang

Stephen J. Nutting
Law Office of Stephen J. Nutting
6th Floor Marianas Business Plaza
P.O. Box 5093 Saipan, MP 96950
Michael Chen
Michael Chen Law Offices
7330 Edna Ave.
Las Vegas, NV 89117
(*Pro Hac Vice*)

*Attorneys for Plaintiff IPI (CNMI) LLC*

**BEFORE THE COMMONWEALTH CASINO COMMISSION**

| | |
|---|---|
| ANDREW YEOM, in his official capacity as Executive Director of the Commonwealth Casino Commission, | Complaint: 2021-002, 2021-003 |
| Petitioner, | **RESPONDENT'S MOTION FOR DISQUALIFICTION OF COMMISSIONERS AS HEARING COMMISSIONERS AND VOTING COMMISSIONERS FOR REVOCATION HEARING** |
| v. | |
| Imperial Pacific International (CNMI) LLC | |
| Respondent. | **RESPONDENT'S MOTION FOR ORDER TO DISREGARD OUT OF HEARING STATEMENT AND DECLARE THE REVOCATION HEARING INVALID** |

I, Howyo Chi, hereby declare:

1.   I am over the age of eighteen, competent to make this declaration, and all statements made in this declaration are based on my personal knowledge unless specifically indicated otherwise.

2.   At all times relevant to this matter, I was and still is employed by IPI (CNMI) LLC. (hereinafter referred to as "IPI"). I currently serve as the executive director of IPI.

3.   I submit this declaration in support of IPI (CNMI) LLC's Motions in the above captioned matter.

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002x

4.   In March 2014, the Commonwealth of Northern Mariana Islands ("CNMI") announced that it would hold a competitive bidding process for the first ever casino license to be issued by the CNMI. On July 8, 2014, the CNMI enacted Public Law 18-56 to allow for the issuance of an exclusive gaming license for the operation of a Casino in the Commonwealth.

5.   The CNMI decided to issue such a license because it "was faced with significant economic challenges including a significant reduction of government revenues, unfunded government retirement obligations, reduction of the economy, and lack of economic opportunity for residents" and it determined that "the issuance of an exclusive casino license on the island of Saipan with specific development requires that are meant to provide immediate economic stimulus and long-term benefits to the community" was necessary to address the economic challenges facing the CNMI. The CNMI's authority to issue the license derived from Public Law 18-56.

6.   IPI, through one of its directors, Ms. Cai Ling Li, executed the CLA on 12 August 2014. The Lottery Commission executed the CLA for the CNMI. The Acting Attorney General of the CNMI, Mr. Gilbert Bimbrich, signed the CLA as well.

7.   Under Article 33 of the CLA, "[t]his License Agreement is to be interpreted under the laws of the Commonwealth of the Northern Mariana Islands and the exclusive jurisdiction of the courts thereof."

8.   Paragraph 6 of the CLA required IPI to pay an Annual License Fee of $15,000,000. IPI dutifully paid the Annual License Fee each year from 2015 and 2019.

9.   The CLA does not require IPI to pay any other fees to CNMI in addition to the Annual License fee.

10.  On December 4, 2015, the CNMI promulgated Public Law 19-24, which imposed an obligation on IPI to pay an annual "Casino Regulatory Fee" of $3,000,000 on or before October 1 of each year beginning October 1, 2015.

11.  Under Public Law 19-24, the fee is due to CCC "regardless of the actual costs incurred by the [CCC]."

12.  IPI paid the Casino Regulatory Fee each year from 2016 through 2019.

DECLARATION OF HOWYO CHI                                                    -2-

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com | Call: 626.249.2002x

13.  CCC itself is entirely funded from this annual regulatory fee collected from IPI and its affiliates.

14.  On October 28, 2016, CCC issued the Commonwealth Casino Commission Rules and Regulation, which are codified as NMIAC § 175 -10.1.

15.  In January 2020, to try and contain the spread of COVID-19 on CNMI, Governor Ralph Deleon Guerrero Torres issued Executive Order 2020-01, which based on my understanding placed CNMI under a state of emergency to combat the growing pandemic. The emergency measures included banning all visitors from mainland China from entering the CNMI. Over the course of 2020, the CNMI renewed its state of emergency four times and adopted numerous other restrictions on inbound tourism and on activities on the islands. On March 7, 2020, I understand that the government imposed a 14-day government quarantine on travelers entering the CNMI and restricted all gatherings of more than 25 people in a single room. On March 30, 2020, I understand that the government extended these measures by creating a curfew from 7:00pm to 5:00am. I also understand that the CNMI's largest airline, Star Marianas Air, suspended all inter-island flights between Rota, Saipan and Tinian islands. As a result of these measures, it is my understanding that CNMI had little to no tourists entering the CNMI beginning in January 2020 and CNMI was considered in "lockdown" beginning in March 2020, essentially cutting off all nonessential economic activity.

16.  Under these conditions, IPI was ultimately forced to close its premises and cease all operations in the casino on March 17, 2020. The COVID-19 pandemic and protective measures resulted in IPI earning almost no revenue for the vast majority of 2020. The loss of almost all revenue in 2020, combined with the impact of the prior unexpected natural disasters and labor law changes, placed the company in dire financial straits. In particular, IPI's revenue decreased from approximately $412 million in 2018, to approximately $68 million in 2019, to approximately $3.1 million in 2020.

