OFFICE OF THE ATTORNEY GENERAL
EDWARD MANIBUSAN
Attorney General
J. Robert Glass, Jr. (F0523)
Assistant Attorney General
Hon. Juan A. Sablan Memorial Bldg., 2nd Fl.
Caller Box 10007, Capital Hill
Saipan, MP 96950
Telephone: 670-237-7500
Email: robby_glass@cnmioag.org
Attorney for Defendant Commonwealth of the
Northern Mariana Islands

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| IMPERIAL PACIFIC INTERNATIONAL (CNMI) LLC,<br>            Plaintiff,<br>vs.<br>COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, the COMMONWEALTH CASINO COMMISSION, ARNOLD PALACIOS, GOVERNOR OF CNMI, in his official and personal capacities, et. al.,<br><br>            Defendants. | CIVIL CASE NO. 1:24-CV-0001<br><br>**DEFENDANT COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS AUTHORITIES PROVIDED PURSUANT TO LOCAL RULE 5.2(b)** |

## TABLE OF CONTENTS OF COMMONWEALTH'S EXHIBIT 1

1) Supreme Court of the United States Office
   of the Clerk Letter Denying Certiorari ............................................ 001

2) Order Denying Panel Rehearing and Rehearing En Banc ............... 002

3) *Commonwealth Casino Commission v.
   Imperial Pacific International*, 2023 MP 8 ............................ 003-021

4) Judgment in *CCC v. IPI* ............................................................ 022

5) Mandate in *CCC v. IPI* ............................................................. 023

6) Order Affirming The Casino Commission's
   Suspension of Petitioner's Exclusive Casino License and
   Monetary Penalties, NMI Superior Court Civil Action No. 21-0173          024-055

7) *IGI General Contractor v. CNMI PSS*, 1999 MP 12                          064-071

8) *Santos v. Santos*, 4 NMI 206 (1994)                                      072-076

# COMMONWEALTH'S EXHIBIT 1

# Supreme Court of the United States
# Office of the Clerk
# Washington, DC  20543-0001

January 8, 2024

**Scott S. Harris**
Clerk of the Court
(202) 479-3011

**F I L E D**
Clerk
District Court

JAN 09 2024

for the Northern Mariana Islands
By_____
(Deputy Clerk)

Clerk
United States Court of Appeals for the Ninth
Circuit
95 Seventh Street
San Francisco, CA  94103-1526

    Re:  Imperial Pacific International (CNMI), LLC
          v. Commonwealth Casino Commission, as Agency of the
          Commonwealth of the Northern Mariana Islands
          No. 23-522
          (Your No. 22-16630)

Dear Clerk:

    The Court today entered the following order in the above-entitled case:

    The petition for a writ of certiorari is denied.

Sincerely,

**Scott S. Harris**, Clerk

Appx 001

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

AUG 7 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

|  |  |
|---|---|
| BEST SUNSHINE INTERNATIONAL, LTD (BVI), <br><br> Plaintiff, <br><br> and <br><br> IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC, <br><br> Plaintiff-Appellee, <br><br> v. <br><br> COMMONWEALTH CASINO COMMISSION, as Agency of the Commonwealth of the Northern Mariana Islands, <br><br> Defendant-Appellant. | No.   22-16630 <br><br> D.C. No. 1:22-cv-00007 District of the Northern Mariana Islands, Saipan <br><br> ORDER |

F I L E D
Clerk
District Court
AUG 08 2023
for the Northern Mariana Islands
By_____
*JP*
(Deputy Clerk)

Before:  BADE, BUMATAY, and SANCHEZ, Circuit Judges.

The panel unanimously votes to deny the petition for panel rehearing and rehearing en banc.  The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and rehearing en banc, filed July 12, 2023, is **DENIED**.

Panel


**E-FILED**
**CNMI SUPREME COURT**
E-filed: Aug 25 2023 08:08PM
Clerk Review: Aug 25 2023 08:08PM
Filing ID: 70715709
Case No.: 2022-SCC-0006-CIV
NoraV  Borja



Iɴ ᴛʜᴇ

# Supreme Court

ᴏғ ᴛʜᴇ

# Commonwealth of the Northern Mariana Islands

---

Cᴏᴍᴍᴏɴᴡᴇᴀʟᴛʜ Cᴀsɪɴᴏ Cᴏᴍᴍɪssɪᴏɴ,
*Respondent-Appellee,*

*v.*

Iᴍᴘᴇʀɪᴀʟ Pᴀᴄɪғɪᴄ Iɴᴛᴇʀɴᴀᴛɪᴏɴᴀʟ (CNMI), LLC,
*Petitioner-Appellant.*

**Supreme Court No. 2022-SCC-0006-CIV**

---

**Sʟɪᴘ Oᴘɪɴɪᴏɴ**

**Cite as: 2023 MP 8**

Decided August 25, 2023

---------

Cʜɪᴇғ Jᴜsᴛɪᴄᴇ Aʟᴇxᴀɴᴅʀᴏ C. Cᴀsᴛʀᴏ
Assᴏᴄɪᴀᴛᴇ Jᴜsᴛɪᴄᴇ Jᴏʜɴ A. Mᴀɴɢʟᴏ�ña
Assᴏᴄɪᴀᴛᴇ Jᴜsᴛɪᴄᴇ Pᴇʀʀʏ B. Iɴᴏs

---------

Superior Court No. 21-0173-CV
Associate Judge Wesley M. Bogdan, Presiding

---------

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

INOS, J.:

¶ 1      Petitioner-Appellant Imperial Pacific International (CNMI), LLC ("IPI") appeals the trial court order upholding Respondent-Appellee Commonwealth Casino Commission's ("CCC") decision suspending its casino license and imposing fines. For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND this matter to CCC for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

¶ 2      In 2014, the Commonwealth Lottery Commission entered into an exclusive Casino License Agreement ("CLA") with IPI. The CLA granted IPI the right to operate as the exclusive licensee. Under the CLA, "[t]he continuing validity of this License is conditional upon the Licensee's compliance with applicable laws, rules, and regulations of the Commonwealth and the United States." CLA cl. 17. Additionally, the agreement provides that "[f]ailure to pay any amount due and payable hereunder upon the date when such payment is due" is a material breach that permits suspension or revocation of the exclusive license. CLA cl. 31. Since its formation, the CLA has been amended nine times. CCC is the regulatory agency responsible for overseeing the casino licensee and enforcing the CLA's provisions. 4 CMC § 2314. Clause 25 of the CLA deals with force majeure.

¶ 3      Under the agreement, IPI must comply with multiple contractual, statutory, and regulatory requirements. These include paying the $15 million Annual License Fee[1] and the annual $3 million Casino Regulatory Fee.[2] IPI was also required to contribute $20 million annually to a Community Benefit Fund.[3]

¶ 4      IPI failed to make the Community Benefit Fund contributions for 2018 and 2019. In March 2020, shortly after the advent of the COVID-19 pandemic ("COVID-19"), IPI closed the casino.

¶ 5      Following IPI's closure, CCC initiated five complaints over the course of 2020:

> (1) Complaint 001—failure to pay the 2018 and 2019 Community Benefit Fund contributions.
>
> (2) Complaint 002—failure to pay the Annual License Fee due August 12, 2020.
>
> (3) Complaint 003—failure to maintain the required cash or cash equivalents in a CNMI or United States bank.

---

[1]   CLA cl. 5; 4 CMC § 2306(b).

[2]   4 CMC § 2309.

[3]   CLA cl. 16; Amendment No. 9.

(4) Complaint 004—failure to pay accounts payable that were over 89 days old.

(5) Complaint 005—failure to pay the Casino Regulatory Fee due by October 1, 2020.

¶ 6    In December 2020, following CCC's complaints, IPI and the Commonwealth Lottery Commission signed Amendment No. 9. Amendment No. 9 addresses, in part, COVID-19's impact on IPI's ability to make the Community Benefit Fund contributions and extends deadlines on the 2018 and 2019 contributions to 2025.

¶ 7    On February 25, 2021, CCC conducted an evidentiary hearing for Complaints 001 and 002. In response to Complaint 001, IPI argued that Amendment No. 9 extended the payment dates to 2025. In response to Complaint 002, IPI invoked the force majeure clause in its answer, citing the devastating effects of the pandemic on the tourism industry.

¶ 8    On March 2, 2021, CCC conducted an evidentiary hearing for Complaints 003, 004, and 005. IPI did not dispute the violations and did not raise any affirmative defense.

¶ 9    On April 22, 2021, CCC met with an IPI representative. At this meeting, CCC commissioners asked about IPI's parent company's 2020 annual report, which included information regarding its financial situation. The commissioners then unanimously voted to find clear and convincing evidence supported suspending IPI's exclusive casino license and issuing monetary sanctions.

¶ 10    CCC imposed the following sanctions and conditions:

(1) Complaint 001—$100,000 fine and a license suspension of six months.

(2) Complaint 002—$1.5 million fine and an indefinite license suspension conditioned on paying the Annual License Fee in full. CCC found that force majeure did not apply as an affirmative defense because the Annual License Fee was statutorily required. It also determined that IPI had not adequately demonstrated that COVID-19 was the proximate cause of its failure to pay the Annual License Fee.

(3) Complaint 003—$1.5 million fine and an indefinite license suspension conditioned on complying with Commission Order 2020-003.

(4) Complaint 004—$2 million fine and an indefinite license suspension conditioned on paying overdue accounts.

(5) Complaint 005—$1.5 million fine and an indefinite license suspension conditioned on paying the Casino Regulatory Fee in full.

In total, the fines amounted to $6.6 million.

¶ 11    IPI appealed CCC's order to the Superior Court, arguing that COVID-19 and other factors like Super Typhoon Yutu and changes in federal immigration law constituted force majeure events that excused all its performance obligations. Additionally, IPI claimed that CCC violated its due process rights by discussing IPI's parent company's annual report at the April 2021 meeting. IPI asserted that CCC improperly considered evidence outside the record, leading it to decide against IPI's force majeure defense.

¶ 12    In an order affirming CCC's decision to suspend IPI's license and impose fines, the Superior Court did not decide the question of force majeure. The court instead found that while IPI had raised the issue of force majeure for Complaints 001 and 002, it had not raised force majeure or any other defense to Complaints 003–005, and thus CCC had properly suspended IPI's license. The court further found no due process violation and held that CCC's order was not arbitrary or capricious.

¶ 13    On appeal, IPI argues that the court erred in failing to address force majeure, asserting that COVID-19 and other occurrences are force majeure events excusing performance in all five complaints. IPI claims CCC should have found that force majeure applied to Complaint 002 and held that COVID-19 was the proximate cause of its failure to pay the Annual License Fee. IPI contends Amendment No. 9 constitutes a deferment of its obligations to pay the Community Benefit Funds, which Complaint 001 concerns. Finally, IPI argues that it suffered a due process violation which requires setting aside all sanctions.

## II. JURISDICTION

¶ 14    We have appellate jurisdiction over final judgments and orders of the Commonwealth Superior Court. NMI CONST. art. IV, § 3; *see also* 1 CMC § 9113 (governing appeals from judicial review under the Commonwealth Administrative Procedure Act ("CAPA")).[4]

## III. STANDARD OF REVIEW

¶ 15    We review de novo the Superior Court's review of an agency action. *Calvo v. Northern Mariana Islands Scholarship Advisory Bd.*, 2009 MP 2 ¶ 9. As a general rule, courts will "[h]old unlawful and set aside agency action, findings, and conclusions found to be" arbitrary or capricious or "[c]ontrary to constitutional right." 1 CMC § 9112(f)(2)(i)–(ii). However, a more stringent standard applies to this case because Commonwealth law provides that the casino license "shall not be suspended or revoked absent [sic] finding of clear and convincing evidence during a hearing pursuant to 1 CMC § 9101 *et seq.* by unanimous vote of the Commonwealth Casino Commission." 4 CMC § 2314(h). When the burden of proof is clear and convincing evidence and the alleged error

---

[4]    1 CMC § 9113 states: "An aggrieved party may obtain a review of any final judgment of the Commonwealth Superior Court under this chapter by appeal to the Commonwealth Supreme Court. The appeal shall be taken as in other civil cases."

on appeal is that the evidence does not support the findings, "the standard of review is whether as a matter of law the findings are supported by competent and substantial evidence." *Salas v. Mafnas*, 2010 MP 9 ¶ 19 (citing *Off. of the Att'y Gen. v. Estel*, 2004 MP 20 ¶ 23). Substantial evidence is a "more searching" standard than arbitrariness. *Limon v. Camacho*, 5 NMI 21, 30 (1996). This is in line with the general standard of review for administrative agency adjudications and hearings laid out in the Commonwealth Administrative Procedures Act, requiring a reviewing court to set aside an agency action that is unsupported by substantial evidence. 1 CMC § 9112(f)(v). "Substantial evidence" refers to "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Owens v. Commonwealth Health Ctr.*, 2012 MP 5 ¶ 8. We examine the propriety of the agency's action considering the evidence before it at the time the decision was made. *See In re Blankenship*, 3 NMI 209, 217 (1992).

¶ 16    We review de novo the legal question of whether an agency's conduct satisfies statutory and constitutional due process protections. *Premier Ins. Co. v. Commonwealth Dep't of Lab.*, 2012 MP 16 ¶ 7. Finally, contract interpretation is a question of law reviewed de novo. *Manglona v. Baza*, 2012 MP 4 ¶ 11.

## IV. DISCUSSION
### A. Force Majeure

¶ 17    As force majeure is a key concept in this matter, we begin by discussing force majeure generally. Force majeure refers to "[a]n event or effect that can neither be anticipated nor controlled. The term includes both acts of nature (e.g., floods and hurricanes) and acts of people (e.g., riots, strikes, and wars)." BLACK'S LAW DICTIONARY 562 (9th ed. 2010). "[I]n order to constitute a force majeure, an event must be the proximate cause of nonperformance of the contract." *Hong Kong Islands Line Am. S.A. v. Distrib. Servs., Ltd.*, 795 F. Supp. 983, 989 (C.D. Cal. 1991), *aff'd*, 963 F.2d 378 (9th Cir. 1992). A force majeure clause is "[a] contractual provision allocating the risk of loss if performance becomes impossible or impracticable, [especially] as a result of an event or effect that the parties could not have anticipated or controlled." BLACK'S LAW DICTIONARY 562 (9th ed. 2010). "What types of events constitute force majeure depend on the specific language included in the clause itself." *Entzel v. Moritz Sport & Marine*, 841 N.W.2d 774, 778 (N.D. 2014) (citation omitted).

¶ 18    Force majeure is an affirmative defense. *Id.* The party invoking force majeure must prove it by a preponderance of the evidence. *See United States v. Mobil Oil Guam, Inc.*, No. 10-00006, 2010 U.S. Dist. LEXIS 75799, at *26 (D. Guam July 27, 2010) ("Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event."); *Rosello Cruz. v. Pedro Luís García*, 116 D.P.R. 511, 519 (P.R. 1985) ("To release himself from liability, the [defendant] . . . must, through a preponderance of the evidence, prove that . . . it was a case of force majeure."); *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1059 (Colo. 1992) ("Of course, the defendant bears the burden of proving by a

preponderance of the evidence any affirmative defense to the plaintiff's contractual claim.").

¶ 19    In the CLA, the parties anticipated the possibility of force majeure. The force majeure clause reads:

> Licensee shall not be in default for any failure or delay in performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee ("Force Majeure Event"). Invocation of force majeure by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.

> Where such Force Majeure Event results in failure in the performance or delay exceeding six (6) months of the performance due under this License Agreement, the Licensee may terminate this License Agreement forthwith provided that the Licensee shall not be excused from any payment obligations to the Commonwealth where the grounds and/or the purpose for such payments have already accrued.

> A change in law which prohibits performance of this agreement or makes such performance illegal shall result in a suspension of the performance of both Parties under this License Agreement until such prohibition no longer exists, provided that the Licensee shall have the option to terminate this License Agreement upon the adoption of the change in law pursuant to this section 25 as if such change in law is a Force Majeure Event.
> CLA cl. 25.

¶ 20    COVID-19 is the type of event that falls within the force majeure clause as an event "beyond the reasonable control of either party." *JN Contemp. Art, LLC v. Phillips Auctioneers, LLC*, 29 F.4th 118, 125 (2d Cir. 2022) (internal quotation and citation omitted). *See also Lampo Grp., LLC v. Marriott Hotel Servs.*, No. 3:20-cv-00641, 2021 U.S. Dist. LEXIS 148824, at *23 (M.D. Tenn. Aug. 9, 2021) ("[A] global pandemic is the type of 'act of God' that qualifies as a *force majeure*."). Thus, the force majeure clause would serve as a defense if COVID-19 was the proximate cause of IPI's noncompliance.

### B. Failure to Rule on Force Majeure

¶ 21    We next consider whether the Superior Court adequately considered the issue of force majeure. In its order, the court found that IPI had raised the defense to Complaints 001 and 002 but did not raise it to Complaints 003–005. However, upon deciding that CCC properly suspended IPI's license and imposed fines under the last three complaints, the court did not analyze whether force majeure was enforceable as to Complaints 001 and 002. *Commonwealth Casino Comm'n*

*v. Imperial Pac. Int'l (CNMI), LLC*, No. 21-0173 (NMI Super. Ct. Mar. 15, 2022) (Order Affirming the Casino Commission's Suspension of Petitioner's Exclusive Casino License and Monetary Penalties at 23–26). IPI claims the court erred by not considering force majeure's applicability to Complaints 001 and 002 because CCC imposed fines of $100,000 for Complaint 001 and $1,500,000 for Complaint 002, in addition to suspending its license.

¶ 22    We agree with IPI. Each of the five complaints is separate and distinct from the others—attacking IPI's violations under distinct provisions of the CLA, CMC, and NMIAC. *Commission Order No: 2021-002*, at ¶¶ 4, 8, 14–16. CCC weighed and meted out the penalties, specific to the violations in each complaint and independent of the other complaints. *Id.* at ¶¶ 5–7, 9–13, 17–33. Importantly, the penalties imposed for Complaints 001 and 002 included fines totaling $1.6 million above and beyond the fines imposed for Complaints 003–005. *Id.* at ¶¶ 7, 13; *see also* at ¶¶ 23–24. Consequently, the Superior Court erred in not considering IPI's force majeure defense on the grounds that the suspension of its exclusive license for the violations contained in Complaints 003–005 essentially mooted the issue of force majeure for Complaints 001 and 002.

### C. Complaint 001
#### i. Whether IPI Properly Raised Force Majeure as a Defense

¶ 23    In response to IPI's assertion of a force majeure defense regarding its failure to make the Community Benefit Fund contributions due in 2018 and 2019, CCC cites the NMI Rules of Civil Procedure, contending that IPI waived this affirmative defense by not raising it in its answer to Complaint 001. IPI counters that it raised the defense at the evidentiary hearing and that doing so was sufficient because the Rules of Civil Procedure do not apply to administrative proceedings. Appellant's Reply Br. at 4.

