# EXHIBIT E



E-FILED
CNMI SUPREME COURT
E-filed: Sep 26 2023 09:08AM
Clerk Review: Sep 26 2023 09:08AM
Filing ID: 70947650
Case Number: 2022-SCC-0006-CIV
N/A

E-FILED
CNMI SUPERIOR COURT
E-filed: Aug 23 2023 02:08PM
Filing Reviewed By:
Case ID: Doc No:
Notary Bojul:



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**COMMONWEALTH CASINO COMMISSION,**
*Respondent-Appellee,*

*v.*

**IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC,**
*Petitioner-Appellant.*

**Supreme Court No. 2022-SCC-0006-CIV**

---

**SLIP OPINION**

**Cite as: 2023 MP 8**

Decided August 25, 2023

———————

CHIEF JUSTICE ALEXANDRO C. CASTRO
ASSOCIATE JUSTICE JOHN A. MANGLOÑA
ASSOCIATE JUSTICE PERRY B. INOS

———————

Superior Court No. 21-0173-CV
Associate Judge Wesley M. Bogdan, Presiding

———————

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

INOS, J.:

¶ 1     Petitioner-Appellant Imperial Pacific International (CNMI), LLC ("IPI") appeals the trial court order upholding Respondent-Appellee Commonwealth Casino Commission's ("CCC") decision suspending its casino license and imposing fines. For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND this matter to CCC for further proceedings consistent with this opinion.

### I. FACTS AND PROCEDURAL HISTORY

¶ 2     In 2014, the Commonwealth Lottery Commission entered into an exclusive Casino License Agreement ("CLA") with IPI. The CLA granted IPI the right to operate as the exclusive licensee. Under the CLA, "[t]he continuing validity of this License is conditional upon the Licensee's compliance with applicable laws, rules, and regulations of the Commonwealth and the United States." CLA cl. 17. Additionally, the agreement provides that "[f]ailure to pay any amount due and payable hereunder upon the date when such payment is due" is a material breach that permits suspension or revocation of the exclusive license. CLA cl. 31. Since its formation, the CLA has been amended nine times. CCC is the regulatory agency responsible for overseeing the casino licensee and enforcing the CLA's provisions. 4 CMC § 2314. Clause 25 of the CLA deals with force majeure.

¶ 3     Under the agreement, IPI must comply with multiple contractual, statutory, and regulatory requirements. These include paying the $15 million Annual License Fee[1] and the annual $3 million Casino Regulatory Fee.[2] IPI was also required to contribute $20 million annually to a Community Benefit Fund.[3]

¶ 4     IPI failed to make the Community Benefit Fund contributions for 2018 and 2019. In March 2020, shortly after the advent of the COVID-19 pandemic ("COVID-19"), IPI closed the casino.

¶ 5     Following IPI's closure, CCC initiated five complaints over the course of 2020:

> (1) Complaint 001—failure to pay the 2018 and 2019 Community Benefit Fund contributions.
>
> (2) Complaint 002—failure to pay the Annual License Fee due August 12, 2020.
>
> (3) Complaint 003—failure to maintain the required cash or cash equivalents in a CNMI or United States bank.

---

[1]   CLA cl. 5; 4 CMC § 2306(b).

[2]   4 CMC § 2309.

[3]   CLA cl. 16; Amendment No. 9.

    (4) Complaint 004—failure to pay accounts payable that were over 89 days old.

    (5) Complaint 005—failure to pay the Casino Regulatory Fee due by October 1, 2020.

¶ 6    In December 2020, following CCC's complaints, IPI and the Commonwealth Lottery Commission signed Amendment No. 9. Amendment No. 9 addresses, in part, COVID-19's impact on IPI's ability to make the Community Benefit Fund contributions and extends deadlines on the 2018 and 2019 contributions to 2025.

¶ 7    On February 25, 2021, CCC conducted an evidentiary hearing for Complaints 001 and 002. In response to Complaint 001, IPI argued that Amendment No. 9 extended the payment dates to 2025. In response to Complaint 002, IPI invoked the force majeure clause in its answer, citing the devastating effects of the pandemic on the tourism industry.

¶ 8    On March 2, 2021, CCC conducted an evidentiary hearing for Complaints 003, 004, and 005. IPI did not dispute the violations and did not raise any affirmative defense.

¶ 9    On April 22, 2021, CCC met with an IPI representative. At this meeting, CCC commissioners asked about IPI's parent company's 2020 annual report, which included information regarding its financial situation. The commissioners then unanimously voted to find clear and convincing evidence supported suspending IPI's exclusive casino license and issuing monetary sanctions.

¶ 10    CCC imposed the following sanctions and conditions:

    (1) Complaint 001—$100,000 fine and a license suspension of six months.

    (2) Complaint 002—$1.5 million fine and an indefinite license suspension conditioned on paying the Annual License Fee in full. CCC found that force majeure did not apply as an affirmative defense because the Annual License Fee was statutorily required. It also determined that IPI had not adequately demonstrated that COVID-19 was the proximate cause of its failure to pay the Annual License Fee.

    (3) Complaint 003—$1.5 million fine and an indefinite license suspension conditioned on complying with Commission Order 2020-003.

    (4) Complaint 004—$2 million fine and an indefinite license suspension conditioned on paying overdue accounts.

    (5) Complaint 005—$1.5 million fine and an indefinite license suspension conditioned on paying the Casino Regulatory Fee in full.

In total, the fines amounted to $6.6 million.