17.  The Executive Director of the CCC initiated five complaints against IPI in 2020, later consolidated into Enforcement Action 2020-001 (encompassing actions 2020-001 and 2020-002)

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com | Call: 626.249.2002x

and Enforcement Action 2020-003 (encompassing actions 2020-003, 2020-004 and 2020-005), as follows:

a) Complaint 2020-001 included claims for violations of the CLA based on IPI's failure to make Community Benefit Contributions in certain years;

b) Compliant 2020-002 included claims for violations of Commonwealth law and the CLA based on IPI's failure to pay the Annual License Fee for 2020;

c) Complaint 2020-003 included claims for violation of a prior CCC order (2020-003) requiring IPI to maintain at least $4.2 million in cash or cash equivalents in a bank in the CNMI or United States and for IPI's executives to detail the means by which they would comply with that order;

d) Complaint 2020-004 included claims for violations of a prior CCC order (2020-004) requiring IPI to pay accounts payable over 89 days old and to certify compliance with that order;

e) Complaint 2020-005 included claims for violation of Commonwealth law and the CLA for IPI's failure to pay the Casino Regulatory Fee of $3,150,000.00 for 2020

18.  Based on information provided to me by counsel, I understand that on February 25 and March 2, 2021, the CCC held evidentiary hearings to address the charges against IPI. I understand that the CCC only heard from one witness, the CCC's Audit Manager, who testified that the auditors who prepared IPTs financial statement had raised concerns regarding its ability to operate as a going concern and that IPTs operations had halted and its financial position had worsened due to the COVID-19 pandemic.

19.  Based on information provided to me by counsel. I understand that on April 22, 2021, the CCC held a hearing on these enforcement actions and issued Order No: 2021-002. The Order suspended IPI's gaming license, ordering IPI to pay a total of $18.65 million that it found was due under the CLA's Annual License Fee and Annual Regulatory Fee, and imposing a total of $6.6 million in penalties against IPI. The Order also required IPI to comply with previous Orders issued by the CCC.

20.  On Nov. 5, 2021, IPI appealed the CCC's Order in the Superior Court for the Commonwealth of the Northern Mariana Islands, arguing that the CCC's Order was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and unwarranted by the facts. IPI's primary argument was that the CCC failed to recognize the doctrine of *force majeure* despite the presence of the *force majeure* provision in the CLA and the clear, severe impact of a *force majeure* event, the COVID-19 pandemic, on IPI's ability to comply with its obligations.

21.  On March 15, 2022, the Superior Court of CNMI affirmed the CCC's order.

22.  On April 11, 2022, IPI appealed the Order issued by the Superior Court of CNMI to the Supreme Court of CNMI.

23.  On September 25, 2023, the CNMI Supreme Court affirmed the trial court's ruling in part and reversed it in part, and asked CCC to "decide on a reasonable deadline for IPI to pay" the annual license fees for 2020 and the following years. The CNMI Supreme Court remanded the matter back to the Commission for further proceedings consistent with the opinion.

24.  On October 16, 2023, CNMI Superior Court thus issued its order "return[ing] this matter to CCC for proceedings consistent with the CNMI Supreme Court's" order.

25.  On November 30, 2023, without any further hearing or proceedings, CCC issued a "Notice of Payment Deadline" and unilaterally determined that a "reasonable deadline" for IPI to pay the $62,010.280.00 is "30 days from receipt of this notice."

26. On September 17, 2021, Andrew Yeom, in his official capacity as Executive Director of CCC, filed five complaints against IPI with CCC.

a)  Complaint No. 2021-001 alleges breach of the CLA by IPI for its failure to pay the annual license fee for year 2020 under the CLA.

b)  Complaint No. 2021-002 alleges that IPI failed to maintain minimum capital requirements set by CCC.

**c)**  Complaint No. 2021-003 alleges that IPI failed to pay the annual regulatory fee for year 2020.

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com | Call: 626.249.2002x

DECLARATION OF HOWYO CHI

-5-

d) Complaint No. 2021-004 alleges breach of the CLA by IPI for its failure to pay the annual license fee for year 2021 under the CLA.

e) Complaint No. 2021-005 alleges that IPI failed to pay the annual regulatory fee for year 2021.

27. On December 13, 2023, Andrew Yeom, in his official capacity as Executive Director of CCC filed a motion with CCC and requested CCC to issue an order setting a Revocation Hearing for Complaints No. 2021-002 and 2021-003.

28. Complaint No. 2021-002 sought to enforce Commission Order 2020-003, which was ordered on June 25, 2020. Commission Order 2020-003 was signed by Chairman Edward Deleon Guerrero of CCC.

29. When Commission Order 2020-003 was ordered, CCC was constituted with the following commissioners: Edward C. Deleon Guerrero, Rafael Demapan, Ramon M. Dela Cruz, Mariano Taitano, and Diego M. Songao.

30. Other than the fact Chairman Guerrero signed the Commission Order 2020-003, what roles the other commissioners played in issuing Commission Order 2020-003 was unclear at this point. See **Exhibit A. Commission Order 2020-003.**

31. Complaint No. 2021-003 sought to enforce Commission Order 2021-002, which was ordered on April 22, 2021 by Chairman Edward C. Deleon Guerrero and Vice Chairman Rafael S. Demapan.

32. When Commission Order 2021-002 was ordered, CCC was constituted with the following commissioners: Edward C. DeLeon Guerrero, Rafael Demapan, Ramon M. Dela Cruz, Mariano Taitano, and Diego M. Songao. Based upon the record, all five commissioners unanimously voted for Commission Order 2021-002. See **Exhibit B (Commission Order 2021-002).**

33. The revocation hearing started on February 28, 2024 and lasted three days from February 28, 2024, to March 1, 2024.

34. Based upon information and belief, CCC is operating on funds borrowed from CNMI treasury, the question for the Court to decide is whether there is "possible temptation" the commissioners might face to revoke IPI's license blindly in order to set the table for a more

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com | Call: 626.249.2002x

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com | Call: 626.249.2002x

favorable license reinstatement discussion in the post revocation negotiation with IPI, in order to repay the loan borrowed from CNMI treasury.

35. At the revocation hearing, Executive Director of CCC, Andrew Yeom, was represented by Assistant Attorney General of CNMI, Keisha Blaise and Alison Nelson.    IPI was represented by Michael Chen.

36. The presiding hearing commissioner was Vice Chairman Rafael S. Demapan, who was also the Acting Chairman of CCC due to the absence of Chairman Guerrero from the island.

37. In addition to Vice/Acting Chairman Demapan, the other three commissioners, Commissioners Cruz, Taitano and Mendiola all functioned as the hearing commissioners at the revocation hearing.