¶ 24    We have held that under NMI R. CIV. P. 8(c), parties must assert affirmative defenses in their responsive pleadings; otherwise, they are generally waived. *Sablan v. Elameto*, 2013 MP 7 ¶ 17. For the waiver not to apply, the plaintiff must either have had notice of the unpled defense, or else not have been prejudiced by the lack of notice ("the notice-prejudice exception"). *Id.* "Notice can be delivered in a motion for summary judgment or a pre-trial conference. [I]f a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice." *Id.* (internal quotation and citation omitted).

¶ 25    In the context of administrative procedures, the Montana Supreme Court provides helpful guidance:

> The purpose of requiring affirmative defenses to be pleaded is to give the opposing party notice of the defense and a chance to argue why imposition of the defense would be inappropriate . . . However . . . this is a function of the federal rules of civil procedure. Generally, the rules of civil procedure do not apply with equal force to administrative proceedings . . . The strict technical rules

> governing judicial procedure generally do not apply to administrative proceedings which are simpler, less technical, and less formal than court proceedings . . . . Administrative procedures need not conform to all procedural niceties that surround the judicial process.
>
> *Thompson v. J.C. Billion, Inc.*, 294 P.3d 397, 400 (Mont. 2013) (internal quotations and citations omitted).

¶ 26    Federal courts also recognize that the "technical failure to comply precisely with Rule 8(c) is not fatal." *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 856 (5th Cir. 1983). The Ninth Circuit, for example, has "liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings." *Magana v. Northern Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997). "The failure to assert an affirmative defense in an answer will not result in waiver if the opposing party has notice of the defense sufficient to avoid prejudice." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 924, n.9 (3d. Cir. 1997).

¶ 27    Taking into account the notice-prejudice exception and the relatively informal nature of administrative proceedings, we reject a hard rule in this instance. Parties can raise affirmative defenses for the first time at an agency hearing so long as the other party had notice or is not prejudiced.

¶ 28    Here, CCC had notice and was not prejudiced. IPI raised force majeure in its answer to Complaint 002, and since Complaint 001 and 002 were discussed at the same evidentiary hearing on February 25, 2021, CCC was on notice that the defense would be discussed. We hold that IPI did not waive force majeure as a defense to Complaint 001 by not raising it in its answer.

¶ 29    However, the record indicates that IPI did not raise force majeure at hearing:

> CCC Counsel: So -- so, the events complained of, in Complaint Number 1 -- Exhibit Number 1, um, have absolutely no applicability to a force majeure situation, which they're not even allowed to raise anyway. This is for 2, not the first page. It doesn't apply to the CBF (phonetic) one.
>
> IPI Counsel: Yeah.
>
> Unidentified Male: Right.
>
> IPI Counsel: Agreed.
>
> *Id.* at 27.

¶ 30    IPI agreed that force majeure was inapplicable to Complaint 001. When it next spoke, it stated it was not raising force majeure as a defense to Complaint 001:

> The idea of force majeure as it has to do with the Community Benefit Fund is pulled from the language of Ex- -- plaintiff's Exhibit 5I. I was just pointing it out to the Commission, so that is in

evidence as – as it's been stipulated to. *Uh, I was not making a force majeure argument in relations to [the] Community Benefit Fund.* I was only bringing it up to - to show that there was a context for that agreement between the Lottery Commission and IPI.

*On the other hand, I was making a force majeure argument on behalf of, um – for Complaint 002, which is the license fee.*
*Id.* at 38–39 (emphasis added).

¶ 31   IPI stated that it was raising force majeure as an affirmative defense to Complaint 002 but not to Complaint 001. In administrative proceedings, affirmative defenses must be raised in an answer or alternatively at the agency hearing if the other party has notice or is not prejudiced. By failing to raise force majeure in its answer or at the hearing, we hold IPI waived that defense to Complaint 001.

### ii. Amendment No. 9

¶ 32   We ask next whether Amendment No. 9 affects the validity of CCC's imposition of sanctions for IPI's failure to make the required Community Benefit Fund contributions. Enacted after Complaint 001 was initiated, Amendment No. 9 states, "Licensee shall be given a deferment until October 1, 2025 to complete [payment of the Community Benefit Fund contributions due in 2018 and 2019.]" Amendment No. 9 at 2–3.

¶ 33   IPI argues that this deferment made Complaint 001's sanctions improper, and we agree. The United States Supreme Court has ruled:

> [W]hen the legislature repeals a criminal statute or otherwise removes the State's condemnation from conduct that was formerly deemed criminal, this action requires the dismissal of a pending criminal proceeding charging such conduct. The rule applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it.
>
> *Bell v. Maryland*, 378 U.S. 226, 230 (1964).

While this case is not criminal in nature, the same principle applies. Amendment No. 9 essentially operates as an intervening change in the law;[5] once the

---

[5]   At oral argument we questioned the Assistant Attorney General about the Office of the Attorney General's seeming omnipresence in this case, but did not receive a satisfactory answer. The Office of the Attorney General was signatory to the original CLA, and to its amendments, approving each document as to form and content or legal sufficiency. CLA at 17; Amendment No. 9 at 4. The Assistant Attorney General was present at evidentiary and non-evidentiary hearings, appearing on behalf of the CCC Executive Director on at least five separate occasions. Appx. to Appellant's Br. at 16, 77, 148, 355, 442, 494. The Assistant Attorney General has represented CCC before the Superior Court and now before this Court. We note that the varying roles and, at-times, contradictory legal positions the OAG has adopted throughout this case give us pause.

Community Benefit Fund contributions were no longer due in 2018 and 2019, CCC could no longer impose sanctions for IPI's failure to pay them in those years. CCC conceded this at oral argument. Accordingly, we hold that CCC erred in finding IPI liable for the violations contained in Complaint 001 and imposing sanctions.

### D. Complaint 002
#### i. Validity of Force Majeure in Light of Statutory Requirements

¶ 34    While IPI failed to raise force majeure as a defense to Complaint 001, it successfully raised the defense against the alleged violations in Complaint 002. But before we can discuss the merits of IPI's asserted force majeure defense to Complaint 002, we must determine whether the force majeure clause is preempted by statute. CCC found that, as a matter of law, force majeure is inapplicable as a defense to statutory requirements. The Superior Court did not reach this issue because it held the undisputed and undefended violations in Complaints 003–005 constituted sufficient grounds to uphold the sanctions for Complaints 001 and 002.

¶ 35    It is well-established that contractual provisions cannot override statutes. *Thayer v. Tandy Corp.*, No. 153, 1987, 1987 Del. LEXIS 1237, at *4 (Del. Sept. 28, 1987) ("Where contractual provisions circumvent statutory law, the statute overrides the contract."); *United States v. Hampton Rds. Sanitation Dep't*, No. 2:09-cv-481, 2012 U.S. Dist. LEXIS 46984, at *13 (E.D. Va. Apr. 2, 2012) ("The *force majeure* provision['s] . . . invocation here does not circumvent federal and state laws."). However, statutes themselves can contain force majeure clauses. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Jamison*, 815 F. Supp. 454, 470 (D.D.C. 1992) ("Congress provided a statutory *force majeure* exception to the requirements that leaseholders mine commercial quantities of coal within ten years and each subsequent year."); HAW. REV. STAT. ANN. § 209E-14 (LexisNexis 2023) (creating a force majeure exception to the requirements for agricultural businesses to be eligible for certain tax incentives).

¶ 36    Here, the legislature provided that, "After approving an application for the exclusive license, the Commonwealth Lottery Commission may negotiate the terms of the exclusive license before it is issued." 4 CMC § 2317(a)(1)(i)(A). By granting the Lottery Commission this statutory authority, the legislature implicitly authorized standard contract provisions such as a force majeure clause that could excuse noncompliance with contractual requirements, even if those obligations were also statutory requirements. The Annual License Fee is set by statute, but it is also required in Clause 5 of the CLA. Thus, even though 4 CMC § 2306 does not expressly contain a force majeure clause, the force majeure clause nonetheless applies to the Annual License Fee by way of the broad authority the statute delegates to the Lottery Commission to negotiate license

terms. CCC erred in ruling that force majeure was inapplicable as a matter of law to Complaint 002.[6]

### ii. Substantial Evidence for Force Majeure

¶ 37    Having determined that IPI's force majeure defense to Complaint 002 is not invalidated by statute, we consider CCC's rejection of the defense. When reviewing an administrative agency's factfinding, we apply a "substantial evidence" standard. 1 CMC § 9112(f)(v); *Pac. Sec. Alarm, Inc. v. CPA*, 2006 MP 17 ¶ 6. We have defined substantial evidence as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Owens v. Commonwealth Health Ctr.*, 2012 MP 05 ¶ 8. Considering the administrative record, we ask whether the evidence before CCC was such that a reasonable mind would find it adequate to support CCC's conclusion.

¶ 38    In rejecting the force majeure defense, CCC found that even if the defense was potentially applicable, IPI had failed to offer sufficient evidence to prove it. CCC went a step further, stating that "the Executive Director has established by clear and convincing evidence that the casino licensee's failure to make the required annual license fee payment was not due to a force majeure reason." Commission Order No: 2021-002 at ¶ 10. It claimed that the Executive Director:

> [O]ffered testimony that the casino licensee failed to pay the annual license fee not due to force majeure reasons; namely, that IPI had suffered large financial losses prior to the pandemic, that the casino licensee's auditors expressed "going concern" issues prior to the pandemic, and that the then-CEO admitted to the Commission in a public meeting on July 20, 2020 that IPI has some funding to satisfy the annual license fee.
>
> *Id.* at ¶ 9.

¶ 39    However, this testimony is not all the evidence that was before CCC. Having found that CCC should have considered Amendment No. 9 with respect to Complaint 001, we similarly hold that CCC should have taken Amendment No. 9's findings into account when considering COVID-19's impact on IPI's ability to pay the Annual License Fee. After all, the Lottery Commission acknowledged that COVID-19 negatively impacted IPI's financial ability to pay the fee. Amendment No. 9, in relevant part, states:

> WHEREAS, as a result of the COVID-19 pandemic, an unexpected major unpredicted global event that has already lasted almost 6 months and generally expected to last for many more months to come, Imperial Pacific's current ability to make payments that are currently in arrears has been impacted. On or about March 17, 2020,

---

[6]   CCC cites NMIAC §§ 175-10.1-640, 175-10.1-645, and 175-10.1-650 for the proposition that its regulations restrict the applicability of force majeure. However, these regulations were repealed prior to CCC sanctioning IPI. 42 Com. Reg. 44562 (Dec. 28, 2020).

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

> Imperial Pacific closed the operation of its casino in CNMI, citing
> diminished tourists to the CNMI and the present unknown as to
> when tourism may properly resume.
> Amendment No. 9 at 1.

In addition, IPI had paid the Annual License Fee every year until COVID-19
began and IPI shut down, cutting off revenue.

¶ 40    IPI's history of timely payment of the Annual License Fee until the advent
of COVID-19 was known to CCC as enforcer of the CLA. The parties' findings
in Amendment No. 9, which represent the Commonwealth's acknowledgment
that IPI was in a force majeure situation, were also known to CCC. Considering
the administrative record as a whole, the evidence that was before CCC when it
rejected IPI's force majeure defense was such that a reasonable mind would not
accept its conclusion as adequately supported in the record. Substantial evidence
does not support CCC's finding that COVID-19 was not the proximate cause for
the nonpayment of the Annual License Fee.[7]

¶ 41    Our finding that CCC's rejection of IPI's force majeure defense to
Complaint 002 lacked substantial evidence does not disturb our finding that force
majeure is an affirmative defense—the burden of proof for which lies with the
party asserting it. *Supra* at ¶ 18. On the contrary, our review for substantial
evidence holds IPI to its burden of proof while allowing additional deference for
CCC's adjudicatory authority. Indeed, if IPI met its burden of proof to
demonstrate by a preponderance of the evidence that COVID-19 was the
proximate cause of its default, CCC could still reasonably reject the defense
provided that such a rejection was supported by substantial evidence. *See
Universal Camera Corp. v. NLRB*, 340 U.S. 474, 481 (1951) ("[I]f what is called
substantial evidence is found anywhere in the record to support conclusions of
fact, the courts are said to be obliged to sustain the decision without reference to
how heavily the countervailing evidence may preponderate.") (internal
quotations omitted); *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014)
("Substantial evidence means more than a mere scintilla, but less than a
preponderance.") (internal quotations omitted). Thus, our holding that CCC's
decision fails for lack of substantial evidence incorporates a finding that IPI met
its burden of proof by a preponderance of the evidence.

### *iii. Force Majeure Clause — Plain Meaning Interpretation*

¶ 42    We now address the scope of the force majeure defense. CCC argues that
even if the force majeure clause is valid, IPI has agreed that force majeure will
not excuse its payment obligations that have already accrued. Appellee's Br. at
12. CCC also claims the Annual License Fee accrued upon executing the CLA
in 2014 and remained accrued as long as IPI retains the license. *Id*. IPI contends
that CCC's interpretation contradicts the plain meaning of the clause and would

---

[7]    Because we find that COVID-19 was a force majeure event, we do not discuss whether
Typhoons Soudelor and Yutu and changes to federal immigration law are force majeure
events.

render it meaningless and absurd because no contracting party would negotiate for a term excusing performance in the event of an Act of God, while at the same time making performance obligatory regardless of future events. Appellant's Reply Br. at 7–8. IPI interprets the clause to mean that its obligation to pay the Annual License Fee is fully excused because of force majeure, or alternatively, that its delay in making the Annual License Fee payments is excused during a force majeure event. *Id*.

¶ 43    We look to the plain language of the contract terms because, generally, they contain the parties' intent. *See Riley v. Pub. Sch. Sys.*, 4 NMI 85, 88 (1994). Also generally speaking, "[a] written contract must be read as a whole and every part interpreted with reference to the whole." *Isla Dev. Prop. v. Jang*, 2017 MP 13 ¶ 9. Put differently, "a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995). Additionally, we do not interpret a contract "in a way that will defy common sense or lead to absurd results." *Northern Marianas Housing Corp. v. BankPacific, Ltd.*, 2021 MP 07 ¶ 21 (citing *Manglona v. Baza*, 2012 MP 4 ¶ 36); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 203(a) ("[A]n interpretation which gives a 'reasonable' . . . meaning . . . is preferred.")

¶ 44    The first sentence of the force majeure clause states that IPI:

> [S]hall not be in default for any failure or delay in performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee.
> CLA cl. 25.

Reading this sentence in isolation, the parties intended to excuse any *failure* or *delay* in performance caused by the force majeure event. The second sentence then follows with:

> Invocation of force majeure by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.
> *Id*.

Sentence two clarifies that the parties did not intend for the invocation of force majeure to excuse IPI's payment obligations. Read together, sentence one protects IPI from default in the event of force majeure, while sentence two clarifies that this protection does not have the effect of excusing IPI's payment obligations.

¶ 45    IPI's contention that it would never have negotiated for a term excusing performance, while at the same time making performance obligatory, misstates what it agreed to in the CLA. The force majeure clause excuses IPI's *default* in

the event of force majeure, not its duty to perform as a whole. The term "default" refers to "the omission or failure to perform a legal or contractual duty." BLACK'S LAW DICTIONARY 377 (9th ed. 2010). When a party to a contract defaults, that is, fails to perform their contractual duties when time comes to perform, they have breached the contract. *Manglona v. Baza*, 2012 MP 04 ¶ 13 (citing RESTATEMENT (SECOND) OF CONTRACTS § 235(2) (1979)). Non-payment of a lump sum required by the contract at the appropriate time set forth in the contract is a breach of the contract for which relief can be granted. *Id.* As such, were it not for the protection of the force majeure clause, IPI's failure to pay the 2020 Annual License Fee when time came due would normally constitute a default for which CCC, as enforcer of the Commonwealth's interests under the CLA, could obtain appropriate relief. However, the force majeure clause has the effect of protecting IPI from the consequences of default during a force majeure event. Thus, because we have concluded that COVID-19 was a valid force majeure event that was the proximate cause of IPI's failure to pay the 2020 Annual License Fee, CCC's imposition of penalties under Complaint 002 was improper because the force majeure clause protects IPI from the consequences of default.

¶ 46    The penalties for IPI's default on the 2020 Annual License Fee were improper because of force majeure. That being said, the force majeure clause plainly states that invocation of the defense, while excusing default resulting from a force majeure event, does not excuse payment obligations, "where the grounds and or purpose for such payments have already accrued." CLA cl. 25. Notably, the CLA refers to *where*—not *when*—such grounds or purpose accrue. *Id*. The question, then, is not when IPI's obligation to pay the 2020 Annual License Fee accrued, but whether it accrued. The grounds or purpose for payment of the 2020 Annual License Fee would appear simple: the maintenance of IPI's status as exclusive licensee for the year 2020. By this measure, IPI's obligation as Licensee to make the Annual License Fee payment each year accrues for the purpose of maintaining its status as Licensee. As such, every year that IPI continues as the exclusive licensee under the CLA, the grounds and or purpose of its obligation to pay the Annual License Fee accrue. While IPI would like us to find that the COVID-19 pandemic excused its obligation to pay outright, that would contradict the plain language of the CLA, which excuses IPI's default during a force majeure event, but not its obligation to pay.

¶ 47    We similarly reject CCC's interpretation that IPI's obligation to pay each year accrued at the time the CLA was formed. After all, sentence three of the force majeure clause provides IPI with an escape route from its contractual obligations in the event of force majeure. It reads:

> Where such Force Majeure event results in failure in the performance or delay exceeding six (6) months of the performance due under this License Agreement, the Licensee may terminate this License Agreement forthwith provided that the Licensee shall not be excused from any payment obligations to the Commonwealth

where the grounds and/or the purpose for such payments have already accrued.

CLA cl. 25.

If IPI, six months after COVID-19 forced the shutdown, had chosen to promptly exercise its right under the force majeure clause to terminate the license agreement, CCC's interpretation of "accrual" would have the absurd result of terminating the CLA while requiring IPI to continue making Annual License Fee payments in perpetuity. We will not construe the CLA "in a way that . . . lead[s] to absurd results," *NMHC*, 2021 MP 7 ¶ 21, so we reject CCC's reading of the force majeure clause.

¶ 48    A reasonable interpretation of the force majeure clause, read with "reference to the whole," and "giv[ing] effect to all its provisions, and to render them consistent with each other," *Isla Dev. Prop.*, 2017 MP 13 and *Mastrobuono*, 514 U.S. 52 at 63, is that force majeure excuses any default in IPI's payment during a force majeure event. At the same time, IPI remains obligated to pay the Annual License Fee for every year that the grounds or purpose for that fee, that is, IPI's maintenance of its status as the exclusive licensee under the CLA, accrues. IPI's failure to terminate the CLA under sentence three of the force majeure clause demonstrates IPI's intention to remain the exclusive licensee under the CLA, with all the rights and duties thereof. Under the force majeure clause of the CLA, IPI's default in paying the Annual License Fee is excused while force majeure is in effect, but its payment obligations continue to accrue each year. At oral argument, IPI agreed that the force majeure event has now ended, meaning that the unpaid fees are now due within a reasonable period of time as CCC determines.