¶ 11    IPI appealed CCC's order to the Superior Court, arguing that COVID-19 and other factors like Super Typhoon Yutu and changes in federal immigration law constituted force majeure events that excused all its performance obligations. Additionally, IPI claimed that CCC violated its due process rights by discussing IPI's parent company's annual report at the April 2021 meeting. IPI asserted that CCC improperly considered evidence outside the record, leading it to decide against IPI's force majeure defense.

¶ 12    In an order affirming CCC's decision to suspend IPI's license and impose fines, the Superior Court did not decide the question of force majeure. The court instead found that while IPI had raised the issue of force majeure for Complaints 001 and 002, it had not raised force majeure or any other defense to Complaints 003–005, and thus CCC had properly suspended IPI's license. The court further found no due process violation and held that CCC's order was not arbitrary or capricious.

¶ 13    On appeal, IPI argues that the court erred in failing to address force majeure, asserting that COVID-19 and other occurrences are force majeure events excusing performance in all five complaints. IPI claims CCC should have found that force majeure applied to Complaint 002 and held that COVID-19 was the proximate cause of its failure to pay the Annual License Fee. IPI contends Amendment No. 9 constitutes a deferment of its obligations to pay the Community Benefit Funds, which Complaint 001 concerns. Finally, IPI argues that it suffered a due process violation which requires setting aside all sanctions.

## II. JURISDICTION

¶ 14    We have appellate jurisdiction over final judgments and orders of the Commonwealth Superior Court. NMI CONST. art. IV, § 3; *see also* 1 CMC § 9113 (governing appeals from judicial review under the Commonwealth Administrative Procedure Act ("CAPA")).[4]

## III. STANDARD OF REVIEW

¶ 15    We review de novo the Superior Court's review of an agency action. *Calvo v. Northern Mariana Islands Scholarship Advisory Bd.*, 2009 MP 2 ¶ 9. As a general rule, courts will "[h]old unlawful and set aside agency action, findings, and conclusions found to be arbitrary or capricious or "[c]ontrary to constitutional right." 1 CMC § 9112(f)(2)(i)–(ii). However, a more stringent standard applies to this case because Commonwealth law provides that the casino license "shall not be suspended or revoked absent [sic] finding of clear and convincing evidence during a hearing pursuant to 1 CMC § 9101 *et seq.* by unanimous vote of the Commonwealth Casino Commission." 4 CMC § 2314(h). When the burden of proof is clear and convincing evidence and the alleged error

---

[4]    1 CMC § 9113 states: "An aggrieved party may obtain a review of any final judgment of the Commonwealth Superior Court under this chapter by appeal to the Commonwealth Supreme Court. The appeal shall be taken as in other civil cases."

on appeal is that the evidence does not support the findings, "the standard of review is whether as a matter of law the findings are supported by competent and substantial evidence." *Salas v. Mafnas*, 2010 MP 9 ¶ 19 (citing *Off. of the Att'y Gen. v. Estel*, 2004 MP 20 ¶ 23). Substantial evidence is a "more searching" standard than arbitrariness. *Limon v. Camacho*, 5 NMI 21, 30 (1996). This is in line with the general standard of review for administrative agency adjudications and hearings laid out in the Commonwealth Administrative Procedures Act, requiring a reviewing court to set aside an agency action that is unsupported by substantial evidence. 1 CMC § 9112(f)(v). "Substantial evidence" refers to "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Owens v. Commonwealth Health Ctr.*, 2012 MP 5 ¶ 8. We examine the propriety of the agency's action considering the evidence before it at the time the decision was made. *See In re Blankenship*, 3 NMI 209, 217 (1992).

¶ 16    We review de novo the legal question of whether an agency's conduct satisfies statutory and constitutional due process protections. *Premier Ins. Co. v. Commonwealth Dep't of Lab.*, 2012 MP 16 ¶ 7. Finally, contract interpretation is a question of law reviewed de novo. *Manglona v. Baza*, 2012 MP 4 ¶ 11.

## IV. DISCUSSION
### *A. Force Majeure*

¶ 17    As force majeure is a key concept in this matter, we begin by discussing force majeure generally. Force majeure refers to "[a]n event or effect that can neither be anticipated nor controlled. The term includes both acts of nature (e.g., floods and hurricanes) and acts of people (e.g., riots, strikes, and wars)." BLACK'S LAW DICTIONARY 562 (9th ed. 2010). "[I]n order to constitute a force majeure, an event must be the proximate cause of nonperformance of the contract." *Hong Kong Islands Line Am. S.A. v. Distrib. Servs., Ltd.*, 795 F. Supp. 983, 989 (C.D. Cal. 1991), *aff'd*, 963 F.2d 378 (9th Cir. 1992). A force majeure clause is "[a] contractual provision allocating the risk of loss if performance becomes impossible or impracticable, [especially] as a result of an event or effect that the parties could not have anticipated or controlled." BLACK'S LAW DICTIONARY 562 (9th ed. 2010). "What types of events constitute force majeure depend on the specific language included in the clause itself." *Entzel v. Moritz Sport & Marine*, 841 N.W.2d 774, 778 (N.D. 2014) (citation omitted).

¶ 18    Force majeure is an affirmative defense. *Id.* The party invoking force majeure must prove it by a preponderance of the evidence. *See United States v. Mobil Oil Guam, Inc.*, No. 10-00006, 2010 U.S. Dist. LEXIS 75799, at *26 (D. Guam July 27, 2010) ("Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event."); *Rosello Cruz. v. Pedro Luís García*, 116 D.P.R. 511, 519 (P.R. 1985) ("To release himself from liability, the [defendant] . . . must, through a preponderance of the evidence, prove that . . . it was a case of force majeure."); *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1059 (Colo. 1992) ("Of course, the defendant bears the burden of proving by a

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

preponderance of the evidence any affirmative defense to the plaintiff's contractual claim.").