38. Chairman Guerrero participated at the revocation hearing remotely as "citizen Guerrero" at the hearing.

39. Media was permitted to attend the hearing throughout and a number of news articles about the proceeding were posted online and in print in CNMI.

40. During the revocation hearing, attorney Michael Chen made four oral motions to disqualify the four hearing commissioners and gave the following reasons for the motion for disqualifications:

a. All four hearing commissioners are paid by CCC, which is financed exclusively by the regulatory fee, a major defense by IPI is the constitutionality of the underlying regulatory fee statue and regulations, it would be "professional suicide" for the commissioners to rule that the underlying regulatory fee statue is unconstitutional.

b. Based upon the testimony produced at the hearing, all five commissioners, through the official monthly CCC public meetings and private communication with the executive director of CCC, had prior knowledge about the underlying claims, i.e. the alleged failure of IPI to maintain the minimum capital requirement and the failure to pay the regulatory fees in year 2020.

c. All five commissioners were involved in issuing Commission Orders 2020-003 and 2021-002. The current complaints before the Commission are seeking to enforce Commission

Orders 2020-003 and 2021-002. The Commissioners are asked to self-affirm decisions they made earlier.

d.  The disqualification of the five commissioners would not cripple the Commission, as provided by the regulation and cited by the Memorandum Decision for the TRO, (which became available in the midst of the revocation hearing), the commissioners could appoint a non-commissioner hearing officer to conduct the revocation hearing, which is a quasi-judicial proceeding.

41.  The oral motions to disqualify the commissioners were brought at least three times, once when the grounds for disqualification became clear, once at the closing argument for each complaint.

42.  The Hearing Commissioners did not make a ruling on the motions to disqualify during the proceeding and continue to proceed with the revocation hearing until it was adjourned on March 1, 2024.

**43.**  After the adjournment of the revocation hearing, I received the agenda for the monthly meeting of CCC, which is scheduled to take place on March 28, 2024, CCC plans to begin to deliberate and render decision for the revocation hearing on April 2, 2024.

44.  There is no indication that the hearing commissioner would recuse themselves for the deliberation and rendition of a decision for the revocation hearing.

45.  I was informed by the Executive Director of CCC that the deliberation and voting of the revocation hearing will be postponed till April 9, 2024, which was later confirmed by a court filing by CCC.

**46.**  On March 6, 2024, the Office of the Governor of CNMI caused a statement published on local newspapers with wide circulation in CNMI. The statement commented on the credibility of me by stating "IPI Director Howyo Chi falsely accused me of backing out on a deal." See **Exhibit C.**

**47.**  I believe that all five commissioners of CCC, as well as the general public in CNMI, are aware of the statement made by Governor Palacios.

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002x

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MICHAEL CHEN LAW OFFICE**
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002x

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and execute this declaration in Saipan, CNMI, on March 27, 2024.

By: _/s/ Howyo Chi_
Howyo Chi

# EXHIBIT

# A



**COMMONWEALTH CASINO COMMISSION**
Commonwealth of the Northern Mariana Islands
Unit 13 & 14, Springs Plaza, Chalan Pale Arnold, Gualo Rai
P.O. Box 500237, Saipan, MP  96950
Telephone: +1 (670) 233-1857/58
Facsimile: +1 (670) 233-1856
Website:  www.cnmicasinocommission.com
E-mail: info@cnmicasinocommission.com



# COMMISSION ORDER NO:  2020-003

### Order Requiring Casino Licensee to Maintain Sufficient Working Capital to Pay Three Months' Payroll In a Bank in the CNMI or USA

For good cause determined at the June 25, 2020 public meeting of the Commonwealth Casino Commission, which was duly publicly noticed, and based on the authority granted by the laws of the Commonwealth (including but not limited to Public Laws 18-56 and 19-24) and the Regulations of the Commonwealth Casino Commission, NMIAC Chapter 175-10.1, the Commonwealth Casino Commission hereby finds and **ORDERS AS FOLLOWS:**

1.      WHEREAS, Section 2314(b)(2) of Title 4 of the Commonwealth Code requires the Commission to promulgate regulations as may be necessary to properly supervise, monitor and investigate to ensure the suitability and compliance with the legal, statutory and contractual obligations of owners, operators, and employees of casinos; and

2.      WHEREAS, Section 2314(b)(3) of Title 4 of the Commonwealth Code requires the Commission to promulgate regulations which provide for "[t]he examination, supervision and monitoring of the continuing fiscal and financial capability of casino owners, operators, concessionaires and other parties with any direct relation to the sole casino and to protect the public in the event that such capability is significantly diminished"; and

3.      WHEREAS, the Commission has, pursuant to the above statutory mandate, promulgated regulations found at NMIAC Chapter 175-10.1 et. seq. which address the financial suitability of the casino licensee for the protection of the gaming industry and the residents of the Commonwealth of the Northern Mariana Islands; and

4.      WHEREAS, Regulation §175-10.1-1805(a) states: "The Commission deems any activity on the part of the casino gaming licensee, its agents, or employees, that is inimical to the public health, safety, morals, good order, and general welfare of the people of the Commonwealth, or that would reflect or tend to reflect discredit upon the Commonwealth of the Northern Mariana Islands or the gaming industry, to be an unsuitable method of operation and shall be grounds for disciplinary action by the Commission in accordance with the Act and the regulations." and

5.      WHEREAS, Regulation §175-10.1-1805(b)(15) declares the breaching of any contract an unsuitable method of operation which subjects the casino licensee to discipline; and

6.      WHEREAS, Regulation §175-10.1-560(a) allows the Commission to adopt or revise a bankroll formula that specifies the minimum bankroll requirements applicable to the casino

gaming licensee, along with instructions for computing available bankroll. The formula adopted by the Commission may require the licensee to maintain a number of days of cash on hand, utilize a debt-to service ratio, or utilize any other ratio the Commission deems fit; and

7.   WHEREAS, it has come to the attention of the Commission that the casino licensee has recently failed to pay its employees in a timely fashion as required by applicable law, regulation and business custom, for consecutive pay periods; and