### E. Complaints 003, 004, and 005

¶ 49    Lastly, we turn to Complaints 003–005, asking whether substantial evidence supports CCC's imposition of sanctions for these complaints. IPI asks us to find that force majeure "applies to each of the Enforcement Actions brought by the CCC." Appellant's Br. at 26. It says its invocation of force majeure with respect to Complaint 002 should be "applied broadly" because its "obligations, from which all of the Commission's Enforcement Actions sprout, are derived from the same root: the exclusive casino license" and because its "inability to fulfill the various obligations that form the basis for the CCC's Enforcement Actions also all derive from the same cause: IPI's complete lack of revenue after the COVID-19 pandemic forced the Company to close its operations in March 2020." *Id*. at 26–27.

¶ 50    CCC's order states that "[t]he casino licensee offered no defense to the claims alleged in Enforcement Actions 2020-003, 2020-004, and 2020-005." Commission Order No: 2021-002 at ¶ 17. The court below agreed, finding that IPI "offered no defense and did not contest any of the claims alleged in Enforcement Actions 2020-003, 2020-004, or 2020-005." *Commonwealth Casino Comm'n v. Imperial Pac. Int'l (CNMI), LLC*, No. 21-0173 (NMI Super. Ct. Mar. 15, 2022) (Order Affirming the Casino Commission's Suspension of

Petitioner's Exclusive Casino License and Monetary Penalties at 25) (emphasis omitted). It held that CCC met its evidentiary burden. *Id.* at 22.

¶ 51    The evidentiary hearing on Complaints 003–005 occurred on March 2, 2021. After CCC explained what the complaints involved, IPI said, "We don't dispute the charges against IPI as outlined by [CCC]." March 2, 2021 Tr. at 9.

¶ 52    After introducing a list of different stipulations in which IPI conceded that it had committed violations alleged in Complaints 003-005, CCC said, "If IPI will offer no defense, the Director moves for judgement on each claim of each complaint and is ready to argue for the appropriate penalty." *Id*. at 14–15. IPI responded that it "will not be mounting a defense." *Id*. at 15. When CCC discussed possible sanctions for IPI, it said:

> [T]he fact is the evidence shows that IPI has absolutely zero respect for you . . . If IPI respected the Commission, it would have done the bare minimum. They're going to say "We have no money." I'm assuming they're going to say force majeure. They're going to say "We have a federal receivership."
> *Id*. at 24.

¶ 53    IPI responded:

> Um, it was -- it was mentioned dismissively about force majeure. Um, and I didn't raise it as an affirmative defense in the defense section but wanted to just bring it up as a mitigating circumstance that I think this Commission ought to take into consideration when framing whatever plan that is that's gonna [sic] be imposed on IPI.
> *Id.* at 34.

¶ 54    IPI continued, asking that CCC "create . . . systems of checks and balances and uphold IPI accountable but with the understanding of the economic crisis that it's being faced with and its ability to incrementally make progress." *Id.* at 37–38.

¶ 55    IPI first said, "We don't dispute the charges." *Id*. at 9. Second, it stated that it "will not be mounting a defense." *Id*. at 15. Third, it said that it "didn't raise [force majeure] as an affirmative defense." *Id*. at 34. Finally, it asked CCC to create "systems of checks and balances and hold [it] accountable." *Id*. at 38.

¶ 56    Instead of contesting Complaints 003–005, IPI conceded the violations, seemingly in hopes of lessening the sanctions. When IPI discussed force majeure, it called it "a mitigating circumstance . . . to [be] take[n] into consideration when framing whatever plan that is that's gonna [sic] be imposed." *Id*. at 34. Seeking leniency in sanctions imposed by CCC on the basis of alleged economic constraints is not equivalent to arguing that force majeure excuses its performance.

¶ 57    Having previously chosen to ask for leniency instead of raising any defenses, IPI now adopts a different tactic by asserting force majeure excuses for

all its noncompliance. But IPI's force majeure argument for Complaint 002 cannot be so easily translated to Complaint 003–005 because to do so would ignore IPI's consistent representations before the agency.

¶ 58    A party may change its mind or its theory of the case so long as it avoids judicial estoppel,[8] but to permit IPI to raise force majeure at this stage as to Complaints 003–005 would violate four overlapping rules.

¶ 59    First, as a general matter, "[t]o preserve an issue for appeal from an agency's decision, a party must raise the issue before the agency." *Doucette v. Mass. Parole Bd.*, 18 N.E.3d 1096, 1100 (Mass. App. Ct. 2014); *see also Tejeda-Mata v. I.N.S*, 626 F.2d 721, 726 (9th Cir. 1980) ("[I]f a petitioner wishes to preserve an issue for appeal, he must raise it first in the proper administrative forum."). Second, as already discussed, force majeure is an affirmative defense, and in administrative proceedings, affirmative defenses must be raised in an answer or at the agency hearing if the other party has notice or is not prejudiced. S*upra*, at ¶ 27. Because it did not, IPI waived force majeure as a defense to Complaints 003–005.

¶ 60    Third, "[o]urs is an adversarial system of justice. The presumption, therefore, is to hold the parties responsible for raising their own defenses." *United States v. Mitchell*, 518 F.3d 740, 749 (10th Cir. 2008); *see also Holsey v. Bass*, 519 F. Supp. 395, 408 (D. Md. 1981) ("Generally, it is the duty of the defendant to plead affirmative defenses, and the court cannot raise such defenses sua sponte."). While remaining silent would have been enough to waive force majeure, IPI affirmatively stated it was not raising the defense to Complaints 003–005. CCC can hardly be faulted for not applying a defense that IPI explicitly waived.

¶ 61    Fourth, the goal of judicial review is to examine the propriety of the determination at the time it was made, not to allow a redo of what happened before the agency. *See DOL, Licensing & Regul. v. Boardley*, 883 A.2d 953, 960 (Md. 2005) ("It is the function of the reviewing court to review only the materials that were in the record before the agency at the time it made its final decision."); *Fund for Animals v. Williams*, 391 F. Supp 2d. 191, 196 (D.D.C. 2005) ("Because the court's review is confined to the administrative record at the time of the agency's decision, it may not include some new record made initially in the

---

[8]   Judicial estoppel is a doctrine that prevents parties from unfairly flip-flopping:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.
>
> *KTT Corp. v. Tomokane*, 2003 MP 17 ¶ 21 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

reviewing court.") (internal quotation and citation omitted). IPI states, "In its arguments before the Superior Court, IPI drew no distinction between the application of the *force majeure* defense to the various Enforcement Actions brought against it by the CCC." Appellant's Br. at 26. That is irrelevant because our review focuses on what happened before the agency, not the court below. *See In re Blankenship*, 3 NMI 209, 217 (1992).

¶ 62     In short, IPI admitted to the violations in Complaints 003–005, stated multiple times that it was not raising any defense, and even asked to be held accountable. CCC accepted as much and ruled accordingly. Unlike the evidence in the record contradicting the reasonableness of CCC's rejection of IPI's force majeure defense to Complaint 002, no such evidence is in the record to gainsay the reasonableness of CCC's decision as to Complaints 003–005 in light of IPI's admissions at hearing. Thus, we find that substantial evidence supports CCC's sanctions for Complaint 003, Complaint 004, and Complaint 005.

*F. CAPA & Due Process*

¶ 63     Lastly, IPI claims that CCC violated CAPA and its due process rights by considering evidence outside the record. Specifically, IPI argues that CCC improperly considered the 2020 annual report released by IPI's parent company when rejecting its force majeure defense. Because we have already reversed CCC's decisions as to Complaints 001 and 002 on other grounds and found that CCC did not raise a force majeure defense as to Complaints 003–005, we need not address whether the CCC's consideration of the annual report violated CAPA or due process.

## V. CONCLUSION

¶ 64     The Commonwealth Casino Commission improperly imposed sanctions against IPI for Complaint 001. The Lottery Commission approved Amendment No. 9, which, in effect, eliminated IPI's default by altering the due dates of its obligation to make the required contributions to the Community Benefit Fund. CCC improperly imposed sanctions against IPI for Complaint 002. The record demonstrates that there was not substantial evidence to support CCC's finding that COVID-19 was not the proximate cause of IPI's failure to pay the Annual License Fee in 2020, excusing its default. The Annual License Fees for 2020 and the following years have accrued and continue to accrue, and CCC must now decide on a reasonable deadline for IPI to pay them. Finally, the sanctions CCC imposed against IPI for Complaint 003, Complaint 004, and Complaint 005— suspending its license and imposing fines—were proper. Substantial evidence supports them because IPI admitted to the violations and offered no defense. For the foregoing reasons, the trial court's ruling is AFFIRMED in part and REVERSED in part. This matter is REMANDED to the Commonwealth Casino Commission for further proceedings consistent with this opinion.

SO ORDERED this 25th day of August, 2023.

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

/s/
ALEXANDRO C. CASTRO
Chief Justice


/s/
JOHN A. MANGLOÑA
Associate Justice


/s/
PERRY B. INOS
Associate Justice

COUNSEL

Kevin T. Abikoff, Washington, D.C. (pro hac vice); Joey P. San Nicolas, Saipan, MP, for Appellant.

Keisha Blaise, Assistant Attorney General, Saipan, MP, for Appellee.

NOTICE

This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it is subject to revision or withdrawal. In any event of discrepancies between this slip opinion and the opinion certified for publication, the certified opinion controls. Readers are requested to bring errors to the attention of the Clerk of the Supreme Court, P.O. Box 502165 Saipan, MP 96950, phone (670) 236–9715, fax (670) 236–9702, e–mail Supreme.Court@NMIJudiciary.gov.



**E-FILED**
**CNMI SUPREME COURT**
E-filed: Aug 25 2023 08:08PM
Clerk Review: Aug 25 2023 08:08PM
Filing ID: 70715709
Case No.: 2022-SCC-0006-CIV
NoraV  Borja



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

COMMONWEALTH CASINO COMMISSION,
*Respondent-Appellee*,

*v.*

IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC,
*Petitioner-Appellant*.

---

**Supreme Court No. 2022-SCC-0006-CIV**
Superior Court No. 21-0173-CV

### JUDGMENT

Petitioner-Appellant Imperial Pacific International (CNMI), LLC appeals the trial court order upholding Respondent-Appellee Commonwealth Casino Commission's decision suspending its casino license and imposing fines. For the reasons discussed in the accompanying opinion, the Court AFFIRMS in part, REVERSES in part, and REMANDS this matter to CCC for further proceedings consistent with this opinion.

ENTERED this 25th day of August, 2023.


  /s/
_____
NORA V. BORJA
Deputy Clerk of the Supreme Court



**E-FILED**
**CNMI SUPREME COURT**
E-filed: Sep 15 2023 03:57PM
Clerk Review: Sep 15 2023 03:58PM
Filing ID: 70868823
Case No.: 2022-SCC-0006-CIV
NoraV  Borja

IN THE
**SUPREME COURT**
OF THE
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

---

**COMMONWEALTH CASINO COMMISSION,**
*Respondent-Appellee,*

*v.*

**IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC,**
*Petitioner-Appellant.*

---

**Supreme Court No. 2022-SCC-0006-CIV**
Superior Court No. 21-0173-CV

---

## MANDATE

JUDGMENT in this matter was entered on August 25, 2023. No petition for rehearing has been filed. Therefore, pursuant to Northern Mariana Islands Supreme Court Rule 41, the Superior Court is instructed to act upon the JUDGMENT.

ENTERED this 15th day of September, 2023.


/s/
NORA V. BORJA
Deputy Clerk of the Supreme Court

Appx 023



**By order of the Court,  Associate Judge Wesley M. Bogdan**

**E-FILED**
**CNMI SUPERIOR COURT**
E-filed: Mar 15 2022 03:53PM
Clerk Review: Mar 15 2022 03:53PM
Filing ID: 67393912
Case Number: 21-0173-CV
N/A

**IN THE SUPERIOR COURT**
**FOR THE**
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| In re: ) | CIVIL CASE NO. 21-0173 |
| ) | |
| **Commission Order No: 2021-002; Final** ) | |
| **Order for Enforcement 20-001 and 20-003** ) | |
| **(Consolidated),** ) | **ORDER AFFIRMING THE CASINO** |
| ) | **COMMISSION'S SUSPENSION OF** |
| **COMMONWEALTH CASINO** ) | **PETITIONER'S EXCLUSIVE CASINO** |
| **COMMISSION,** ) | **LICENSE AND MONETARY PENALTIES** |
| ) | |
| **Agency,** ) | |
| ) | |
| **IMPERIAL PACIFIC INTERNATIONAL** ) | |
| **(CNMI) LLC,** ) | |
| ) | |
| **Petitioner.** ) | |

## I. INTRODUCTION

Before the Court is a Petition for Judicial Review filed by Imperial Pacific International (CNMI) LLC's ("IPI or Petitioner") seeking relief from the Commonwealth Casino Commission's ("Casino Commission") April 22, 2021 Commission Order No. 2021-002 suspending Petitioner's Exclusive Casino License and imposing other penalties.[1]  For the reasons set out below, Commission Order No. 2021-002 is hereby **AFFIRMED**.

## II. FACTS

1.  Gambling is prohibited in the Northern Mariana Islands except as provided by Commonwealth law.  N.M.I. Const. art. XXI, § 1.

---

[1] Based on the record before the Court and the legal counsels' written arguments, the Court issues this ruling based on the submission of the briefs and without oral argument as authorized by NMI Rules of Procedure for Administrative Appeals. *See* NMI. R. P. ADMIN. APP. 6(b) (the trial court may on its own motion *issue a ruling on the petition without oral argument*) (emphasis added).

2.  On March 3, 2014, the 18th Northern Marianas Commonwealth Legislature enacted Public Law 18-38 ("PL 18-38") to authorize, establish and provide for casino gambling through the issuance of an Exclusive Gaming License.

3.  The Findings and Purposes section of PL 18-38 explains that the CNMI was in "dire need" of revenue to honor its financial obligations to the Commonwealth's retirees and the need to increase tourism and created the Commonwealth Casino Regulatory Commission to carry out the purposes of the new law.

4.  In his signing and transmittal letter to the Legislature, then-Governor Eloy S. Inos explained that he was approving the legislation with reservation because of "shortcomings" in the law based on the assurances given that by the Commonwealth Legislature to enact agreed upon amendments that will address the various concerns that he saw.

5.  Three weeks later, on March 26, 2014, the political-exchange between the Executive and Legislative Branches resulted in the enactment of Public Law 18-43 ("PL 18-43") to address the shortcomings identified by the former Governor.

6.  PL 18-43 was then signed into law by Governor Inos on April 1, 2014.  In his signing and transmittal letter to the Legislature, he thanked both houses of the Commonwealth Legislature and explained:

    > This joint effort between the Legislative and Executive branches of government in the establishment of this important public policy is to be commended.

7.  PL 18-43 clarified the Exclusive Casino License application process and made clear that granting of the license was solely within the discretion of the Commonwealth Lottery Commission.

8. PL 18-43 also renamed the Commonwealth Casino Regulatory Commission to what it is referred as to today, the "Commonwealth Casino Commission", and explained that the Casino Commission's regulatory jurisdiction was limited to the island of Saipan and that that body was only to be empowered to promulgate such rules and regulations to fulfill the intent, policies, and purposes of the new public law.

9. As set out by statute, the Casino Commission was originally set up only to regulate the gaming activities, key casino employees, vendor licensees, service providers, junket operators, et. cetera, and not actually issue the Exclusive Casino License itself.

10. A short time later, in July 2014, the CNMI Legislature enacted Public Law 18-56 ("PL 18-56"), the third Legislative effort enacted in approximately four months intending to establish the lawful process to allow gambling in the CNMI and control over the authorization, granting and regulation of an exclusive license that was still to be issued.

11. The Findings and Purposes section of PL 18-56 explained that although the prior laws had established the necessary framework for the casino industry, there still existed "ambiguities and conflicts."

12. For example, PL 18-56 clarified that while the CNMI Legislature had previously granted the Commonwealth Lottery Commission the power to review applications and issue the Exclusive Casino License, PL 18-56 was necessary to clarify that the Lottery Commission "could carry out" an investigation on its own (if the Commonwealth Casino Commission was not actually operational by the time the applications were received).

13. PL 18-56 also sought to once-again try and clarify the overlapping, but differing grants of authority the CNMI Legislature bestowed upon the Lottery Commission, as compared to the Casino Commission.

14. For example, PL 18-56 confirmed that the granting of the Exclusive Casino License was within the discretion of the Commonwealth Lottery Commission through an amendment to 4 CMC § 2317(a)(1)(i)(A):

> . . . After approving an application for the exclusive license, the Commonwealth Lottery Commission may negotiate the terms of the exclusive license before it is issued. The license shall be subject to such conditions as the Commonwealth Lottery Commission deems necessary to assure compliance with this chapter, including timelines for construction, commencing operations, and achieving the minimum initial investment requirements. The issuance of the license by the Commonwealth Lottery Commission shall not be subject to judicial review.

15. PL 18-56 also provided that after the issuance of the license, the Lottery Commission may amend, by regulation, the requirements set out in statutory law (4 CMC § 2317(a)(1)(iv)) as it deems to be in the best interest of the Commonwealth.

16. With respect to the actual oversight and regulation of casino operations (and gaming activities including the hiring key employees and licensing vendors and approving junket operators, et cetera), PL 18-56 again clarified that those responsibilities were to be the exclusive area of work for the newly renamed Casino Commission including, without limitation, the responsibility:

> (a) To conduct hearings pertaining to the violation of this chapter or regulations promulgated hereto; including hearings for the purpose of approving casino licenses [employee, vendors and junket operators et cetera] and other business allowed under this chapter.

> (b) To promulgate such rules and regulations, as may be necessary to fulfill the intent, policies and purposes of this chapter. The Commission may use such rules and regulations to interpret, enlarge upon, except provisions defining the authority and powers of the Commission, or define, or any provision of this chapter to the extent that such provision is not specifically defined by this chapter. The rules and regulations shall, at a minimum, provide for the following:
>
>> (1) A code of ethics for the members of the Commission and its officers and employees.

(2) Supervision, monitoring and investigation or other means to ensure the suitability and compliance with the legal, statutory and contractual obligations of owners, operators, and employees of casinos and other persons licensed under this chapter.

(3) The examination, supervision and monitoring of the continuing fiscal and financial capability of casino owners, operators, concessionaires and other parties with any direct relation to the sole casino and to protect the public in the event that such capability is significantly diminished.

(4) To collaborate in the definition, coordination and execution of the economic policies for the operations of the casino games of fortune and other ways of gaming, pari-mutuels, wagering and casino gaming activities offered to the public.