¶ 19    In the CLA, the parties anticipated the possibility of force majeure. The force majeure clause reads:

> Licensee shall not be in default for any failure or delay in performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee ("Force Majeure Event"). Invocation of force majeure by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.

> Where such Force Majeure Event results in failure in the performance or delay exceeding six (6) months of the performance due under this License Agreement, the Licensee may terminate this License Agreement forthwith provided that the Licensee shall not be excused from any payment obligations to the Commonwealth where the grounds and/or the purpose for such payments have already accrued.

> A change in law which prohibits performance of this agreement or makes such performance illegal shall result in a suspension of the performance of both Parties under this License Agreement until such prohibition no longer exists, provided that the Licensee shall have the option to terminate this License Agreement upon the adoption of the change in law pursuant to this section 25 as if such change in law is a Force Majeure Event.
> CLA cl. 25.

¶ 20    COVID-19 is the type of event that falls within the force majeure clause as an event "beyond the reasonable control of either party." *JN Contemp. Art, LLC v. Phillips Auctioneers, LLC*, 29 F.4th 118, 125 (2d Cir. 2022) (internal quotation and citation omitted). *See also Lampo Grp., LLC v. Marriott Hotel Servs.*, No. 3:20-cv-00641, 2021 U.S. Dist. LEXIS 148824, at *23 (M.D. Tenn. Aug. 9, 2021) ("[A] global pandemic is the type of 'act of God' that qualifies as a *force majeure*."). Thus, the force majeure clause would serve as a defense if COVID-19 was the proximate cause of IPI's noncompliance.

### B. Failure to Rule on Force Majeure

¶ 21    We next consider whether the Superior Court adequately considered the issue of force majeure. In its order, the court found that IPI had raised the defense to Complaints 001 and 002 but did not raise it to Complaints 003–005. However, upon deciding that CCC properly suspended IPI's license and imposed fines under the last three complaints, the court did not analyze whether force majeure was enforceable as to Complaints 001 and 002. *Commonwealth Casino Comm'n*

*v. Imperial Pac. Int'l (CNMI), LLC*, No. 21-0173 (NMI Super. Ct. Mar. 15, 2022) (Order Affirming the Casino Commission's Suspension of Petitioner's Exclusive Casino License and Monetary Penalties at 23–26). IPI claims the court erred by not considering force majeure's applicability to Complaints 001 and 002 because CCC imposed fines of $100,000 for Complaint 001 and $1,500,000 for Complaint 002, in addition to suspending its license.

¶ 22    We agree with IPI. Each of the five complaints is separate and distinct from the others—attacking IPI's violations under distinct provisions of the CLA, CMC, and NMIAC. *Commission Order No: 2021-002*, at ¶¶ 4, 8, 14–16. CCC weighed and meted out the penalties, specific to the violations in each complaint and independent of the other complaints. *Id.* at ¶¶ 5–7, 9–13, 17–33. Importantly, the penalties imposed for Complaints 001 and 002 included fines totaling $1.6 million above and beyond the fines imposed for Complaints 003–005. *Id.* at ¶¶ 7, 13; *see also* at ¶¶ 23–24. Consequently, the Superior Court erred in not considering IPI's force majeure defense on the grounds that the suspension of its exclusive license for the violations contained in Complaints 003–005 essentially mooted the issue of force majeure for Complaints 001 and 002.

### C. Complaint 001
#### i. Whether IPI Properly Raised Force Majeure as a Defense

¶ 23    In response to IPI's assertion of a force majeure defense regarding its failure to make the Community Benefit Fund contributions due in 2018 and 2019, CCC cites the NMI Rules of Civil Procedure, contending that IPI waived this affirmative defense by not raising it in its answer to Complaint 001. IPI counters that it raised the defense at the evidentiary hearing and that doing so was sufficient because the Rules of Civil Procedure do not apply to administrative proceedings. Appellant's Reply Br. at 4.

¶ 24    We have held that under NMI R. Civ. P. 8(c), parties must assert affirmative defenses in their responsive pleadings; otherwise, they are generally waived. *Sablan v. Elameto*, 2013 MP 7 ¶ 17. For the waiver not to apply, the plaintiff must either have had notice of the unpled defense, or else not have been prejudiced by the lack of notice ("the notice-prejudice exception"). *Id.* "Notice can be delivered in a motion for summary judgment or a pre-trial conference. [I]f a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice." *Id.* (internal quotation and citation omitted).

¶ 25    In the context of administrative procedures, the Montana Supreme Court provides helpful guidance:

> The purpose of requiring affirmative defenses to be pleaded is to give the opposing party notice of the defense and a chance to argue why imposition of the defense would be inappropriate . . . However . . . this is a function of the federal rules of civil procedure. Generally, the rules of civil procedure do not apply with equal force to administrative proceedings . . . The strict technical rules

governing judicial procedure generally do not apply to administrative proceedings which are simpler, less technical, and less formal than court proceedings . . . . Administrative procedures need not conform to all procedural niceties that surround the judicial process.

*Thompson v. J.C. Billion, Inc.*, 294 P.3d 397, 400 (Mont. 2013) (internal quotations and citations omitted).

¶ 26    Federal courts also recognize that the "technical failure to comply precisely with Rule 8(c) is not fatal." *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 856 (5th Cir. 1983). The Ninth Circuit, for example, has "liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings." *Magana v. Northern Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997). "The failure to assert an affirmative defense in an answer will not result in waiver if the opposing party has notice of the defense sufficient to avoid prejudice." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 924, n.9 (3d. Cir. 1997).