8.   WHEREAS, the Commission deems the licensee's unwillingness or inability to timely pay its employees as an unsuitable method of operation and indicia of unsuitability to hold a license, and further specifically deems that the failure to pay employees in a timely fashion is inimical to the public health, safety, morals, good order, and general welfare of the people of the Commonwealth and reflects discredit upon the gaming industry, and further calls into question the casino licensee's ability to pay winning patrons; and

9.   WHEREAS, the failure to timely pay employees could be explained by difficulties with the bank wire transfer process, but ultimately is due to the fact that the casino licensee fails to keep sufficient funds on hand and readily available; and

10.   WHEREAS, the Commission finds that, if the casino licensee fails to keep sufficient cash on hand to ensure timely payment of its employees, it likewise fails to keep sufficient cash or cash equivalents on hand in an amount sufficient to reasonably protect the licensee's patrons against defaults in gaming debts owed by the licensee such that the minimum bankroll formula must be supplemented by additional cash reserves; and

11.   WHEREAS, the Commission deems it necessary and proper to ensure the casino licensee is financially suitable and operating suitably by requiring the casino licensee to maintain in the Commonwealth at all times funds sufficient to pay for three months' payroll, in addition to the previous minimum bankroll required by Regulation §175-10.1-560(a) as reflected in Commission Order 2019-002; **NOW, THEREFORE**,

12.   **IT IS HEREBY ORDERED** that no later than thirty (30) calendar days from the effective date of this Order, the casino licensee shall maintain cash or cash equivalents in a restricted account in a bank in the CNMI or United States of America an amount sufficient to reasonably protect the licensee's employees against defaults of debts owed by the licensee as they become due; in no case shall the amount of cash or cash equivalents be less than three months worth of expected obligations, subject to the schedule listed in paragraph 13 below; and

13.   **IT IS HEREBY FURTHER ORDERED** that: notwithstanding the foregoing:

A.   For the first three months from the effective date of the Order, the casino licensee must reserve One (1) month payroll in advance for the August 2020 through October 2020 payrolls. Amount in reserve to be no less than $1,400,000 regardless of actual payroll;

B.   For the second three months, the casino licensee must reserve Two (2) months payroll in advance for the November 2020 through January 2021 payrolls. Amount in reserve to be no less than $2,800,000 regardless of actual payroll;

C.   For all months thereafter the casino licensee must reserve Three (3) Months payroll in advance beginning February 2021.  Amount in reserve to be no less than $4,200,000 regardless of actual payroll; and

14.      **IT IS HEREBY FURTHER ORDERED** If at any time the licensee's available cash or cash equivalents should be less than the amount required by this Order, the licensee or operator shall immediately notify the Commission of this deficiency and shall also detail the means by which the licensee shall comply with the minimum capital requirements; and

15.      **IT IS HEREBY FURTHER ORDERED** that the Commission Chairman or the Executive Director shall take steps necessary to ensure that this Order is published in the Commonwealth Register without reasonable delay; and

16.      **IT IS HEREBY FURTHER ORDERED** that this Order is to take effect immediately or at the earliest time allowed by law, and shall remain in effect until it is repealed or replaced by subsequent Order of the Commission.

SO ORDERED this 25th day of June, 2020.

Signature: _____

EDWARD DELEON GUERRERO
CHAIRMAN

Exhibit A of Second TRO

4

# EXHIBIT

# B



**COMMONWEALTH CASINO COMMISSION**
Commonwealth of the Northern Mariana Islands
Unit 13 & 14, Springs Plaza, Chalan Pale Arnold, Gualo Rai
P.O. Box 500237, Saipan, MP  96950
Telephone: +1 (670) 233-1857/58
Facsimile: +1 (670) 233-1856
Website: www.cnmicasinocommission.com
E-mail: info@cnmicasinocommission.com



E-FILED
CNMI SUPERIOR COURT
E-filed: May 27 2021 07:38AM
Clerk Review: May 27 2021 07:38AM
Filing ID: 66632246
Case Number: 21-0173-CV
Eva  Calvo

# COMMISSION ORDER NO:  2021-002

**Final Order for Enforcement Actions 20-001 (consolidated) and 20-003 (consolidated).**

For good cause determined at the February 25, 2021 and March 02, 2021 evidentiary hearings of the Commonwealth Casino Commission, which were duly publicly noticed and open to the public, and based on the authority granted by the laws of the Commonwealth (including but not limited to Public Laws 18-56, 19-24 and 21-38) and the Regulations of the Commonwealth Casino Commission, NMIAC Chapter 175-10.1, the Commonwealth Casino Commission hereby finds and **ORDERS AS FOLLOWS:**

1.      WHEREAS, On or about February 25, 2021 Vice Chairman Ralph S. Demapan presided over an evidentiary hearing of the Commission in Enforcement Action 2020-001 (consolidated).  The consolidated enforcement action encompassed actions 2020-001 and 2020-002; and

2.      WHEREAS, On or about March 02, 2021 Chairman Edward C. Deleon Guerrero presided over an evidentiary hearing of the Commission in Enforcement Action 2020-003 (consolidated).  The consolidated enforcement action encompassed actions 2020-003, 2020-004 and 2020-005; and

3.      WHEREAS, At the evidentiary hearing held on or about March 02, 2021, the parties mutually requested for the Final Orders regarding Enforcement Action 2020-001 (consolidated) and Enforcement Action 2020-003 (consolidated) to be combined; and

4.      WHEREAS, Enforcement Action 2020-001 contains two claims.  Claim one alleges that the casino licensee committed a violation of the Casino License Agreement by failing to make for more than twelve hours the required Community Benefit Fund contributions required by Amendment #3 in violation of §175-10.1-675(b)(1), and committed a violation of §175-10.1-1805(b)(15) by breaching a contract by failing to make the required contributions for more than twelve hours.  Claim Two alleges that is that the casino licensee committed a violation of the Casino License Agreement by failing to make for more than twelve hours the required Community Benefit Fund contributions required by Amendment #5 in violation of §175-10.1-675(b)(1), and committed a violation of §175-10.1-1805(b)(15) by breaching a contract by failing to make the required contributions for more than twelve hours; and