(5) To authorize and certify all the equipment and utensils used by the operations of the concessionaires approved in the respective concessions.

(6) To issue licenses for "junket" promoters of casino games of fortune or other casino gaming activities.

(7) To examine, supervise and monitor the eligibility of the single or collective junket promoter(s), their partners and principal employees.

(8) To examine, supervise and monitor the activities and promotions of the junket promoters in relation to their compliance with legal, statutory, and contractual obligations, and other responsibilities stipulated in the applicable legislation and contracts.

(9) To investigate and penalize any administrative infractions practiced according to the appropriate substantial and procedural legislations.

(10) To ensure that the relationship of the licensed gaming operators with the government and the public is in compliance with the Commission's regulations and provides the highest interest to Commonwealth.

(11) The exclusion and removal of undesirable persons from the sole casino.

(12) Civil penalties for the violation of provision's or regulations imposed under this chapter.

- 5 -

1          (13) Penalties for the late payment of applicable fines, or fees.

2     (c) To levy fines and penalties for the violation of provisions of this chapter and the regulation promulgated by the Commission.

3

4     (d) To require and demand access to and inspect, examine, photocopy, and audit all papers, books and records of the casino operator on its premises or elsewhere as practical, including inspecting the gross income produced by the casino operators, gaming business and verification of their income, and all other matters affecting the enforcement of the Commission's policy or as required pursuant to this chapter.

5

6

7     (e) For the types of gaming and games to be covered by the casino license and their structure.

8

9     (f) The Commission shall also regulate sports betting, pari-mutuel betting, and other wagering which relies on events occurring within or without the casinos regulated by the Commission.

10

11     (g) The Commission shall not regulate betting or wagering associated with cockfighting.

12   18. Subsection (h) expressly emphasized once again, in amending 4 CMC § 2314(h), that the

13      Casino Commission shall not have the authority to issue the exclusive gaming license to

14      the sole Casino Operator, and instead, that the power to issue such a license was vested

15      with the Commonwealth Lottery Commission.

16   19. Accordingly, on August 14, 2014—after swift completion of the vetting process—the

17      Commonwealth Lottery Commission awarded IPI the CNMI's Exclusive Casino License

18      with the signing of a Casino License Agreement ("CLA").

19   20. The CLA contains various provisions which seem to extend, or at least in some degree

20      differ from legislative directives set out in PL 18-56.

21   21. For example, Section 2 of the Casino License Agreement (entitled "Authority for

22      Enforcement of this License Agreement") provides in whole:

23        Under the terms of PL 18-56, the Commonwealth Lottery Commission ("Lottery Commission") was granted authority to issue an exclusive Casino

24        License for gaming facilities on the island of Saipan and attach terms and

conditions for issuance of the Casino License. Upon issuance of the Casino License the authority of the Lottery Commission over this License shall cease and the Office of the Governor shall have authority for enforcement of the terms and conditions of this License Agreement except for the elements specifically identified for control by the Casino Commission, as identified in section 3 below.

22. Likewise, Section 3 of the Casino License Agreement (entitled "Authority of the Commonwealth Casino Commission") provides, among other provisions, that:

The authority of the Casino Commission includes the ability to suspend or revoke the Casino License, in accordance with the requirements of the Commonwealth Administrative Procedure Act, for violation of the Rules.

23. The Casino License Agreement contains a *Force Majeure* clause in Section 25 which provides:

Licensee shall not be in default for any failure or delay in the performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee ("*Force Majeure* Event"). Invocation of *force majeure* by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.

Where such *Force Majeure* Event results in failure in the performance or delay exceeding six (6) months of the performance due under this License Agreement, the Licensee may terminate this License Agreement forthwith provided that the Licensee shall not be excused from any payment obligations to the Commonwealth where the grounds and/or purpose for such payments have already accrued.

A change in law which prohibits performance of this agreement or makes such performance illegal shall result in a suspension of the performance of both Parties under this License Agreement until such prohibition no longer exists, provided that the Licensee shall have the option to terminate this License Agreement upon the adoption of the change in law pursuant to this section 25 as if such change in law is a *Force Majeure* Event.

24. Following the award of the Exclusive Casino License, the CNMI Legislature enacted two additional Public Laws concerning governance and oversight over the Exclusive Casino

- 7 -

License; **_and_** the Lottery Commission subsequently amended the Casino License Agreement nine (9) times.

25. The first amendment was in November 2014 and allowed Petitioner to offer outside investors a minority percentage of ownership of the issued share capital of IPI without triggering the prohibition against such transfers without prior approval.

26. The second amendment was in March 2015 and allowed Petitioner to open and operate a Temporary Live Training on the First Floor of the T Galleria in Garapan, Saipan.

27. Thereafter, in November 2015, the 19th Northern Marianas Commonwealth Legislature enacted Public Law 19-24, clarifying—among other provisions—previous legislative instructions with respect to the allocation of the monies collected from the Annual License Fees; providing annual funding of the Casino Commission as an autonomous public agency of the Commonwealth government ("the Casino Regulatory Fee"); and to yet once again attempting to clarify the specific duties, responsibilities, and authorities of the Casino Commission.

28. Of particular note is Section 10 of Public Law 19-24 ("PL 19-24") wherein the 19th Legislature expressly provided that the Casino Commission could not suspend or revoke the Exclusive Casino License absent a finding of clear and convincing evidence during a hearing pursuant to 1 CMC § 9101 *et. seq*. by unanimous vote of the Casino Commission and, provided that any decision of the Commission to revoke the Exclusive Casino License shall be submitted to the legislature for approval by a majority of the members of each house through a joint resolution.

29. In his signing and transmittal letter to the Legislature, Governor Ralph DLG. Torres explained that although he agreed with the fundamental purpose of the legislation, with respect to Exclusive Casino License oversight and the power to revoke the Exclusive

- 8 -

Casino License—Governor Torres disagreed and therefore vetoed the statutory provision included in the new Public Law requiring prior "legislative approval" of any Casino Commission decision to revoke Petitioner's Exclusive Casino License.

30. Thereafter, a third amendment to the Casino License Agreement was made to by the Lottery Commission in April 2017 which among other provisions: (i) extended the period of time that Petitioner was allowed operate the Temporary Live Training Facility; (ii) extended the period of time given and required for Petitioner to complete construction and begin operations of the Initial Gaming Facility and delay paying $10,000,000.00 into the Community Benefit Program; (iii) extended the period of time given and required to complete construction and begin operations of Phase One of the Integrated Resort (as required by the CLA); and (iv) clarified and corrected certain language contained in the CLA to reflect the formation of the Development Plan Advisory Committee ("DPAC").

31. The Casino License Agreement was amended a fourth time in June 2017 and in effect allowed Petitioner to relocate and operate the Temporary Live Training Facility from the T Galleria to the unfinished casino portion of the Initial Gaming Facility (also referred to as the Imperial Pacific Resort and Hotel ("IPR")).

32. IPR remains unfinished (at this time of this writing) and no announcements or information have been made available as to when it might be completed.

33. The Casino License Agreement was amended a fifth time in July 2017. This amendment extended the time period for which IPI was to make a $10,000,000.00 Community Benefit Payment and was required to complete construction and begin operations of Phase One and Phase Two of the Integrated Resort _and_ also to address safety items raised by the community and government regulatory agencies—including matters related to the Initial Gaming Facility structure and facilities related to IPI's total compliance obligations.

- 9 -

34. The Casino License Agreement was amended a sixth time in August 2018 extending again the deadline to complete construction and begin operations of the Initial Gaming Facility hotel (and related facility operations) given work stoppages for various reasons and worker shortages.

35. This Amendment required IPI to: (i) submit a Construction Milestone Schedule ("CMS") and quarterly reports to the Lottery Commission with detailed explanations of Petitioner's progress which may (or, may not) have allowed for the holding of public hearings; (ii) work with the CNMI Department of Public Works' participation in the Occupational Safety and Health Administration ("OSHA") compliance process and occupancy permits; and (iii) pay liquidated damages for future delays and also make a $500,000.00 donation to the Commonwealth Healthcare Corporation ("CHCC") for the purchase of medical equipment as determined by CHCC.

36. The Casino License Agreement was amended a seventh time in September 2018 to specifically authorize IPI to operate a less than four to five-star existing facility, namely the resort previously operated by Kan Pacific Saipan, Ltd. (better known as the Marianas Resort and Spa).

37. The Casino License Agreement was amended an eighth time in May 2019 in order to decrease the Minimum Shareholder Restriction provision requiring Inventive Star Limited to maintain at least fifty one percent (51%) shares in the capital of IPI; to change the License Agreement to provide the flexibility needed to invite third party investors (and/or partners to provide the high-end amenities in the Integrated Resort); as well as to ensure proper capital exists for successful completion of the Integrated Resort project.

38. In January 2020—and approximately simultaneously to the first reported news stories of the beginning of the COVID-19 epidemic outbreak in Wuhan, China and the World Health

- 10 -

Organization's classification of COVID-19 as a Public Health Emergency of International Concern—the Commonwealth Casino Commission began formal oversight and enforcement actions against Petitioner which culminated in, among other provisions, the temporary suspension of IPI's authority to conduct gaming activities in the CNMI.

39. Specifically, the Casino Commission initiated five complaints against IPI, later consolidated into Enforcement Action 2020-001 (encompassing actions 2020-001 and 2020-002) and Enforcement Action 2020-003 (encompassing actions 2020-003, 2020-004 and 2020-005).

40. Enforcement Action 2020-001 contains two claims. Claim one alleged that Petitioner committed a violation of the Casino License Agreement by failing to make Community Benefit Fund contributions required by Amendment No. Three to that Agreement in violation of §175-10.1-675(b)(1), and committed a violation of §175-10.1-1805(b)(15) by breaching a contract by failing to make the required contributions. Claim Two alleged that is that IPI committed a violation of the Casino License Agreement by failing to make Community Benefit Fund contributions required by Amendment No. Five in violation of §175-10.1-675(b)(1), and committed a violation of §175-10.1-1805(b)(15) by breaching a contract by failing to make the required contributions.

41. Enforcement Action 2020-002 contains four claims. Claim one alleged that IPI violated Commonwealth law, specifically 4 CMC §2306(b) by failing to pay the Annual License Fee when due on August 12, 2020. Claim Two alleged that is that Petitioner violated the Casino License Agreement by failing to make the required Annual License Fee payment in violation of §175-10.1-610(b). Claim Three alleged that IPI violated §175-10.1-1805(b)(15) by breaching a contract by failing to make the required Annual License Fee payment. Claim Four seeks an Order declaring that Petitioner's failure to pay the Annual

- 11 -

1      License Fee in full when due is an unsuitable method of operation and requiring IPI to pay

2      the Annual License Fee immediately upon the effective date of the Commission's Order.

3   42. Enforcement Action 2020-003 has four claims. Claim One alleged that Petitioner violated

4      Commission Order 2020-003 by not maintaining the required cash or cash equivalents in

5      a restricted account in a bank in the Commonwealth of the Northern Mariana Islands or

6      United States of America. Claim Two alleged that petitioner violated Commission Order

7      2020-003 when its highest-ranking executives failed to detail the means by which it would

8      comply with the Order. Claim Three requests an Order declaring that IPI's failure to

9      comply with the minimum capital requirements of Commission Order 2020-003 and

10     failure to make the required explanations amount to unsuitable methods of operation and

11     requiring immediate compliance. Claim Four requests an Order declaring that IPI's fiscal

12     and financial capability as owner and operator of the casino has significantly diminished

13     such that the public interest is no longer protected, and requiring Petitioner to immediately

14     obtain financial capability sufficient to pay all debts as they become due so the public

15     interest is sufficiently protected.

16  43. Enforcement Action 2020-004 has four claims. Claim One alleged that IPI violated

17     Commission Order 2020-004 by not paying accounts payable that were over 89 days old

18     as ordered by the Commission. Claim Two alleged that IPI violated Commission Order

19     2020-004 by not making the required certifications as ordered by the Commission. Claim

20     Three requests an Order declaring that IPI's failure to comply with the payment and

21     certification requirements of Commission Order 2020-004 are unsuitable methods of

22     operation and requiring the casino licensee to pay all amounts required by Commission

23     Order 2020-004 immediately upon the effective date of the Order. Claim Four seeks an

24     Order declaring that: the IPI is not a "going concern" as that phrase is commonly used in

- 12 -

the area of financial accounting; Petitioner, as a business entity, is not "solvent" as that word is commonly used in the area of financial accounting as of the date of the Order; Petitioner lacks the present ability to pay debts as they mature and become due; Petitioner lacks the present ability to pay to public and private entities all payments required by contract; and Petitioner lacks the present ability to fully construct the entirety of the Initial Gaming Facility located in Garapan, Saipan, CNMI in accordance with all applicable laws, regulations and codes.

44. Enforcement Action 2020-005 has four claims. Claim One alleged that IPI violated Commonwealth law, specifically 4 CMC § 2309 by failing to pay the Casino Regulatory Fee in full when due. Claim Two alleged that IPI violated Regulation § 175-10.1-1225 by failing to pay the Casino Regulatory Fee in full when due. Claim Three alleged that IPI breached a contract by failing to pay the casino license fee in full when due. Claim Four seeks a declaration that Petitioner's failure to pay the casino regulatory fee in full when due amounts to an unsuitable method of operation and requiring the casino licensee to pay the casino regulatory fee in full immediately upon the effective date of the Order.

45. On or about March 17, 2020, IPI closed its operations.

46. After the Casino Enforcement actions were first initiated, but before their ultimate resolution, the Casino License Agreement was amended a ninth time by the Casino Lottery Commission on December 1, 2020 to provide Petitioner with additional time to fulfill payment obligations imposed by Section 16 of the Exclusive License Agreement that had come due and not been paid.

47. Amendment No. Nine explains that additional amendments are necessary because Petitioner is currently the subject of both administrative and legal proceedings based on its failure to fulfill current and past payment obligations in 2018, 2019, and 2020,

- 13 -

including the five Complaints noted above which were, at that time, still under consideration by the Commonwealth Casino Commission.

48. Amendment No. Nine also reports, rather ambiguously, that although the Lottery Commission does not have authority over the enforcement of the License Agreement, and does not intend by this action to interfere with the administrative review and deciding of the Administrative Complaints currently pending before the Commonwealth Casino Commission: the Lottery Commission is nonetheless revising payment date requirements *set out in Section 16 of the CLA by deferring the community benefit program payments past due and delinquent for 2018 and 2019 until October 1, 2025; and deferring the community benefit program payment past due for 2020 until October 1, 2023*. (Emphasis added.)

49. With respect to community benefit program payments due after 2020, the Lottery Commission then created in Amendment No. Nine an entirely new subsection within Section 16 of the CLA deferring those subsequent multi-million dollar annual contributions until no later than sixty (60) after the completion of the Initial Gaming Facility (when that might be remains unclear).

50. However, Amendment No. Nine makes no mention of current and past due Annual License Fees; IPI's failure to: maintain at least $4.2 million in cash or cash equivalents in a bank in the CNMI or the United States (or, for IPI's failure to explain or detail the means by which they would comply with that requirement); IPI's failure to pay accounts payable within 90 days (or, make required certifications); or, its failure to pay the Casino Regulatory Fee.

51. Then, just days later, the 21st Legislature of the Commonwealth of the Northern Mariana Islands on December 10, 2020 enacted Public Law 21-38 ("PL 21-38") in an effort to once

- 14 -

again clarify the powers of the Commonwealth Casino Commission and to make needed changes to the Commonwealth Code given the "unique" regulatory oversight of the casino industry in the Commonwealth.

52. PL 21-38 was signed into law by Governor Torres on January 7, 2021 and allows the Casino Commission, not the Finance Secretary, to maintain the CCC Regulatory Fee Fund that is separate from the Commonwealth Government's General Fund; determine its own staffing levels and also granted the Casino Commission the authority to issue a casino license, a power that was previously vested with the CNMI Lottery Commission.

53. Four months later, on April 22, 2021, the Casino Commission issued its final Order No. 2021-002 (which is the subject of the instant Petition).

54. Prior to voting at that meeting, questions were asked by the Casino Commission and responses given by two IPI representatives about a report entitled, *Annual Results for the Year Ended 31 December 2020 (the Annual Report))* issued by IPI's Hong Kong-based parent company, Imperial Pacific International Holdings Ltd ("IPI Holdings").

55. Commission Order: 2020-002 ("Order") explains that it was issued for "good cause" as determined during the February 25, 2021 and March 02, 2021 evidentiary hearings conducted by the Casino Commission.

56. The Order provides that the Casino Commission's Executive Director established by "clear and convincing" evidence through the admissions, stipulations, exhibits admitted into evidence, and matters officially noticed that IPI violated the applicable laws and regulations and breached the applicable contract as alleged in Enforcement Action 2020-001 with respect to failing to pay Community Benefit Fund payments when due.

57. The Order reported that IPI offered "no defense" to the claims alleged in Enforcement Action 2020-001 and that the Casino Commission found, by clear and convincing

- 15 -

evidence, that IPI committed the two violations alleged in Claim One and Claim Two of Enforcement Action 2020-001, and that they were major violations under the Casino Commission Regulations. *See generally* Northern Marianas Administrative Code, Title 175-10.1 *et. seq.*, *Commonwealth Casino Commission Regulations*.

58. The Order further reported that the Casino Commission found by clear and convincing evidence, as to the allegations in Enforcement Action 2020-001, that: the violations were actions of omission; IPI did not self-report all the facts concerning the violations; IPI did not promptly accept responsibility for the offenses; and that IPI has numerous actions pending in the courts of the United States of America and the Commonwealth.

59. IPI was fined $50,000.00 and its Exclusive Casino License was suspended for six months for the violations alleged in Claim One and fined $50,000.00; and it was fined $50,000.00 and its Exclusive Casino License suspended for six months for the violations alleged in Claim Two of Enforcement Action 2020-001.

60. With respect to the Claims raised in Enforcement Action 2020-002, the Order provided that, for "good cause" as determined during the February 25, 2021 and March 02, 2021 evidentiary hearings undertaken by the Casino Commission—and by clear and convincing evidence through admissions, stipulations, exhibits, and matters officially noticed—that IPI failed to pay the Annual License Fees in full when due.

61. IPI offered in defense that the <u>*Annual License Fee*</u> was subject to the *force majeure* clause of the Casino License Agreement.

62. The Casino Commission considered, but then ruled that the *force majeure* clause does not, as a matter of law, apply to the payment of the Annual License Fee, as the time for payment was set by statute, and the Lottery Commission could not amend an act of the Legislature.

63. Alternatively, the Casino Commission found, by clear and convincing evidence, that even if the *force majeure* clause of the Casino License Agreement could toll the requirement to pay the Annual License Fee, IPI had not established that its failure to make the required Annual License Fee payments when due was related to a *force majeure* reason.