¶ 27    Taking into account the notice-prejudice exception and the relatively informal nature of administrative proceedings, we reject a hard rule in this instance. Parties can raise affirmative defenses for the first time at an agency hearing so long as the other party had notice or is not prejudiced.

¶ 28    Here, CCC had notice and was not prejudiced. IPI raised force majeure in its answer to Complaint 002, and since Complaint 001 and 002 were discussed at the same evidentiary hearing on February 25, 2021, CCC was on notice that the defense would be discussed. We hold that IPI did not waive force majeure as a defense to Complaint 001 by not raising it in its answer.

¶ 29    However, the record indicates that IPI did not raise force majeure at hearing:

CCC Counsel: So -- so, the events complained of, in Complaint Number 1 -- Exhibit Number 1, um, have absolutely no applicability to a force majeure situation, which they're not even allowed to raise anyway. This is for 2, not the first page. It doesn't apply to the CBF (phonetic) one.

IPI Counsel: Yeah.

Unidentified Male: Right.

IPI Counsel: Agreed.

*Id.* at 27.

¶ 30    IPI agreed that force majeure was inapplicable to Complaint 001. When it next spoke, it stated it was not raising force majeure as a defense to Complaint 001:

The idea of force majeure as it has to do with the Community Benefit Fund is pulled from the language of Ex- -- plaintiff's Exhibit 5I. I was just pointing it out to the Commission, so that is in

> evidence as – as it's been stipulated to. *Uh, I was not making a force majeure argument in relations to [the] Community Benefit Fund.* I was only bringing it up to - to show that there was a context for that agreement between the Lottery Commission and IPI.
>
> *On the other hand, I was making a force majeure argument on behalf of, um – for Complaint 002, which is the license fee.*
> *Id.* at 38–39 (emphasis added).

¶ 31    IPI stated that it was raising force majeure as an affirmative defense to Complaint 002 but not to Complaint 001. In administrative proceedings, affirmative defenses must be raised in an answer or alternatively at the agency hearing if the other party has notice or is not prejudiced. By failing to raise force majeure in its answer or at the hearing, we hold IPI waived that defense to Complaint 001.

### ii. Amendment No. 9

¶ 32    We ask next whether Amendment No. 9 affects the validity of CCC's imposition of sanctions for IPI's failure to make the required Community Benefit Fund contributions. Enacted after Complaint 001 was initiated, Amendment No. 9 states, "Licensee shall be given a deferment until October 1, 2025 to complete [payment of the Community Benefit Fund contributions due in 2018 and 2019.]" Amendment No. 9 at 2–3.

¶ 33    IPI argues that this deferment made Complaint 001's sanctions improper, and we agree. The United States Supreme Court has ruled:

> [W]hen the legislature repeals a criminal statute or otherwise removes the State's condemnation from conduct that was formerly deemed criminal, this action requires the dismissal of a pending criminal proceeding charging such conduct. The rule applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it.
> *Bell v. Maryland*, 378 U.S. 226, 230 (1964).

While this case is not criminal in nature, the same principle applies. Amendment No. 9 essentially operates as an intervening change in the law;[5] once the

---

[5]    At oral argument we questioned the Assistant Attorney General about the Office of the Attorney General's seeming omnipresence in this case, but did not receive a satisfactory answer. The Office of the Attorney General was signatory to the original CLA, and to its amendments, approving each document as to form and content or legal sufficiency. CLA at 17; Amendment No. 9 at 4. The Assistant Attorney General was present at evidentiary and non-evidentiary hearings, appearing on behalf of the CCC Executive Director on at least five separate occasions. Appx. to Appellant's Br. at 16, 77, 148, 355, 442, 494. The Assistant Attorney General has represented CCC before the Superior Court and now before this Court. We note that the varying roles and, at-times, contradictory legal positions the OAG has adopted throughout this case give us pause.

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

Community Benefit Fund contributions were no longer due in 2018 and 2019, CCC could no longer impose sanctions for IPI's failure to pay them in those years. CCC conceded this at oral argument. Accordingly, we hold that CCC erred in finding IPI liable for the violations contained in Complaint 001 and imposing sanctions.

### D. Complaint 002
#### i. Validity of Force Majeure in Light of Statutory Requirements

¶ 34     While IPI failed to raise force majeure as a defense to Complaint 001, it successfully raised the defense against the alleged violations in Complaint 002. But before we can discuss the merits of IPI's asserted force majeure defense to Complaint 002, we must determine whether the force majeure clause is preempted by statute. CCC found that, as a matter of law, force majeure is inapplicable as a defense to statutory requirements. The Superior Court did not reach this issue because it held the undisputed and undefended violations in Complaints 003–005 constituted sufficient grounds to uphold the sanctions for Complaints 001 and 002.

¶ 35     It is well-established that contractual provisions cannot override statutes. *Thayer v. Tandy Corp.*, No. 153, 1987, 1987 Del. LEXIS 1237, at *4 (Del. Sept. 28, 1987) ("Where contractual provisions circumvent statutory law, the statute overrides the contract."); *United States v. Hampton Rds. Sanitation Dep't*, No. 2:09-cv-481, 2012 U.S. Dist. LEXIS 46984, at *13 (E.D. Va. Apr. 2, 2012) ("The *force majeure* provision['s] . . . invocation here does not circumvent federal and state laws."). However, statutes themselves can contain force majeure clauses. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Jamison*, 815 F. Supp. 454, 470 (D.D.C. 1992) ("Congress provided a statutory *force majeure* exception to the requirements that leaseholders mine commercial quantities of coal within ten years and each subsequent year."); HAW. REV. STAT. ANN. § 209E-14 (LexisNexis 2023) (creating a force majeure exception to the requirements for agricultural businesses to be eligible for certain tax incentives).