**RECEIVED**
DATE/BY

@ 9:55
4.23.2021

5.     WHEREAS, At the hearing, the Executive Director established, by clear and convincing evidence, through the stipulations, admissions, and exhibits admitted into evidence and matters officially noticed that the casino licensee violated the applicable regulations as alleged in the Complaint.  The casino licensee offered no defense to the claims alleged in Enforcement Action 2020-001.  The Commission finds that, by clear and convincing evidence, the casino licensee committed two violations of Claim One of Enforcement Action 2020-001 and two violations of Claim Two of Enforcement Action 2020-001; and

6.     WHEREAS, The Commission finds by clear and convincing evidence that all four violations committed by the casino licensee in Enforcement Action 2020-001 are major violations pursuant to §175-10.1-2540(c).    Notwithstanding the foregoing, the Commission, considering the totality of the circumstances, has determined by clear and convincing evidence pursuant to §175-10.1-2535(a), after applying the factors of §175-10.1-2535(b), that the violations committed by the casino licensee in Enforcement Action 2020-001 are major violations.  The commission finds by clear and convincing evidence that: the violations were actions of omission; the casino licensee did not self-report all the facts concerning the violations; the casino licensee did not promptly accept responsibility for the offenses; the casino licensee has numerous actions pending in the courts of the United States of America and Commonwealth; the relative harm suffered by the Commonwealth is moderate to great in that the public's confidence in general and the gaming public specifically, is greatly harmed when the licensee breaches contracts.  In mitigation, the harm to the gaming industry generally is minor and the Lottery Commission did grant some relief; and

7.     WHEREAS, The four members of Commission participating in the action unanimously determined by clear and convincing evidence that, for Claim One of Enforcement Action 2020-001, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities should be suspended for a period of six months from the effective date of this Order, and the licensee should pay penalties amounting to fifty thousand dollars ($50,000).    Further, the four members of Commission participating in the action unanimously determined by clear and convincing evidence that, for Claim Two of Enforcement Action 2020-001, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities should be suspended for a period of six months from the effective date of this Order, and the licensee should pay penalties amounting to fifty thousand dollars ($50,000); and

8.     WHEREAS, Enforcement Action 2020-002 contains four claims.  Claim one alleges that the casino licensee violated Commonwealth law, specifically 4 CMC §2306(b) by failing to pay, for more than twelve hours, the annual license fee when due on August 12, 2020.  Claim Two alleges that is that the casino licensee violated the Casino License Agreement by failing to make for more than twelve hours the required annual license fee payment in violation of §175-10.1-610(b).  Claim Three alleges that the casino licensee violated §175-10.1-1805(b)(15) by breaching a contract by failing to make the required annual licensee fee payment for more than twelve hours.  Claim Four seeks an Order declaring that the casino licensee's failure to pay the annual license fee

in full when due is an unsuitable method of operation and requiring the licensee to pay the annual licensee fee immediately upon the effective date of the Commission's Order; and

9.     WHEREAS, At the hearing, the Executive Director established by clear and convincing evidence through the admissions, stipulations, exhibits admitted into evidence, and matters officially noticed that the casino licensee violated the applicable Commonwealth law, the Casino License Agreement and the applicable regulations by not paying the Annual License Fee in full when due. The casino licensee offered a defense by arguing that the annual license fee was subject to the force majeure clause of the Casino Licensee Agreement.   The Casino Licensee offered no admissible testimony from the casino licensee that it was unable to pay the annual license fee for any reason at all.   The Executive Director argued that the force majeure clause was inapplicable to the Annual License fee as the time for payment was set by statute, and offered testimony that the casino licensee failed to pay the annual license fee not due to force majeure reasons; namely, that IPI had suffered large financial losses prior to the pandemic, that the casino licensee's auditors expressed "going concern" issues prior to the pandemic, and that the then-CEO admitted to the Commission in a public meeting on July 20, 2020 that IPI has some funding to satisfy the annual license fee; and

10.     WHEREAS, The Commission finds that the force majeure clause does not, as a matter of law, apply to the payment of the annual license fee, as the time for payment was set by statute, and the Lottery Commission could not amend an act of the Legislature.     Notwithstanding the foregoing, the Commission finds by clear and convincing evidence that even if the force majeure clause of the Casino License Agreement could toll the requirement to pay the Annual License Fee, the casino licensee has not established that its failure to make the required annual license fee payment when due was at all related to any force majeure reason.   Conversely, the Commission finds that the Executive Director has established by clear and convincing evidence that the casino licensee's failure to make the required annual license fee payment was not due to a force majeure reason; and

11.     WHEREAS, The Commission finds, by clear and convincing evidence, that the casino licensee committed one initial violation of Claim One of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty nine violations for that claim; one initial violation of Claim Two of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty nine violations for that claim; one initial violation of Claim Three of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty nine violations for that claim. The Commission further finds by clear and convincing evidence that the declaratory relief sought by Claim Four should be granted; and

12.     WHEREAS, The Commission finds by clear and convincing evidence that all violations committed by the casino licensee in Claim One and Claim Two of Enforcement Action 2020-002 are major violations pursuant to §175-10.1-2540(c).