64. Accordingly, the Casino Commission found, by clear and convincing evidence, that IPI committed one initial violation of Claim One of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty-nine violations for that claim; one initial violation of Claim Two of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty-nine violations for that claim; one initial violation of Claim Three of Enforcement Action 2020-002 and additional violations every day from January 8, 2020 through February 25, 2020 for a total of forty-nine violations for that claim.

65. The Order reports further that the Casino Commission found, by clear and convincing evidence, that all violations were major violations as to the allegations in Claims One, Two, and Three in Enforcement Action 2020-002 and that IPI's Exclusive Casino License to conduct gaming activities should be suspended indefinitely from the effective date of the Order until such time as IPI has paid the Annual License Fee in full, and that IPI should pay penalties amounting to one million five hundred thousand dollars ($1,500,000) in total.

66. With respect to the alleged violations set forth in Enforcement Actions 2020-003, 2020-004, and 2020-005—IPI offered no defense.

67. Accordingly, the Order reported that the Casino Commission found by "clear and convincing" evidence through the admissions, stipulations, exhibits admitted into

- 17 -

evidence, and matters officially noticed that IPI had committed the following "major" violations:

- In Enforcement Action 2020-003: Claim One, for separate violations from January 8, 2020 through March 1, 2020; and Claim Two, for separate violations every day from January 8, 2020 through March 1, 2020;

- In Enforcement Action 2020-004: For Claim One, for separate violations from January 8, 2020 through March 1, 2020; and for Claim Two, for separate violations from January 8, 2020 through March 1, 2020;

- In Enforcement Action 2020-005: For Claims One and Two, for all 53 violations.

68. The Order reported further that IPI had not self-reported all the facts concerning the violations; did not promptly accept responsibility for the offenses; had numerous actions pending in the courts of the United States of America and the Commonwealth and before the Commission; the relative harm suffered by the Commonwealth is moderate to great in that the public's confidence in general and the gaming public specifically, had been greatly harmed by IPI violations.

69. The Casino Commission unanimously determined that IPI's Casino License to conduct gaming activities should be suspended indefinitely from effective date of the Order until such time the casino licensee is in complete compliance with Commission Order 2020-003, and that IPI should pay penalties amounting to one million five hundred thousand dollars ($1,500,000).

70. With respect to the violations set out in Enforcement Action 2020-004, the Order provided that as for Claims One and Two that IPI's Casino License Agreement was suspended indefinitely from effective date of that Order until such time as IPI is in complete compliance with Commission Order 2020-004.

71. IPI was also ordered to pay penalties amounting to two million dollars ($2,000,000) and ordered to come into compliance immediately upon the effective date of the Order.

72. The Order reported that the Casino Commission also determined that IPI as a business entity, was not "solvent" as that word is commonly used in the area of financial accounting as of the date of the Order; the casino licensee lacked the present ability to pay debts as they mature and become due; the casino licensee lacked the present ability to pay to public and private entities all payments required by contract; and the casino licensee lacked the present ability to fully construct the entirety of the Initial Gaming Facility located in Garapan, Saipan, CNMI.

73. And finally, with respect to the violations of Claims One, Two, and Three of Enforcement Action 2020-005, the Order concluded that IPI's Exclusive Casino License to conduct gaming activities was suspended indefinitely from the effective date of the Order and that IPI shall pay penalties amounting to one million five hundred thousand dollars ($1,500,000) in total within months of the effective date of the Order.

74. Approximately one month later, IPI filed its Petition for Judicial Review with this Court on May 21, 2021.

### III. LEGAL STANDARD

The Commonwealth Rules of Procedure for Administrative Appeals govern the procedures and process to be used in the Superior Court for judicial review of final orders or decisions from an agency in contested cases that are governed by the Administrative Procedures Act, 1 CMC §§ 9101-15.  *See generally* NMI R. P. ADMIN. APP.  Under these Rules, this Court may order any remedy provided for in 1 CMC § 9112; or, order any other remedy appropriate to the facts and circumstances of a particular appeal, including but not limited to remanding the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired

- 19 -

by a material error in procedure or a failure to follow prescribed procedure and the error cannot be corrected in the trial court proceedings. *See* NMI R. P. ADMIN. APP. Rule 6(e).

## IV. DISCUSSION

**a.   Issue Presented: Whether the Casino Commission Erred by Denying Petitioner's *Force Majeure* Defense**

Petitioner argues first that the Casino Commission's suspension of its Exclusive Casino License failed to recognize and apply the doctrine of *force majeure* to the Enforcement Actions set out in Commission Order No. 2021-002 despite the presence of a *force majeure* provision in the Casino License Agreement.  Petitioner proposes that despite the clear and severe impacts a *force majeure* event—i.e. the COVID-19 pandemic—had on Petitioner's ability to comply with its monetary obligations, the Casino Commission improperly ruled that the *force majeure* clause did not apply.

In its briefings before this Court, Petitioner also now emphasizes that in addition to the COVID-19 pandemic, this Court should also consider (1) Super Typhoons Soudelor and Yutu; and (2) unanticipated changes in federal labor law as contributing and/or supporting factors that the *force majeure* clause applied.  Moreover, in support, Petitioner argues that in December 2020, IPI and the CNMI—represented by the CNMI Governor and the CNMI Lottery Commission—entered into CLA Amendment No. Nine, which recognized the extraordinary impact of the COVID-19 pandemic, as well as other natural disasters and changes in immigration law that were beyond IPI's control.

In essence, Petitioner's primary argument is this Court should set aside Commission Order No. 2021-002 in its entirety for the reasons explained in Casino License Agreement Amendment No. Nine.

The Casino Commission counters in effect that the doctrine of *force majeure* could not toll the non-contractual/statutory law requirement to pay the Annual License Fee because those payments

- 20 -

1   were established and created by the Commonwealth Legislature via Public Laws—not its Casino

2   License Agreement—which is something the Casino Commission now suggests the Lottery

3   Commission could not, and cannot, amend. The Casino Commission argues further that even if the

4   *force majeure* clause did apply, IPI did not offer any evidence in its defense at either of the two

5   evidentiary hearings which preceded the vote to suspend Petitioner's Exclusive Casino License that

6   support a *force majeure* defense.

7          **b.    The Casino Commission's Order Was _Not_ Arbitrary, Capricious, an
                    Abuse of Discretion (or, not in Accordance with Law); Contrary to
8                   Constitutional Right; In Excess of Statutory Jurisdiction or Rights;
                    Without Observance of Due Process Procedures Required by Law; or
9                   Unsupported by Substantial Evidence**

10         Under the arbitrary and capricious standard of review set out in 1 CMC § 9112(f)(2)(i), courts

11  should hold as unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of

12  discretion, or otherwise not in accordance with law." *J.G. Sablan Rock Quarry, Inc. v. Dep't of Pub.*

13  *Lands*, 2012 MP 2. Under this standard, an agency action is arbitrary and capricious if the agency has

14  entirely failed to consider an important aspect of the problem. *Id*, ¶ 45.

15         An arbitrary and capricious action is also defined as willful and unreasonable action without

16  consideration or in disregard of facts or without determining principle.  *Id*. (citing *In re Blankenship*,

17  3 NMI 209, 217 (1992) (quoting Black's Law Dict. (5th ed. 1979)); *see also Marsh v. Ore. Natural*

18  *Res. Council*, 490 U.S. 360, 378 (1989) (in evaluating agency actions under the arbitrary and

19  capricious standard, courts "must consider whether the [agency's] decision was based on a

20  consideration of the relevant factors and whether there has been a clear error of judgment."). The

21  scope of review under this standard is "narrow and a court is not to substitute its judgment for that of

22  the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

23         Here, the Casino Commission's Order was based on consideration of the relevant operative

24  facts and evidence generated during the evidentiary hearings (in which IPI admitted the underlying

- 21 -

1    facts, was represented by legal counsel, and offered no defense other than *force majeure*) and

2    therefore the Court cannot find that there has been a clear error of judgment with regards to the

3    suspension of Petitioner's Exclusive Casino License. *See* Exhibit A, Transcript, February 22, 2021

4    Evidentiary Hearing, p. 18 lines 15-19 (the Casino Commission's recitation of the facts are

5    foundational to its case-in-chief and are admitted); Exhibit B, Transcript March 2, 2021 Evidentiary

6    Hearing, p. 9, lines 7-8 (Petitioner does not dispute the charges against itself).

7        Moreover, during the April 22, 2021 Casino Commission hearing, the members of the Casino

8    Commission lawfully voted unanimously to adopt Commission Order 2021-002 suspending

9    Petitioner's Exclusive Casino License for a minimum duration of six months and also requiring IPI

10   to pay certain penalties and make various declarations regarding IPI's operations within six months.

11   The vote was recorded and made upon clear and convincing evidence and the list of violations were

12   well-itemized and accurately set out in Enforcement Actions 2020-001, 2020-002, 2020-003, 2020-

13   004 and 2020-005 described above.

14       Again, and for whatever reasons, Petitioner did not actually contest or challenge (i.e., did not

15   present any witnesses or submit evidence in support of its case before the Casino Commission) during

16   either of the February 25, 2021 or March 2, 2021 Evidentiary Hearings.

17       Instead, before the Casino Commission, the record reveals that Petitioner presented and

18   argued in total that the *force majeure* clause was its defense for its failure to remit Community Benefit

19   Fund payments. To be clear, during the February 22, 2021 Evidentiary Hearing, IPI did try to argue

20   broadly, without calling any witnesses, that the *force majeure* clause could be applied toward the

21   Community Benefit Fund *and* Casino License Fee payments.

22       However, during rebuttal questioning, IPI—through legal counsel—acknowledged that *force*

23   *majeure* had not been raised in its Answers to the Complaints (or, Enforcement Actions) that had

24   been filed against it and that the nonpayment of the Community Benefit Funds raised in Enforcement

- 22 -

1   Action 2020-001 actually accrued years before the start of the COVID-19 pandemic and did not apply

2   to that cause of action.  Feb. 25, 2021 Evidentiary Hearing Tr. at 26-27.

3          More importantly, both parties to this administrative appeal fail to acknowledge that,

4   ultimately, the Casino Commission's suspension of Petitioner's license was made was for material

5   and major violations other than solely for the non-payment of the Community Benefit Fund and

6   Annual License Fee payment requirements. The Court views this as a fatal flaw to Petitioner's *force*

7   *majeure* defense. Put differently, the basis for Petitioner's Exclusive Casino License suspension was

8   made upon multiple grounds separate and distinct from its failure to pay make Community Benefit

9   Fund payments and the Annual License Fee.

10         Specifically, in Enforcement Action 2020-005, the primary legal basis upon which the Casino

11  Commission suspended Petitioner's Exclusive Casino License indefinitely and for which Petitioner

12  was fined $1,500,000, was the nonpayment of the ***Casino Regulatory Fees*** as set out in Claims One

13  and Two of that Enforcement Action.

14         In Enforcement Action 2020-004, the primary legal basis upon which the Casino Commission

15  suspended Petitioner's Exclusive Casino License indefinitely and for which it was fined $2,000,000

16  was for ***not paying accounts payable*** in Claim One of that Enforcement Action and for ***not making***

17  ***the required corporate certifications***, in Claim Two.

18         In Enforcement Action 2020-003, the primary legal basis upon which the Casino Commission

19  suspended Petitioner's Exclusive Casino License indefinitely and for which it was fined $1,500,000

20  was for not maintaining the required amount of cash or cash equivalents ***in a restricted account in a***

21  ***bank in the Commonwealth*** (or, United States of America) in Claim One; and for the ***failure of its***

22  ***highest-ranking corporate executives to explain*** in detail the means by which IPI would comply with

23  that requirement in Claim Two; and for its ***failure to comply with the minimum capital***

24  ***requirements***—in Claim Three—of that Enforcement Action.

- 23 -

1    Ultimately, the Casino Commission's decision with respect to **_these_** violations is not

2    connected to the *force majeure* defense Petitioner raised before the Casino Commission.  Therefore,

3    in short, the Casino Commission's decision was not arbitrary, capricious, an abuse of discretion or,

4    not in accordance with law. This conclusion finds support aside from nonpayment of the Community

5    Benefit Fund and Annual License Fee payments, as there were equally critical determinations made

6    on the record—which Petitioner did not contest—concerning Petitioner's viability as an on-going

7    business and the very real question of whether the unfinished gambling facility in Garapan will ever

8    be completed.

9    To be absolutely clear, Petitioner initially offered the *force majeure* defense with respect to

10   its nonpayment of the Community Benefit Fund requirements as set out in Enforcement Action 2020-

11   001.  It now suggests it also applies to the nonpayment of Casino License Fees. Therefore, even

12   assuming *arguendo* that the Casino Commission erred in its decision concerning the applicability and

13   application of the *force majeure* defense, that would not mean that the Casino Commission's

14   suspension of the Exclusive Casino License for: (i) Petitioner's nonpayment of the Casino Regulatory

15   Fees; (ii) nonpayment of accounts payable; (iii) failure to make the required corporate and banking

16   certifications; (iv) failure to maintain the required amount of cash in a CNMI (or, US) banking

17   institution; (v) failure to maintain the minimum capital requirements; or (vi) for its corporate

18   executive's failure to detail the means by which the company would comply with all these

19   requirements—was in error.

20   In sum, Petitioner argument now that the *force majeure* defense should be interpreted by this

21   Court to excuse all of its violations of the applicable terms and conditions of its Exclusive Casino

22   License and that this Court should set aside Commission Order No. 2021-002 in its entirety is not at

23   all well-taken. Petitioner did not argue this when this matter was before the Casino Commission.

24   There, Petitioner's reliance on the doctrine of *force majeure* was limited and—again, as discussed

- 24 -

1    above, Petitioner offered **_no defense_** and did not contest any of the claims alleged in Enforcement

2    Actions 2020-003, 2020-004 or 2020-005, which are not related to the Annual License Fee or

3    Community Benefit Fund monetary requirements.

4           Accordingly, and without actually determining whether the lawful scope and application of

5    the *force majeure* clause set out in the Casino License Agreement can amend the statutorily-created

6    Annual Casino License Fee payment (*about which the Court has serious concerns*) and/or postpone

7    the Community Benefit Fund payments until no later than sixty days after the completion of the Initial

8    Gaming Facility, this Court can affirm the Casino Commission's final determination to suspend and

9    penalize Petitioner's Exclusive Casino License because of the issues of Petitioner's insolvency,

10    ability to clear its accounts payable, make the required corporate and banking certifications (and

11    maintain minimum capital and cash in an approved bank and for its corporate executive's failure to

12    address these concerns properly raised and adjudicated by the Casino Commission through proper

13    the administrative law process.

14           This same conclusion is also relevant and applicable to Petitioner's arguments in regards to

15    Casino License Agreement No. Nine. While the Court notes that Amendment No. Nine could be

16    broadly construed as some kind-of overall grant to Petitioner of 'additional time' to fulfill all of its

17    payment obligations, it nonetheless simultaneously appears to be explicitly limited to Petitioner's

18    payment obligations under Section 16 of the CLA (concerning Community Benefit Fund payments).

19    In other words, without deciding whether the Lottery Commission could once again amend the Casino

20    License Agreement and unilaterally grant Petitioner another opportunity to meet all its payment

21    obligations and thereby in effect amend or cancel-out statutory law, the Casino Commission's

22    determination that Petitioner was insolvent and unable to complete the Initial Gaming Facility (or,

23    meet its accounts payable et cetera) are material breaches of the Casino Licensing Agreement in and

24    of itself.

1   As outlined in detail above, a careful and full review of the record suggests that the

2   aforementioned legal grounds—at least in part or in conjunction with each other—are distinct from

3   Petitioner's failure to pay the Annual License Fee and Community Benefit Fund payments, and

4   together ultimately served as the basis for the Casino Commission suspending Petitioner's Exclusive

5   Casino License for an indefinite period of time and ordering millions of dollars in penalties.  Article

6   Three of the CLA expressly provides that the lawful "authority of the Casino Commission includes

7   the ability to suspend or revoke the Casino License, in accordance with the requirements of the

8   Commonwealth Administrative Procedure Act, for violation of the Rules."  Moreover, Section 175-

9   10.1-601 of the Commonwealth Casino Commission Regulations provides that IPI's failure to

10  comply with the requirements as set forth in the Casino License Agreement, and all amendments

11  made thereto, is an unsuitable method of operation and are major offenses subject to _penalty_. Under

12  the Administrative Procedures Act's arbitrary and capricious standard of review and as set out above,

13  this Court finds no error in the Casino Commission's issuance of Commission Order 2021-002.

14      **d.      Due Process and the Annual Report for the Year Ended 31 December 2020
            issued by IPI's Hong Kong-based parent company, Imperial Pacific**
15          **International Holdings Ltd.**

16   Petitioner argues next that the Casino Commission relied on materials within the "Annual

17  Report" (issued by Petitioner's Hong Kong-based parent company, Imperial Pacific International

18  Holdings Ltd.) not admitted into the evidentiary record when making its decision, thereby depriving

19  Petitioner of the opportunity to challenge, examine, or rebut under due process considerations the

20  Casino Commission's conclusions drawn from that evidence.  The Casino Commission replies that

21  even if it relied on the Annual Report, which it claims it did not, any such reliance would not be

22  relevant to an outcome-dispositive issue and that this Court could just disregard this evidence without

23  requiring the setting aside of Order No. 2021-002 in its totality. _See_ Opposition Brief, at 15-16.

24

1   Exactly how the Annual Report was introduced and (briefly) discussed, along with many

2 subjects revealing Petitioner's poor state of affairs, is set out in Exhibit G. *See Exhibit G*, April 22,

3 2021 Casino Commission Hearing Transcript.  As explained in the Court's findings of facts above,

4 before the Casino Commission voted on Commission Order 2020-002, the Chairman of the Casino

5 Commission opened the floor for public comments and asked to hear from Petitioner on the status of

6 construction work on the casino.  Mr. Tao Xing as a licensed IPI Representative, responded that a

7 federal 'no work' order on the casino order was still in place. Apr. 22, 2021 Hearing Tr. at 25, lines

8 17-18.

9   The Chairman then asked what was the status of the federal receivership that was created by

10 the United States District Court for the Northern Mariana Islands on March 10, 2021. Apr. 22, 2021

11 Hearing Tr. at 26, lines 9-10. Mr. Tao responded that Petitioner may have reached a settlement and

12 the receivership was on hold with respect to the actions by the United States Department of Labor

13 ("USDOL"). *Id*., lines 16-17.  The Chairman then asked if Petitioner was prepared if the receivership

14 moved forward—and Mr. Tao responded 'yes, definitely' (*Id*., Line 17), but that Petitioner's plan

15 was to make sure the settlement was achieved so that Petitioner did not get to the receivership stage.