¶ 36     Here, the legislature provided that, "After approving an application for the exclusive license, the Commonwealth Lottery Commission may negotiate the terms of the exclusive license before it is issued." 4 CMC § 2317(a)(1)(i)(A). By granting the Lottery Commission this statutory authority, the legislature implicitly authorized standard contract provisions such as a force majeure clause that could excuse noncompliance with contractual requirements, even if those obligations were also statutory requirements. The Annual License Fee is set by statute, but it is also required in Clause 5 of the CLA. Thus, even though 4 CMC § 2306 does not expressly contain a force majeure clause, the force majeure clause nonetheless applies to the Annual License Fee by way of the broad authority the statute delegates to the Lottery Commission to negotiate license

terms. CCC erred in ruling that force majeure was inapplicable as a matter of law to Complaint 002.[6]

### *ii. Substantial Evidence for Force Majeure*

¶ 37    Having determined that IPI's force majeure defense to Complaint 002 is not invalidated by statute, we consider CCC's rejection of the defense. When reviewing an administrative agency's factfinding, we apply a "substantial evidence" standard. 1 CMC § 9112(f)(v); *Pac. Sec. Alarm, Inc. v. CPA*, 2006 MP 17 ¶ 6. We have defined substantial evidence as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Owens v. Commonwealth Health Ctr.*, 2012 MP 05 ¶ 8. Considering the administrative record, we ask whether the evidence before CCC was such that a reasonable mind would find it adequate to support CCC's conclusion.

¶ 38    In rejecting the force majeure defense, CCC found that even if the defense was potentially applicable, IPI had failed to offer sufficient evidence to prove it. CCC went a step further, stating that "the Executive Director has established by clear and convincing evidence that the casino licensee's failure to make the required annual license fee payment was not due to a force majeure reason." Commission Order No: 2021-002 at ¶ 10. It claimed that the Executive Director:

> [O]ffered testimony that the casino licensee failed to pay the annual license fee not due to force majeure reasons; namely, that IPI had suffered large financial losses prior to the pandemic, that the casino licensee's auditors expressed "going concern" issues prior to the pandemic, and that the then-CEO admitted to the Commission in a public meeting on July 20, 2020 that IPI has some funding to satisfy the annual license fee.
>
> *Id.* at ¶ 9.

¶ 39    However, this testimony is not all the evidence that was before CCC. Having found that CCC should have considered Amendment No. 9 with respect to Complaint 001, we similarly hold that CCC should have taken Amendment No. 9's findings into account when considering COVID-19's impact on IPI's ability to pay the Annual License Fee. After all, the Lottery Commission acknowledged that COVID-19 negatively impacted IPI's financial ability to pay the fee. Amendment No. 9, in relevant part, states:

> WHEREAS, as a result of the COVID-19 pandemic, an unexpected major unpredicted global event that has already lasted almost 6 months and generally expected to last for many more months to come, Imperial Pacific's current ability to make payments that are currently in arrears has been impacted. On or about March 17, 2020,

---

[6]    CCC cites NMIAC §§ 175-10.1-640, 175-10.1-645, and 175-10.1-650 for the proposition that its regulations restrict the applicability of force majeure. However, these regulations were repealed prior to CCC sanctioning IPI. 42 Com. Reg. 44562 (Dec. 28, 2020).

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

> Imperial Pacific closed the operation of its casino in CNMI, citing
> diminished tourists to the CNMI and the present unknown as to
> when tourism may properly resume.
> Amendment No. 9 at 1.

In addition, IPI had paid the Annual License Fee every year until COVID-19
began and IPI shut down, cutting off revenue.

¶ 40    IPI's history of timely payment of the Annual License Fee until the advent
of COVID-19 was known to CCC as enforcer of the CLA. The parties' findings
in Amendment No. 9, which represent the Commonwealth's acknowledgment
that IPI was in a force majeure situation, were also known to CCC. Considering
the administrative record as a whole, the evidence that was before CCC when it
rejected IPI's force majeure defense was such that a reasonable mind would not
accept its conclusion as adequately supported in the record. Substantial evidence
does not support CCC's finding that COVID-19 was not the proximate cause for
the nonpayment of the Annual License Fee.[7]

¶ 41    Our finding that CCC's rejection of IPI's force majeure defense to
Complaint 002 lacked substantial evidence does not disturb our finding that force
majeure is an affirmative defense—the burden of proof for which lies with the
party asserting it. *Supra* at ¶ 18. On the contrary, our review for substantial
evidence holds IPI to its burden of proof while allowing additional deference for
CCC's adjudicatory authority. Indeed, if IPI met its burden of proof to
demonstrate by a preponderance of the evidence that COVID-19 was the
proximate cause of its default, CCC could still reasonably reject the defense
provided that such a rejection was supported by substantial evidence. *See
Universal Camera Corp. v. NLRB*, 340 U.S. 474, 481 (1951) ("[I]f what is called
substantial evidence is found anywhere in the record to support conclusions of
fact, the courts are said to be obliged to sustain the decision without reference to
how heavily the countervailing evidence may preponderate.") (internal
quotations omitted); *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014)
("Substantial evidence means more than a mere scintilla, but less than a
preponderance.") (internal quotations omitted). Thus, our holding that CCC's
decision fails for lack of substantial evidence incorporates a finding that IPI met
its burden of proof by a preponderance of the evidence.