Notwithstanding the foregoing, the Commission, considering the totality of the circumstances, has determined by clear and convincing evidence pursuant to §175-10.1-2535(a), after applying the factors of §175-10.1-2535(b), that the violations committed by the casino licensee in Claims One, Two and Three of Enforcement Action 2020-002 are major violations. The Commission finds by clear and convincing evidence that: the violations were actions of omission; the casino licensee did not self-report all the facts concerning the violations; the casino licensee did not promptly accept responsibility for the offenses; the casino licensee has numerous actions pending in the courts of the United States of America and Commonwealth and before the Commission; the relative harm suffered by the Commonwealth is moderate to great in that the public's confidence in general and the gaming public specifically, is greatly harmed when the licensee breaches contracts; and the casino licensee had some funds to pay for the annual license fee but chose not to. In mitigation, the harm to the gaming industry generally is minor; and

13.    WHEREAS, The four members of Commission participating in the action unanimously determined by clear and convincing evidence that, for Claims One, Two and Three of Enforcement Action 2020-002, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities should be suspended indefinitely from effective date of this Order until such time as the casino licensee has paid the Annual License Fee in full, and the licensee should pay penalties amounting to one million five hundred thousand dollars ($1,500,000) in total. The Commission also determined by clear and convincing evidence that the requested declaratory order should issue; and

14.    WHEREAS, Enforcement Action 2020-003 has four claims. Claim One alleges that the casino licensee violated Commission Order 2020-003 by not maintaining the required cash or cash equivalents in a restricted account in a bank in the Commonwealth or United States of America. Claim Two alleges that the casino licensee violated Commission Order 2020-003 when its highest-ranking executives failed to detail the means by which it would comply with the Order. Claim Three requests an Order declaring that the casino licensee's failure to comply with the minimum capital requirements of Commission Order 2020-003 and failure to make the required explanations amount to unsuitable methods of operation and requiring immediate compliance. Claim Four requests an Order declaring that the casino licensee's fiscal and financial capability as owner and operator of the casino has significantly diminished such that the public interest is no longer protected, and requiring the casino licensee to immediately obtain financial capability sufficient to pay all debts as they become due so the public interest is sufficiently protected; and

15.    WHEREAS, Enforcement Action 2020-004 has four claims. Claim One alleges that the casino licensee violated Commission Order 2020-004 by not paying accounts payable that were over 89 days old as ordered by the Commission. Claim Two alleges that the casino licensee violated Commission Order 2020-004 by not making the required certifications as ordered by the Commission. Claim Three requests an Order declaring that the casino licensee's failure to comply with the payment and certification

requirements of Commission Order 2020-004 are unsuitable methods of operation and requiring the casino licensee to pay all amounts required by Commission Order 2020-004 immediately upon the effective date of the Order. Claim Four seeks an Order declaring that: the casino licensee is not a "going concern" as that phrase is commonly used in the area of financial accounting; the casino licensee, as a business entity, is not "solvent" as that word is commonly used in the area of financial accounting as of the date of the Order; the casino licensee lacks the present ability to pay debts as they mature and become due; the casino licensee lacks the present ability to pay to public and private entities all payments required by contract; and the casino licensee lacks the present ability to fully construct the entirety of the Initial Gaming Facility located in Garapan, Saipan, CNMI in accordance with all applicable laws, regulations and codes; and

16.    WHEREAS, Enforcement Action 2020-005 has four claims. Claim One alleges that the casino licensee violated Commonwealth law, specifically 4 CMC §2309 by failing to pay, for more than twelve hours, the Casino Regulatory Fee in full when due. Claim Two alleges that the casino licensee violated Regulation 175-10.1-1225 by failing to pay the Casino Regulatory Fee in full when due for more than twelve hours. Claim Three alleges that the casino licensee breached a contract by failing to pay, for more than twelve hours, the casino license fee in full when due. Claim Four seeks a declaration that Imperial Pacific International (CNMI) LLC's failure to pay the casino regulatory fee in full when due amounts to an unsuitable method of operation and requiring the casino licensee to pay the casino regulatory fee in full immediately upon the effective date of the Order; and

17.    WHEREAS, At the hearing, the Executive Director established by clear and convincing evidence through the admissions, stipulations, exhibits admitted into evidence and matters officially noticed that the casino licensee violated the applicable laws and regulations and breached the applicable contracts as alleged in the consolidated complaints. The casino licensee offered no defense to the claims alleged in Enforcement Actions 2020-003, 2020-004, and 2020-005. The Commission finds that, by clear and convincing evidence, the casino licensee committed the following violations as alleged in their respective Complaints:

   In Enforcement Action 2020-003: One violation of Claim One for the initial violation and additional violations every day from January 8, 2020 through March 1, 2020, for a total of 53 violations; One violation of Claim Two for the initial violation and additional violations every day from January 8, 2020 through March 1, 2020, for a total of 53 violations. The Commission further finds by clear and convincing evidence that the declaratory relief sought by Claim Three and Claim Four should be granted;

   In Enforcement Action 2020-004: Three hundred violations of Claim One for the initial day of violation and three hundred additional violations every day from January 8, 2020 through March 1, 2020, for a total of 15,900 violations; Five violations of Claim Two for the initial day of violation and five additional violations every day from January 8, 2020 through March 1, 2020, for a total of two hundred sixty five (265) violations. The Commission further finds by clear

and convincing evidence that the declaratory relief sought by Claim Three and Claim Four should be granted;

In Enforcement Action 2020-005:  One violation of Claim One for the initial violation and additional violations every day from January 8, 2020 through March 1, 2020, for a total of 53 violations; One violation of Claim Two for the initial violation and additional violations every day from January 8, 2020 through March 1, 2020, for a total of 53 violations. One violation of Claim Three for the initial violation and additional violations every day from January 8, 2020 through March 1, 2020, for a total of 53 violations.  The Commission further finds by clear and convincing evidence that the declaratory relief sought by Claim Four should be granted; and

18.    WHEREAS, the Commission finds by clear and convincing evidence that the following violations committed by the casino licensee are major violations pursuant to §175-10.1-2540(c):

In Enforcement Action 2020-003:  For Claim 1, the 52 violations from January 8, 2020 through March 1, 2020; For Claim Two the 52 violations every day from January 8, 2020 through March 1, 2020;

In Enforcement Action 2020-004: For Claim One for the 15,600 violations January 8, 2020 through March 1, 2020; For Claim Two for the 260 violations from January 8, 2020 through March 1, 2020;

In Enforcement Action 2020-005:  For Claim One all 53 violations; For Claim Two all 53 violations; and