16 Apr. 22, 2021 Hearing Tr. at 28, lines 7-8.

17   The next line of questioning dealt with IPI personnel, status of employee unpaid payroll, and

18 severance pay for employees who had already left the NMI.  *Id*., lines 16-19.   A representative for

19 Petitioner's Human Resources department, Ms. Redie Dela Cruz, appeared remotely via the internet

20 and answered those specific questions.  Apr. 22, 2021 Hearing Tr. at 30-31.  She responded in short

21 that with respect to unpaid payroll, severance pay, unpaid time-off, unused hours and

22 reimbursements, outbound assistance and such, that Petitioner had not been able to pay those benefits

23 due to lack of funding following the casino's closure in March 2020.  Apr. 22, 2021 Hearing Tr. at

24

1  31-32.  The Casino Commission Chairman then asked the total number of such employees and when

2  would Petitioner be able to make those payments.  Apr. 22, 2021 Hearing Tr. at 32, lines 11-13.

3        Ms. Dela Cruz responded in essence that Petitioner did not have an idea at that time, but that

4  it was working on a possible installment plan which was connected to USDOL matters and a five-

5  year extension Petitioner had submitted, and that once all those issues had been decided and final

6  corporate approval had been obtained, Petitioner would share those details and the list of employees

7  with the Casino Commission. Apr. 22, 2021 Hearing Tr. at 32-34.  Mr. Tao then added that the plan

8  and list of employees would be shared with the Casino Commission next week and that the names of

9  the corporate officials are those in Hong Kong and listed in the *annual report*.[2]  Apr. 22, 2021 Hearing

10  Tr. at 34, lines 6-8. The Chairman then followed-up with respect to corporate approval; asking from

11  who that corporate approval would come, referencing a previous meeting with IPI Chairwoman Cui

12  Li Jie and her responses of no knowledge or involvement with corporate decisions.  Apr. 22, 2021

13  Hearing Tr. at 35, lines 5-17.

14        Mr. Tao's response then referenced different corporate roles for the chairman and directors,

15  but, again, that the list of officials could be found in the *annual report*.[3]  Apr. 22, 2021 Hearing Tr.

16  at 36, lines 6-8.  The discussion then continued onto the numbers of employees who had departed the

17  NMI and those that were still on-island and had not yet been paid. Chairman Guerrero asked follow-

18  up questions about repatriation of Taiwanese and Turkish employees—who apparently had refused

19  to leave. However, some departed after signing waivers of claims against Petitioner in exchange for

20  a small amount of cash. Apr. 22, 2021 Hearing Tr. at 37-42.

21

22  _____

23  [2] Mr. Tao's reference to the *annual report* during the question and answer portion of the Hearing and is the first time the report was mentioned on April 22, 2021 (and actually opened the door to further discussion of report).

24  [3] This is the second time the *annual report* is mentioned during the Hearing.

- 28 -

1    The questions then turned to Petitioner's financial status. Apr. 22, 2021 Hearing Tr. at 46,

2   lines 12-13. Mr. Tao reported that there was no good news.  Apr. 22, 2021 Hearing Tr. at 47, lines

3   4-6.  Additionally, the Chairman asked about a local audit that was to be completed. *Id*., lines 11-13.

4   Mr. Tao responded that he had just checked, and that the *annual report* had not yet been published—

5   so he assumed it was still under review. *Id*., lines 14-16.  (This is the third time during the Hearing

6   that IPI brought up the subject of the annual report.)   The Chairman then asked Mr. Tao to please

7   check because there was a deadline for the submission of that audit and that the Casino Commission

8   had already received a copy the audit for the corporation.   Apr. 22, 2021 Hearing Tr. at 47-48.

9    It was at this point during the April 22, 2021 Hearing, when the Casino Commission was

10  trying to find out answers with respect to employees who had not been paid, that Chairman Guerrero

11  said:

12       We have received the audit [of the annual report] for [IPI Holdings]. And it
         continues to make reference about the 500 million loan facility, and it
13       continues to make reference that 350 million of that, IPI have access to that
         money to pay what it needs to pay. Can you find out why your audit from
14       the parent company is saying you have access to 350 million to use? Why
         are you not using this to pay your people you owe including the license fee,
15       the regulatory fee, the orders to preserve payroll? I don't understand how
         you are diverged, falling over the cliff, and that seems to be the salvation.
16       And the other report says you have access to 350 million to use for the
         Saipan project. Why are they not using it?
17
18  Apr. 22, 2021 Hearing Tr. at 48-49. Mr. Taitano, the Commission's Treasurer, supplemented this line

19  of questioning by also mentioning the Annual Report, and stating:

20       Page 17 [of the Annual Report], letter [(iii) says] 'The company will draw
         down the unutilized credit when necessary.' [It] seems like IPI believes or
21       have this perception that what's happening here it's not necessary for them
         to act. And I just wonder when is the time for us to see any movement of
22       payments for all the obligations that must be by made by IPI here locally. I
         just thought I'll mention that to you because it's mentioned here 350 million
23       unutilized funds.

24  Apr. 22, 2021 Hearing Tr. at 55-56.

- 29 -

1    In response to Chairman Guerrero's comments, Mr. Tao explained that he did not have all the

2  details, [but] that there must be some [corporate] requirement attached to [those funds].   Apr. 22, 2021

3  Hearing Tr. At 48.  Mr. Tao was asked if he had read the corporate report, to which he responded in

4  the affirmative ("part of it, yes").   Apr. 22, 2021 Hearing Tr. at 49.   The Casino Commission's

5  comments and questions to Petitioner continued to cover a wide range of topics concerning Petitioner's

6  finances and Mr. Tao was then asked "is there anything else, sir, that you want to tell the Commission,

7  uh, in reference to IPI and its financial position?"  Apr. 22, 2021 Hearing Tr. at 54.  Mr. Tao's response

8  was "not particularly on the complaint because we have had legal representation."  *Id*.

9    Taken out of the context, and wholly ignoring the admissions, stipulations, exhibits admitted

10  into evidence, and matters officially noticed, Petitioner's claim of a possible due process violation

11  based on the two statements noted above could be somewhat plausible.  However, the assertion that

12  Petitioner did not have notice of the grounds for the suspension of its Exclusive Casino License or an

13  opportunity to respond is simply not true upon review of the entire record. During the actual hearing

14  on April 22, 2021 wherein the Annual Report was mentioned, two IPI representatives were present

15  answering the legitimate questions raised by the Casino Commission prior to taking a vote on the

16  matter.  Moreover, IPI had been represented by *legal counsel*, by its own admission the Court notes,

17  *through all stages of the Enforcement Actions*.

18    Petitioner relies on a series of Hawaii cases finding prejudicial procedural error where

19  agencies received and considered evidence which a party to a contested hearing did not have the

20  opportunity to rebut. In *Town v. Land Use Commission*, the underlying agency's decision was

21  reversed due to the fact that agency's vice chairman conducted a "field investigation" without notice

22  to the parties. 524 P.2d 84, 91-92 (Haw. 1974). In *Waikiki Shore, Inc. v. Zoning Board of Appeals*,

23  one of the parties sent an *ex parte* communication to the agency. 625 P.2d 1044, 1045 (Haw. 1981).

24  During a later public meeting, one of the board members of the agency stated that the letter had

- 30 -

1   "clarified a lot of questions we had in our mind." *Id.* Lastly, in *Korean Buddhist Dae Won Sa Temple*

2   *v. Sullivan*, the court distinguished the case before it from *Town* and *Waikiki Shore*, stating:

> In both *Town* and *Waikiki Shore*, the prejudice flowed from (1) *ex parte* arguments of the appellant's adversary, which the appellant had not had an opportunity to rebut, (2) *ex parte* "field investigations," (3) introduction of evidence that was *relevant* to the outcome-dispositive issue, and (4) no opportunity for rebuttal. By contrast, in the case at bar, the "off-the-record" material that was called to the Director's attention was wholly irrelevant to the proceedings.

7   953 P.2d 1315, 1339 n. 27 (Haw. 1998).

8   The Court finds that finds that the agencies' actions in *Town* and *Waikiki Shore*, are easily

9   distinguishable from the case at hand. There, the agencies relied on evidence inappropriately obtained

10  and outside the bounds of its normal course of action: a self-initiated "field inspection" and *ex parte*

11  communications, respectively. Here, the Casino Commission, in its Order, relied on admissions,

12  stipulations, exhibits admitted into evidence, and matters officially noticed in reaching its decision

13  and other information provided by Petitioner.

14  Further, the Court must also note that the comments made by the Casino Commission

15  Chairman and Treasurer were made an ordinary Casino Commission meeting, and *not* an evidentiary

16  hearing. A distinction Petitioner even acknowledges in its brief. *Petitioner's Brief in Support of*

17  *Petition for Judicial Review* at pg. 20. Such discussion of an Annual Report at a meeting is to be

18  expected, given the powers and duties of the Casino Commission. *See generally* 4 CMC § 2314

19  (listing the powers and duties of the Commission, including review and inspection of financial records

20  and fiscal capability of a casino licensee).  In other words, the Casino Commission is lawfully charged

21  with asking those exact types of questions and their comments in passing were not in error or

22  prejudicial.

23  At the risk of sounding repetitive, Petitioner provided no defense whatsoever to Enforcement

24  Actions 2020-003, 004, and 005 and pinned, as it would seem, their entire opposition to the entirety

- 31 -

1   of the Casino Commission's case against it on the doctrine of *force majeure* – which, as discussed

2   extensively above, has no possible application as to the substantive charges involving nonpayment of

3   the Casino Regulatory Fees; nonpayment of accounts payable; failure to make the required corporate

4   and banking certifications; failure to maintain the required amount of cash in a CNMI (or, US)

5   banking institution; failure to maintain the minimum capital requirements challenging their very

6   viability as an on-going business; or for the executive officer's failure to detail the means by which

7   the company would comply with all these requirements et cetera.

8       All of these substantive violations are not even mentioned in IPI's petition and it appears to

9   the Court that Petitioner contends these two isolated statements by the Casino Commission's

10  Chairman and Treasurer alone are enough to set aside Order 2021-002, despite the overwhelming

11  amount of evidence relied upon and the administrative process the Casino Commission followed in

12  reaching its decision. It cannot be said that Petitioner's due process rights were violated.

13                                   **V. CONCLUSION**

14      For the aforementioned reasons, Casino Commission Order 2021-002 is **<u>AFFIRMED</u>**. This

15  administrative appeal is hereby **<u>DISMISSED</u>**.

16

17       **IT IS SO ORDERED** this 15th day of MARCH, 2022.

18

19                                      **/s/**
                                        _____
20                                      **WESLEY M. BOGDAN, Associate Judge**

21

22

23

24

- 32 -

**IN THE SUPREME COURT OF THE**
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

| | | |
|---|---|---|
| I.G.I. GENERAL CONTRACTOR & DEV., INC., | ) ) ) | **APPEAL NO. 97-031** **CIVIL ACTION NO. 94-647** |
| Plaintiff/Appellant, | ) ) | |
| v. | ) ) | |
| PUBLIC SCHOOL SYSTEM, WILLIAM S. TORRES, CLEMENTE S. SABLAN, and JTS INSURANCE COMPANY, INC., | ) ) ) ) | **OPINION** |
| Defendants/Appellees. | ) ) ) | |

Argued and Submitted September 30, 1998

Counsel for Appellant:　　　　　　　Reynaldo O. Yana
　　　　　　　　　　　　　　　　　Saipan, MP

　　　　　　　　　　　　　　　　　(Juan T. Lizama
　　　　　　　　　　　　　　　　　Saipan, MP)

Counsel for Appellees:

　　　Clemente S. Sablan　　　　　　Bret Lubic
　　　　　　　　　　　　　　　　　Law Offices of Brian W. McMahon
　　　　　　　　　　　　　　　　　Saipan, MP

　　　JTS Insurance Co., Inc.　　　　Robert C. Naraja
　　　　　　　　　　　　　　　　　Saipan, MP

　　　Public School System and　　　Michael  Ambrose
　　　William S. Torres　　　　　　　Assistant Attorney General
　　　　　　　　　　　　　　　　　Saipan, MP

BEFORE:　　DEMAPAN, Associate Justice, BELLAS, and ONERHEIM, Justices *Pro Tem*:

DEMAPAN, Associate Justice:

　　　　Plaintiff/Appellant, IGI General Contractor & Dev., Inc. ("IGI") appeals the trial court's

order finding in favor of Defendants/Appellees Public School System ("PSS"), William S. Torres

("Torres"), Clemente S. Sablan ("Sablan") and JTS Insurance Company, Inc. ("JTS").  In its order

dated August 24, 1994, the trial court dismissed  IGI's  tort claim of attempted extortion and conspiracy against Defendants for failure to state a claim upon which relief can be granted.  In a separate order dated July 7, 1997, the trial court ruled that IGI had failed to exhaust administrative remedies and dismissed the entire case.  We have jurisdiction pursuant to 1 CMC§ 3102(a) and Article IV,§ 3 of the Commonwealth Constitution. N.M.I. Const. art IV §3 (1997).

## ISSUES PRESENTED AND STANDARD OF REVIEW

IGI raises two issues for our review:

1.  Whether the trial court erred in dismissing the Amended Complaint for failure to state a claim upon which relief can be granted.  We review the trial court's findings de novo. *Riviera v. Guerrero,* 4 N.M.I. 79, 81 (1993).

2.  Whether the trial court erred in dismissing the entire complaint on the ground that IGI failed to exhaust its administrative remedies. We review the trial court's findings de novo. *Sablan v. Tenorio* 4 N.M.I. 351, 355 (1996).

## FACTUAL AND PROCEDURAL BACKGROUND

In March of 1993, IGI entered into a construction contract with PSS to build five classrooms with toilet facilities at Koblerville Elementary School. The project was supervised by Sablan, the CIP Coordinator for PSS, and Torres, the Commissioner of Education.

IGI's performance under the contract was secured by a construction bond issued by JTS. IGI was removed from the project by PSS, and as a result, JTS arranged to have another contractor complete the project.

IGI filed its original complaint on June 17, 1994.  Under Count I of its complaint, IGI alleged that PSS breached the construction contract.  IGI's claim under Count I,  includes:  Sablan orally stopping the project, PSS's failure to put in writing the change order, and PSS's failure to give IGI written notice of the termination of contract before the end of the term.

Under Count II, referred to as the "tort" claim, IGI alleged that Sablan attempted to extort a payoff from IGI.  Count II also alleged that Torres conspired with Sablan after learning about his

2

conduct by allowing another contractor to complete the  project.[1]Sablan allegedly attempted to extort a payoff from IGI's president and Torres allegedly conspired with Sablan by allowing another contractor to complete the project.

The Defendants filed a motion to dismiss IGI's claim for the tort of attempted extortion and conspiracy.  The motion was granted in its entirety on August 24, 1994. [2]

On July 7, 1997, the trial court  entered an order dismissing the Amended Complaint on the ground that IGI failed to exhaust its administrative remedies. IGI timely appealed.

## ANALYSIS

I.      *Failure to State a Claim Upon Which Relief Can be Granted*

In the trial court's order granting a  Motion to Dismiss, IGI alleged a cause of action for attempted extortion against Sablan and a cause of action for civil conspiracy against Torres.  *IGI Gen. Contractor & Dev., Inc. v. Public Sch. Sys.,* No. 94-647 (N.M.I. Super. Ct. Aug. 24, 1994)(Order Granting Motion to Dismiss at 2.)  The trial court concluded that neither cause of action is recognized in the Commonwealth. *Id.* at 3-4.

Pursuant to 7 CMC § 3401:

In all proceedings, the rules of the common law, as expressed in the restatements of law approved by the American Law Institute and, to the extent not so expressed as generally understood and applied in the United States, shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary.

We agree with the trial court that there is no written law in the Commonwealth as generally understood recognizing the torts of attempted extortion or the tort of conspiracy.  The question we

---

[1] PSS should be aware that this Court frowns upon administrative actions such as the unilateral termination of contracts without notice or due process to the parties affected.

[2] (1) Count II was dismissed in its entirety for failure to state a claim upon which relief can be granted; (2) the Amended Complaint was dismissed in its entirety as against Torres in his individual capacity, and (3) IGI's attempt to hold PSS vicariously liable for the alleged acts of Sablan. *I.G.I Gen. Contractor & Dev., Inc., v. Public Sch. Sys.*, Civil Act. No. 94-647 (N.M.I. Super. Ct. August 24, 1994) (Order Granting Motion to Dismiss).

3

are faced with now is whether there is a claim under the common law as it is generally understood and applied in the United States.

IGI argues that any infliction of emotional harm, resulting in damage, without justification, constitutes a tort and it is not necessary for a tort to have a name or precedent to exist under common law.  "Any private wrong constitutes a tort".  *Fisher v. Toler*, 401 P.2d 1012, 1014 (Kan. 1965).  Many courts have held that IGI would be required to state a claim under a cognizable legal theory in order to be entitled to relief.  A complaint may be dismissed as a matter of law for lack of a cognizable legal theory.  *Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598 (D.Cal. 1991) (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984).  We find that the common law as generally understood and applied in the United States does not provide relief for the tort of attempted extortion or the tort of conspiracy.  Thus, we have no basis for recognizing the alleged torts.

### A. *Attempted Extortion is Not a Cognizable Legal Theory*

IGI cites cases for the proposition that the tort of extortion is not entirely unheard of. *Wilbur v. Balnchard*, 22 Idaho 517, 126 P. 1069 (1912).   IGI is asking that the crimes of attempted extortion[3] and conspiracy to commit the same[4] be used as the basis for  torts of similar designation. Courts have ruled that an act which constitutes a crime such as attempted extortion, does not amount to a tort in the absence of statutory authority.  In *Boschette v. Bach,* 925 F. Supp. 100 (D.Puerto Rico 1996), the court held that Puerto Rico's criminal extortion statute does not give rise to a private right of action based on extortion or attempted extortion.  Similarly, there is no statute in the CNMI which authorizes IGI to pursue a private right of action based on attempted extortion or conspiracy to commit such a crime.

---

[3]        6 CMC §§ 301(a) and 1604 (a).

[4]        6 CMC §§ 303(a)4

B. *Civil Conspiracy is Not a Recognized Tort in the CNMI*

The trial court found, and we agree, there is no written law in the Commonwealth recognizing the tort of civil conspiracy. *IGI Gen. Contractor & Dev., Inc. v. Public Sch. Sys., et al.*, No. 94-647 (N.M.I. Super. Ct. Aug. 24, 1994). The majority view, as acknowledged by the trial court, is there is no substantive tort of civil conspiracy recognized under common law. *Id.* [T]here is no such thing as a tort for civil conspiracy. *Jones v. Spindel,* 147 S.E.2d 615 (Ga. 1966).

C. *The Allegations are Insufficient to Support the Claims of Attempted Extortion and Civil Conspiracy*

Even if we were to recognize civil claims for attempted extortion and civil conspiracy in the Commonwealth, IGI has failed to allege any facts in support of the claims.  We find no basis from the facts presented and from the excerpts of record,  to support the civil tort of conspiracy or attempted extortion for which relief can be granted.