### iii. Force Majeure Clause — Plain Meaning Interpretation

¶ 42    We now address the scope of the force majeure defense. CCC argues that
even if the force majeure clause is valid, IPI has agreed that force majeure will
not excuse its payment obligations that have already accrued. Appellee's Br. at
12. CCC also claims the Annual License Fee accrued upon executing the CLA
in 2014 and remained accrued as long as IPI retains the license. *Id*. IPI contends
that CCC's interpretation contradicts the plain meaning of the clause and would

---

[7]    Because we find that COVID-19 was a force majeure event, we do not discuss whether
Typhoons Soudelor and Yutu and changes to federal immigration law are force majeure
events.

render it meaningless and absurd because no contracting party would negotiate for a term excusing performance in the event of an Act of God, while at the same time making performance obligatory regardless of future events. Appellant's Reply Br. at 7–8. IPI interprets the clause to mean that its obligation to pay the Annual License Fee is fully excused because of force majeure, or alternatively, that its delay in making the Annual License Fee payments is excused during a force majeure event. *Id.*

¶ 43    We look to the plain language of the contract terms because, generally, they contain the parties' intent. *See Riley v. Pub. Sch. Sys.*, 4 NMI 85, 88 (1994). Also generally speaking, "[a] written contract must be read as a whole and every part interpreted with reference to the whole." *Isla Dev. Prop. v. Jang*, 2017 MP 13 ¶ 9. Put differently, "a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995). Additionally, we do not interpret a contract "in a way that will defy common sense or lead to absurd results." *Northern Marianas Housing Corp. v. BankPacific, Ltd.*, 2021 MP 07 ¶ 21 (citing *Manglona v. Baza*, 2012 MP 4 ¶ 36); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 203(a) ("[A]n interpretation which gives a 'reasonable' . . . meaning . . . is preferred.")

¶ 44    The first sentence of the force majeure clause states that IPI:

> [S]hall not be in default for any failure or delay in performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee.
> CLA cl. 25.

Reading this sentence in isolation, the parties intended to excuse any *failure* or *delay* in performance caused by the force majeure event. The second sentence then follows with:

> Invocation of force majeure by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.
> *Id.*

Sentence two clarifies that the parties did not intend for the invocation of force majeure to excuse IPI's payment obligations. Read together, sentence one protects IPI from default in the event of force majeure, while sentence two clarifies that this protection does not have the effect of excusing IPI's payment obligations.

¶ 45    IPI's contention that it would never have negotiated for a term excusing performance, while at the same time making performance obligatory, misstates what it agreed to in the CLA. The force majeure clause excuses IPI's *default* in

the event of force majeure, not its duty to perform as a whole. The term "default" refers to "the omission or failure to perform a legal or contractual duty." BLACK'S LAW DICTIONARY 377 (9th ed. 2010). When a party to a contract defaults, that is, fails to perform their contractual duties when time comes to perform, they have breached the contract. *Manglona v. Baza*, 2012 MP 04 ¶ 13 (citing RESTATEMENT (SECOND) OF CONTRACTS § 235(2) (1979)). Non-payment of a lump sum required by the contract at the appropriate time set forth in the contract is a breach of the contract for which relief can be granted. *Id.* As such, were it not for the protection of the force majeure clause, IPI's failure to pay the 2020 Annual License Fee when time came due would normally constitute a default for which CCC, as enforcer of the Commonwealth's interests under the CLA, could obtain appropriate relief. However, the force majeure clause has the effect of protecting IPI from the consequences of default during a force majeure event. Thus, because we have concluded that COVID-19 was a valid force majeure event that was the proximate cause of IPI's failure to pay the 2020 Annual License Fee, CCC's imposition of penalties under Complaint 002 was improper because the force majeure clause protects IPI from the consequences of default.

¶ 46    The penalties for IPI's default on the 2020 Annual License Fee were improper because of force majeure. That being said, the force majeure clause plainly states that invocation of the defense, while excusing default resulting from a force majeure event, does not excuse payment obligations, "where the grounds and or purpose for such payments have already accrued." CLA cl. 25. Notably, the CLA refers to *where*—not *when*—such grounds or purpose accrue. *Id*. The question, then, is not when IPI's obligation to pay the 2020 Annual License Fee accrued, but whether it accrued. The grounds or purpose for payment of the 2020 Annual License Fee would appear simple: the maintenance of IPI's status as exclusive licensee for the year 2020. By this measure, IPI's obligation as Licensee to make the Annual License Fee payment each year accrues for the purpose of maintaining its status as Licensee. As such, every year that IPI continues as the exclusive licensee under the CLA, the grounds and or purpose of its obligation to pay the Annual License Fee accrue. While IPI would like us to find that the COVID-19 pandemic excused its obligation to pay outright, that would contradict the plain language of the CLA, which excuses IPI's default during a force majeure event, but not its obligation to pay.

¶ 47    We similarly reject CCC's interpretation that IPI's obligation to pay each year accrued at the time the CLA was formed. After all, sentence three of the force majeure clause provides IPI with an escape route from its contractual obligations in the event of force majeure. It reads:

> Where such Force Majeure event results in failure in the performance or delay exceeding six (6) months of the performance due under this License Agreement, the Licensee may terminate this License Agreement forthwith provided that the Licensee shall not be excused from any payment obligations to the Commonwealth

where the grounds and/or the purpose for such payments have already accrued.
CLA cl. 25.