19.    WHEREAS, The Commission considering the totality of the circumstances, has determined by clear and convincing evidence pursuant to §175-10.1-2535(a), after applying the factors of §175-10.1-2535(b), that the remaining violations in the consolidated complaints comprising Enforcement Action 2020-003 (consolidated) committed by Imperial Pacific International (CNMI) LLC are major violations.    The Commission finds by clear and convincing evidence that: the violations were actions of omission; the casino licensee did not self-report all the facts concerning the violations; the casino licensee did not promptly accept responsibility for the offenses; the casino licensee has numerous actions pending in the courts of the United States of America and Commonwealth and before the Commission; the relative harm suffered by the Commonwealth is moderate to great in that the public's confidence in general and the gaming public specifically, is greatly harmed when the licensee breaches contracts.  In mitigation, the harm to the gaming industry generally is minor; and

20.    WHEREAS, The five members of the Commission unanimously determined by clear and convincing evidence that, for Claims One and Two of Enforcement Action 2020-003, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities should be suspended indefinitely from effective date of this Order until such time as the casino licensee is in complete compliance with Commission Order 2020-003, and the licensee should pay penalties amounting to One Million five hundred thousand dollars ($1,500,000) in total. The Commission also determined by

clear and convincing evidence that the requested declaratory orders in Claim Three and Claim Four should issue; and

21.   WHEREAS, The five members of the Commission unanimously determined by clear and convincing evidence that, for Claims One and Two of Enforcement Action 2020-004, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities should be suspended indefinitely from effective date of this Order until such time as the casino licensee is in complete compliance with Commission Order 2020-004, and the licensee should pay penalties amounting to Two Million dollars ($2,000,000) in total. The Commission also determined that the requested declaratory orders in Claim Three and Claim Four should issue; and

22.   WHEREAS, The five members of  the Commission unanimously determined by clear and convincing evidence that, for Claims One, Two and Three of Enforcement Action 2020-005, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities should be suspended indefinitely from effective date of this Order until such time as the casino licensee has fully paid the Casino Regulatory Fee, and the licensee should pay penalties amounting to One Million five hundred thousand dollars ($1,500,000) in total. The Commission also determined that the requested declaratory order in Claim Four should issue; NOW, THEREFORE,

23.   IT IS HEREBY ORDERED that, as to Claims One and Two of Enforcement Action 2020-001, the portion of the Casino License Agreement which allows Imperial Pacific International (CNMI) LLC to conduct gaming activities is hereby suspended for a period of six months from the effective date of this Order, and the casino licensee shall pay penalties of one hundred thousand dollars ($100,000) within one month of the effective date of this Order; and

24.   IT IS HEREBY FURTHER ORDERED that, as to Claims One, Two, and Three of Enforcement Action 2020-002, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities is suspended indefinitely from effective date of this Order until such time as the casino licensee has paid the Annual License Fee in full; and the licensee shall pay penalties amounting to one million five hundred thousand dollars ($1,500,000) in total within six months of the effective date of this Order; and

25.   IT IS HEREBY FURTHER ORDERED that Imperial Pacific International (CNMI) LLC's failure to pay the Annual License Fee in full when required is an unsuitable method of operation.  Imperial Pacific International (CNMI) LLC is ORDERED to pay the Annual License fee in full immediately upon the effective date of this Order; and

26.   IT IS HEREBY FURTHER ORDERED that for Claims One and Two of Enforcement Action 2020-003, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities is suspended indefinitely from the effective date of this Order until such time as the casino licensee is in complete compliance with Commission Order 2020-003, and the licensee shall pay penalties

amounting to one million five hundred thousand dollars ($1,500,000) in total within six months of the effective date of this Order; and

27.    IT IS HEREBY FURTHER ORDERED that Imperial Pacific International (CNMI) LLC's failure to comply with the minimum capital requirements of Commission Order 2020-003 and failure to detail the means by which it shall comply with the minimum capital requirements of Commission Order 2020-003 are unsuitable methods of operation.    Imperial Pacific International (CNMI) LLC is ORDERED to come into compliance with Commission Order 2020-003 prior to the Licensee seeking the lifting of the suspension of its gaming license; and

28.    IT IS HEREBY FURTHER ORDERED that the Commission has determined that Imperial Pacific International (CNMI) LLC's fiscal and financial capability as owner and operator of the casino has significantly diminished such that the public interest is no longer protected.    Imperial Pacific International (CNMI) LLC is ORDERED to obtain financial capability sufficient to pay all debts as they become due so the public interest is sufficiently protected prior to the Licensee seeking the lifting of the suspension of its gaming license; and

29.    IT IS HEREBY FURTHER ORDERED that for Claims One and Two of Enforcement Action 2020-004, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities is suspended indefinitely from effective date of this Order until such time as the casino licensee is in complete compliance with Commission Order 2020-004; and the licensee shall pay penalties amounting to two million dollars ($2,000,000) in total within six months of the effective date of this Order; and

30.    IT IS HEREBY FURTHER ORDERED that that Imperial Pacific International (CNMI) LLC's failure to comply with the payment and certification requirements of Commission Order 2020-004 is an unsuitable method of operation.    Imperial Pacific International (CNMI) LLC is ORDERED to come into compliance with Commission Order 2020-004 immediately upon the effective date of this Order; and

31.    IT IS HEREBY FURTHER ORDERED that the Commission has determined that Imperial Pacific International (CNMI) LLC the casino licensee, as a business entity, is not "solvent" as that word is commonly used in the area of financial accounting as of the date of the Order; the casino licensee lacks the present ability to pay debts as they mature and become due; the casino licensee lacks the present ability to pay to public and private entities all payments required by contract; and the casino licensee lacks the present ability to fully construct the entirety of the Initial Gaming Facility located in Garapan, Saipan, CNMI in accordance with all applicable laws, regulations and codes; and

32.    IT IS HEREBY FURTHER ORDERED that for Claims One, Two and Three of Enforcement Action 2020-005, the portion of the Casino License Agreement that allows the casino licensee to conduct gaming activities is suspended indefinitely from effective

date of this Order until such time as the casino licensee has fully paid the Casino Regulatory Fee; the licensee shall pay penalties amounting to One Million five hundred thousand dollars ($1,500,000) in total within six months of the effective date of this Order; and