D. *Intentional Interference with a Contractual Relationship*

In its August 24, 1994 decision, the trial court stated in a footnote that IGI's claim for a cause of action under Restatement (Second) of Torts §§766 and 766A  for intentional interference with contract, would likewise fail.  *IGI Gen. Contractor & Dev., Inc. v. Public Sch. Sys., et al.*, No. 94-647  (August 24, 1994)(Order Granting Motion to Dismiss at 4 n.1).  Generally, where a party does not discuss issues in its brief, they are treated as waived.  *Santos v. Nansay Micronesia, Inc.*, 4 N.M.I. 155 (1994).  In the brief, Appellants only make a complaint that a "tort" was committed not a complaint for intentional interference with a contractual relationship.  We assume there is a valid contract, but that issue is not on appeal. We will not further address the issue since intentional interference with a contractual relationship was not discussed in IGI's appeal of the trial court's decisions .

5

*II. IGI Failed to Exhaust Its Administrative Remedies*

The trial court granted defendant's Motion to Dismiss on the grounds that it lacked subject matter jurisdiction over the amended complaint due to IGI's failure to exhaust administrative remedies.[5]

As the trial court stated, and we agree, this case is based on contract. The trial court gave deference to the terms in the contract.  Section 3 of the contract between IGI and PSS  provides that any disputes arising between the parties shall be submitted to administrative review and appeal as provided by §5201 of  PSS Procurement Regulations. [6]

IGI admitted in its appeal that it did not go through the proper administrative process as provided for in the contract.  IGI argues that this case falls under the various exceptions to the rule requiring exhaustion of administrative remedies.  IGI contends it was excused from doing so because (1) to have done so would have been futile, as Torres would have been called to adjudicate claims against himself; and (2) neither Torres nor PSS have the authority or jurisdiction to adjudicate IGI's tort claims and constitutional claims.

The trial court disagreed, citing *Rivera, et al. v. Guerrero et al.,* 4 N.M.I. 79 (1993), the case on point.  In that case, the Supreme Court did not acknowledge any exceptions to the doctrine of exhaustion of administrative remedies which allow a party to proceed directly to court in a dispute against an agency or its representatives.  Cases cited by IGI to support an exception, are cases where administrative proceedings had been instituted.[7]

IGI also alleges that Torres was involved in the alleged wrongdoings and could not make a

---

[5] In a footnote the trial court stated because IGI's failure to exhaust administrative remedies is dispositive in this case, the court did not address the issues raised in the Alternative Motion for Summary Judgment on the pleadings. *IGI Gen. Contractor & Dev., Inc. v. Public Sch. Sys,* No. 94-647 (N.M.I. Super. Ct. July 7, 1997)(Order Granting Defendant's Motion to Dismiss).

[6]"Any dispute between PSS and a contractor relating to the performance interpretation of or compensation due under a contract, which is the subject to these regulations must be filed with the Commissioner of Education". *Id.* at 3.

[7]*Lodge 1858, Amer. Fed. of Gov. Emp. v. Paine*, 436 F.2d 882 (D.C. Cir. 1970); *City of Lakeview Station v. Moore Real Estate*, 558 N.E.2d 824 (Ind. 1990).

6

finding against himself, thus rendering exhaustion of administrative remedies futile.[8]  In *Rivera,* the Court stated "we have to presume the administrative official will follow the law or regulation" and invalidate any of its own actions that it finds to be illegal. Only if it fails to do so may judicial review follow." *Id.* at 83.  By not initiating administrative relief, IGI has not demonstrated positively that administrative adjudication could not  provide adequate relief.

IGI argues they were excused from exhausting administrative remedies because there was a claim for violation of a constitutional right. *Dowden v. Warner*, 481 F.2d 642 (9th Cir. 1973).  In *Dowden,* the Ninth Circuit held where a complaint is founded "solely" on a Constitutional issue, exhaustion of administrative remedies might not be required. *Id.* at 643.  However, IGI's claim of a constitutional violation is not the "sole" issue in this case.  As a general rule, the mere presence of a constitutional claim does not bar operation of the doctrine of exhaustion of administrative remedies. *Rivera* at 83.  Accordingly, the trial court was correct in finding dismissal proper.

## CONCLUSION

Based upon the reasons set forth in this opinion, we hereby **AFFIRM** the trial courts August 24, 1994 and July 7, 1997 orders granting Appellee's Motion to Dismiss.

Entered this day   28th   of April, 1999.

---

8 §9 of the contract between IGI and PSS references that the Commissioner has authority to review and remedy  "any act or omission on the part of the Contracting Officer".

7

/s/  Miguel S. Demapan
MIGUEL S. DEMAPAN, Associate Justice


/s/  Timothy H. Bellas
TIMOTHY H. BELLAS, Justice Pro Tem


/s/  Virginia Sablan Onerheim
VIRGINIA SABLAN ONERHEIM, Justice *Pro Tem*

8

# IN THE SUPREME COURT OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

|  |  |  |
|---|---|---|
| ANTONIO L. PITEG, | ) | **APPEAL NO. 98-002** |
|  | ) | **CIVIL ACTION NO.  95-1151** |
| Plaintiff/ Appellant, | ) |  |
| v. | ) |  |
|  | ) | **OPINION** |
| BERNARDO L. PITEG, MIGUEL L. PITEG | ) |  |
| and BENUSTO L. PITEG for himself and as | ) |  |
| guardian of the estate of Emilio Piteg, Serina, | ) |  |
| Piteg, Jeanita P. Piteg and James Piteg | ) |  |
|  | ) |  |
| Defendants/ Appellees. | ) |  |
|  | ) |  |

Argued and Submitted November 8, 1999.

**Cite as: *Piteg v. Piteg,* 2000 MP 3**

Counsel for Appellants:                    Reynaldo O. Yana
                                                          Saipan, MP

Counsel for Appellees:                     Theodore R. Mitchell
                                                          Saipan, MP

BEFORE:      DEMAPAN, Chief Justice, LIZAMA and MANGLONA, Justices *Pro Tem*:

DEMAPAN, Chief Justice:

[1]Appellant Antonio L. Piteg ("Antonio") appeals the December 29,1997 judgment in favor of Defendants/Appellees Bernardo Piteg, Miguel Piteg and Benusto Piteg for himself and as guardian. Antonio brought suit against Appellees to quiet title in certain property based on a Deed of Gift.  The trial court found Antonio was barred under the principles of res judicata and waiver and estoppel from enforcing the deed.  We have jurisdiction pursuant to Article IV, Section 3 of the Commonwealth Constitution, as

amended  N.M.I. Const. art. IV, § 3 (1997).

## ISSUES PRESENTED AND STANDARD OF REVIEW

[2,3,4]The issues before this Court are:

I.      Was Antonio  barred by res judicata because *In re Estate of Isabel L. Piteg* previously distributed Lot 016 B 03 equally to Antonio and the Appellees?  Res judicata is an issue of law and is reviewed *de novo. Santos v. Santos*, 3 N.M.I. 39, 46 (1992); *In re Estate of Camacho*, 4 N.M.I. 22 (1993).

II.      Did Antonio waive his right to enforce the Deed of Gift?  Waiver is a question of fact and is reviewed for clear error.  *United States v. Chichester* 312 F.2d 275 (9th Cir. 1963).

III.      Was Antonio estopped by his own actions from claiming Lot 016 B 03?  Whether the court erred in deciding estoppel is reviewed under the clearly erroneous standard.  *United States v. Derr*, 968 F.2d 943, 945 (9th Cir. 1992).

## FACTUAL AND PROCEDURAL BACKGROUND

The parties stipulate to the facts as stated by the trial court in its Decision and Order.

Antonio and his sibling Miguel, Bernardo and Paciona inherited parcels of land in Tanapag, Saipan from their mother, Isabel L. Piteg.  On or about November of 1987, Antonio claims he asked Miguel, Bernardo, and Paciona for their interest in one of the parcels known as Lot No. 016 B 03 ("the subject Lot").  As a result, the siblings signed a deed relinquishing their interest in the property.

Appellees countered that Antonio asked them to sign a piece of paper so that Antonio could use the land as collateral for a bank loan to build a house.  Appellees denied any knowledge that what they signed in 1987 was a deed relinquishing their interest in the Lot to Antonio.

In 1991, the Appellees, Antonio and other family members leased the land to Tokai Saipan, Inc.  Antonio never questioned or challenged the rent payments for the land given to Appellees.

On or about August 24, 1993, Antonio, as the Administrator of the Estate of Isabel L. Piteg, petitioned the court for final distribution of the Estate's one half undivided interest in the subject Lot and Lot No. 016 B 09, proposing that the property be "distributed, conveyed, and confirmed to the heirs of the decedent," including his brothers Bernardo and Miguel, as well as the children of his deceased sister, Paciona L. Piteg.

In 1994 and 1995 the Tokai Saipan, Inc. lease to the lot was amended. Antonio did not

disclose the 1987 deed at that time.  In September of 1995, Antonio went to the Carlsmith law office and claimed he was entitled to the rent payments based upon the 1987 Deed of Gift.  After Antonio took $150,000, Tokai Saipan, Inc. took judgment by default against Antonio for overpayment.

Antonio filed his complaint to quiet title on December 12, 1995.  Appellees answered the complaint and asserted the affirmative defenses of failure to state a claim, res judicata, waiver, and estoppel.  The parties each moved for summary judgment.  On June 11, 1996, the trial court denied the parties respective motions for summary judgment in a memorandum decision.  *Piteg v. Piteg*, Civ. No. 95-1151 (N.M.I. Super. Ct. June 11, 1996) (Memorandum Decision Denying Summary Judgment) ("Memorandum Decision").  Appellees unsuccessfully moved for reconsideration.

Trial was held May 29, and June 2-3, 1997.  The trial court held:  Antonio was barred by res judicata; he waived his right to enforce the Deed of Gift; he was estopped due to actions in the *Estate of Isabel Piteg* and in leasing the property to Tokai Saipan, Inc.; and Appellees relied on Antonio's actions. *Piteg v. Piteg*, Civ. No. 95-1151 (N.M.I. Super. Ct. Dec 29, 1997) (Decision and Order) ("Order").  The parties timely appealed.

## ANALYSIS

I.    **Was Antonio Barred by Res Judicata Because** *In re Estate of Isabel L. Piteg* **Previously Distributed the Lot Equally to Antonio and the Appellees?**

[5,6] The res judicata effect of a prior judgment depends on the scope of the prior cause of action or claim.  *Camacho*, 4 N.M.I. at 25; *Santos,* 3 N.M.I. at 49.  Res judicata will not only bar matters which were previously litigated, but also those matters which should have been litigated. *Camacho,* 4 N.M.I. at 25.

In the probate cases *In re Rita Neyobul*, *In re Jose N. Lifoifoi II,* and *In re Isabel L. Piteg*, the parties were not adversaries, rather they were perfecting their title. The decrees in the cases of *In re Rita Neyobul*, Civ. No. 91-1095 (N.M.I. Super. Ct. May 5, 1992) (Decree of Final Distribution of the Estate), *In re Jose N. Lifoifoi II,* Civ. No. 93-0424 (N.M.I. Super. Ct. Aug. 24, 1993) (Decree of Final Distribution of the Estate), and  *In re Estate of Isabel L. Piteg*, (N.M.I. Super. Ct. Sept. 30, 1993) (Amended Decree of Final Distribution) had the effect of equally dividing interest in the land to the children of Isabel L. Piteg, who was deceased at the time of the previous probate cases.

**[7]** Appellees executed the Deed of Gift in 1987. At the time the Appellees executed the Deed of Gift they already owned part of Isabel's interest in the land, but their title was not perfected. Probate cases identify heirs and distribute land. The probate court identified the heirs of Isabel L. Piteg. The filing of the Decree of Final Distribution in the *Estate of Isabel L. Piteg* had the effect of confirming title that had vested in the heirs. When the probate was completed for Isabel's estate, only then was title perfect.

**[8]** The Decree of Final Distribution only distributes what interest Isabel L. Piteg herself had in the property. While a decree of distribution is conclusive as to the rights of heirs, legatees, or devisees, insofar as they claim in such capacities, it does not determine that the deceased had any title to the property distributed; nor does it bind third persons who claim an interest adverse to that of the intestate or testator. It merely determines the succession or testamentary disposition of such title as the decedent may have had. *Shelton v. Vance*, 234 P.2d 1012, 1014 (Cal. 1951); *see also* Memorandum Decision at 5-6.

**[9]** Antonio's claim derives from contract between Isabel's children, after their rights to the estate were determined in the probate cases. Antonio's claim is not against Isabel L. Piteg's former estate; it does not concern intestate succession or testamentary dispositions. This issue could not have been addressed by the final decree of distribution. To be bound by res judicata an issue must be addressed and decided. *Santos*, 3 N.M.I. at 48. Therefore, the Final Decree of Distribution does not have a res judicata effect and does not preclude the action.

**II**     **Did Antonio Waive His Right to Claim Under the Deed of Gift Because of the Participation in the Probate Cases and the Lease of the Lots?**

[10,11,12]Antonio had an obligation to see that Isabel's estate be distributed in a manner consistent with the statutorily defined rights of the heirs at the time of her death.  *See* 8 CMC 2901 *et seq*. As administrator, Antonio was in a fiduciary relationship with the other heirs.  Candor and fidelity are hallmarks of the relationship between an administrator and heirs.  Dealings between a fiduciary with a near relative, whether by blood or marriage, are not prohibited, but are a factor to be considered in determining the fairness and good faith of the transaction.  *Setaro v. Pernigotti,* 136 A. 571, 573 (1927).  As a fiduciary Antonio was required to be fair and equitable, and if he breached that duty, the probate order could be remanded.

Antonio's claim to sole ownership of a one half interest in the Lot arises out of an alleged transfer by Bernardo, Miguel and Paciona of their vested interests in the Lot after Isabel's death.  Thus, Antonio is asserting contractual rights against the Appellants pursuant to a deed of gift, not additional rights as an heir of Isabel's estate.  *Piteg v. Piteg,* No. 95-1151, (N.M.I. Super. Ct. Oct. 31, 1996) (Memorandum Decision Denying Defendants' Motion for Reconsideration).

[13]Antonio argues he did not waive his right to claim ownership of the Lot under the Deed of Gift because participation in the probate cases and in the lease of the lots are insufficient to prove waiver.  We agree.  A waiver is a voluntary relinquishment of a known right, *Trinity Ventures, Inc. v. Guerrero*, 1 N.M.I. 54, 62 (1990), with knowledge of its existence and intent to relinquish it.  *CBS, Inc. v. Merrick*, 716 F.2d 1292,1295 (9th Cir. 1983).  Mere silence does not constitute a waiver unless there is an obligation to speak. *United States v. Chichester*, 312 F.2d 275 (9th Cir. 1963).

[14]Although the Court finds neither res judicata nor waiver apply to the particular facts of this case, the Court is disturbed by Antonio's silence during the probate proceedings in his capacity as Administrator.  As an administrator, Antonio had additional duties beyond those of a participant in the probate proceedings.  In *Satti v. Rago*, 441 A.2d 615 (1982), the court found the relationship between an administrator and an heir of the estate analogous to that of a trustee who

owes a duty of equity and fair dealing.[1] The Court seriously questions Antonio's lack of candor to the probate court by not disclosing the fact of the deed, but what remains is that he holds a deed of gift entitling him to the property.   A breach of duty is difficult to sustain; the relative heirs are presumed to have known about the deed of gift as they were signatories to the deed.  Therefore, Antonio's silence as to the deed is not fatal to this case.

 **[15]**Courts have held that a court has the inherent power to set aside a decree procured by extrinsic fraud. *Cross v. Tustin*, 236 P.2d 142 (1951).  The doctrine of extrinsic fraud is quite broad.[2] Extrinsic fraud is fraud that induced a party to default or consent to judgment against him. RESTATEMENT (SECOND) OF JUDGMENTS § 70 (1980).  Although Antonio's conduct is not proper, we find it does not rise to the level of fraud.  Because not only Antonio but the siblings who were signatories to the deed, also chose not to disclose the issue of the deed of gift between themselves to the court, we find no fraud.

Since the parties failed to disclose the issues of title to the properties distributed, that would be a matter for a future quiet title action.  Anyone who did not participate in  the Decree of Final Distribution or the probate proceeding will not be barred from pursuing future actions challenging the title to the property which was distributed to the heirs.  The probate court does not determine title to the properties.  The Court will construe the Deed of Gift in a manner that will uphold the validity of the conveyance if possible. *Camacho*, 4 N.M.I. 22.

---

[1]   The administrator sold a piece of property in the estate to his step daughter without notifying his siblings of the sale. The trial court found the relationship of the defendant Administrator to the plaintiff heir was fiduciary in character. The administrator's breach of his fiduciary duty was sufficient justification for revocation of the Probate Court Order and for remand to that court for a fresh start. *Satti v. Rago*, 441 A.2d 615, 620 (1982), *see O'Connor v. Chiascione*, 33 A.2d 336 (1943).

[2]   Arizona has held that extrinsic fraud may consist of deceptive practices by a successful party in purposely keeping his opponent ignorant of the proceedings.  *Honk v. Karlsson*, 292 P.2d 455 (1956).  California has held extrinsic fraud is present when a decree is produced from probate court by conduct which prevents those from having an interest in the estate from appearing and asserting their rights. *Estate of Starkweather*, 64 Cal. App. 4th 580 (1998).

### III.    Was Antonio Estopped by His Own Actions From Claiming Lot 016 B 03?

[16]The lower court found that Antonio was estopped from claiming sole ownership to the subject Lot by his own actions in the administration of the estate of Isabel L. Piteg and in leasing the property to Tokai, Saipan, Inc. because the Appellees detrimentally relied on him. Decision and Order at 4.

The doctrine of estoppel requires:

(1) the party to be estopped must know the facts;
(2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;
(3) the party asserting estoppel must be ignorant of the true facts;
(4) the party asserting estoppel must rely on the former's conduct to his injury.

*In re Blankenship*, 3 N.M.I. 209, 214 (1992).

[17,18]Equitable estoppel is invoked where a party relies on the statement of the other party and is prejudiced thereby. *Sartain v. Dixie Coal & Iron Co.,* 266 S.W. 313, 317 (1924). Equitable estoppel requires a repudiated statement or a change of position and detrimental reliance.[3] There must be ignorance of the truth and absence of equal means of knowledge of it by the party who claims the benefit of estoppel. *Int'l Sport Divers Ass'n, Inc. v. Marine Midland Bank, N.A.*, 25 F. Supp. 2d 101,108 (1998).

With full knowledge of the facts, Antonio took the position in the prior proceeding in the *Estate of Isabel L. Piteg* that the Lot was an asset of the estate. Antonio, as administrator, sought and obtained a court decree, which was agreed to by all the heirs, and which "distributed, conveyed and confirmed" the property to the Appellees. The Second Amendment to Ground Lease was signed by the parties sometime between April and June 1995, but not until September 1995, did Antonio claim he also was entitled to the land and rent payments.