If IPI, six months after COVID-19 forced the shutdown, had chosen to promptly exercise its right under the force majeure clause to terminate the license agreement, CCC's interpretation of "accrual" would have the absurd result of terminating the CLA while requiring IPI to continue making Annual License Fee payments in perpetuity. We will not construe the CLA "in a way that . . . lead[s] to absurd results," *NMHC*, 2021 MP 7 ¶ 21, so we reject CCC's reading of the force majeure clause.

¶ 48    A reasonable interpretation of the force majeure clause, read with "reference to the whole," and "giv[ing] effect to all its provisions, and to render them consistent with each other," *Isla Dev. Prop.*, 2017 MP 13 and *Mastrobuono*, 514 U.S. 52 at 63, is that force majeure excuses any default in IPI's payment during a force majeure event. At the same time, IPI remains obligated to pay the Annual License Fee for every year that the grounds or purpose for that fee, that is, IPI's maintenance of its status as the exclusive licensee under the CLA, accrues. IPI's failure to terminate the CLA under sentence three of the force majeure clause demonstrates IPI's intention to remain the exclusive licensee under the CLA, with all the rights and duties thereof. Under the force majeure clause of the CLA, IPI's default in paying the Annual License Fee is excused while force majeure is in effect, but its payment obligations continue to accrue each year. At oral argument, IPI agreed that the force majeure event has now ended, meaning that the unpaid fees are now due within a reasonable period of time as CCC determines.

*E. Complaints 003, 004, and 005*

¶ 49    Lastly, we turn to Complaints 003–005, asking whether substantial evidence supports CCC's imposition of sanctions for these complaints. IPI asks us to find that force majeure "applies to each of the Enforcement Actions brought by the CCC." Appellant's Br. at 26. It says its invocation of force majeure with respect to Complaint 002 should be "applied broadly" because its "obligations, from which all of the Commission's Enforcement Actions sprout, are derived from the same root: the exclusive casino license" and because its "inability to fulfill the various obligations that form the basis for the CCC's Enforcement Actions also all derive from the same cause: IPI's complete lack of revenue after the COVID-19 pandemic forced the Company to close its operations in March 2020." *Id*. at 26–27.

¶ 50    CCC's order states that "[t]he casino licensee offered no defense to the claims alleged in Enforcement Actions 2020-003, 2020-004, and 2020-005." Commission Order No: 2021-002 at ¶ 17. The court below agreed, finding that IPI "offered no defense and did not contest any of the claims alleged in Enforcement Actions 2020-003, 2020-004, or 2020-005." *Commonwealth Casino Comm'n v. Imperial Pac. Int'l (CNMI), LLC*, No. 21-0173 (NMI Super. Ct. Mar. 15, 2022) (Order Affirming the Casino Commission's Suspension of

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

Petitioner's Exclusive Casino License and Monetary Penalties at 25) (emphasis omitted). It held that CCC met its evidentiary burden. *Id.* at 22.

¶ 51    The evidentiary hearing on Complaints 003–005 occurred on March 2, 2021. After CCC explained what the complaints involved, IPI said, "We don't dispute the charges against IPI as outlined by [CCC]." March 2, 2021 Tr. at 9.

¶ 52    After introducing a list of different stipulations in which IPI conceded that it had committed violations alleged in Complaints 003-005, CCC said, "If IPI will offer no defense, the Director moves for judgement on each claim of each complaint and is ready to argue for the appropriate penalty." *Id*. at 14–15. IPI responded that it "will not be mounting a defense." *Id*. at 15. When CCC discussed possible sanctions for IPI, it said:

> [T]he fact is the evidence shows that IPI has absolutely zero respect for you . . . If IPI respected the Commission, it would have done the bare minimum. They're going to say "We have no money." I'm assuming they're going to say force majeure. They're going to say "We have a federal receivership."
> *Id*. at 24.

¶ 53    IPI responded:

> Um, it was -- it was mentioned dismissively about force majeure. Um, and I didn't raise it as an affirmative defense in the defense section but wanted to just bring it up as a mitigating circumstance that I think this Commission ought to take into consideration when framing whatever plan that is that's gonna [sic] be imposed on IPI.
> *Id.* at 34.

¶ 54    IPI continued, asking that CCC "create . . . systems of checks and balances and uphold IPI accountable but with the understanding of the economic crisis that it's being faced with and its ability to incrementally make progress." *Id.* at 37–38.

¶ 55    IPI first said, "We don't dispute the charges." *Id*. at 9. Second, it stated that it "will not be mounting a defense." *Id*. at 15. Third, it said that it "didn't raise [force majeure] as an affirmative defense." *Id*. at 34. Finally, it asked CCC to create "systems of checks and balances and hold [it] accountable." *Id*. at 38.

¶ 56    Instead of contesting Complaints 003–005, IPI conceded the violations, seemingly in hopes of lessening the sanctions. When IPI discussed force majeure, it called it "a mitigating circumstance . . . to [be] take[n] into consideration when framing whatever plan that is that's gonna [sic] be imposed." *Id*. at 34. Seeking leniency in sanctions imposed by CCC on the basis of alleged economic constraints is not equivalent to arguing that force majeure excuses its performance.

¶ 57    Having previously chosen to ask for leniency instead of raising any defenses, IPI now adopts a different tactic by asserting force majeure excuses for

all its noncompliance. But IPI's force majeure argument for Complaint 002 cannot be so easily translated to Complaint 003–005 because to do so would ignore IPI's consistent representations before the agency.

¶ 58    A party may change its mind or its theory of the case so long as it avoids judicial estoppel,[8] but to permit IPI to raise force majeure at this stage as to Complaints 003–005 would violate four overlapping rules.