33.   IT IS HEREBY FURTHER ORDERED that Imperial Pacific International (CNMI) LLC's failure to pay the Casino Regulatory Fee in full when required is an unsuitable method of operation.  Imperial Pacific International (CNMI) LLC is ORDERED to pay the Casino Regulatory Fee in full immediately upon the effective date of this Order; and

34.   IT IS HEREBY FURTHER ORDERED that the Chairman or the Executive Director shall take steps necessary to ensure that this Order is published in the Commonwealth Register as soon as is practicable; and

35.   IT IS HEREBY FURTHER ORDERED that this Order is to take effect ten days after its publication in the Commonwealth Register and shall remain in effect until it is repealed or replaced by subsequent Order of the Commission; and

36.   NOTICE IS HEREBY PROVIDED that this Order constitutes a final agency order in a contested case. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action, is entitled to judicial review of the action within 30 days thereafter in the Commonwealth Superior Court." 1 CMC §9112.

SO ORDERED this _22 nd_ day of April, 2021.

Signature: _Edward C. deleonguerrero_

EDWARD C. DELEON GUERRERO
CHAIRMAN
As to Complaint 20-003 (consolidated)

Signature: _____

RAFAEL S. DEMAPAN
VICE CHAIRMAN
As to Complaint 20-001 (consolidated)

# EXHIBIT C



**Arnold I. Palacios**
Governor

**David M. Apatang**
Lieutenant Governor

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
# OFFICE OF THE GOVERNOR

### *Governor Arnold Palacios's Statement on IPI Settlement Offer: "Let's Be Transparent"*

Last week, the Commonwealth Casino Commission (CCC) finally moved to revoke the exclusive casino license of Imperial Pacific International (IPI). The hearing was pushed back no less than three times. IPI tried up to the very last minute to stop it from happening by filing for a temporary restraining order in federal court.

They failed.

Years of lawsuits, unpaid workers and vendors, broken promises, and an unfinished shell of a hotel building at the heart of our tourist district in Garapan have brought us to this point. But at last week's hearing, in testimony under oath, IPI Director Howyo Chi falsely accused me of backing out on a deal.

According to Mr. Chi's sworn testimony at the revocation hearing, settlement terms totaling $50 million were mutually agreed between IPI and the CCC but rejected when presented to me.

That is untrue.

In fact, after Mr. Chi had agreed to put terms discussed with the CCC in writing for my consideration, he instead presented me entirely different terms in writing with a third the monetary value.

The CCC and Office of the Attorney General (OAG) flatly rejected those terms. I also rejected them. That proposal, under which IPI would pay only $15 million of the more than $60 million it owes the Commonwealth in arrears, was the *only* one ever tendered to me before the revocation hearing commenced on February 28.

I was brought into settlement discussions between IPI and the CCC late in the game—on February 6, just two weeks ahead of what was then the revocation hearing date. My involvement was necessary only to the extent that any settlement would require my signature on yet another amendment to IPI's casino license agreement.

From the beginning, I was clear that I wanted the opportunity to carefully review proposed settlement terms in writing before making any decisions on a license amendment. I wanted to make sure that the terms of any settlement would be beneficial to the Commonwealth and have the endorsement of the CCC and the OAG.

Although counsel for IPI and the CCC both agreed during settlement negotiations that the terms of settlement would be inadmissible in any other forum, IPI breached that agreement by eliciting testimony about settlement terms during the revocation hearing. It further filed a settlement proposal under seal that purportedly presents terms mutually agreed between IPI and the CCC.

IPI now publicly accuses me of rejecting that proposal. Let me be clear: *I have not seen the proposal that was filed under seal.* I have no idea what the terms are.

*Juan A. Sablan Memorial Building ▪ 12306 Rota Pl. ▪ Capitol Hill, Saipan*
*Caller Box 10007 ▪ Saipan, MP  96950 ▪ (670) 237-2200 ▪ governor.gov.mp*

1



**Arnold I. Palacios**
Governor

**David M. Apatang**
Lieutenant Governor

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
# OFFICE OF THE GOVERNOR

During settlement negotiations, IPI not only threatened to refile lawsuits against the Commonwealth, the Casino Commissioners, and me if no agreement was reached; they also threatened to go to the media and the court of public opinion to claim that the Commonwealth was leaving money on the table. These promises, at least, they have kept.

Ironically, if not disingenuously, Mr. Chi expressed frustration with the Commonwealth government and claimed to not know who the government's decision-makers are. For nearly a decade that has been the Commonwealth's experience in dealing with IPI and holding them accountable. Negotiating with them has been like chasing butterflies in a field. Who's calling the shots at IPI?

The CNMI government's decision-makers are not obscure. The CCC has the sole authority under the law to revoke, reinstate, or approve a transfer of IPI's casino license. As governor, I have the authority to approve or disapprove a casino license amendment. And I cannot make a decision on terms I have not even seen.

If IPI is truly interested in "leaving the island peacefully" and settling its debts to the Commonwealth, it can begin by acting in good faith and transparency and providing in writing what I have requested all along: settlement terms that are fair and beneficial to the Commonwealth, agreeable to the CCC, and approved by the Attorney General.

Mr. Chi also testified under oath at the revocation hearing that he has been personally communicating with an outside investor, Kyosei Bank, since August 2023. IPI filed in federal court a Memorandum of Understanding (MOU) which it purportedly signed with Kyosei Bank in July 2023 but never disclosed to the CCC. This MOU promised a cash infusion which IPI's own exhibits in federal court demonstrate was never actually provided.

At last week's hearing, Mr. Chi testified that Kyosei has promised funding to complete the casino project well beyond what it outlined in this MOU. If this is in fact true, there is nothing barring IPI from simply paying what it owes the CNMI government and IPI's judgment creditors in the Commonwealth and federal courts.

###

Juan A. Sablan Memorial Building ▪ 12306 Rota Pl. ▪ Capitol Hill, Saipan
Caller Box 10007 ▪ Saipan, MP  96950 ▪ (670) 237-2200 ▪ governor.gov.mp