[19]We find Appellees relied on Antonio not enforcing the Deed of Gift and were ignorant of his true intention. Antonio's conduct in having the Appellees sign the lease with Tokai Saipan, Inc., in addition to obtaining their signatures for the Lease amendment, augmented Appellees' reliance that

---

[3] Equitable estoppel concerns the brand of estoppel placed on people who make false representations or conceal material facts, with knowledge of the facts, to a party ignorant of the truth of the matter, with the intention that the other party should act upon it, and with the result that such a party is actually induced to act upon it, to his damage. BLACK'S LAW DICTIONARY, 632 (rev. 4th ed.).

Antonio would not be enforcing the deed.  Parties must accept the consequences of the position they assume; they are estopped to deny the reality of the state of things which they have made to appear to exist, and upon which others have been led to rely.  *Casey v. Galli*, 94 U.S. 673, 24 L.Ed. 168, 170 (1877).

[20]However in applying estoppel to the ownership of the Lot, an element of estoppel is lacking. The party asserting estoppel must be ignorant of the facts. The heirs of Isabel L. Piteg who signed the deed of gift can not be held ignorant of the existence of the deed. The absence of this element is fatal to Appellees' contentions for estoppel, thus Antonio is not estopped from claiming ownership of Lot 016 B 03.  However, we partially estop Antonio as to the lease.  Appellees are entitled to lease payments, if any, for the remainder of the terms of the lease with Tokai Saipan, Inc. attributable to  Lot 016 B 03. Lease profits are to be disbursed in accordance with the provisions of the operative lease with Tokai Saipan, Inc. Upon conclusion of the current obligations to the Lot, Antonio will be owner of the Lot per the Deed of Gift.


## CONCLUSION

The holdings of this case are unique to the particular facts and circumstances of this case. We **REVERSE** the Superior Court as to the holding Antonio is barred by res judicata and we **REVERSE** the holding that Antonio waived his right to enforce the Deed of Gift.  We partially **AFFIRM** as to estoppel.  Antonio is not estopped from claiming the Lot, but is estopped to claiming the sole profits from the existing lease.

So Ordered this  17th  of February, 2000.

/s/   Miguel S. Demapan
MIGUEL S. DEMAPAN, Chief Justice


/s/   Juan T. Lizama
JUAN T. LIZAMA, Justice *Pro Tem*


/s/   John A. Manglona
JOHN A MANGLONA, Justice *Pro Tem*

*Santos v. Santos*, 4 N.M.I. 206 (1994)

Enrique A. **Santos**,
Plaintiff/Appellant,
**v.**
Jose A. **Santos**, Roque Santos,
Heirs of Vicente A. Santos,
Heirs of Francisca A. Santos, and
Heirs of Ramon A. Santos,
Defendants/Appellees.
Appeal No. 93-017
Civil Action No. 92-1366
December 15, 1994
Amended January 6, 1995

Argued and Submitted March 8, 1994

Counsel for appellant: Timothy H. Bellas, Saipan.

Counsel for appellees, the heirs of Francisca A. Santos and Evelyn S. Benavente as representative of the heirs of Roman A. Santos: Jeanne H. Rayphand & Theodore R. Mitchell, Saipan.

Counsel for appellees Jose A. Santos, Roque A. Santos and the heirs of Vicente A. Santos: Vicente T. Salas, Saipan.

BEFORE: DELA CRUZ, Chief Justice, and CRUZ and MACK, Special Judges.

DELA CRUZ, Chief Justice:

The plaintiff/appellant, Enrique A. Santos ("Enrique") appeals from an order granting summary judgment in favor of the defendants/appellees on res judicata grounds. At issue is the ownership of Lots 013 B 19, 013 B 20 and 008 B 05, located on Saipan (hereinafter Lots 19, 20 and 05, respectively). The trial court found that the three parcels belong to all of the heirs of Nicolas C. Santos ("Nicolas"), Enrique's deceased father, and not to Enrique alone. We affirm in part and reverse in part.[1]

## I.  FACTS

The estates of Eduvigis Camacho Santos (also known as Debis Delos Santos; hereinafter "Debis") and

---

[1] The appellees Jose A. Santos, Roque A. Santos and the heirs of Vicente A. Santos join in the brief of the other appellees. Maria A. Santos joins in the brief, as well. She was not, however, named in the complaint. Despite the fact that she was not named, she was served a summons in this action. For an unidentified reason, the appellants' counsel never filed an amended complaint. Thus Maria was never named as a party. Nevertheless, she filed an answer. Similarly, Evelyn S. Benavente was not named in the complaint but she filed an answer as the representative of the heirs of Ramon A. Santos and in her individual capacity. Others, too, were served with a summons and complaint but were never named as parties to this action. The record does not indicate the relationship that any of these people have to this action.

her brother Nicolas were probated in consolidated orders by the Trust Territory High Court in 1979 ("probate cases 30 and 31"). Those cases resolved the ownership of eight specific parcels. Enrique inherited two of these lots, Lots 013 B 15 and 013 B 16. These two parcels were formerly part of a larger tract of land designated as Lot 13 B 01 ("Lot 01"), which Debis originally owned. *See Santos v. Santos*, 3 N.M.I. 39, 42 (1992). After Debis's death, ownership of Lot 01 passed to Nicolas, then her only surviving heir. *Id.* Upon Nicolas's death, Lot 01 was subdivided and distributed to Ramon, Enrique and Jose pursuant to the order of final distribution issued in probate cases 30 and 31 ("1979 order").[2] A map depicting the distribution was attached to that order.

The 1979 order did not mention Lots 19, 20 or 05, the lots at issue here. Enrique claims that these lots were part of the land distributed to him under the 1979 order, pursuant to a partida made by his father.

Lots 19 and 20 are access lots (i.e., roadways) across former Lot 01. Neither Lot 19 nor Lot 20 were expressly distributed to any heir in either probate case. Certificates of title were issued for Lots 19 and 20 to the "Heirs of Debis Delos Santos" in 1981. Excerpts of Record at 8-9, 12-13. The certificates of title for both lots were issued pursuant to the 1979 order. *Id.* at 2, 8, 12.[3]

Lot 05 is also an access lot, which Enrique claims.[4] He alleges that "pursuant to the express wishes of his father, Nicolas[,] . . . [Enrique] was to have received Lot [05] which was part of his original parcel." Complaint for Quiet Title to Real Property ¶ 14, *Santos v. Santos*, Civ. No. 92-1366 (N.M.I. Super. Ct. filed Oct. 16, 1992) ("complaint"). Enrique admitted that the 1979 order and attached map, which partitioned and distributed Lot 01, do not mention Lot 05. Transcript of Proceedings at 8:2-5, *Santos*, Civ. No. 92-1366 (N.M.I. Super. Ct. Mar. 17, 1993). Enrique argued to the trial court that Lot 05 was "carved out of [Lot] 01." *Id.* at 10:8-9. He also asserted that Lot 05's distribution was part of a partida allegedly effectuated by the 1979 order. *Id.* at 7:17-22.[5] In 1981 a certificate of title was issued to Debis's heirs for Lot 05, pursuant to "a determination of ownership made by the [Land Title Division of the Saipan District of the Trust Territory]." Excerpts of Record at 10.

## II. ISSUES

1.  Whether the trial court erred in granting the motion for summary judgment on the basis that Enrique's claim to Lots 19, 20, and 05 was barred by the doctrine of res judicata.

2.  Whether the Superior Court erred in presuming that Enrique sought to set aside the distribution order in probate cases 30 and 31.

3.  Whether the Superior Court's ruling that the three lots at issue belong to all seven of Nicolas's heirs was inconsistent with this Court's ruling in *Santos v. Santos*, 3 N.M.I. 39 (1992).

---

[2] Nicolas had seven heirs. They were Ramon, Enrique, Francisca, Vicente, Jose, Asuncion and Maria.

[3] The 1979 order stated: "[T]he Northern Marianas Land Commission shall, in due course, issue Certificates of Title for the land herein distributed to the distributees as set forth herein." Excerpts of Record at 3. On September 14, 1981, certificates of title to Lots 19 and 20 were issued to the "Heirs of Debis Delos Santos" pursuant to "a[n] Order of the Trial Division of the High Court made on the 20th day of December 1979, numbered Probate Case 30 & 31." *Id.* at 8, 12.

[4] Lot 05 is "contiguous to Lots 013 B 15 and 16 and is part of the public roadway adjacent to Lot 013 B 15." Complaint for Quiet Title to Real Property ¶ 15, *Santos v. Santos*, Civ. No. 92-1366 (N.M.I. Super. Ct. filed Oct. 16, 1992).

[5] Enrique's counsel represented below that this Court "makes factual findings in its [*Santos v. Santos*, 3 N.M.I. 39 (1992)] opinion and says that this distribution in probate cases 30 and 31 occurred pursuant to a partida." Transcript of Proceedings at 7:19-22, *Santos*, *supra* note 4. Counsel is wrong. *Santos* does not indicate that probate cases 30 and 31 followed a partida; the partida mentioned in *Santos* involved an entirely different case, entitled *In re Estate of Vicente Agulto Santos*, Civ. No. 88-0598 (N.M.I. Trial Ct. filed Aug. 15, 1988). *See Santos*, 3 N.M.I. at 44 n.3. Probate cases 30 and 31 concerned the estates of Vicente's father, Nicolas C. Santos, and his aunt, Eduvigis (Debis). Neither *Santos* nor probate cases 30 and 31 indicate that the 1979 distribution was made pursuant to a partida. The distribution set forth in the 1979 order may have followed a partida, but there was no record made by the parties to substantiate this claim.

*Santos v. Santos*, 4 N.M.I. 206 (1994)

### III. DISCUSSION

**1.      Summary Judgment**

Summary judgment may be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Com. R. Civ. P. 56(c). In deciding a summary judgment motion, a court will construe the evidence and inferences drawn therefrom in favor of the non-moving party. *Rios v. Marianas Pub. Land Corp.*, 3 N.M.I. 512, 518 (1993). If we determine that no genuine issue of material fact exists, our analysis shifts to whether the substantive law was correctly applied. *Borja v. Rangamar*, 1 N.M.I. 347, 355 (1990). Our review of an order granting summary judgment is de novo. *Id.*

**2.      Res Judicata**

The trial court entered summary judgment in favor of the appellees pursuant to the doctrine of res judicata. "'Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Santos*, 3 N.M.I. at 49 (emphasis omitted) (quoting *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 414, 66 L. Ed. 2d 308, 313 (1980)).

The appellees' summary judgment motion below was based on the assertion that the 1979 order incorporated a map, Excerpts of Record at 4, somehow showing that Lots 19 and 20 were to be distributed to them. On appeal, the appellees also state that the certificates of title to Lots 19 and 20 were issued to Debis's heirs based on the 1979 order and were, therefore, final. The 1979 order is the basis of their res judicata defense. The appellees conclude that these two parcels belong to Debis's heirs and thus to them as Nicolas's heirs.

As to Lot 05, the appellees state that the lot's certificate of title was also issued to Debis's heirs. They contend that the doctrine of administrative res judicata renders this ownership determination conclusive. *See In re Estate of Dela Cruz*, 2 N.M.I. 1, 10-11 (1991). Therefore, the appellees argue, this land also belongs to all the heirs and not to Enrique alone.

The appellees also advance an alternative basis of support for the trial court's ruling on res judicata grounds. In 1988, Enrique's two sisters, Asuncion and Maria, filed suit to set aside the 1979 order because they were not given notice of probate cases 30 and 31. Thus, they were improperly excluded from sharing in their father's estate. *See Santos*, 3 N.M.I. at 44 n.2, discussing *Ooka v. Santos*, Civ. No. 88-0367 (N.M.I. Trial Ct. filed Apr. 26, 1988). The appellees assert that *Ooka* bars Enrique's claim because the claim should have been brought in that action. They do not, however, offer any justification for this last assertion.

The appellees' motion for summary judgment was made without any supporting declarations or other documents. They relied solely on the documents attached to the complaint filed by Enrique. On appeal, they advance documents in their supplemental excerpts of record that apparently were a part of the record in other related cases, e.g., probate cases 30 and 31, but were not expressly included in the record of this case below. These documents purportedly support the order granting summary judgment.[6]

Enrique disagrees that the 1979 order resolved the issues of ownership of Lots 19, 20, and 05. He argues that the order did not specify "the precise nature" of the "res" adjudicated in probate cases 30 and 31. Appellant's Brief at 6. While he does not dispute the ownership of the eight lots specifically distributed in the 1979 order, Enrique asserts that the order did not identify and distribute Lots 19, 20 and 05, the lots at issue here. He argues that these lots nevertheless were part of the land distributed to him pursuant to the 1979 order. He concludes that res judicata does not bar his action.

A moving party bears the "initial and the ultimate" burden of establishing its entitlement to summary judgment. *Lopez v. Corporacion Azucarera de Puerto Rico*, 938 F.2d 1510, 1516 (1st Cir. 1991). If a moving party is the plaintiff, he or she must prove that the undisputed facts establish every element of the presented claim.

---

[6] We will not consider these documents since it is not clear that the trial court relied on them.

*Id.* If a movant is the defendant, he or she has the correlative duty of showing that the undisputed facts establish every element of an asserted affirmative defense. *Id.* Upon satisfying this burden, the non-moving party must establish that there exists a genuine issue of material fact. *Bais v. Advantage Int'l, Inc.*, 905 F.2d 1558, 1561 (D.C. Cir. 1990).

A.      *Lots 19 and 20*

Here, the burden of establishing the affirmative defense of res judicata rested with the defendants/-appellees. They had the burden of establishing that no genuine issue of material fact existed with respect to the defense of res judicata, i.e., that prior actions resolved Enrique's present claim or that he should have asserted the claim in a prior action but failed to do so.

We have reviewed the 1979 order and the map attached to it. Lots 19 and 20 are not mentioned in the order. The map attached to the order is illegible and incomprehensible. Consequently, we do not find any clear indication from the map as to whom the probate court distributed Lots 19 and 20. Moreover, the "Order Amending Order of Distribution," which was subsequently entered in the same case, does not mention Lots 19 and 20. Excerpts of Record at 6.

The appellees offer no declaration establishing that the 1979 order distributed Lots 19 and 20 to Debis's heirs and thereby to them as Nicolas's heirs. The order does not mention that any unidentified lots, such as Lots 19 and 20, were to be distributed to Debis's heirs and thus to them as Nicolas's heirs, as the appellees contend it does. The 1979 order states that "[i]n the event that the names written upon the said map indicate a distribution different from that set forth [in the order], then and in such event this Order shall govern and take precedence." *Id.* at 2. This language does not necessarily mean that lots not mentioned in the 1979 order but appearing on the map attached to it were to be distributed to all of Nicolas's heirs. In summary, there is no evidence showing that the 1979 order was intended to distribute Lots 19 and 20 to all of Nicolas's heirs. We cannot and will not presume these facts.

We also fail to see how Enrique's claim is barred by *Ooka*. That action was initiated because two of Enrique's sisters were excluded by lack of notice of the probate cases from sharing in their father's estate.[7] Enrique claims that Lots 19 and 20 were part of the land distributed to him by the 1979 order, which was not changed by *Ooka*. The appellees' summary judgment motion provided no facts or documents showing the precise nature of *Ooka* and how that action precluded Enrique's claim.

In order for the appellees successfully to assert the affirmative defense of res judicata in a motion for summary judgment, they must have showed that, according to the undisputed facts, the rights to Lots 19 and 20 were adjudicated in probate cases 30 and 31, or that Enrique's claim should have been brought in *Ooka*, and thus relief was precluded. The appellees failed to meet their burden in this motion.

The fact that certificates of title were issued to the "heirs of Debis," thereby entitling the appellees to the land as Nicolas's heirs, is of no consequence here because they were issued pursuant to the 1979 order, which did not resolve the question of ownership of Lots 19 and 20. This factor distinguishes our decision (which follows) with regard to Lot 05. The certificate of title for Lot 05 was not issued pursuant to the 1979 order and it appears valid on its face.

B.      *Lot 05*

As to Lot 05, the appellees assert that the certificate of title issued on September 14, 1981, evidences their entitlement to the land. A certificate of title "shall be prima facie evidence of ownership as therein stated against the world." 2 CMC § 4251(a). The appellees have met their burden of establishing ownership in all of Nicolas's heirs.

Enrique refuted the appellees' claim of ownership below with the conclusory statement that based on his "belief" Lot 05 was given to him by his father by partida. An adverse party "must set forth specific facts showing

---

[7] Ironically, Asuncion S. Ooka was not served in this action, either. Because of our disposition of this matter, Ooka's interest in the land at issue is not impaired. On remand, the trial court should consider whether this action may properly proceed without Ooka being named as a party.

*Santos v. Santos*, 4 N.M.I. 206 (1994)

---

that there is a genuine issue for trial."  Com. R. Civ. P. 56(e).  Mere conclusions will not suffice.  *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990); *Redden v. Wal-Mart Stores, Inc.*, 832 F. Supp. 1262, 1267 (N.D. Ind. 1993).  Merely stating that it was his belief that he owned the land as the result of a partida did not create a factual dispute on the issue of ownership.  *See Griggs-Ryan*, 904 F.2d at 115.

Enrique argued below that Lot 05 was "carved" out of former Lot 01.  Transcript of Proceedings, *supra*, at 10:8-9.  Nowhere in his declaration did he set forth any facts supporting this allegation.  Furthermore, from the record before us, Lot 05 appears to lie outside of former Lot 01.  Enrique's declaration was also silent as to the nature of the alleged partida and the nature of his entitlement under it.  Accordingly, as to Lot 05 we hold that the order granting summary judgment in favor of all the heirs was correct.

C.       *The* Santos *Opinion*

Before concluding, we address Enrique's claim that the trial court's summary judgement order was inconsistent with our earlier opinion in *Santos*, *supra*.  In *Santos* we held that Vicente, Enrique's late brother, disclaimed any interest in former Lot 01.  3 N.M.I. at 50.  However, the trial court in the present action distributed the three lots at issue to all of Nicolas's heirs, including Vicente.  Enrique's argument as to Vicente appears meritorious if he can show on remand that Lots 19 and 20 are encompassed by former Lot 01.  Because of our disposition of this appeal, Lot 05 is the only lot belonging to all of Nicolas's heirs, including Vicente.  Enrique failed to show that Lot 05 is part of former Lot 01.  Consequently, there is no inconsistency between the trial court's order of summary judgment regarding Lot 05 and *Santos*.

**IV.  CONCLUSION**

Although Lots 19 and 20 appear from the documents and briefs to be parts of former Lot 01, the 1979 order and map do not refer to or clearly identify these lots or indicate to whom they should be distributed.  The 1979 order was silent as to the distribution of Lots 19 and 20, and thus did not establish a finding or conclusion as to whether Enrique's claim was barred by res judicata for purposes of summary judgment.  Similarly, the motion failed to establish how *Ooka* barred relief.  Accordingly, the order granting summary judgment as to these two lots is **REVERSED**, but **AFFIRMED** as to Lot 05, and the case is **REMANDED** for further proceedings consistent with this opinion.