¶ 59    First, as a general matter, "[t]o preserve an issue for appeal from an agency's decision, a party must raise the issue before the agency." *Doucette v. Mass. Parole Bd.*, 18 N.E.3d 1096, 1100 (Mass. App. Ct. 2014); *see also Tejeda-Mata v. I.N.S*, 626 F.2d 721, 726 (9th Cir. 1980) ("[I]f a petitioner wishes to preserve an issue for appeal, he must raise it first in the proper administrative forum."). Second, as already discussed, force majeure is an affirmative defense, and in administrative proceedings, affirmative defenses must be raised in an answer or at the agency hearing if the other party has notice or is not prejudiced. S*upra*, at ¶ 27. Because it did not, IPI waived force majeure as a defense to Complaints 003–005.

¶ 60    Third, "[o]urs is an adversarial system of justice. The presumption, therefore, is to hold the parties responsible for raising their own defenses." *United States v. Mitchell*, 518 F.3d 740, 749 (10th Cir. 2008); *see also Holsey v. Bass*, 519 F. Supp. 395, 408 (D. Md. 1981) ("Generally, it is the duty of the defendant to plead affirmative defenses, and the court cannot raise such defenses sua sponte."). While remaining silent would have been enough to waive force majeure, IPI affirmatively stated it was not raising the defense to Complaints 003–005. CCC can hardly be faulted for not applying a defense that IPI explicitly waived.

¶ 61    Fourth, the goal of judicial review is to examine the propriety of the determination at the time it was made, not to allow a redo of what happened before the agency. *See DOL, Licensing & Regul. v. Boardley*, 883 A.2d 953, 960 (Md. 2005) ("It is the function of the reviewing court to review only the materials that were in the record before the agency at the time it made its final decision."); *Fund for Animals v. Williams*, 391 F. Supp 2d. 191, 196 (D.D.C. 2005) ("Because the court's review is confined to the administrative record at the time of the agency's decision, it may not include some new record made initially in the

---

8    Judicial estoppel is a doctrine that prevents parties from unfairly flip-flopping:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.
> *KTT Corp. v. Tomokane*, 2003 MP 17 ¶ 21 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

reviewing court.") (internal quotation and citation omitted). IPI states, "In its arguments before the Superior Court, IPI drew no distinction between the application of the *force majeure* defense to the various Enforcement Actions brought against it by the CCC." Appellant's Br. at 26. That is irrelevant because our review focuses on what happened before the agency, not the court below. *See In re Blankenship*, 3 NMI 209, 217 (1992).

¶ 62   In short, IPI admitted to the violations in Complaints 003–005, stated multiple times that it was not raising any defense, and even asked to be held accountable. CCC accepted as much and ruled accordingly. Unlike the evidence in the record contradicting the reasonableness of CCC's rejection of IPI's force majeure defense to Complaint 002, no such evidence is in the record to gainsay the reasonableness of CCC's decision as to Complaints 003–005 in light of IPI's admissions at hearing. Thus, we find that substantial evidence supports CCC's sanctions for Complaint 003, Complaint 004, and Complaint 005.

### F. CAPA & Due Process

¶ 63   Lastly, IPI claims that CCC violated CAPA and its due process rights by considering evidence outside the record. Specifically, IPI argues that CCC improperly considered the 2020 annual report released by IPI's parent company when rejecting its force majeure defense. Because we have already reversed CCC's decisions as to Complaints 001 and 002 on other grounds and found that CCC did not raise a force majeure defense as to Complaints 003–005, we need not address whether the CCC's consideration of the annual report violated CAPA or due process.

### V. CONCLUSION

¶ 64   The Commonwealth Casino Commission improperly imposed sanctions against IPI for Complaint 001. The Lottery Commission approved Amendment No. 9, which, in effect, eliminated IPI's default by altering the due dates of its obligation to make the required contributions to the Community Benefit Fund. CCC improperly imposed sanctions against IPI for Complaint 002. The record demonstrates that there was not substantial evidence to support CCC's finding that COVID-19 was not the proximate cause of IPI's failure to pay the Annual License Fee in 2020, excusing its default. The Annual License Fees for 2020 and the following years have accrued and continue to accrue, and CCC must now decide on a reasonable deadline for IPI to pay them. Finally, the sanctions CCC imposed against IPI for Complaint 003, Complaint 004, and Complaint 005— suspending its license and imposing fines—were proper. Substantial evidence supports them because IPI admitted to the violations and offered no defense. For the foregoing reasons, the trial court's ruling is AFFIRMED in part and REVERSED in part. This matter is REMANDED to the Commonwealth Casino Commission for further proceedings consistent with this opinion.

SO ORDERED this 25th day of August, 2023.

*Commonwealth Casino Comm'n v. Imperial Pac. Int'l*, 2023 MP 8

_/s/_____
ALEXANDRO C. CASTRO
Chief Justice


_/s/_____
JOHN A. MANGLOÑA
Associate Justice


_/s/_____
PERRY B. INOS
Associate Justice

COUNSEL

Kevin T. Abikoff, Washington, D.C. (pro hac vice); Joey P. San Nicolas, Saipan, MP, for Appellant.

Keisha Blaise, Assistant Attorney General, Saipan, MP, for Appellee.

NOTICE

This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it is subject to revision or withdrawal. In any event of discrepancies between this slip opinion and the opinion certified for publication, the certified opinion controls. Readers are requested to bring errors to the attention of the Clerk of the Supreme Court, P.O. Box 502165 Saipan, MP 96950, phone (670) 236–9715, fax (670) 236–9702, e–mail Supreme.Court@NMIJudiciary.gov.