# COMMONWEALTH'S EXHIBIT 1

1

Juan Lizama, Esq.
LIZAMA LAW OFFICE

2

P.O. Box 501508, Saipan, MP 96950
Telephone: (670) 234-7220/483-2662

3

lizama2008@gmail.com

4

Tiberius D. Mocanu
LAW OFFICE OF STEPHEN J. NUTTING

5

6th Floor Marianas Business Plaza
P.O. Box 5093

6

Saipan, MP 96950
Telephone: (670) 234-6891

7

Facsimile: (670) 234-6893
tiberiusmocanu@gmail.com

8

*Attorneys for Defendant Imperial Pacific International (CNMI), LLC*

9

10

IN THE SUPERIOR COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

11

12

**In re:**

CIVIL CASE NO. _____

13

**Commission Order No: 2021-002; Final
Order for Enforcement 20-001 and 20-003
(consolidated).**

14

**COMMONWEALTH CASINO
COMMISSION,**

15

**PETITION FOR JUDICIAL REVIEW**

16

**Agency,**

17

**IMPERIAL PACIFIC INTERNATIONAL
(CNMI) LLC,**

18

19

**Petitioner.**

20

21

**PETITION FOR JUDICIAL REVIEW**

22

Pursuant to 1 CMC § 9112 and the Commonwealth Rules of Procedure for Administrative

23

Appeals, Petitioner Imperial Pacific International (CNMI), LLC ("Imperial Pacific" or "Petitioner")

24

hereby petitions the Court for judicial review of Commission Order No: 2021-002; Final Order for

E-FILED
CNMI SUPERIOR COURT
E-filed: May 21 2021 02:01PM
Clerk Review: May 26 2021 10:25AM
Filing ID: 66620511
Case Number: 21-0173-CV
Delia  Barcinas

Enforcement Actions 20-001 (consolidated) and 20-003 (consolidated), issued by the Commonwealth Casino Commission ("CCC") on April 22, 2021.

This proceeding is an enforcement action by the CCC, addressing (1) Enforcement Action 2020-001 (consolidated), which encompassed actions 2020-001 and 2020-002, and (2) Enforcement Action 2020-003 (consolidated), which encompassed actions 2020-003, 2020-004 and 2020-005. The CCC issued Commission Order No: 2021-002 based on (1) Petitioner's non-payment of community benefit fund contributions allegedly required pursuant to the August 12, 2014 Casino License Agreement between Petitioner and the Commonwealth Lottery Commission (the "Lottery Commission") and amendments thereto (the "Casino License Agreement"), (2) Petitioner's non-payment of annual license fees allegedly required pursuant to Commonwealth law, the Casino License Agreement, and applicable regulation, (3) Petitioner's alleged failure to comply with previous CCC Orders 2020-003 and 2020-004, and (4) Petitioner's non-payment of casino regulatory fees purportedly required under Commonwealth law, applicable regulation, and the Casino License Agreement.  Based on these findings, the CCC issued Commonwealth Order No: 2021-002, requiring Petitioner to pay penalties totaling $6.6 million, indefinitely suspending Petitioner's gaming license, ordering Petitioner to pay a total of $18.6 million purportedly due under the Casino License Agreement and applicable regulation, and directing Petitioner to comply with previous Orders issued by the CCC.

Petitioner now asks the Court to set aside the CCC's Commission Order No: 2021-002 on the following grounds:

1. That Order is arbitrary, capricious, an abuse of discretion and not in accordance with the law, as the CCC did not consider, determine or reasonably base that Order upon the appropriate

application of principles of *force majeure* under Commonwealth law, the Force Majeure clause set forth in the Casino License Agreement (Article 25), and the undisputed occurrence of *force majeure* events, including without limitation those events expressly recognized by the Governor of the Commonwealth and the Lottery Commission in Amendment No. 9 to the Casino License Agreement (executed December 15, 2020), stating that:

> [A]s a result of the COVID-19 pandemic, an unexpected major unpredicted global event that has already lasted almost 6 months and generally expected to last for many more months to come, Imperial Pacific's current ability to make payments that are currently in arrears has been impacted. On or about March 17, 2020, Imperial Pacific closed the operation of its casino in CNMI, citing diminished tourists to the CNMI and the present unknown as to when tourism may property resume; and

> [A]s a result of various natural climatic events including super typhoons Soudelor and Yutu and recently, the Federal change in immigration laws and regulations that include a prevention of CW visa holders from working in construction, [and] further an additional Federal change in immigration policy that prevents construction companies from hiring H-2B workers as construction workers, which are entirely beyond the control of Imperial Pacific, Imperial Pacific [has] not completed the needed construction [of the first hotel in the Integrated Resort];

    2. That Order is unwarranted by the facts, including without limitation for the reasons set forth in Amendment No. 9 to the Casino License Agreement, above; and

    3. That the proceedings on which the CCC based that Order were held without observance of procedure required by law, as the CCC in making its findings improperly relied on material not in the evidentiary record, including without limitation the 2020 annual report of Petitioner's indirect parent company.  Petitioner did not have an opportunity to challenge, examine or rebut the conclusions drawn from the CCC's consideration of such evidence.

Dated:  May 21, 2021

Respectfully Submitted,

_____/s/_____
Juan Lizama, Esq.
P.O. Box 501508, Saipan, MP 96950
Telephone: (670) 234-7220/483-2662
lizama2008@gmail.com

Tiberius D. Mocanu
6th Floor Marianas Business Plaza
P.O. Box 5093
Saipan, MP 96950
Telephone: (670) 234-6891
Facsimile: (670) 234-6893
tiberiusmocanu@gmail.com

*Attorneys for Defendant Imperial Pacific*
*International (CNMI), LLC*

Juan Lizama, Esq.
LIZAMA LAW OFFICE
P.O. Box 501508, Saipan, MP 96950
Telephone: (670) 234-7220/483-2662
lizama2008@gmail.com

Daniel H. Weiner, Esq. (*Pro Hac Vice*)
Kevin T. Abikoff, Esq. (*Pro Hac Vice*)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Tel: (212) 837-6000
daniel.weiner@hugheshubbard.com
kevin.abikoff@hugheshubbard.com

*Attorneys for Petitioner Imperial Pacific International (CNMI), LLC*

E-FILED
CNMI SUPERIOR COURT
E-filed: Nov 05 2021 02:49PM
Clerk Review: Nov 08 2021 07:48AM
Filing ID: 67071768
Case Number: 21-0173-CV
Eva  Calvo

## IN THE SUPERIOR COURT
## FOR THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

**In re:**

**Commission Order No: 2021-002; Final Order for Enforcement Actions 20-001 (consolidated) and 20-003 (consolidated).**

**COMMONWEALTH CASINO COMMISSION,**

**Agency,**

**IMPERIAL PACIFIC INTERNATIONAL (CNMI) LLC,**

**Petitioner.**

**Civil Case No. 21-0173-CV**

**PETITIONER'S BRIEF IN SUPPORT OF PETITION FOR JUDICIAL REVIEW**

**Date:  November 5, 2021**

**Judge Wesley M. Bogdan**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# Table of Contents

PRELIMINARY STATEMENT ........................................................................1

JURISDICTIONAL STATEMENT ...................................................................2

STATEMENT OF THE ISSUES.......................................................................2

STATEMENT OF FACTS ................................................................................2

    I.      The Casino License Agreement ...................................................2

    II.     Force Majeure Events ...................................................................4

         A.      Super Typhoons Soudelor and Yutu .................................5

         B.      Unanticipated Changes in Labor Law.........................6

         C.      The COVID-19 Pandemic...........................................7

    III.    CLA Amendment No. 9 ...............................................................9

    IV.    CCC Order No: 2021-002 ..........................................................10

ARGUMENT ..................................................................................................12

    I.      The Commission's Failure to Recognize COVID-19 as a *Force Majeure* Event Warrants Setting Aside the CCC Order.........................12

         A.      COVID-19 Constituted a *Force Majeure* Event under Article 25 of the CLA.........................................................12

         B.      The CCC's Reasons for Refusing to Invoke the *Force Majeure* Provision Were Unsupported by the Evidence. .........................15

    II.    The Commission Improperly Based its Findings on Materials Outside the Evidentiary Record. ..................................................................18

         A.      Due Process and Commonwealth Law Required the CCC to Base its Order Only on Materials in the Evidentiary Record. ...........................18

         B.      The CCC Commissioners' own Statements Demonstrate that They Based the CCC Order on Evidence that was not Properly Admitted. ......................................................20

C.   The CCC Commissioners Consideration of Evidence that was Not
     Properly Admitted is Grounds to Set Aside the CCC Order. ....................22

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Claasens v. Rota Health Ctr.*, 2021 WL 32780026 (N. Mar. I. Aug. 2, 2021) ..........................................4

*Commonwealth v. The Tinian Casino Gaming Control Comm*, 1992 WL 135873
   (N. Mar. I. May 12, 1992) ..........................................................16, 17, 18

*Friends of DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020) ...............................................13, 14

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ........................................................19

*Hydrocarbon Mgmt. Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427 (Tex.
   App. 7th 1993) .................................................................13

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 2020 WL 7405262
   (S.D.N.Y. Dec. 16. 2020) ........................................................14

*Johnson v. Johnson*, 153 A.2d 863 (Pa. Super. 2007) ...................................................19

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) .............................................18, 19

*Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295 (N.Y. 1987) ..................................................13

*Korean Buddhist Dae Won Sa Temple v. Sullivan*, 953 P.2d 1315 (Haw. 1998) ........................23

*Masaki v. Gen. Motors Corp.*, 780 P. 2d 566 (Hawaii 1989) ....................................................16, 17

*Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) ....................................14

*Snell v. Walz*, 2021 Minn. Dist. LEXIS 98 (Mar. 15) ....................................................14

*Sun Pac. Mktg. Coop., Inc. v. DiMare Fresh, Inc.*, 2010 WL 3220301 (E.D. Cal.
   Aug. 13, 2010) .................................................................13

*Taylor v. Caldwell*, 122 ER 309 (1863) ..........................................................12

*Town v. Land Use Commission*, 524 P.2d 84 (Haw. 1974) ...........................................22, 23, 24

*Waikiki Shore, Inc. v. Zoning Bd. Of Appeals*, 625 P.2d 1044 (Haw. 1981) ...................22, 23, 24

**Statutes and Rules**

U.S. Const. amend. XIV ..........................................................18

48 U.S.C. § 1801, Sec. 501(a) ..........................................................18

FED. R. EVID. 201 ............................................................................................4

8 CFR 214.2(w)(2)(vii) ....................................................................................7

175 N. MAR. I. ADMIN. CODE § 10.1-1415 ...................................................19

NMI R. EVID. 201 ............................................................................................4

1 CMC § 9109(l) ............................................................................................19

1 CMC § 9112 ...................................................................................2, 12, 19

4 CMC § 2309(a) .........................................................................................4, 15

HAW. REV. STAT. § 91-10 ............................................................................23

**Other Authorities**

*Act of God*, MERRIAM WEBSTER DICTIONARY ............................................13

*Force Majeure*, BLACK'S LAW DICTIONARY (11th ed. 2019) .................13, 14

JOHN HENRY WIGMORE, THE POCKET CODE OF THE RULES OF EVIDENCE IN TRIALS
    AT LAW § 2120 (1910) ............................................................................4

Restatement (Second) of Contracts § 1 (1981) ............................................16

**PRELIMINARY STATEMENT**

Petitioner Imperial Pacific International (CNMI) LLC ("IPI") seeks relief from Commonwealth Casino Commission ("CCC" or "Commission") Order No: 2021-002 (the "CCC Order"), issued by the CCC on April 22, 2021.  In the midst of a global pandemic that prevented all travel to the CNMI and forced IPI's casino business to close, the CCC brought enforcement actions against IPI based on its failure to pay casino licensing and regulatory fees and to make annual contributions to the Community Benefit Fund, as well as IPI's alleged violations of past CCC orders based on failure to maintain Commission-mandated cash reserves in a CNMI or U.S. bank account, and failure to pay certain accounts payable as ordered by the CCC.

In making the findings on which the Commission based its order, the CCC failed to recognize the doctrine of *force majeure*, despite the presence of a *force majeure* provision in the Casino Licensing Agreement ("CLA")—the contractual agreement governing the terms and conditions of the casino license issued to IPI by the government of the CNMI, acting through the Commonwealth Lottery Commission (the "CNMI Lottery Commission")—and the clear, severe impact of a *force majeure* event, the COVID-19 pandemic, on IPI's ability to comply with its obligations.  By ignoring the significant impact of the COVID-19 pandemic on IPI's ability to comply with these obligations, the CCC Order was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and was unwarranted by the facts.  In addition, statements made by the CCC in announcing the CCC Order illustrate that, in reaching its decision and issuing that order, the CCC relied on materials not admitted in the evidentiary record, and thereby deprived IPI of the opportunity to challenge, examine, or rebut the CCC's conclusions drawn from that evidence.  As such, the CCC Order was issued without observance of procedure required by law.  Based on these reasons, the Court should set aside the CCC Order.

**JURISDICTIONAL STATEMENT**

The Court has jurisdiction of this action pursuant to 1 CMC § 9112(b), which authorizes IPI to appeal for judicial review of an agency action. Here, IPI seeks judicial review of the CCC Order, which is a final agency order in a contested case. *See* CCC Order at ¶ 36.

**STATEMENT OF THE ISSUES**

1) Whether the Court should set aside the CCC Order based on the Commission's failure to consider, determine, or reasonably base that order upon the appropriate application of principles of *force majeure* under Commonwealth law, the *Force Majeure* clause at Article 25 of the Casino License Agreement, and the undisputed occurrence of *force majeure* events—in particular, the COVID-19 pandemic—as expressly recognized by the Governor of the Commonwealth and the CNMI Lottery Commission in Amendment No. 9 to the Casino License Agreement (executed December 15, 2020).

2) Whether the Court should set aside the CCC Order based on the Commission's improper consideration, in making findings and issuing that Order, on evidence not admitted in the evidentiary record, thereby depriving IPI of the opportunity to challenge, examine, or rebut the CCC's conclusions drawn from that evidence.

**STATEMENT OF FACTS**

**I.    The Casino License Agreement**

On August 12, 2014, IPI entered into the CLA with the government of the CNMI, represented by the CNMI Lottery Commission; the agreement was also signed by the CNMI Attorney General. *See* Declaration of Daniel H. Weiner in Support of Petitioner's Brief (hereinafter "Weiner Decl."), Ex. 1. The CLA grants IPI an exclusive license to operate casino gaming activity in Saipan for a term of twenty-five years, pursuant to Public Law 18-56, which was incorporated into the CLA. *See id.* at §§ 1, 4. The CLA provides that, following the CCC's

issuance of a casino license to IPI, the CCC will have authority over all casino operations and gaming activity conducted under that license, including establishing gaming rules and regulations and licensing "consistent with the requirements of the Commonwealth Administrative Procedure Act and this Agreement." *Id.* at § 3.

The CLA provides for IPI's payment of a $15 million Annual License Fee, which may be adjusted every five years based on the consumer price index, *id*. at § 5, as well as payments tied to completion of certain milestones and made for the purpose of benefiting the community— identified as "Community Benefit Contribution."  *Id*. at § 16.  The CLA also requires IPI to develop and construct gaming and hospitality facilities, and includes terms governing the scope and timing of development and the establishment of an advisory committee to coordinate between IPI and the Commonwealth.  *Id*. at §§ 6–13.

While the CLA provides that IPI's gaming license may be suspended or revoked based on "failure to pay any amount due and payable hereunder upon the date when such payment is due," *id*. at § 31, that agreement also includes a *Force Majeure* provision, which provides that IPI will not be in default if its failure or delay is due to causes beyond IPI's control:

> Licensee shall not be in default for any failure or delay in the performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to:  Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee ("Force Majeure Event"). Invocation of force majeure by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.

*Id*. at § 25.

Since entering into force in August 2014, the CLA has been amended nine times for various purposes, including altering its scope, monitoring requirements, schedule for completion, and other terms related to the gaming and hospitality facilities being developed by IPI.  Most

recently, in December 2020, IPI and the CNMI government, represented by Governor Ralph Deleon Guerrero Torres and the CNMI Lottery Commission, entered CLA Amendment No. 9, which as discussed in greater detail below addressed the extraordinary impact of the COVID-19 pandemic and other events outside of IPI's control on IPI's ability to make payments under the CLA. *See* Weiner Decl., Ex. 2.

In addition to the licensing fee required by the CLA, on December 4, 2015, the CNMI Governor signed Public Law No. 19-24, which established a casino regulatory fee, initially set at $3 million with 5% increases authorized every five years, to be paid annually by IPI to the CCC on October 1. *See* 4 CMC § 2309(a).

## II.    Force Majeure Events

The years since 2014 have been marked by a succession of unanticipated natural disasters and unexpected changes in federal law that, both individually and taken together, led to significant unexpected delays in IPI's casino and hospitality developments. Even prior to the onset of the COVID-19 pandemic, IPI's casino and hotel development projects had been delayed by multiple *force majeure* events. [1]

---

[1] The Court can take judicial notice of facts that are considered general knowledge or which are not subject to reasonable dispute. See Fed. R. Evid. 201; NMI R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the Commonwealth or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Claasens v. Rota Health Ctr.*, 2021 WL 32780026, at *2, n.7 (N. Mar. I. Aug. 2, 2021) ("The court is authorized to take judicial notice *sua sponte* of a fact that cannot be subject to reasonable dispute"). This rule of judicial notice has been a long-standing feature of U.S. law and is used by courts "to save time, labor, and expense in securing and introducing evidence on matters which are not ordinarily capable of dispute and are actually not bona fide disputed, and the tenor of which safely be assumed from the tribunal's general knowledge or from slight research on its part." John Henry Wigmore, *The Pocket Code of the Rules of Evidence in Trials at Law* § 2120 (1910).

4

A.  Super Typhoons Soudelor and Yutu

On August 2, 2015, super typhoon Soudelor hit the CNMI, causing widespread damage across the islands.  The CNMI Acting Governor declared a "state of major disaster and significant emergency" as wind gusts of 130–160 miles per hour downed trees and power lines, destroyed numerous homes, and damaged much of CNMI's physical and electrical infrastructure.[2]  Destruction in the CNMI was extensive. Soudelor caused an estimated $20 million in damage and destroyed an estimated one-half of the primary power distribution system.[3]  At that time, it was considered the largest typhoon to impact the CNMI in over 30 years.[4]  Just three years later, super typhoon Yutu—labelled a Category 5-equivalent typhoon— surpassed Soudelor to become the strongest tropical cyclone to ever strike the CNMI.[5]  Winds of nearly 180 miles per hour left the entirety of Saipan and Tinian without electricity or running water and damaged or destroyed the majority of buildings and most of the CNMI's infrastructure.[6]

---

[2] See Storm Events Database, NAT'L OCEANIC AND ATMOSPHERIC ADMINISTRATION, https://www.ncdc.noaa.gov/stormevents/eventdetails.jsp?id=601887 (last visited Oct. 27, 2021); Typhoon Soudelor Slams Saipan, PACIFIC NEWS CENTER (Aug. 3, 2015), https://web.archive.org/web/20150805021239/http://www.pacificnewscenter.com/local/item/4930-typhoon-soudelor-slams-saipan.

[3] See Storm Events Database, supra note 2.

[4] Typhoon Soudelor becomes world's most powerful storm as it trashes through Northern Marianas, RELIEFWEB.INT (Aug. 5, 2015), https://reliefweb.int/report/northern-mariana-islands-united-states-america/typhoon-soudelor-becomes-worlds-most-powerful.

[5] Super Typhoon Yutu Strongest to Hit Northern Mariana Islands Ever, THE WEATHER CHANNEL (Oct. 25, 2018), https://weather.com/storms/hurricane/video/super-typhoon-yutu-strongest-to-hit-northern-mariana-islands-ever; see also Extreme Category 5 typhoon, the worst U.S. storm since 1935, leaves Northern Mariana Islands devastated, WASH. POST (Oct. 25, 2018), https://www.washingtonpost.com/energy-environment/2018/10/24/extreme-category-typhoon-yutu-makes-devastating-landfall-northern-mariana-islands-us-commonwealth/.

[6] Humanitarian crisis looms after Super Typhoon Yutu flattens parts of Saipan and Tinian, USA TODAY (Oct. 26, 2018), https://www.usatoday.com/story/news/2018/10/25/super-typhoon-yutu-leaves-1-dead-crisis-looms-saipan-and-tinian/1771400002/.

Both of these super typhoons caused significant delay in IPI's development projects—not only by damaging the casino construction site, but through damage to infrastructure, housing, and other facilities throughout Saipan that made it difficult or impossible for IPI to continue construction at full pace in the wake of these devastating storms.

B.  Unanticipated Changes in Labor Law

As IPI continued to recover from the effects of two of the largest typhoons in the CNMI's history, its development progress was further affected by unanticipated changes in federal immigration and labor law.  Prior to 2019, IPI had used the H-2B visa program[7] and the CW-1 visa program[8] to bring skilled international construction workers to Saipan to work on its casino construction project.  IPI found that, due to the complexity and scale of its construction, it was unable to adequately staff the project using local labor alone.

However, in 2020 the federal government restricted both the H2-B and CW-1 visa programs.  On April 14, 2020, then-President Trump issued a Presidential Proclamation suspending the H-2B visa program.  The program was initially suspended for 60 days, but this was later extended until the end of 2020.  *See* Proclamation No. 10014, 85 Fed. Reg. 23,441 (Apr. 22, 2020); Proclamation No. 10052, 85 Fed. Reg. 38,263 (June 22, 2020).  Then, on May

---

[7] The H-2B nonimmigrant program permits U.S. employers to temporarily hire nonimmigrants to perform nonagricultural labor or services in the United States.  The employment must be temporary, such as a one-time occurrence, seasonal, or intermittent need, and requires that the U.S. employer attest to the U.S. Department of Labor that the employment needs cannot be met by hiring U.S. workers.  *See H-2B Program*, DEP'T LAB, https://www.dol.gov/agencies/whd/immigration/h2b (last visited Oct. 29, 2020).

[8] The CW-1 nonimmigrant visa program permits U.S. employers who meet program requirements to hire nonimmigrant workers temporarily in the CNMI to perform services or labor based on the employer's need.  In order for the U.S. Department of Labor to issue a CW-1 certification, an employer must establish that: (i) There are not sufficient U.S. workers in the CNMI who are able, willing, qualified, and available at the time and place needed to perform the services or labor involved in the petition; and (ii) the employment of a nonimmigrant worker who is the subject of a petition will not adversely affect the wages and working conditions of similarly employed U.S. workers.  *See CW-1*, DEP'T LAB, https://www.dol.gov/agencies/eta/foreign-labor/programs/cw-1 (last visited Oct. 29, 2020).

14, 2020, the Department of Homeland Security issued the Implementation of the Northern Mariana Islands U.S. Workforce Act, which "prohibit[ed] the CW-1 classification from being available to workers who will be performing jobs classified as 'construction and extraction occupations.'"  8 CFR 214.2(w)(2)(vii).  These changes in regulation meant that IPI was no longer able to renew its employees' visas or to bring in skilled, short-term construction workers to complete the development of its casinos in 2020.

### C.  The COVID-19 Pandemic

#### i.  Protective Measures Taken by CNMI Government

On January 30, 2020, the World Health Organization ("WHO") classified COVID-19 as a Public Health Emergency of International Concern.  Efforts to contain COVID-19 were unsuccessful and, on March 11, 2020, with the virus having spread to every continent, the WHO reclassified COVID-19 as a pandemic.[9]

The CNMI economy was severely affected by COVID-19.  On January 29, 2020, Governor Torres issued Executive Order 2020-01, which placed CNMI under a state of significant emergency to establish preventive and containment measures to limit the spread of COVID-19 in the CNMI.[10]  These measures included banning all visitors from mainland China—then the epicenter of the growing pandemic—from entering the CNMI.[11]  Over the course of 2020, the CNMI renewed its state of emergency four times[12] and adopted numerous

---

[9] *See WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, WORLD HEALTH ORG. (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[10] *See Coronavirus Prompts CNMI to Declare a State of Emergency*, PNC GUAM (Jan. 30, 2020), https://www.pncguam.com/coronavirus-prompts-cnmi-to-declare-an-emergency/.

[11] *Id.*

[12] *See* Order Nos. 2020-002; 2020-004; 2020-006; 2020-010.

other restrictions on inbound tourism.  On March 7, 2020, the government imposed a 14-day government quarantine on travelers entering the CNMI and restricted all gatherings of more than twenty-five people in a single room.[13]  On March 30, 2020, the government extended these measures by creating a mandatory curfew from 7:00pm until 5:00am.[14]  The CNMI's largest airline, Star Marianas Air, also suspended inter-island flights between Rota, Saipan, and Tinian islands.[15]

*ii.  Adverse Impact on the CNMI's Gaming Industry and IPI*

COVID-19 and the resulting protective government measures crippled the CNMI's economy—particularly the tourism sector.  Prior to 2020, over 650,000 tourists visited CNMI each year,[16] accounting for nearly 72% of GDP, the highest of any U.S. state or territory.[17]  In particular, visitors from China, Korea, and Japan constituted the largest source of tourists for CNMI, accounting for over 600,000 visitors each year.[18]  As noted above, travel from China was restricted in late January 2020, and Saipan had no tourists entering the country for many months

---

[13] *Northern Mariana Islands*, TRAVELBANS.ORG, https://travelbans.org/oceania-australia/northern-mariana-islands/ (last updated Sep. 28, 2021); *Coronavirus: What you need to know*, SABLAN.HOUSE.GOV (Apr. 2, 2020), https://sablan.house.gov/coronavirus-what-you-need-know.

[14] *See Coronavirus: What you need to know*, *supra* note 12.

[15] *Star Marianas suspends flights*, SAIPAN TRIBUNE (Apr. 2, 2020), https://www.saipantribune.com/index.php/star-marianas-suspends-flights/.

[16] MARIANAS VISITORS AUTHORITY, 2017 ANNUAL REPORT at 4 (2017) (accessible at https://dcrm.gov.mp/wp-content/uploads/crm/2017_MVA_Annual_Report.pdf).

[17] *'Tourism a big part of GDP growth'*, SAIPAN TRIBUNE (Oct. 20, 2017), https://www.saipantribune.com/index.php/262650/; *The Northern Mariana Islands: US Territory, China-Dependent*, THE DIPLOMAT (Sep. 25, 2021), https://thediplomat.com/2021/09/the-northern-mariana-islands-us-territory-china-dependent/.

[18] *See* MARIANAS VISITORS AUTHORITY, *supra* note 16, at 11, 26, 42.

after it went into lockdown in March 2020.[19]  The shutdown of the tourism industry contributed to 66% of the eligible workforce population in CNMI seeking pandemic compensation,[20] and the imposition of the CNMI's austerity measures as the government reduced its operating hours and cut all non-essential services.[21]

IPI suffered directly from these extreme economic hardships.  Due to its heavy reliance on revenue from tourists, particularly from China, IPI's operations and revenue-generating activities were deeply impacted.  IPI experienced a significant decrease in revenue from the start of 2020, ultimately closing its premises and ceasing all operations in its casino on March 17, 2020.  As a result, IPI did not generate revenue or conduct gaming operations for the majority of 2020.

### III.   CLA Amendment No. 9

In December 2020, IPI and the CNMI—represented by the CNMI Governor and the CNMI Lottery Commission—entered into CLA Amendment No. 9, which recognized the extraordinary impact of the COVID-19 pandemic, as well as other natural disasters and changes in immigration law that were beyond IPI's control.  That amendment provided IPI with "additional time to fulfill payment obligations" under the CLA to make Community Benefit Contribution.  Weiner Decl., Ex. 2.  While this Amendment notes on its face that "the Lottery

[19] *See Northern Mariana Islands to be adversely affected by ban on Chinese airlines*, CHINATRAVELNEWS.COM (June 8, 2020) https://www.chinatravelnews.com/article/138314 ("China is one of the key tourism markets of the CNMI, alongside South Korea and Japan. The Commonwealth has had no tourists since it went into semi-lockdown in March and had planned to reopen next month, but it received notice from the US Department of Transportation disapproving the resumption of flights by Chinese airlines.").

[20] *See* Letter from Gov. Torres to the U.S. Department of Homeland Security (Sep. 28, 2020), https://www.uscis.gov/sites/default/files/document/foia/Commonwealth_of_the_Northern_Mariana_Islands_Governor_Torres.pdf.

[21] *Northern Marianas confirms Covid-19 death, more austerity*, RNZ.CO.NZ (Apr. 1, 2020), https://www.rnz.co.nz/international/pacific-news/413175/northern-marianas-confirms-covid-19-death-more-austerity.

Commission does not have authority over the enforcement of the [CLA], and does not intend by this action to interfere with the administrative review and deciding of the administrative complaints currently pending before the [CCC],"—it expressly acknowledges that IPI cannot make payments *because of* COVID-19:

> [A]s a result of the COVID-19 pandemic, an unexpected major unpredicted global event that has already lasted almost 6 months and generally expected to last for many more months to come, [IPI's] current ability to make payments that are currently in arrears has been impacted. On or about March 17, 2020, [IPI] closed the operation of its casino in CNMI, citing diminished tourists to the CNMI and [at] present [it is] unknown as to when tourism may properly resume.

*Id*. at 1.   Amendment No. 9 additionally recognized that IPI's delay in completing the construction of its casino and hotel were due to the occurrence of prior *force majeure* events beyond its control:

> [A]s a result of various natural climactic events including super typhoons Soudelor and Yutu and recently, the Federal change in immigration laws and regulations that include a prevention of CW visa holders from working in construction, [and] further an additional Federal change in immigration policy that prevents construction companies from hiring H-2B workers as construction workers, which are entirely beyond the control of Imperial Pacific, Imperial Pacific [has] not completed the needed construction [of the first hotel in the Integrated Resort]."

> *Id*.

## IV.   CCC Order No: 2021-002

The Executive Director of the CCC initiated five complaints against IPI, later consolidated into Enforcement Action 2020-001 (encompassing actions 2020-001 and 2020-002) and Enforcement Action 2020-003 (encompassing actions 2020-003, 2020-004 and 2020-005), as follows:

- Complaint 2020-001 included claims for violations of the CLA based on IPI's failure to make Community Benefit Contributions.

10

- Complaint 2020-002 included claims for violation of Commonwealth law and the CLA based on IPI's failure to pay the Annual License Fee.

- Complaint 2020-003 included claims for violation of a prior CCC order (2020-003) requiring IPI to maintain at least $4.2 million in cash or cash equivalents in a bank in the CNMI or the United States, and for IPI's executives to detail the means by which they would comply with that order.

- Complaint 2020-004 included claims for violation of a prior CCC order (2020-004) requiring IPI to pay accounts payable over 89 days old and to certify its compliance with that order.

- Complaint 2020-005 included claims for violation of Commonwealth law and the CLA for IPI's failure to pay the Casino Regulatory Fee.

On February 25 and March 2, 2021, the Commission held evidentiary hearings to address the charges against IPI.  *See* Provision of Agreed Transcripts Pursuant to Order on Designation of the Record (Sept. 14, 2021), Ex. A (hereinafter "Feb. 25 Hearing Tr."); *id.*, Ex. B (hereinafter "Mar. 2 Hearing Tr.").  The Commission heard one witness:  Eleuterio Palacios Jr., the CCC's Audit Manager.  Mr. Palacios testified that (i) he was familiar with IPI's audited financial statement, (ii) the auditors who prepared the financial statement raised concerns regarding IPI's ability to operate as a going concern, noting that IPI's liabilities exceeded its assets and that it had incurred significant net losses in 2019, and that (iii) IPI's operations had halted and its financial position had worsened due to the COVID-19 pandemic.  *See* Feb. 25 Hearing Tr. at 28–37.

On April 22, 2021, the CCC held a meeting at which it issued the CCC Order.  *See* Provision of Agreed Transcripts Pursuant to Order on Designation of the Record (Sept. 14, 2021), Ex. G (hereinafter "Apr. 22 Meeting Tr.").  During this meeting, members of the

11

Commission made repeated reference to an "annual report" issued by IPI's Hong Kong-based parent company, Imperial Pacific International Holdings Ltd.—an entity that was not a party to the enforcement actions and did not appear at the CCC's evidentiary hearings. *See id.* at 55–58. This "annual report" was not discussed or entered into evidence during either of the CCC's evidentiary hearings.

On April 22, 2021, the Commission issued the CCC Order, suspending IPI's gaming license, ordering IPI to pay a total of $18.65 million that it found was due under the CLA's Annual License Fee and Annual Regulatory Fee, and imposing a total of $6.6 million in penalties against IPI. In the CCC Order, the Commission erroneously concluded that IPI had not suffered from *force majeure* events:

> "[T]he force majeure clause does not, as a matter of law, apply to the payment of the annual license fee, as the time for payment was set by statute, and the Lottery Commission could not amend an act of the Legislature . . . [T]he Commission finds that the Executive Director has established by clear and convincing evidence that the casino licensee's failure to make the required annual license fee payment was not due to a force majeure reason."

CCC Order ¶ 10. The CCC Order constitutes a final agency order under 1 CMC § 9112. *Id.* ¶ 36.

## ARGUMENT

**I.    The Commission's Failure to Recognize COVID-19 as a *Force Majeure* Event Warrants Setting Aside the CCC Order.**

### A.    COVID-19 Constituted a *Force Majeure* Event under Article 25 of the CLA.

*Force majeure* ("superior force" in French) is a long-standing principle of contract law, which can be traced back to nineteenth-century English common law. *See Taylor v. Caldwell*, 122 ER 309 (1863) (holding that circumstances beyond the control or fault of two contracting parties excused performance under their contract). The principle of *force majeure* relieves a party from its contractual duties if the duties are made impracticable by forces beyond that

party's reasonable control.  Such an event is typically one that "can be neither anticipated nor controlled; esp., an unexpected event that prevents someone from doing or completing something that he or she had agreed or officially planned to do."  *Force Majeure*, Black's Law Dictionary (11th ed. 2019).

As with other contractual provisions, *force majeure* is not assumed into a contract; rather, it is the parties' responsibility to agree on a *force majeure* provision that will specify events that may trigger a *force majeure* defense.  *See, e.g.*, *Hydrocarbon Mgmt. Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 436 (Tex. App. 7th 1993) ("We note initially that the [contract] terms are controlling regarding *force majeure*, and common law rules merely fill in gaps left by the lease."); *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296–97 (N.Y. 1987).  In creating these provisions, many contracts introduce justifiable excuses for nonperformance for "Acts of God"—*i.e.*, events that are widely understood to cover "natural disasters" and other phenomenon beyond human control.  *See Act of God*, Merriam Webster Dictionary ("[A]n extraordinary interruption by a natural cause").  Courts often extend the definition of an "Act of God" to cover other, unenumerated disasters defined by natural phenomenon.  *See Sun Pac. Mktg. Coop., Inc. v. DiMare Fresh, Inc.*, 2010 WL 3220301, at *10 (E.D. Cal. Aug. 13, 2010) (finding an Act of God covered an extreme heat wave, even if it was not specifically delineated in the contract).  Many *force majeure* clauses also include broader, catch-all language that covers other unanticipated events beyond a party's control that could significantly affect its ability to perform.

Over the past eighteen months, courts throughout the United States have regularly found that COVID-19 is a *force majeure* event beyond any party's reasonable control.  Numerous courts have excused non-performance based on the devastating economic hardships presented by COVID-19 where contracts provided *force majeure* clauses listing events such as "Acts of God" or "natural disasters."  *See, e.g.*, *Friends of DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) ("The

COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions."); *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster."); *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 2020 WL 7405262, at *17 (S.D.N.Y. Dec. 16. 2020) ("It cannot be seriously disputed that the COVID-19 pandemic is a natural disaster."); *Snell v. Walz*, 2021 Minn. Dist. LEXIS 98, at *29 (Mar. 15, 2021) (holding that the definition of "Act of God" is synonymous with "Act of nature," which "encompasses the emergence . . . of deadly and highly contagious viruses such as COVID-19.").

As noted above, Article 25 of the CLA is titled "*Force Majeure*," and provides that IPI is not in default of that Agreement where its failure or delay in performance of obligations due under the CLA is "due to causes beyond reasonable control." Weiner Decl., Ex. 1 at § 25. Article 25 specifically lists several *force majeure* events, including Acts of God, and specifically provides that this is a non-exhaustive list. *Id.* The provision additionally states that invocation of *force majeure* "shall not excuse payment obligations to the Commonwealth where the grounds and/or the purpose for such payments have already accrued." *Id.*

The COVID-19 pandemic meets the definition of a *force majeure* event under the CLA. Article 25 expressly provides that a *force majeure* event is one with "causes beyond reasonable control" of IPI, and explicitly states that the definition is "not limited to" the examples it includes. *Id.* As noted above, courts have consistently found that COVID-19 falls within the commonly understood meaning of *force majeure* as an event that "can be neither anticipated nor controlled," and can be considered as an "Act of God." *Force Majeure*, Black's Law Dictionary; *see also Snell v. Walz*, 2021 Minn. Dist. LEXIS 98, at *29. When IPI and the CNMI entered into the CLA in 2014, neither could have reasonably anticipated the dramatic consequences that this global pandemic would have on IPI's ability to operate its business, due to the resulting

14

economic fallout and prolonged travel restrictions.  That, of course, was the purpose of including the *Force Majeure* clause in the CLA:  to protect IPI against an inability to perform as required under the CLA that is caused by unforeseen events outside of its control.

Further, the CLA specifically contemplates that, in the event of a *force majeure* event, Article 25 may be used to excuse IPI's payment obligations to the Commonwealth.  While the CLA limits this use to circumstances in which the grounds or purpose for the payments had not already accrued prior to the *force majeure* event, here the CCC itself found that IPI's obligation to make payments of the Annual License Fee and the Annual Regulatory Fee accrued on August 12, 2020, and October 1, 2020, respectively—each several months after the COVID-19 pandemic caused the shuttering of IPI's casino in March 2020.  *See* CCC Order at ¶¶ 8, 16; *see also* 4 CMC § 2309(a).

What's more, the CNMI government itself amended the CLA to expressly recognize the existence of COVID-19 as a *force majeure* event, stating that, due to the pandemic "[IPI]'s current ability to make payments that are currently in arrears has been impacted."  Weiner Decl., Ex. 2, at 1.

B.  The CCC's Reasons for Refusing to Invoke the *Force Majeure* Provision Were Unsupported by the Evidence.

IPI raised *force majeure* both explicitly and implicitly as a defense to the CCC's complaints—explicitly by raising it as a defense to claims regarding the Annual Licensing Fee; and implicitly by arguing throughout the CCC's evidentiary hearings that IPI was unable to pay the amounts due because of forces beyond its control and that it should therefore not be penalized.

Notwithstanding IPI's invocation of the *force majeure* provision of the CLA, the CCC found that, as a matter of law, *force majeure* does not apply for two improper and invalid

15

1   reasons:  the CCC found that (1) the time for IPI's payment of the annual license fee is set by

2   CNMI statute, and cannot be amended; and (2) the CCC Executive Director purportedly

3   established that IPI's failure to make the required annual license fee payment was not due to a

4   *force majeure* event.  *See* CCC Order at ¶¶ 9–10.

5          The CCC was wrong.  The CLA, and not CNMI law, governs payment of the annual

6   license fee.  The CLA represents the agreement between IPI and the CNMI, gives the CCC the

7   authority to regulate conduct "consistent with the requirements of the Commonwealth

8   Administrative Procedure Act and this Agreement," and includes a *force majeure* clause.  The

9   CCC is therefore contractually bound to comply with, and operate in a manner consistent with,

10  the CLA.  *See* Restatement (Second) of Contracts § 1 (1981) ("A contract is a set of promises for

11  the breach of which the law gives a remedy, or the performance of which the law in some way

12  recognizes as a duty.").  Additionally, in the CCC Order, the CCC did not limit its finding of

13  violations to claims based on violations of CNMI law; instead, the CCC erroneously found that

14  IPI violated contractual obligations under the CLA. Those findings are flatly inconsistent with

15  the CLA, which provides that IPI "shall not be in default for any failure or delay in the

16  performance due under [the CLA] if such failure or delay is due to causes beyond reasonable

17  control."  Weiner Decl., Ex. 1 at § 25.

18         The evidence introduced by the CCC in its evidentiary hearings did not provide a

19  reasonable basis for the Commission to find, on a standard of clear and convincing evidence—

20  the standard cited in the CCC Order—that IPI's failure to make required payments were not due

21  to a *force majeure* event.  In the CNMI, clear and convincing evidence "is that degree of proof

22  which will produce in the mind of the trier of fact a firm belief or conviction as to the allegation

23  sought to be established, and requires the existence of a fact be highly probable."

24  *Commonwealth v. The Tinian Casino Gaming Control Comm*, 1992 WL 135873, at *6 (N. Mar.

1    I. May 12, 1992) (quoting *Masaki v. Gen. Motors Corp*., 780 P. 2d 566, 574 (Hawaii 1989)).  As

2    noted above, many courts around the United States have properly allowed invocation of *force*

3    *majeure* clauses due to the COVID-19 pandemic.  In stark contrast to other courts' recognition of

4    the nature and effect of the COVID-19 pandemic, here the CCC disregarded the extraordinary

5    impact of a global pandemic with only fleeting reference to limited testimony by a single person,

6    the CCC's own Audit Manager.  The CCC Order states that, in response to IPI's invocation of

7    the *force majeure* clause in a valid and enforceable contract, "[t]he Executive Director

8    . . . offered testimony that the casino licensee failed to pay the annual license fee not due to force

9    majeure reasons," but instead because:  (i) "IPI had suffered large financial losses prior to the

10   pandemic"; (ii) "that the casino licensee's auditors expressed 'going concern' issues prior to the

11   pandemic"; and (iii) "that the then-CEO admitted to the Commission in a public meeting on July

12   20, 2020 that IPI has some funding to satisfy the annual license fee."  CCC Order at ¶ 9.  None of

13   these constitutes clear and convincing evidence.

14         The first two reasons cited by the CCC in opposition to application of the CLA's *force*

15   *majeure* provision reference brief testimony by CCC Audit Manager Eleuterio Palacios, Jr.  *See*

16   Feb. 25 Hearing Tr. at 28–35.  Mr. Palacios references an "audited financial statement" from IPI,

17   a "going concern" about IPI's finances, IPI's annual loss in 2019, and concern about IPI's

18   finances for the coming year.  *Id.*.  But Mr. Palacios's testimony concerned an audit for the years

19   2018 and 2019, Feb. 25 Hearing Tr. at 31—years in which it is undisputed that IPI paid the

20   annual license and regulatory fees.  The first time that IPI did not pay the annual license and

21   regulatory fees was in 2020, after the global pandemic caused IPI to close its casino.  Nor did

22   Mr. Palacios address how long IPI had carried any of its debt (something that is not uncommon

23   for a company like IPI) or IPI's cashflow in 2020 or any previous year.  Far from being clear and

24

convincing evidence, Mr. Palacios's testimony did not address why IPI could not make the annual license fee payment in 2020.

The third reason cited by the CCC is equally unavailing.  During the unprecedented global event, with its extreme adverse effects on the tourism industry in the CNMI, the then-CEO of IPI made a statement in July 2020 that the company had "some funding."  If anything, the fact that IPI's then-CEO made this statement, but IPI was ultimately unable to pay the annual license fee due to the COVID-19 pandemic, provides further evidence of why the *force majeure* provision applies in this matter.  In short, no reason provided by the CCC for refusing to recognize IPI's invocation of the *force majeure* provision demonstrated that it is "highly probable" that IPI's failure to make payments was not due to the COVID-19 pandemic.  *See Tinian Casino*, 1992 WL 135873, at *6 (citation omitted).

## II.   The Commission Improperly Based its Findings on Materials Outside the Evidentiary Record.

### A.   Due Process and Commonwealth Law Required the CCC to Base its Order Only on Materials in the Evidentiary Record.

Section 1 of the Fourteenth Amendment to the U.S. Constitution provides that no person shall "be deprived of life, liberty, or property without due process of law" (the "Due Process Clause").  U.S. CONST. amend. XIV.  Article 1 § 5 of the CNMI Constitution matches this provision virtually word for word.  NMI CONST. art. I, § 5.  Additionally, the Covenant Establishing a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America provides that section 1 of the Fourteenth Amendment "will be applicable within the Northern Mariana Islands . . . as if the Northern Mariana Islands were one of the several States." *See* 48 U.S.C. § 1801, Sec. 501(a).

The Due Process Clause provides that, at a basic level, every litigant has the right "to present his case and have its merits fairly judged." *Logan v. Zimmerman Brush Co.*, 455 U.S.

422, 433 (1982).  In practice, due process requires a fact finder to base its decision only on

evidence that has been properly admitted in the record.  "[T]he decisionmaker's conclusion must

rest solely on legal rules and evidence adduced at the hearing."  *Goldberg v. Kelly*, 397 U.S. 254,

271 (1970); *see also Johnson v. Johnson*, 153 A.2d 863, 866 (Pa. Super. Ct. 2007) ("A trial court

may not consider evidence outside of the record in making its determination.  Nor may [an

appellate court] uphold a trial court's order on the basis of off-the-record facts.").

CNMI law incorporates these due process requirements with respect to administrative

actions. The Commonwealth Casino Commission Regulations ("CCC Regulations"), which

governed the proceedings in this matter (*see* CCC Order at 1), include liberal requirements

regarding the admission of evidence in contested cases, providing that "[a]ny relevant evidence,

not subject to a claim of privilege, may be admitted regardless of the rules of evidence which

would bar such evidence in judicial matters."  175 N. Mar. I. Admin. Code § 175-10.1-

1415(d)(1).  But even with this liberal admission standard, to comply with due process and

CNMI law, an agency cannot simply consider any document, but only the documents and

evidence properly admitted in the matter.

CNMI's Administrative Procedure Act further provides that findings of fact resulting

from administrative hearings "shall be based exclusively on the evidence and on matters

officially noticed."  *See* 1 CMC § 9109(l).  Additionally, under the CCC Regulations, parties in a

contested case hearing have a right to "[o]ffer rebuttal evidence."  175 N. Mar. I. Admin. Code

§ 175-10.1-1415(b)(5).  It follows that, where the agency's ruling is based on evidence that was

not admitted, the party has been deprived not only of its right to offer rebuttal evidence on that

issue, but its right to notice of the evidence that would be considered by the agency.  Further,

where an agency has issued an order based on proceedings that do not comport with due process

or CNMI law, 1 CMC § 9112, which provides for judicial review of agency actions in contested

1    cases, authorizes the Court to "hold unlawful and set aside agency action, findings, and

2    conclusion found to be . . . [w]ithout observance of procedure required by law." 1 CMC §

3    9112(f)(2)(iv).

4        Here, the CCC acted as fact-finder, holding two evidentiary hearings and ultimately

5    issuing the CCC Order, containing findings of fact regarding IPI's alleged violations of the CLA,

6    CNMI law, and CCC orders, as well as regarding the applicability of IPI's asserted *force*

7    *majeure* defense.  Pursuant to due process and applicable CNMI law, the CCC was required to

8    base its findings on evidence properly admitted in this matter.

9        B.  The CCC Commissioners' own Statements Demonstrate that They Based the
             CCC Order on Evidence that was not Properly Admitted.

10       On April 22, 2021, the CCC held a meeting at which it issued the CCC Order.  This

11   meeting was *not* an evidentiary hearing; the CCC Chairperson specifically stated that the CCC

12   would not be debating the CCC Order.  Apr. 22 Meeting Tr. At 54.  At this meeting, however,

13   multiple CCC Commissioners made statements demonstrating that the CCC had considered and

14   based its findings in the CCC Order on an Annual Results for the Year Ended 31 December 2020

15   (the "Annual Report") issued by IPI's Hong Kong-based parent company, Imperial Pacific

16   International Holdings Ltd ("IPI Holdings").  *See* Weiner Decl., Ex. 3.  This Annual Report was

17   never admitted into the evidentiary record in this action and, accordingly, IPI did not have an

18   opportunity to offer evidence to rebut the CCC's findings made on the basis of its review of that

19   document.

20       The Annual Report was issued by IPI Holdings on March 31, 2021.  *Id*. at 27.  It includes

21   statements regarding IPI Holdings' financial position and the then-ongoing enforcement actions

22   by the CCC.  Among other things, the Annual Report states that:

23

24

1.  IPI Holdings had an unused credit facility of $350 million from an independent third party, which IPI Holdings planned to draw upon "when necessary." *Id*. at 6, 17.

2.  IPI Holdings and its subsidiaries were "actively exploring and negotiating" with the CCC on the settlement of the annual license fee, Community Benefit Contributions, and related penalties. *Id.*

3.  IPI Holdings and its subsidiaries had five cases pending before the CCC resulting from IPI's failure to pay various fees and other amounts due. IPI Holdings and its subsidiaries did not dispute that it owes these funds, but argued that the *Force Majeure* clause in the CLA should be applicable and that payment should be delayed. Nonetheless, IPI Holdings "anticipated that an immediate payment will be ordered under threat of cancelation of casino license. In the opinion of the Directors [of IPI Holdings] adequate provision has been made in financial information." *Id*. at 20.

Despite the fact that the Annual Report had not been introduced as evidence in the CCC's evidentiary hearings, during the April 22, 2021 meeting, members of the Commission made frequent references to that document, explicitly linking its content to the CCC Order. At one point, the Commission's Chairperson, Mr. Guerrero, told IPI:

> "We have received the audit for [IPI Holdings]. And it continues to make reference about the 500 million loan facility, and it continues to make reference that 350 million of that, IPI have access to that money to pay what it needs to pay. Can you find out why your audit from the parent company is saying you have access to 350 million to use? Why are you not using this to pay your people you owe including the license fee, the regulatory fee, the orders to preserve payroll? I don't understand how you are diverged, falling over the cliff, and that seems to be the salvation. And the other report says you have access to 350 million to use for the Saipan project. Why are they not using it?"

Apr. 22 Hearing Tr. at 48–49.

Mr. Guerrero went on to explicitly link the content of the Annual Report to IPI's payment of potential penalties to be imposed by the CCC, characterizing that document as stating that IPI Holding "do[es]n't know yet what CCC will do.  And [IPI Holding is] saying 'we're ready to pay what we need to pay.'  I . . . have a hard time understanding this process, you have a humongous obligation.  You have access to the money, and yet you're draining everybody to death."  *Id*. at 49.

Similarly, Mr. Taitano, the Commission's Treasurer, also raised the Annual Report, stating:

> "Page 17 [of the Annual Report], letter [(iii) says] 'The company will draw down the unutilized credit when necessary.' [It] seems like IPI believes or have this perception that what's happening here it's not necessary for them to act.  And I just wonder when is the time for us to see any movement of payments for all the obligations that must be by made by IPI here locally.  I just thought I'll mention that to you because it's mentioned here 350 million unutilized funds."

*Id*. at 55–56.  Mr. Guerrero followed this by stating, "[Y]our auditor is telling the world you have 350 [million] ready to provide wherever you need it. But yet you're not giving to where it is needed."  *Id*. at 57.  Shortly following these repeated references to the Annual Report—that had not been admitted into evidence and to which IPI had not been given any opportunity to respond—the CCC Commissioners briefly convened in executive session and then unanimously voted to approve the CCC Order.  *Id*. at 72–73.

C.  The CCC Commissioners Consideration of Evidence that was Not Properly Admitted is Grounds to Set Aside the CCC Order.

In similar cases involving judicial review of agency rulings, courts have found prejudicial procedural error where agencies received and considered evidence which a party to a contested hearing did not have the opportunity to rebut.  In *Town v. Land Use Commission*, 524 P.2d 84 (Haw. 1974), an administrative agency held several evidentiary hearings to consider whether certain property should be redistricted.  The agency ultimately approved the redistricting based,

in part, on a "field investigation" conducted by agency's vice chairman. *Id.* at 86. Upon judicial review, the Hawaii Supreme Court reversed the agency's decision since the "investigation" was conducted without notice to the parties, which were not given the opportunity to contest the agency's findings.[22] *Id.* at 91–92. Similarly, in *Waikiki Shore, Inc. v. Zoning Board Of Appeals*, 625 P.2d 1044 (Haw. 1981), the reviewing court reversed an agency's variance order. In the agency proceedings, one party sent an *ex parte* communication to the agency; and during the course of a later public meeting, an agency board member stated that the letter had "clarified a lot of questions we had in our mind." *Id.* at 1045. Even though, in issuing its final determination, the agency included an express disclaimer that it had in any way considered the *ex parte* letter, the reviewing court reversed the agency's decision, noting that the opponents of the variance had "no opportunity to rebut" the *ex parte* communication. *Id.* at 1045-46. Finally, in *Korean Buddhist Dae Won Sa Temple v. Sullivan*, 953 P.2d 1315 (Haw. 1998), the Hawaii Supreme Court explained that, in both *Town* and *Waikiki Shore*, prejudice flowed from "introduction of evidence that was *relevant* to the outcome-dispositive issue" in the administrative proceeding, where a party to the action had "no opportunity for rebuttal." *Id*. at 1339 n.27. However, in *Korean Buddhist*, the court did not reverse the agency's decision based on its finding that the improperly admitted and unrebutted evidence considered by the agency was "wholly irrelevant" to the proceedings. *Id.*

Here, like in *Town* and *Waikiki Shore*, the Annual Report—which was considered and relied upon by the CCC, but was not admitted into evidence during the administrative proceeding—was directly "relevant" to the decision reached by the agency. This is particularly

---

[22] As in the CNMI, Hawaii's administrative procedure law holds that parties to contested administrative proceedings have a right to submit rebuttal evidence. *See* Haw. Rev. Stat. § 91-10 ("Every party shall have the right to conduct such cross-examination as may be required for a full and true disclosure of the facts, and shall have the right to submit rebuttal evidence").

true given the nature of IPI's position:   due to COVID-19—unquestionably a *force majeure* event—it was unable to pay the fees owed, but that this failure or delay should be excused on the basis of *force majeure* and that a penalty was not appropriate.   Rather than addressing this issue on the record before it, the statements of the CCC Commissioners at the April 22, 2021 meeting demonstrate that the CCC considered improper and unrebutted evidence outside the administrative record, namely the Annual Report, to conclude (incorrectly) that IPI had funds available.

In both *Town* and *Waikiki Shore*, the agency attempted to disclaim reliance on the unrebutted evidence in reaching its determinations.  *See Town*, 524 P.2d at 86 (the vice chairman of the agency stated that his motion to approve the petition was "not based on anything that was said here today because these facts were made known to us before."); *Waikiki Shore*, 625 P.2d at 1045 (the agency "voted to approve the variance with an express disclaimer that it was in any way considering" the *ex parte* communication).   However, on appeal those supposed disclaimers did not matter, and the reviewing courts did not look to whether the agencies might have reached the same decision without considering the improper evidence.   Instead, the courts agreed that the agencies' receipt of evidence that a party had no opportunity to rebut was "procedurally fatal" and reversed the agencies' decisions.  *See, e.g.*, *Waikiki Shore*, 25 P.2d at 1046.

Similarly here, despite the CCC's anticipated arguments that it did not consider the Annual Report in making the findings included in the CCC Order, or that it had an independent basis on which to base the CCC Order, the CCC Commissioners' own words from the April 22, 2021 meeting demonstrate that they directly and specifically relied on the Annual Report in reaching the conclusion in the CCC Order.   In violation of IPI's due process rights, the CNMI Administrative Procedures Act, and the CCC Regulations, IPI was not provided with notice and

did not have the opportunity to rebut this evidence.  Based on this fatal procedural defect, this Court should set aside the CCC Order.

<b><u>CONCLUSION</u></b>

For the reasons stated here, IPI hereby asks the Court to set aside Commission Order No: 2021-002.

Dated:  November 5, 2021                        Respectfully Submitted,

                                                /s/_____
                                                Juan Lizama, Esq.
                                                P.O. Box 501508, Saipan, MP 96950
                                                Telephone: (670) 234-7220/483-2662
                                                lizama2008@gmail.com

                                                Daniel H. Weiner, Esq. (*Pro Hac Vice*)
                                                Kevin T. Abikoff, Esq. (*Pro Hac Vice*)
                                                HUGHES HUBBARD & REED LLP
                                                One Battery Park Plaza
                                                New York, NY 10004
                                                Tel: (212) 837-6000
                                                daniel.weiner@hugheshubbard.com
                                                kevin.abikoff@hugheshubbard.com

                                                *Attorneys for Defendant Imperial Pacific*
                                                *International (CNMI) LLC*

Juan Lizama, Esq.
LIZAMA LAW OFFICE
P.O. Box 501508, Saipan, MP 96950
Telephone: (670) 234-7220/483-2662
lizama2008@gmail.com

Daniel H. Weiner, Esq. (*Pro Hac Vice*)
Kevin T. Abikoff, Esq. (*Pro Hac Vice*)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Tel: (212) 837-6000
daniel.weiner@hugheshubbard.com
kevin.abikoff@hugheshubbard.com

E-FILED
CNMI SUPERIOR COURT
E-filed: Dec 18 2021 06:39PM
Clerk Review: Dec 20 2021 02:31PM
Filing ID: 67178965
Case Number: 21-0173-CV
Eva  Calvo

*Attorneys for Petitioner Imperial Pacific International (CNMI), LLC*

## IN THE SUPERIOR COURT
## FOR THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| In re: | |
| **Commission Order No: 2021-002; Final Order for Enforcement Actions 20-001 (consolidated) and 20-003 (consolidated).** | **Civil Case No. 21-0173-CV** |
| **COMMONWEALTH CASINO COMMISSION,** | **PETITIONER'S REPLY BRIEF IN SUPPORT OF PETITION FOR JUDICIAL REVIEW** |
| Agency, | |
| **IMPERIAL PACIFIC INTERNATIONAL (CNMI) LLC,** | Date: TBD |
| | Time: TBD |
| Petitioner. | Judge: Hon. Wesley M. Bogdan |

<u>Preliminary Statement</u>

In its opposition to IPI's Petition for Judicial Review, the CCC asserts that IPI failed to raise the affirmative defense of *force majeure*, failed to sufficiently prove the elements of that defense, and that it does not apply to its claims against IPI.  The truth is otherwise: the evidence demonstrates that IPI <u>did</u> raise an affirmative *force majeure* defense, that the negative impact of COVID-19 was well-known and acknowledged both by CNMI's Governor and Lottery Commission, and that the only evidence presented by the CCC failed to counter IPI's assertion of *force majeure*.  The CCC also fails to respond to IPI's showing that the Commission issued the CCC Order "[w]ithout observance of procedure required by law," where the record shows that the CCC based that Order on evidence not admitted to the record in violation of IPI's due process rights.  For these reasons and those set forth in IPI's opening brief, the Court should set aside the CCC Order pursuant to 1 CMC § 9112(f).

<u>Argument</u>

**I.     THE CCC SHOULD HAVE RECOGNIZED *FORCE MAJEURE* AS A DEFENSE TO ITS CLAIMS AGAINST IPI.**

   A.     <u>IPI properly raised a *force majeure* defense.</u>

The CCC argues that IPI did not raise *force majeure* as an affirmative defense at either of the evidentiary hearings held by the Commission on Complaints 2020-001 through -005.  (Opp'n Br. at 2.)  Not so: the evidentiary record shows that IPI raised *force majeure* at the February 25, 2021 evidentiary hearing regarding Complaints 2020-001 and 2020-002.[1]  At that hearing, IPI's counsel explicitly discussed *force majeure* with respect to the Commission's claims against IPI for both nonpayment of CBF contributions and the annual license fee.

---

[1] The Commission based Complaint 2020-001 on nonpayment of Community Benefit Fund ("CBF") contributions defined in the Casino License Agreement ("CLA"), and based Complaint 2020-002 on nonpayment of the annual license fee set by the CLA.

In response to the CCC's complaint regarding nonpayment of CBF contributions, IPI directed the Commission to Amendment 9 to the CLA, "entered into under the backdrop of the COVID-19 pandemic." (Provision of Agreed Trs. Pursuant to Order on Designation of the R. (Sept. 14, 2021), Ex. A (hereinafter "Feb. 25 Hearing Tr.") at 20–22, 38–39.) Signed by both the Governor of the CNMI and the CNMI Lottery Commission, Amendment 9 acknowledges the COVID-19 pandemic as "an unexpected major unpredicted global event" that directly and adversely impacted IPI's ability to make CBF payments. (Pet'r's Br. in Supp. of Pet. for Judicial Review, Decl. of Daniel H. Weiner (hereinafter "Weiner Decl."), Ex. 2.) In recognition of the hardships IPI endured as a result of the pandemic, that Amendment delayed IPI's obligations to pay CBF contributions until 2025. Despite the plain language of Amendment 9 that the COVID-19 pandemic prevented IPI from making required payments, the CCC disregards the text of Amendment 9 and incorrectly dismisses it as irrelevant. (Opp'n Br. at 11.)

The Commission argues that IPI waived any *force majeure* defense because it did not raise *force majeure* regarding its nonpayment of CBF contributions. (Opp'n Br. at 13–14.) But, as IPI noted at the evidentiary hearing, Amendment 9 demonstrates that the CCC should not penalize IPI, as the CNMI agreed to delay IPI's payment of CBF contributions. (*See* Feb. 25 Hearing Tr. at 20–21; Weiner Decl., Ex. 2.) IPI placed before the CCC evidence that the CNMI government recognized the occurrence of COVID-19 as a *force majeure* event, and that IPI's inability to comply with its payment obligations was directly attributable to that event.

IPI also raised *force majeure* as an affirmative defense to Complaint 2020-002, which involved claims regarding IPI's nonpayment of the annual license fee. (Feb. 25 Hearing Tr. at 39.) IPI noted that the annual license fee payment came due on August 12, 2020—in the midst of the COVID-19 pandemic. (Feb. 25 Hearing Tr. at 22.) IPI's counsel outlined several ways that COVID-19 had devastated IPI's business, noting that "IPI has not been able to bring in

3

tourists, has not been able to bring in gamblers, has not operated, [] a gaming casino, which [is the purpose of its license]."  (Feb. 25 Hearing Tr. at 23.)  Given that COVID-19 halted IPI's operations, IPI properly asserted that it constituted a *force majeure* event and that, pursuant to the *force majeure* clause in the CLA, IPI should not be found to have violated its obligations based on nonpayment of the annual license fee.  (Feb. 25 Hearing Tr. at 22–23)

The CCC did not introduce evidence sufficient to rebut IPI's *force majeure* defense.  As discussed below, the Commission presented no evidence that refuted IPI's demonstration regarding the adverse impact of COVID-19 on IPI's ability to operate and generate revenue.  The only evidence the Commission heard in opposition to IPI's *force majeure* defense was irrelevant since it did not refute IPI's assertions.

> 1.    *The Commission was well aware of the devastating impact of COVID-19 on the CNMI economy and the gaming industry, including IPI.*

In addition to IPI's assertions at the Commission's February 25, 2021 evidentiary hearing, IPI representatives made additional statements at other Commission meetings about the pandemic's deleterious effect on IPI.  For example, at the Commission's February 24, 2021 meeting, former CNMI Senator Ray Yumul, IPI's then-newly appointed CEO, laid out the devastating impact COVID-19 had on the CNMI economy, CNMI's gaming industry, and IPI:

> COVID-19 has dealt the CNMI its worst financial crisis in over a decade.  International travel is closed.  Most of our large hotels are [] now closed [. . .]  All the indicators of a shattered tourism industry [are] clearly seen all around [. . .]  And IPI is not immune to that economic hardship facing the CNMI.  The IPI had to close its doors to comply with the Honorable Ralph Deleon Guerrero's Executive Order [which] stretched well into 2020.  And at that point, IPI's <u>revenue fell to zero</u>.

(Provision of Agreed Trs. Pursuant to Order on Designation of the R. (Sept. 14, 2021), Ex. E (hereinafter "Feb. 24 Hearing Tr.") at 19–20 (emphasis added).)

Neither the Commission's Executive Director nor any Commissioners refuted Mr. Yumul's statements.   Transcripts of other Commission meetings indicate that CCC Commissioners fully understood that the pandemic had decimated CNMI's gaming industry and IPI's ability to operate.[2]

2.   *The Commission failed to present evidence to rebut IPI's force majeure defense.*

In the CCC Order, the Commission noted that the fact that IPI's auditors had expressed "going concern" issues prior to the pandemic, purportedly indicating that *force majeure* was not the cause of IPI's failure to pay the annual license fee.  (CCC Order at ¶ 9.)  Thus, Mr. Eleuterio Palacios, the CCC's Audit Manager, read excerpts from an IPI audit report addressing IPI's fiscal years 2018 and 2019, testifying that this audit report stated: (1) IPI had a member's deficiency of $559 million; (2) its current liabilities exceeded current assets by $280 million; and (3) for 2019,  IPI incurred a net loss of approximately $442 million.  (Feb. 25 Hearing Tr. at 33.)  As a result, the audit report stated that "substantial doubt exists about [IPI's] ability to continue as a going concern."  (Feb. 25 Hearing Tr. at 33.)  However, as explained in IPI's opening brief, the Commission's reliance on this audit report to refute IPI's *force majeure* defense is misguided; rather that evidence actually *supports* IPI's assertion of that defense.

The audit report focused on the years 2018 and 2019—years during which IPI <u>paid</u> the annual license fee.[3]  Nowhere in its Opposition does the Commission address how evidence regarding IPI's financial condition during years in which it *met* its financial obligations to the

---

[2] Members of the Commission made statements acknowledging that the COVID-19 pandemic adversely affected the viability of CNMI's gaming industry, the work of the CCC, and had caused IPI to close its gaming facility. (Provision of Agreed Trs. Pursuant to Order on Designation of the R. (Sept. 14, 2021), Ex. C (Dec. 22 Hearing Tr.) at 5–6; Feb. 24 Hearing Tr. at 6.)

[3] IPI paid the annual license fee until August 12, 2020, in the midst of the unprecedented COVID-19 Pandemic. (Pet'r's Br. at 17.)

CCC supports the notion that its subsequent inability to make payments in the midst of a disruptive global pandemic was somehow *not* due to that pandemic.  At most, Mr. Palacios's testimony indicates that IPI may have been carrying a heavy debt burden.  However, it is common for companies like IPI to carry debt, even substantial debt.  (Pet'r's Br. at 17.)  That IPI's debts exceeded its assets during the years analyzed by the audit report has no bearing on its ability to pay the annual license fee—as noted above, IPI *did* pay the license fee during those years.  A more reasonable analysis of IPI's finances would be that, despite its debt load, IPI was able to pay the fees due to the CCC during 2018 and 2019 due to its revenue, which it used to pay operating expenses.  Once that revenue stopped due to the worldwide pandemic halting tourism, IPI was unable to make such payments.

The Commission's focus on the "going concern" issue raised in the audit report misses the point.  Mr. Palacios's testimony—the only evidence the CCC offers to rebut IPI's *force majeure* defense—does not provide substantial evidence on which the CCC could have reasonably concluded that IPI's failure to make payments to the CCC was not due, as IPI asserted, to a *force majeure* event.  Because the Commission based its dismissal of IPI's *force majeure* defense on insufficient evidence, the Court should set aside the CCC Order.

## II.   THE CCC FAILED TO REBUT IPI'S DUE PROCESS ARGUMENT.

In its opening brief, IPI showed that the Court should set aside the CCC Order because the CCC issued it "[w]ithout observance of procedure required by law."  (Pet'r's Br. at 1, 19–20.)  IPI based its due process argument on statements by CCC Commissioners at the April 22, 2021 meeting at which the CCC issued its Order indicating that the Commission based that Order on specific evidence not presented in any of the evidentiary hearings the CCC held in this matter.

In its opposition brief, the CCC fails to confront IPI's showing; the term "due process" does not appear a single time in the CCC's brief.  Instead, the CCC argues that it provided a sufficient evidentiary basis for the CCC Order, even without the evidence that IPI demonstrated the Commissioners considered.

The CCC responded to the argument it wishes IPI had made, not the argument IPI actually made.  The question at issue is not about the sufficiency of the evidence; rather it is about whether IPI received notice of the evidence against it and had an opportunity to rebut that evidence.  The Commissioners' own statements demonstrate that the CCC violated IPI's due process rights by basing the CCC Order on evidence outside of the record, depriving IPI of an opportunity to address that evidence.  Accordingly, the Court should set aside the CCC Order because the CCC issued it "without observance of procedure required by law."

A.   The Commission's argument regarding evidentiary sufficiency ignores its violation of IPI's due process rights.

As outlined in IPI's opening brief, the Commissioners' own statements demonstrate that the CCC improperly based the CCC Order on materials outside of the evidentiary record, violating IPI's right to due process under Section 1 of the Fourteenth Amendment to the U.S. Constitution, which provides that no person shall "be deprived of life, liberty, or property without due process of law."  (Pet'r's Br. at 18.[4])  CNMI law incorporates these due process principles into its requirements for administrative actions: the CNMI Administrative Procedures Act ("APA") provides that findings of fact resulting from administrative hearings "shall be based exclusively on the evidence and on matters officially noticed."  1 CMC § 9109(l).  Under CNMI law, the Commission has the authority to "conduct hearings pertaining the violation of [P.L. 18-56] or regulations promulgated thereto."  175 N. Mar. I. Admin. Code § 175-10.1-105(a).  The

_____

[4] The CNMI constitution contains an identical due process provision.  *See* CNMI Const. Art. 1, § 5.

regulations governing these hearings state that "[a]ny relevant evidence, not subject to a claim of privilege, may be admitted," but also provide that parties in a contested case hearing have a right to "[o]ffer rebuttal evidence."  *Id.* §§ 175-10.1-1415(d)(1), 175-10.1-1415(b)(5).   To comply with the due process requirements under CNMI law, an agency's findings must be based only on evidence <u>properly admitted in the matter</u>.  (Pet'r's Br. at 19 (emphasis added).)

During the April 22, 2021 CCC meeting at which the Commission issued the CCC Order, the CCC Commissioners repeatedly referred to an annual report from IPI's Hong Kong-based parent company, Imperial Pacific International Holding Ltd., in making their findings.  (Pet'r's Br. at 11–12, 20.)   The Commission did not introduce the annual report as evidence in its evidentiary hearings, depriving IPI of any opportunity to respond to that document or any statements it contained.  (Pet'r's Br. at 21–22.)   Thus, the Commission violated IPI's right to due process and the Court should therefore set aside the CCC Order.

Instead of addressing IPI's due process argument, the Commission responds that the stipulations and admissions in the record provided "substantial evidence" to support the CCC Order.  (Opp'n Br. at 14–15.)   In the alternative, the Commission argues that the annual report could "only be used to show that IPI had money available to make payments," and that such evidence "could only serve as rebuttal evidence to a properly asserted *force majeure* defense"—a defense the Commission incorrectly argued IPI did not make.  (Opp'n Br. at 15.)   In essence, the Commission argues that its improper reliance on the annual report would not have been relevant to its findings regarding any "outcome-dispositive issue."  (Opp'n Br. at 15.)

Whether substantial evidence existed to support the CCC Order does not erase the Commission's improper reliance on the annual report in issuing the CCC Order.[5]  Consistent with CNMI law and IPI's due process rights, the Commission should have given IPI notice that it considered this evidence and provided IPI with the opportunity to rebut that evidence.

Courts have properly overturned agency decisions in cases dealing with similar issues and statutory regimes.  As IPI observed in its opening brief, the statutory framework establishing the Commission explicitly recognizes the application of the APA in contested cases.  175 N. Mar. I. Admin. Code § 175.10.1-1405(a).  The APA states that any findings of fact "shall be based exclusively on evidence and on matters officially noticed."  1 CMC § 9109(1) (emphasis added).  In addition, the statutory framework establishing the Commission also recognizes that parties in contested cases have the right to offer rebuttal evidence.  175 N. Mar. I. Admin. Code § 175.10.1-1415(b)(5).

Courts have found due process violations, and reversed agency decisions, based on similar procedural deficiencies.  In *Town v. Land Use Commission*, 524 P.2d 84 (Haw. 1974), the Supreme Court of Hawaii reversed the decision of the Land Use Commission's petition to amend property designations where landowners did not receive the opportunity to rebut evidence or cross-examine the petitioner.  According to the Court, this violated provisions of Hawaii's Administrative Procedure Act, which stated that in contested cases: "(3) Every party shall have the right to conduct such cross-examination as may be required for a full and true disclosure of facts and shall have the right to submit rebuttal evidence."  *Id.* at 549 (quoting Haw. Rev. Stat. § 91-10(3)).  This statutory language is nearly identical to the statutory provisions applicable in this case.  *See* 175 N. Mar. I. Admin. Code § 175.10.1-1415(b).  Therefore, as in *Town*, the CCC

---

[5] In addition, as discussed above, IPI properly raised a *force majeure* defense to the Commission's claims.  Therefore, even by the Commission's own standards, the annual report would be relevant to these proceedings.

Order should be set aside, since the record demonstrates that the Commission improperly relied on an annual report that had not been entered into evidence or officially noticed, and which IPI had no opportunity to rebut.

      B.    <u>The Commission's new assertion that it did not rely on the annual report is irrelevant to the existence of a due process violation.</u>

Seeking to avoid addressing the due process violation raised by IPI, the Commission now argues that it did not actually rely on the annual report in making its findings. (Opp'n Br. at 15.) As noted in IPI's opening brief, statements by the CCC Commissioners demonstrate that the Commission based the CCC Order on information contained in the annual report; the Commissioners themselves explicitly link the Order to that report. (Pet'r's Br. at 20–22.) Without providing evidence or explaining the Commissioners' statements, the CCC claims that it did not actually rely on the annual report in issuing the CCC Order. (Opp'n Br. at 15.) The CCC's *post-hoc* assertions are not dispositive. Multiple cases cited by IPI involve examples in which courts overturned agency orders despite the agency's claims that those orders were not actually based on extraneous evidence. *See Waikiki Shore, Inc. v. Zoning Bd. of Appeals*, 625 P.2d 1044, 1045–46 (Haw. 1981) (holding that opponents of a variance had "no opportunity to rebut" an *ex parte* communication in violation of their due process rights, even though the agency issuing the variance expressly disclaimed that it did not rely on the communication in making its decision); *see also Town*, 524 P.2d at 540, 549–50 (reversing and remanding agency's decision on the ground that it admitted evidence after a public hearing was closed, despite the agency's disclaimer that it did not consider the evidence in making its decision).

The holdings in these cases highlight the central issue: IPI's fundamental right to due process. The CCC reviewed and considered the annual report, which it found relevant to its decision-making. The annual report was not admitted as evidence in this matter. IPI received no

notice that the CCC considered the annual report and did not have the opportunity to rebut that document.

<u>Conclusion</u>

For the foregoing reasons and those set forth in IPI's opening brief, IPI asks the Court to set aside Commission Order No: 2021-002.

Dated:  December 17, 2021                    Respectfully Submitted,

/s/ _____
Juan Lizama, Esq.
P.O. Box 501508, Saipan, MP 96950
Telephone: (670) 234-7220/483-2662
lizama2008@gmail.com

Daniel H. Weiner, Esq. (*Pro Hac Vice*)
Kevin T. Abikoff, Esq. (*Pro Hac Vice*)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Tel: (212) 837-6000
daniel.weiner@hugheshubbard.com
kevin.abikoff@hugheshubbard.com

*Attorneys for Defendant Imperial Pacific*
*International (CNMI), LLC*



E-FILED
CNMI SUPREME COURT
E-filed: Aug 23 2022 05:59PM
Clerk Review: Aug 24 2022 08:36AM
Filing ID: 67958626
Case No.: 2022-SCC-0006-CIV
NoraV  Borja

No. 2022-SCC-0006-CIV

# IN THE SUPREME COURT
# OF THE
# COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

_____

IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC,

*Defendant - Appellant,*

v.

COMMONWEALTH CASINO COMMISSION,

*Agency - Respondent.*

_____

On Appeal from the Superior Court for the Commonwealth of the Northern Mariana Islands,
Civil Case No. 21-0173
The Honorable Wesley M. Bogdan

_____

## APPELLANT IMPERIAL PACIFIC INTERNATIONAL (CNMI) LLC'S
## OPENING BRIEF

_____

Joey P. San Nicolas, Esq.
SAN NICOLAS LAW OFFICE, LLC
2nd Floor, ICCI Bldg. (Middle Road)
P.O. Box 10001 PMB 602
Saipan, MP 96950
(670) 234-7659

Kevin T. Abikoff, Esq.
Daniel H. Weiner, Esq.
HUGHES HUBBARD & REED, LLP
1775 I St. NW
Washington, D.C. 20001
(202) 721-4600

*Counsel for Appellant Imperial Pacific International (CNMI), LLC*

103444865_2

## CORPORATE DISCLOSURE STATEMENT

Appellant Imperial Pacific International (CNMI), LLC ("IPI" or the "Company") is a CNMI-incorporated limited liability corporation that is wholly owned by Best Sunshine International Ltd., a company incorporated in the British Virgin Islands.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................................3

JURISDICTIONAL STATEMENT .................................................................................................5

STATEMENT OF THE ISSUES .....................................................................................................5

STATEMENT OF THE CASE ..........................................................................................................6

STATEMENT OF THE FACTS .......................................................................................................9

SUMMARY OF THE ARGUMENT ............................................................................................14

ARGUMENT ......................................................................................................................................16

    I.    THE COURT SHOULD SET ASIDE THE CCC'S ORDER WITH RESPECT TO ENFORCEMENT ACTIONS 2020-001 AND 2020-002 BASED ON IPI'S *FORCE MAJEURE* DEFENSE. ..........................................................16

        A.    This Court Reviews the Superior Court's Decision De Novo, Applying the Same Arbitrary and Capricious Standard to its Review of the CCC's Agency Action. ..................................17

        B.    The Force Majeure Clause in the Casino License Agreement Applies to the COVID-19 Pandemic. .......18

        C.    This Court Should Find that the COVID-19 Pandemic was a Force Majeure Event that Prevented IPI from Meeting its Payment Obligations under the Casino License Agreement. .........................*20*

            i.    *The Commission failed to present evidence that could reasonably rebut IPI's force majeure defense.*...*22*

            ii.  *The Commission's finding that the force majeure clause in the CLA does not, as a matter of law, apply to the Annual License Fee is meritless.* .........................................................*23*

        D.    The Superior Court Erred by Failing to Rule on IPI's Force Majeure Defense To Enforcement Actions 2020-001 and -002. ..................................................................................*24*

    II.    IPI'S ASSERTION OF A *FORCE MAJEURE* DEFENSE SHOULD BE APPLIED AGAINST EACH OF THE CASINO COMMISSION'S ENFORCEMENT ACTIONS. ...................................................................26

    III.    IPI'S DUE PROCESS RIGHTS WERE VIOLATED BY THE COMMISSION'S RELIANCE ON EVIDENCE NOT PROPERLY ADMITTED INTO THE RECORD. ..............................................................27

        A.    Due Process and Commonwealth Law Required the CCC to Base its Order Only on Materials Admitted to the Evidentiary Record. .............................................28

        B.    The CCC Commissioners' Own Statements Show that the Commission Based its Order on Evidence that was Not Properly Admitted. .................................................29

        C.    The Commissioners' Consideration of Evidence Not Properly Admitted is Grounds to Set Aside the Commission's Order and the Superior Court Erred by Failing to Do So. .............................30

CONCLUSION ..................................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Calvo v. N. Mariana Islands Scholarship Advisory Bd.*, 8 N. Mar. I. 181 (2009) ......................... 17, 18, 28

*Castro v. Castro*, 8 N. Mar. I. 218 (2009) ................................................................................. 28

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .............................................. 28, 29

*Commonwealth Edison Co. v. Allied-General Nuclear Servs.*, 731 F. Supp. 850 (N.D. Ill. 1990) ...... 18, 19

*Commonwealth v. The Tinian Casino Control Comm.*, 1992 WL 135873 (N. Mar. I. May 12, 1992) ......22

*Friends of DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020) ............................................................... 19

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ................................................................................. 28

*Hong Kong Islands Line Am. S.A. v. Distribution Servs. Ltd.*, 795 F. Supp. 983 (C.D. Cal. 1991), aff'd, 963 F.2d 378 (9th Cir. 1992) ........................................................................................... 18

*Hydrocarbon Mgmt. Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427 (Tex. App. 7th 1993) ............... 18

*In re Estate of Tudela*, 4 N. Mar. I. 1 (1993) ........................................................................ 28

*In re Hafadai Beach Hotel Extension*, 4 N. Mar. I. 37 (1993) .......................................... 17, 28

*In re San Nicolas*, 1 N. Mar. I. 329 (1990) ........................................................................... 17

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 2020 WL 7405262 (S.D.N.Y. Dec. 16, 2020) ..19

*Johnson v. Johnson*, 153 A.3d 318 (Pa. Super. Ct. 2007) ....................................................... 28

*Korean Buddhist Dae Won Sa Temple v. Sullivan*, 953 P.2d 1315 (Haw. 1998) ................................ 31, 32

*Masaki v. Gen. Motors Corp.*, 780 P.2d 566 (Haw. 1989) ....................................................... 22

*Matthews v. Eldridge*, 424 U.S. 319 (1976) .......................................................................... 28

*Pac. Sec. Alarm, Inc. v. Commonwealth Ports Auth.*, 7 N. Mar. I. 334 (2006) .......................... 18

*Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) ................................... 19

*Schweiger v. Solbeck*, 230 P.2d 195 (Or. 1951) ..................................................................... 19

*Enter. Life Ins. Co. v. Dept of Ins.*, 463 P.3d 845 (Ariz. Ct. App. Div. 1 2020) ......................... 23

*Snell v. Walz*, 2021 Minn. Dist. LEXIS 98 (Mar. 15, 2021) ................................................... 19

*Sun Pac. Mktg. Coop., Inc. v. DiMare Fresh, Inc.*, 2010 WL 3220301 ..................................... 19

3

*Town v. Land Use Commission*, 524 P.2d 84 (Haw. 1974) .................................................................. 31, 32

*Waikiki Shore, Inc. v. Zoning Bd. of Appeals*, 625 P.2d 1044 (Haw. 1981) ........................................ 31, 32

**Constitutions**

CNMI CONST. art. I § 5 ............................................................................................................... 5, 28

U.S. CONST amend. XIV § 1 ................................................................................................................ 28

**Statutes**

1 CMC § 9112 .............................................................................................................. 5, 17, 18, 29

1 CMC § 9113 ........................................................................................................................................ 5

4 CMC § 2309(a)-(b) ....................................................................................................................... 7, 10

4 CMC § 2317(a)(1)(i) ...................................................................................................................... 9, 23

48 U.S.C. § 1801, Sec. 501(a) ............................................................................................................. 28

8 C.F.R. 214.2(w)(2)(vii) ....................................................................................................................... 11

**Other Authorities**

*Coronavirus: What you need to know*, SABLAN.HOUSE.GOV (Apr. 2, 2020),
    https://sablan.house.gov/coronavirus-what-you-need-know .................................................... 12

*Extreme Category 5 typhoon, the worst U.S. storm since 1935, leaves Northern Mariana Islands
    devastated*, WASH. POST (Oct. 25, 2018), https://www.washingtonpost.com/energy-
    environment/2018/10/24/extreme-category-typhoon-yutumakes-devastating-landfall-northern-mariana-
    islands-us-commonwealth/ ....................................................................................................... 11

Gov. Torres Exec. Order Nos. 2020-01, 2020-02; 2020-04; 2020-06; 2020-10 ........................................ 11

H. Friendly, *Some Kind of Hearing*, 123 U. PENN. L. REV. 1267, 1287–1291 (1975) ............................... 32

*Humanitarian crisis looms after Super Typhoon Yutu flattens parts of Saipan and Tinian*, USA TODAY
    (Oct. 26, 2018), https://www.usatoday.com/story/news/2018/10/25/super-typhoon-yutu-leaves-1-
    deadcrisis-looms-saipan-and-tinian/1771400002/ ....................................................................... 11

Letter from Gov. Torres to the U.S. Department of Homeland Security (Sep. 28, 2020),
    https://www.uscis.gov/sites/default/files/document/foia/Commonwealth_of_the_Northern_Mariana_Islan
    ds_Governor_Torres.pdf ................................................................................................................ 12

*Northern Mariana Islands to be adversely affected by ban on Chinese airlines*,
    CHINATRAVELNEWS.COM (June 8, 2020), https://www.chinatravelnews.com/article/138314 ...... 12

Proclamation No. 10052, 85 Fed. Reg. 38263 (June 22, 2020) ............................................................... 11

Proclamation No. 10014, 85 Fed. Reg. 23441 (Apr. 22, 2020) ............................................................... 11

103444865_2

*Storm Events Database*, NAT'L OCEANIC AND ATMOSPHERIC ADMINISTRATION, https://www.ncdc.noaa.gov/stormevents/eventdetails.jsp?id=601887 (last visited Oct. 27, 2021)........10

*Super Typhoon Yutu Strongest to Hit Northern Mariana Islands Ever*, THE WEATHER CHANNEL (Oct. 25, 2018), https://weather.com/storms/hurricane/video/super-typhoon-yutu-strongest-to-hit-northernmariana-islands-ever .............................................................................................................11

*Tourism a big part of GDP growth*, SAIPAN TRIBUNE (Oct. 20, 2017), https://www.saipantribune.com/index.php/262650/ .............................................................................12

*WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, WORLD HEALTH ORG. (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020...................11

## JURISDICTIONAL STATEMENT

The Superior Court of the Commonwealth for the Northern Mariana Islands (hereinafter "the Superior Court") exercised jurisdiction pursuant to 1 CMC § 9112(b) to hear IPI's request for judicial review of the final agency action of the Commonwealth Casino Commission ("CCC" or the "Commission").  This Court has appellate jurisdiction over any final judgment or order of the Superior Court. NMI Const. art. IV § 3; 1 CMC § 9113.

The Superior Court issued its Order Affirming the Casino Commission's Suspension of Petitioner's Exclusive Casino License and Monetary Penalties on March 15, 2022, disposing of all IPI's claims.  Order Aff'ming Susp.  Thereafter, IPI filed timely notice of appeal on April 11, 2022, Notice of Appeal, and filed a Proposed Entry of Judgment on April 21, 2022, which the Superior Court entered on April 22, 2022.  Entry of Judgment.

## STATEMENT OF THE ISSUES

1) Whether to set aside the Commission's ruling with respect to Enforcement Actions 2020-001 and 2020-002, which resulted in fines totaling $1.6 million imposed against IPI, based on IPI's *force majeure* defense, on which the Superior Court did not rule.

2) Whether to set aside the Commission's ruling with respect to Enforcement Actions 2020-003, 2020-004, and 2020-005, on the basis that IPI should be considered to have raised a valid *force majeure* defense to those Enforcement Actions.

3) Whether the Commission's ruling violated IPI's Due Process rights where the record shows that, in making its rulings, the Commission considered evidence outside the evidentiary record, depriving IPI of the opportunity to respond.

## STATEMENT OF THE CASE

In early 2020, the COVID-19 pandemic caused travel throughout the world to grind to a halt. While the economic impact of the pandemic was broadly felt, nowhere were the effects more severe than in the CNMI, and virtually no industry was more disrupted than the gaming industry.  In December 2020, the CNMI government acknowledged the impact of the COVID-19 pandemic on IPI's business, entering Amendment 9 to the Casino License Agreement between IPI and the Commonwealth to provide IPI with additional time to make certain payments that had accrued.  Yet, against this backdrop, in April 2021, the CCC issued an Order suspending IPI's exclusive casino license and assessing penalties based on its findings that IPI violated the Casino License Agreement, CNMI law, and the Commission's prior orders by, among other things, failing to make payment of licensing and regulatory fees.  IPI timely requested judicial review of that Order.  On March 15, 2022, the Superior Court issued an Order affirming the CCC's suspension of IPI's casino license and imposition of monetary penalties.  IPI now appeals from the Superior Court's Order.

During the course 2020, the CCC brought five Enforcement Actions against IPI:

1) Enforcement Action 2020-001, filed June 28, 2020, contained two claims, alleging that IPI violated the Casino License Agreement by failing to make Community Benefit Fund contributions due in 2018 and 2019, which were required by Amendment No. 3 and Amendment No. 5 of the Casino License Agreement, in violation of Regulations §175-10.1-675(b)(1) and §175-10.1-1805(b)(15).  Commission Order No. 2021-002 ¶ 4.

2) Enforcement Action 2020-002, filed August 26, 2020, contained four claims, alleging IPI failed to pay the Annual License Fee when due on August 12, 2020.  Claim one alleged that IPI's nonpayment of the Annual License Fee was in violation of Commonwealth law, specifically 4 CMC § 2306(b).  Claim two alleged that IPI's nonpayment of the Annual License Fee was in violation of Regulation § 175-10.1-601(b).  Claim three alleged that IPI's nonpayment of the Annual License Fee violated Regulation § 175-10.1-1805(b)(15), because it constituted a breach of the Casino License Agreement.  Claim Four sought an order declaring that IPI's failure to pay the Annual License Fee when due is an unsuitable method of operation and requiring IPI to pay the Annual License Fee immediately.  Commission Order No. 2021-002 ¶ 8.

3) Enforcement Action 2020-003, filed September 1, 2020, contained four claims, alleging that IPI violated the CCC's prior Commission Order 2020-003.  Claim one alleged that IPI violated Commission Order 2020-003 by not maintaining certain required cash or cash equivalents in a restricted bank account in CNMI or the United States.  Claim two alleged that IPI further violated Commission Order 2020-003 when its highest-ranking executives failed to detail how the Company would comply with the Order.  Claim three requested an Order declaring that the above

two allegations amounted to unsuitable methods of operation and requiring IPI to immediately comply.  Claim four requested an order declaring the IPI's fiscal and financial capability as owner and operator of the casino had significantly diminished such that the public interest was no longer protected, and requiring IPI to immediately obtain financial capability sufficient to pay all debts as they become due.  Commission Order No. 2021-002 ¶ 14.

4) Enforcement Action 2020-004, filed September 24, 2020, contained four claims alleging that IPI violated the CCC's prior Commission Order 2020-004.  Claim one alleged that IPI violated Commission Order 2020-004 by not paying accounts payable that were over 89 days old as required by the Commission's Order.  Claim two alleged that IPI further violated Commission Order 2020-004 by not making certain required certifications as ordered by the Commission. Claim three requested an Order declaring that the above two allegations amount to unsuitable methods of operation, and requiring IPI to pay all amounts required by Commission Order 2020-004 immediately.  Claim four requested an order declaring that:  IPI is not a "going concern" as that phrase is commonly used in financial accounting; IPI, as a business entity, is not "solvent" as that phrase is commonly used in financial accounting; IPI lacks the present ability to pay debts as they mature and come due; IPI lacks the present ability to pay all public and private payments as required by contract, and IPI lacks the present ability to fully construct the entirety of the Initial Gaming Facility in Saipan in accordance with all applicable laws, regulations, and codes. Commission Order No. 2021-002 ¶ 15.

5) Enforcement Action 2020-005, filed October 6, 2020, contained four claims, alleging that IPI failed to pay the Casino Regulatory Fee when due on October 1, 2020.  Claim one alleged that IPI violated Commonwealth law, specifically 4 CMC § 2309 by failing to pay the Casino Regulatory Fee in full when due.  Claim two alleged that IPI violated Regulation § 175-10.1-1225 by failing to pay the Casino Regulatory Fee in full when due for more than twelve hours.  Claim three alleged that IPI breached the Casino License Agreement by failing to pay the Casino Regulatory Fee in full when due.  Claim four sought a declaration that IPI's failure to pay the Casino Regulatory Fee in full when due amounted to an unsuitable method of operation, and requiring IPI to pay the Casino Regulatory Fee in full immediately.  Commission Order No. 2021-002 ¶ 16.

On April 22, 2021, the Commission issued Commission Order 2021-002, finding against IPI on all five Enforcement Actions, suspending IPI's Exclusive Casino License and imposing various financial penalties against IPI for each of the Enforcement Actions.

1) For Enforcement Action 2020-001, the Commission found in favor of both claims by clear and convincing evidence.  The Commission ordered the suspension of IPI's casino license for six

103444865_2

months and that IPI pay penalties amounting to one hundred thousand ($100,000) dollars. Commission Order No. 2021-002 ¶¶ 5–7, 23.

2) For Enforcement Action 2020-002, the Commission found in favor of all four claims by clear and convincing evidence.  The Commission identified that IPI raised a *force majeure* defense to the nonpayment of the Annual License Fee, and that the CCC Executive Director argued and offered testimony against the *force majeure* defense, but did not specifically make any ruling as to the application of the *force majeure* provision in the Casino License Agreement to the Annual License Fee.  The Commission ordered the indefinite suspension of IPI's casino license until IPI has paid its License Fee in full, and that IPI pay penalties amounting to one million five hundred thousand dollars ($1,500,000).  Commission Order No. 2021-002 ¶¶ 8-13, 24, 25.

3) For Enforcement Action 2020-003, the Commission found in favor of all four claims by clear and convincing evidence.  The Commission ordered the indefinite suspension of IPI's casino license until IPI is in compliance with Commission Order 2020-003, and that IPI pay penalties amounting to one million five hundred thousand dollars ($1,500,000).  Commission Order No. 2021-002 ¶¶ 17–20, 26–28.

4) For Enforcement Action 2020-004, the Commission found in favor of all four claims by clear and convincing evidence.  The Commission ordered the indefinite suspension of IPI's casino license until IPI is in compliance with Commission Order 2020-004, and that IPI pay penalties amounting to two million dollars ($2,000,000).  Commission Order No. 2021-002 ¶¶ 17–19, 21, 29–31.

5) For Enforcement Action 2020-005, the Commission found in favor of all four claims by clear and convincing evidence.  The Commission ordered the indefinite suspension of IPI's casino license until IPI has paid the Casino Regulatory Fee in full, and that IPI pay penalties amounting to one million five hundred thousand dollars ($1,500,000).  Commission Order No. 2021-002 ¶¶ 17–19, 22, 32, 33.

IPI petitioned for judicial review of the Commission's Order by the Superior Court, arguing that the COVID-19 pandemic and other unforeseen occurrences constituted *force majeure* events under Section 25 of the Casino License Agreement, and the Commission's refusal to apply the *force majeure* clause was unsupported by the evidence, which warranted setting aside the Commission's Order.  IPI further argued that the Commission considered materials not properly admitted into the evidentiary record, in violation of IPI's Due Process rights.

The Superior Court affirmed the CCC Order, holding that IPI raised a *force majeure* defense only with respect to its nonpayment of the Community Benefit Fund and Annual License Fee payments (Enforcement Actions 2020-001 and 2020-002).  Order Aff'ming Susp. at 22-23.  The Superior Court

concluded that, because IPI did not raise a *force majeure* defense with respect to Enforcement Actions 2020-003, 2020-004, and 2020-005, and those actions "ultimately served as the basis for [the Commission] suspending [IPI's] Exclusive Casino License for an indefinite period of time and ordering millions of dollars in payment," it could affirm the Commission's Order without determining "the lawful scope and application of the *force majeure* clause set out in the Casino License Agreement." *Id.* at 23–26. The Superior Court also rejected IPI's argument that the Commission's consideration of materials outside of the evidentiary record violated IPI's Due Process rights, distinguished this matter from cases cited by IPI in which courts rejected agency actions where those agencies "relied on evidence inappropriately obtained and outside the bounds of its normal course of action"; the Superior Court concluded, by contrast, the Commission "relied on admissions, stipulations, exhibits entered into evidence, and matters officially noticed in reaching its decision, and other information provided by [IPI]." *Id.* at 31.

## STATEMENT OF THE FACTS

### IPI and the Casino License Agreement

IPI is a casino company incorporated and operated in the Commonwealth for the Northern Mariana Islands. On August 12, 2014, the CNMI's Commonwealth Lottery Commission, acting within the scope of its authority,[1] entered a Casino License Agreement ("CLA" or the "Agreement") with IPI and awarded it the CNMI's Exclusive Casino License to operate casino gaming activity in Saipan for a term of twenty-five years. The CLA expressly stated that it was "derived from P.L. 18-56"—a statute enacted by the CNMI Legislature in July 2014 establishing the lawful process of gambling in the CNMI—and that the Agreement "incorporate[s] [P.L. 18-56] as part of this License Agreement" and "is intended to implement and supplement the terms of [P.L. 18-56]." CLA § 1.

P.L. 18-56 established the Commission and granted it authority to regulate casino operations and gaming activity by the exclusive casino licensee. *See* 4 CMC § 2313 et. seq. Similarly, the CLA also recognized the Commission's authority to regulate gaming activity conducted under the Agreement. S*ee* CLA § 3. In entering the CLA, IPI agreed to invest billions of dollars to construct various resort, gaming, and entertainment facilities. CLA §§ 7, 9-12. Under the CLA, IPI also agreed to pay fifteen million dollars ($15,000,000) each year as an Annual License Fee and, after the completion of certain milestones, to make contributions to a Community Benefit Fund. CLA §§ 5, 16.

---

[1] *See* 4 CMC § 2317(a)(1)(i) ("The granting of the exclusive casino license is within the discretion of the Commonwealth Lottery Commission. . . . After approving an application for the exclusive license, the Commonwealth Lottery Commission may negotiate the terms of the exclusive license before it is issued. The license shall be subject to such conditions as the Commonwealth Lottery Commission deems necessary to assure compliance with this chapter, including timelines for construction, commencing operations, and achieving the minimum initial investment requirements.")

103444865_2

The CLA contained a *force majeure* clause in Section 25 that excused IPI's failure to perform under the Agreement in certain circumstances:

> Licensee shall not be in default for any failure or delay in the performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee ("Force Majeure Event"). Invocation of force majeure by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.
>
> Where such Force Majeure Event results in failure in the performance or delay exceeding six (6) months of the performance due under this License Agreement, the Licensee may terminate this License Agreement forthwith provided that the Licensee shall not be excused from any payment obligations to the Commonwealth where the grounds and/or the purpose for such payments have already accrued.
>
> A change in law which prohibits performance of this agreement or makes such performance illegal shall result in a suspension of the performance of both Parties under this License Agreement until such prohibition no longer exists, provided that the Licensee shall have the option to terminate this License Agreement upon the adoption of the change in law pursuant to this section 25 as if such change in law isa Force Majeure Event.

Thereafter, in November 2015, CNMI Governor Ralph Torres signed Public Law No. 19-24, which, among other provisions, required the exclusive casino licensee to pay an annual Casino Regulatory Fee on October 1 of each year.  The Casino Regulatory Fee was initially set at three million dollars ($3,000,000) with a 5% increase to take effect every five years.  *See* 4 CMC § 2309(a)-(b).

Typhoons Soudelor and Yutu, Changes to CNMI Law, and the COVID-19 Pandemic[2]

As IPI was preparing to begin construction of the casino, the first of several significant unforeseeable events struck the CNMI and IPI.  In August 2015, Super Typhoon Soudelor made landfall in the CNMI, resulting in the Acting Governor declaring a "state of major disaster and significant emergency" and causing extensive damage to much of the islands' properties, infrastructure, and power distribution.[3]  Just three years later, Super Typhoon Yutu, a Category 5-equivalent typhoon and the CNMI's strongest ever tropical cyclone, devastated the islands and damaged much of its buildings and

---

[2] This Court may take judicial notice of facts parties raised before the Superior Court about which there is no dispute.  IPI therefore offers supporting references to facts presented before Superior Court below.  *See infra* notes 3–10.

[3] *See Storm Events Database*, Nat'l Oceanic and Atmospheric Administration, https://www.ncdc.noaa.gov/stormevents/eventdetails.jsp?id=601887 (last visited Oct. 27, 2021); *Typhoon Soudelor Slams Saipan*, Pacific News Center (Aug. 3, 2015), https://web.archive.org/web/20150805021239/http://www.pacificnewscenter.com/local/item/4930-typhoon-soudelor-slams-saipan.

infrastructure.[4]  Collectively, Super Typhoons Soudelor and Yutu damaged IPI's construction site and their fallout caused significant delay to IPI's ability to construct and operate its facilities.

Even as IPI was reeling from the damage caused by two of CNMI's largest typhoons, its construction progress was once again impeded by a change in federal law which restricted IPI's ability to source skilled, foreign labor, which was necessary since IPI was not able to adequately staff its construction project using local labor alone.  In 2020, the federal government restricted access to the two visa programs IPI relied on, the H-2B and CW-1 visa programs.  Proclamation No. 10014, 85 Fed. Reg. 23441 (Apr. 22, 2020); Proclamation No. 10052, 85 Fed. Reg. 38263 (June 22, 2020).  During that time, the U.S. Department of Homeland Security issued a new regulation prohibiting the availability of CW-1 classifications for workers "employed in a Construction and Extraction Occupation . . . unless the alien is a long-term worker."  8 C.F.R. 214.2(w)(2)(vii).  These changes meant that IPI, which had previously relied on skilled international labor due to the scale and complexity of its construction project, was unable to renew its employees' visas or bring in short-term replacements in 2020.

That same year, the CNMI—and, indeed, the whole world—was severely affected by the outbreak of the COVID-19 virus, which the World Health Organization classified as a pandemic on March 11, 2020.[5]  Due to its proximity and the significance of Chinese tourism to its economy, the CNMI suffered particularly harsh economic effects from the COVID-19 pandemic.  As early as January 29, 2020, Governor Torres issued an Executive Order placing the CNMI under a state of immediate emergency and banning all visitors from mainland China from entering the CNMI.[6]  Throughout the course of this unprecedented pandemic, the CNMI renewed its state of emergency four times[7] and enacted other restrictions on tourism, including various travel bans and quarantine periods for travelers entering

---

[4] *See Super Typhoon Yutu Strongest to Hit Northern Mariana Islands Ever*, THE WEATHER CHANNEL (Oct. 25, 2018), https://weather.com/storms/hurricane/video/super-typhoon-yutu-strongest-to-hit-northernmariana-islands-ever; *Extreme Category 5 typhoon, the worst U.S. storm since 1935, leaves Northern Mariana Islands devastated*, WASH. POST (Oct. 25, 2018),

https://www.washingtonpost.com/energy-environment/2018/10/24/extreme-category-typhoon-yutumakes-devastating-landfall-northern-mariana-islands-us-commonwealth/; *Humanitarian crisis looms after Super Typhoon Yutu flattens parts of Saipan and Tinian*, USA TODAY (Oct. 26, 2018), https://www.usatoday.com/story/news/2018/10/25/super-typhoon-yutu-leaves-1-deadcrisis-looms-saipan-and-tinian/1771400002/.

[5] *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, WORLD HEALTH ORG. (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[6] Gov. Torres Exec. Order No. 2020-01.

[7] Gov. Torres Exec. Order Nos. 2020-02; 2020-04; 2020-06; 2020-10.

103444865_2

the CNMI, restrictions on gatherings of more than 25 people in a single room, and a mandatory curfew between 7:00 pm and 5:00 am.[8]  Together, these measures paralyzed the CNMI's tourism sector, which accounted for nearly 72% of CNMI's GDP prior to 2020.[9]  Following the shutdown of the tourism industry, 66% of the eligible workforce population in CNMI sought pandemic compensation to cover their loss of income.[10]

IPI's fortunes were no different.  Indeed, since IPI's business was virtually entirely dependent on revenue from tourists—in particular, tourists from mainland China—the pandemic crippled IPI.  Shortly after start of the pandemic, IPI experienced a devastating loss of nearly all revenue, which resulted in IPI being forced to close its premises and cease all operations from March 17, 2020, onwards.  As a result, IPI did not generate any revenue for nearly all of 2020.

Casino License Agreement Amendment No. 9

In light of these extraordinary circumstances, unforeseen and beyond IPI's reasonable control, the Casino Lottery Commission and the CNMI Governor entered into an agreement with IPI to amend the CLA (hereinafter "CLA Amendment No. 9"), referencing the CLA's *force majeure* clause and granting IPI "additional time to fulfil payment obligations" with respect to the Community Benefit Fund.  CLA Amendment No. 9 (1)(b)-(d); *see also* CLA § 16.  This agreement followed two properly noticed public meetings on October 8 and November 20, 2020, after which the Lottery Commission concluded that amending the CLA to allow IPI to defer its payment obligations was "in the best interest of the Commonwealth."  CLA Amendment No. 9.  CLA Amendment No. 9 extended the deadline for IPI to make 2018 and 2019 payments to the Community Benefit Fund until October 1, 2025, and extended the Company's deadline to make 2020 payments to the Community Benefit Fund until October 1, 2023.  *Id.*

CLA Amendment No. 9 acknowledged the existence of *force majeure* events that prevented IPI from making its Community Benefit Fund payments on the previously defined timeline:

---

[8] *Coronavirus: What you need to know*, SABLAN.HOUSE.GOV (Apr. 2, 2020), https://sablan.house.gov/coronavirus-what-you-need-know.

[9] *See Tourism a big part of GDP growth*, SAIPAN TRIBUNE (Oct. 20, 2017), https://www.saipantribune.com/index.php/262650/ ("tourism is roughly 72 percent of the entire economy of the CNMI"); *Northern Mariana Islands to be adversely affected by ban on Chinese airlines*, CHINATRAVELNEWS.COM (June 8, 2020) https://www.chinatravelnews.com/article/138314 ("China is one of the key tourism markets of the CNMI, alongside South Korea and Japan. The Commonwealth has had no tourists since it went into semi-lockdown in March and had planned to reopen next month, but it received notice from the US Department of Transportation disapproving the resumption of flights by Chinese airlines.").

[10] *See* Letter from Gov. Torres to the U.S. Department of Homeland Security (Sep. 28, 2020), https://www.uscis.gov/sites/default/files/document/foia/Commonwealth_of_the_Northern_Mariana_Islands_Governor_Torres.pdf.

12

[A]s a result of the COVID-19 pandemic, an unexpected major unpredicted global event that has already lasted almost 6 months and generally expected to last for many more months to come, Imperial Pacific's current ability to make payments that are currently in arrears has been impacted. On or about March 17, 2020, Imperial Pacific closed the operation of its casino in CNMI, citing diminished tourists to the CNMI and the present unknown as to when tourism may properly continue. . . .

[A]s a result of various natural climatic events including super typhoons Soudelor and Yutu and recently, the Federal change in immigration laws and regulations that include a prevention of CW visa holders from working in construction, [and] further an additional Federal change in immigration policy that prevents construction companies from hiring H-2B workers as construction workers, which are entirely beyond the control of Imperial Pacific, Imperial Pacific [has] not completed the needed construction.

*Id.* This Amendment was signed by the CNMI Governor and the Casino Lottery Commission on December 1, 2020. *Id.*

<u>The Commission's Enforcement Actions and Evidentiary Hearing</u>

From June-October 2021, the Commission initiated five Enforcement Actions against IPI, which were ultimately consolidated into Enforcement Action 2020-001 (consolidating 2020-001 and 2020-002), and 2020-003 (consolidating 2020-003, 2020-004, and 2020-005). Commission Order No. 2021-002 ¶¶ 1–2. These Enforcement Actions related to IPI's failure to meet certain obligations, including its failing to make Community Benefit Fund contributions, pay the 2020 Annual License Fee and Annual Regulatory Fee, and to comply with prior CCC Orders to make certain payments and maintain a minimum amount of cash or cash equivalent in a CNMI or US bank account, as well as to make certain corporate certifications regarding its compliance with these Orders. *See supra* at 6-7.

The Commission held two evidentiary hearings regarding these Enforcement Actions on February 25, 2021, and March 2, 2021. Commission Order No. 2021-002 at 1. On April 22, 2021, the Commission held a meeting (hereinafter "April 22 Meeting") at which it addressed the five Enforcement Actions and ultimately voted to issue Commission Order No. 2021-002, suspending IPI's exclusive casino license and imposing a total of $6.6 million in fines against IPI. During this meeting—prior to voting on the Order—the Commission Chairman, Mr. Guerrero, and Treasurer, Mr. Tatiano, made several references to the Annual Results for the Year Ended 31 December 2020 (the "Annual Report"), a recently issued report issued by IPI's Hong Kong-based ultimate parent company, Imperial Pacific International Holdings Ltd. ("IPI Holdings"). This Annual Report was not been admitted into the evidentiary record at any point during the CCC action.

The IPI Holdings Annual Report stated, among other things, that: (1) IPI Holdings had an unused credit facility of $350 million from an independent third party, which IPI Holdings planned to draw upon "when necessary," Annual Report at 6, 17; and (2) IPI Holdings had five cases pending before the Commission (the five Enforcement Actions) and, although it believed that payment should be delayed due

to the various *force majeure* circumstances, IPI Holdings "anticipated that an immediate payment will be ordered under threat of cancellation of casino license." *Id.* at 20.

In discussing IPI's inability to preserve its payroll and pay its license and regulatory fee, Mr. Guerrero referenced the annual report, stating:

> We have received the audit [of the annual report] for [IPI Holdings]. And it continues to make reference about the 500 million loan facility, and it continues to make reference that 350 million of that, IPI have access to that money to pay what it needs to pay. Can you find out why your audit from the parent company is saying you have access to 350 million to use? Why are you not using this to pay your people you owe including the license fee, the regulatory fee, the orders to preserve payroll? I don't understand how you are diverged, falling over the cliff, and that seems to be the salvation. And the other report says you have access to 350 million to use for the Saipan project. Why are they not using it?

April 22, 2021 Hearing Tr. at 48–49.  Mr. Guerrero went on to directly link the statements in the Annual Report to the Commission's pending decision regarding the five Enforcement Actions, stating:

> "[IPI Holding] do[es]n't know yet what [The Commission] will do. And [IPI Holding is] saying 'we're ready to pay what we need to pay.' I . . . have a hard time understanding this process, you have a humongous obligation. You have access to the money, and yet you're draining everybody to death."

*Id.* at 49.  Again, referencing the annual report, Mr. Tatiano similarly commented:

> Page 17 [of the Annual Report], letter [(iii) says] 'The company will draw down the unutilized credit when necessary.' [It] seems like IPI believes or have this perception that what's happening here it's not necessary for them to act. And I just wonder when is the time for us to see any movement of payments for all the obligations that must be by made by IPI here locally. I just thought I'll mention that to you because it's mentioned here 350 million unutilized funds.

*Id.* at 55–56.

Shortly after these comments, the Commission convened in executive session and unanimously voted to find against IPI on consolidated Enforcement Actions 2020-001 and 2020-003, and to approve Commission Order 2021-002.  *Id.* at 72–73.

## SUMMARY OF THE ARGUMENT

I.       The Court should set aside Commission Order 2021-002 with respect to Enforcement Actions 2020-001 and -002 based on IPI's *force majeure* defense.

   A.       Pursuant to CNMI law, this Court conducts a review of the CCC's agency actions using the same arbitrary and capricious standard applied by the Superior Court. This Court is not required to accord any deference to the Superior Court's conclusion about the agency's actions.

   B.       The *force majeure* clause included in the Casino License Agreement is applicable here. The clause was negotiated between IPI and the CNMI government and includes an expansive definition of what constitutes a *force majeure* event, which applies to the COVID-19 pandemic.  Courts throughout the U.S. and the CNMI government have also recognized COVID-19 as a *force majeure* event.

C.      The Court should find that COVID-19 constituted a *force majeure* event that prevented IPI from fulfilling its payment obligations.  The dramatic economic consequences of the COVID-19 pandemic, both on IPI and throughout the CNMI and the world, are clear.  IPI asserted a *force majeure* defense before the CCC with respect to Enforcement Actions 2020-001 and -002. The evidence presented by the CCC did not reasonably rebut IPI's assertion, and the CCC's finding that it established by clear and convincing evidence that IPI's failure to pay the Annual License Fee was not due to a *force majeure* reason is arbitrary and capricious and not supported by the facts. Similarly, the CCC's finding that, as a matter of law, the *force majeure* clause in the Casino License Agreement does not apply to the Annual License Fee is not supported by the law.

D.      The Superior Court's failure to rule on IPI's *force majeure* defense to Enforcement Actions 2020-001 and -002 was error.  The Superior Court's conclusion that IPI had not raised a *force majeure* defense to Enforcement Actions 2020-003, -004, and -005, and that those Enforcement Actions provided a sufficient basis to fully affirm the CCC's Order was flawed because it did not account for the fact that the CCC imposed specific penalties for each Enforcement Action.  Without ruling on IPI's *force majeure* defense, there is no ground to affirm the penalties imposed by the CCC with respect to Enforcement Actions 2020-001 and -002.  This Court should set aside the CCC's Order with respect to Enforcement Actions 2020-001 and -002, as its findings with respect to these Actions are arbitrary and capricious and unsupported by fact or law.

2.      The Court should apply IPI's *force majeure* defense to all five Enforcement Actions brought by the CCC.  All of the contractual, statutory, and regulatory obligations that form the basis for the CCC's five Enforcement Actions against IPI are, fundamentally, based on IPI's status as the exclusive casino licensee, pursuant to the Casino License Agreement.  Similarly, the factual basis for IPI's assertion of its *force majeure* defense is the same for each of the Enforcement Actions: the COVID-19 pandemic prevented IPI from fulfilling its financial obligations.  Because the legal and factual grounds for IPI's *force majeure* defense is the same for each Enforcement Action, IPI's assertion of a *force majeure* defense before the CCC should be applied broadly to all five Enforcement Actions, and the Court should set aside the CCC's Order in full because the CCC failed to rebut IPI's *force majeure* defense.

3.      The CCC improperly considered and based its Order on an Annual Report issued by IPI's ultimate parent company that was not admitted into evidence in this matter, which constituted a violation of IPI's Due Process rights.

A.      The Due Process requirements of the U.S. and the CNMI Constitutions, as well as CNMI law, require that agency actions are based only on evidence properly admitted into the evidentiary record.

B.      Statements made by CCC Commissioners shortly before they voted to issue Commission Order 2021-002 demonstrate that the Commissioners considered and based their decision on the Annual

Report.  The Commissioners' statements show that, based on this document, they concluded that IPI had funds available but chose not to use those funds to fulfill its payment obligations.

C.      Based on the CCC's improper consideration of this evidence, which IPI did not have a chance to rebut, the Court should set aside Commission Order 2021-002.  The record shows that the Annual Report was relevant to the Commissioners' findings.  The Superior Court improperly found that the Commissioners' consideration of the Annual Report did not constitute a due process violation because there was other evidence on which the CCC could have based its findings.  However, relevant case law shows that this analysis is unpersuasive and that, regardless of an agency's disclaimer or the fact that there was other evidence on which it could have based its finding, where the record shows that the agency received improper evidence, as is shown here, that is "procedurally fatal" to the agency's action.

<strong>ARGUMENT</strong>

**I.      The Court Should Set Aside Commission Order 2021-002 with Respect to Enforcement Actions 2020-001 and 2020-002 Based on IPI's *Force Majeure* Defense.**

Section 25 of the CLA is titled "*Force Majeure*."  It provides that IPI is not in default where its failure or delay in performance of obligations due under the CLA is "due to causes beyond reasonable control."  CLA § 25.  This section goes on to provide that applicable *force majeure* events may include but *are not limited to*: "Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of [IPI]."  *Id.*  In negotiating the terms of the CLA in 2014, while IPI and the CNMI government did not expect a horrific worldwide pandemic to strike every corner of the globe, they nevertheless addressed potential cataclysmic events beyond IPI's control when they agreed on the *force majeure* clause in Section 25.  Indeed, the global pandemic paralyzed not only activities in and travel to the CNMI, it disrupted every aspect of the global economy.  For the protection of CNMI citizens, the CNMI government instituted travel restrictions, mandatory quarantines, limitations on the number of people within a room, and mandatory curfews from 7:00 pm and 5:00 am, forcing IPI to close its business.  IPI and the CNMI government negotiated and included a *force majeure* clause in the CLA precisely to address such an unforeseeable situation and to confirm, by the plain language of the Agreement, that in such circumstances IPI's delay or failure to perform its obligations would be excused.

It should be undisputed to any reasonable observer that the COVID-19 pandemic constituted a *force majeure* event.  The severe economic harm caused to the tourism sector in the CNMI is unquestionable.  The economic harm to IPI, which depended in large part on revenue derived from tourists from China—the country that experienced the earliest and most persistent travel restrictions—was catastrophic.  The CNMI Lottery Commission and the CNMI Governor recognized as much in December

16

2020 by entering CLA Amendment No. 9 to grant IPI additional time to make certain Community Benefit Fund payments, explicitly recognizing the COVID-19 pandemic as "an unexpected major unpredicted global event that has lasted almost 6 months and generally expected to last for many more months to come," which caused IPI to cease operation of its casino in the CNMI, and left IPI unable to make certain payments owed pursuant to the CLA.  *See* CLA Amendment No. 9.  The only remaining question should be the extent to which IPI's inability to perform its obligations should be excused.

In its March 15, 2022 Order, the Superior Court acknowledged that IPI raised a *force majeure* defense with respect to the CCC's Enforcement Actions 2020-001 and 2020-002.  Order Aff'ming Susp. at 22, 24.  Nonetheless, the Superior Court held that it could affirm the CCC's determination to suspend IPI's exclusive casino license and monetarily penalize IPI "without actually determining" the applicability of IPI's *force majeure* defense to Enforcement Actions 2020-001 and 2020-002, by holding that IPI did not raise a *force majeure* defense to Enforcement Actions 2020-003, 2020-004, and 2020-005, and that those actions provided independent and sufficient support for the Commission's Order.  *Id.* at 23-26.  The Superior Court erred by ignoring the fact that the Commission's Order imposed separate penalties for the violations of *each Enforcement Action*.  By failing to address the applicability of IPI's *force majeure* defense with respect to Enforcement Actions 2020-001 and 2020-002, the Superior Court failed to address IPI's argument that the CCC's Order should be set aside based on the *force majeure* defense that IPI raised with respect to those two Enforcement Actions.  This Court should remedy the Superior Court's error by holding that, at least with respect to Enforcement Actions 2020-001 and 2020-002, the CCC's failure to credit IPI's *force majeure* defense was arbitrary, capricious, an abuse of discretion, and was unwarranted by the facts.

A. This Court Reviews the Superior Court's Decision *De Novo*, Applying the Same Arbitrary and Capricious Standard to its Review of the CCC's Agency Action.

"[An appellate court's] review of agency actions is done with the identical guidelines followed by the trial court under the [Commonwealth] Administrative Procedure Act."  *Calvo v. N. Mariana Islands Scholarship Advisory Bd.*, 8 N. Mar. I. 181, 184 (2009) (quotations omitted); *see also* 1 CMC § 9112 (the Commonwealth Administrative Procedure Act).  This means that "the higher court is not required to accord any particular deference to the lower court's conclusion about the agency's actions.  Thus the appellate court's review of the lower court's review of agency action is *de novo*."  *In re San Nicolas*, 1 N. Mar. I. 329, 333–34 (1990) (citations omitted); *see also In re Hafadai Beach Hotel Extension*, 4 N. Mar. I. 37, 41 (1993).  Moreover, since the Superior Court did not address the merits of IPI's *force majeure* defense and made no factual findings regarding the *force majeure* events IPI raised, this Court properly reviews the application of IPI's *force majeure* defense *de novo*.

The Commonwealth Administrative Procedure Act ("APA") requires that a reviewing court holds unlawful and sets aside agency action it finds to be "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  1 CMC § 9112(f); *see also Calvo*, 8 N. Mar. I. at 184 ("Under Section 9112(f) of the APA, agency decisions are reviewed under the "arbitrary and capricious" standard.").  "An agency action is arbitrary and capricious when it is willful and unreasonable without consideration or in disregard of facts or without determining principle."  *Calvo*, 8 N. Mar. I. at 184.  Agency action should be overturned if the agency "relied on factors the Legislature has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Pac. Sec. Alarm, Inc. v. Commonwealth Ports Auth.*, 7 N. Mar. I. 334, 338 12 (2006).

    B.   The *Force Majeure* Clause in the Casino License Agreement Applies to the COVID-19 Pandemic.

While the review and analysis of the CLA's *force majeure* clause begins (as it must) with the plain language of the Agreement (which itself compels its application to the instant situation), the *force majeure* provision in the CLA should be interpreted broadly.  Section 25 provides that IPI "shall not be in default for any failure or delay in the performance due under [the CLA] if such failure or delay is due to causes beyond [IPI's] reasonable control."  CLA § 25.  Section 25 goes on to define "Act(s) of God" as an applicable *force majeure* event, and the clause explicitly states that this definition may encompass more circumstances than those specifically delineated.  *Id.*

*Force majeure* is a well-established principle of contract law that relieves a party from liability if performance is prevented by circumstances or events outside a party's reasonable control.  During a contract formation, parties have the responsibility of agreeing on the *force majeure* provision and defining the events that may trigger a *force majeure* defense.  *See Hydrocarbon Mgmt. Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 436 (Tex. App. 7th 1993).  When the terms of a *force majeure* clause are unambiguous, courts give effect to the intentions of the party expressed in the clause when determining the merits of a *force majeure* defense and whether performance is necessary given the circumstances.  *See Hong Kong Islands Line Am. S.A. v. Distribution Servs. Ltd.*, 795 F. Supp. 983, 989 (C.D. Cal. 1991), aff'd, 963 F.2d 378 (9th Cir. 1992) ("We note initially that the [contract] terms are controlling regarding *force majeure*, and common law rules merely fill in gaps left by the [contract]."); *see also Commonwealth Edison Co. v. Allied-General Nuclear Servs.*, 731 F. Supp. 850, 855–56 (N.D. Ill. 1990) (finding that because the parties "spelled out the circumstances" that would fall under a contract's force majeure clause "with considerable specificity," it "is the contract, rather than a body of judicial doctrine, that [the court] must interpret.").

103444865_2

The *force majeure* clause included as Section 25 of the CLA provides that IPI is excused from any failure or delay in performance due to an "Act of God."  Courts apply an expansive definition to the term "Act of God," holding that it includes natural disasters, even if they are not specifically enumerated in the *force majeure* clause.  *See Schweiger v. Solbeck*, 230 P2d 195, 200 (Or. 1951) ("An '[A]ct of God' is defined as a natural occurrence . . . whose magnitude and destructiveness could not have been anticipated or provided against by the exercise of ordinary foresight."); *see also Sun Pac. Mktg. Coop., Inc. v. DiMare Fresh, Inc.*, 2010 WL 3220301, at *10 (E.D. Cal. Aug. 13, 2010) (finding "Act of God" included an extreme heatwave, even where not expressly defined in the contract).  Courts also expansively define *force majeure* clauses, like the one in the CLA, that include open-ended or catch-all language covering unanticipated events beyond a party's control that makes it impracticable to reasonably perform under a contract.  *See Commonwealth Edison Co.*, 731 F. Supp. at 855 (N.D. Ill. 1990).

Particularly given the expansive language included in the CLA's *force majeure* clause, this Court should readily conclude that the COVID-19 pandemic constitutes a *force majeure* event pursuant to the CLA.  Indeed, since COVID-19 was declared a global pandemic in March 2020, courts throughout the United States have consistently recognized COVID-19 as a *force majeure* event encompassed within the definitions of "Acts of God" or "natural disasters."  *See, e.g*, *Friends of DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) ("The COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions."); *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020); *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 2020 WL 7405262, at *17 (S.D.N.Y. Dec. 16, 2020) ("It cannot be seriously disputed that the COVID-19 pandemic is a natural disaster."); *Snell v. Walz*, 2021 Minn. Dist. LEXIS 98, at *29 (Mar. 15, 2021) (holding that the definition of "Act of God" "encompasses the emergence . . . of deadly and highly contagious viruses such as COVID-19.").

The CNMI government has also recognized the applicability of the CLA's *force majeure* provision.  On December 1, 2020, after the CNMI had spent almost nine months grappling with the economic fallout of COVID-19, the Casino Lottery Commission and the CNMI Governor amended the CLA to recognize the occurrence of *force majeure* events and to grant IPI additional time to fulfil payment obligations that it had been unable to meet.  *See* Order Aff'ming Susp. at 13; *see also* CLA Amendment No. 9.  CLA Amendment No. 9 provided that IPI's Community Benefit Fund contributions that were due in 2018 and 2019—and which are the subject of Enforcement Action 2020-001—were deferred until October 1, 2025, and that the contributions originally due in 2020 were deferred until October 1, 2023.  CLA Amendment No. 9.  In its preamble, CLA Amendment No. 9 directly identified Super Typhoons Yutu and Soudelor, as well as the change in federal immigration laws and regulations, as circumstances beyond IPI's control and which prevented IPI from completing its construction project as planned.  *Id.*  The preamble also addressed the effect of COVID-19, "an unexpected major unpredicted

19

global event that has lasted almost 6 months and generally expected to last for many more months to come," as a reason why IPI was unable to make certain payments.  *Id.*  The Amendment acknowledged that, as a result of COVID-19, "[IPI] closed the operation of its casino in CNMI, citing diminished tourists to the CNMI and the present unknown as to when tourism may properly continue."  *Id.*

Based on the plain language of the CLA and the principles of *force majeure* and contractual interpretation, this Court should join other courts throughout the United States, as well as the CNMI government, in concluding that the COVID-19 pandemic constitutes a *force majeure* event—particularly pursuant to the expansive terms of the Section 25 of the CLA.

C.  <u>This Court Should Find that the COVID-19 Pandemic was a *Force Majeure* Event that Prevented IPI from Meeting its Payment Obligations under the Casino License Agreement.</u>

In conducting a judicial review of the CCC's finding that IPI failed to establish a *force majeure* defense with respect to Enforcement Actions 2020-001 and 2020-002 (nonpayment of Community Benefit Fund payments and the 2020 Annual License Fee), this Court should readily conclude that the COVID-19 pandemic constituted a *force majeure* event that prevented IPI from meeting its payment obligations.  It in unquestionable that a global pandemic is the type of unforeseen, natural disaster that IPI and the CNMI government intended to address when they included the *force* majeure provision as Section 25 in the CLA.  While CCC concluded that "the casino licensee's failure to make the required annual license fee payment was not due to a force majeure reason," Commission Order No. 2021-002 ¶ 10, the evidence cited by the CCC in support of that finding does not reasonably support the CCC's position, much less the CCC's assertion that such evidence is "clear and convincing."  Moreover, the CCC's position that, as a matter of law, the *force majeure* clause of the CLA does not apply to IPI's nonpayment of the Annual License Fee is meritless.  For those who have witnessed the events of the past two and a half years, the severe economic impact of COVID-19 on a tourism-dependent business in Saipan is obvious.  That the CCC has twisted itself into knots to claim that IPI's failure to pay an Annual License Fee that came due in August 2020 was not due to the COVID-19 pandemic, particularly when IPI timely paid all prior years' fees, should give this Court significant pause.

As an initial matter and as noted above, IPI and the CNMI government included a *force majeure* clause in the CLA to ensure that, in the event of unforeseen circumstances "beyond [IPI's] reasonable control" that prevented or delayed its performance under the CLA, IPI would be excused from such liability.  The willingness of parties to enter into contracts—particularly with government entities—is fundamentally dependent on an understanding that the negotiated and agreed-on provisions of such contracts will have force, even where they might cut against the immediate interests of government bodies invested with power and authority.

As also previously noted, the CNMI government recognized the COVID-19 pandemic as a *force majeure* event, and agreed to amend the CLA in December 2021 to defer the dates of IPI payments to the Community Benefit Fund on the basis that "[IPI]'s current ability to make payments that are currently in arrears has been impacted" by the COVID-19 pandemic and IPI's need to shut down its premises.[11]   CLA Amendment No. 9.   The CNMI government's conclusion that the COVID-19 pandemic was the cause of IPI's inability to make payments in late 2020 is consistent with the facts surrounding IPI's inability to pay the 2020 Annual License Fee.   It is undisputed that prior to August 12, 2020, IPI paid the Annual License Fee every year in full.    It was only on August 12, 2020—seven months after the CNMI restricted tourism from China and five months after the CNMI government implemented its full slate of emergency measures and IPI was forced to shut its doors—that IPI found itself unable to pay the Annual License Fee. *See* Commission Order No. 2021-002 ¶ 8.

IPI expressly raised this *force majeure* defense during the February 25, 2021, evidentiary hearing held before the Commission.   Regarding the Community Benefit Fund payments, IPI offered the Commission evidence that the CNMI government recognized COVID-19 as a *force majeure* event, which prevented IPI from being able to make the Community Benefit Fund payments that had become due on October 1, 2020.   Feb. 25, 2021 Hearing Tr. at 20–21; *see also* CLA Amendment No. 9.   IPI directed the Commission to CLA Amendment No. 9, "entered into the backdrop of the pandemic," which acknowledges the COVID-19 pandemic as "an unexpected major unpredicted global event" and allowed IPI to defer its payment obligations for the Community Benefit Fund to 2023 and 2025.   CLA Amendment No. 9.   Similarly, during the evidentiary hearing, IPI argued before the Commission that its inability to pay the 2020 Annual License Fee, which had come due on August 12, 2020, was because of the effect of COVID-19 on tourism in CNMI:   "IPI has not been able to bring in tourists, has not been able to bring in gamblers, has not operated . . . a gaming casino, which [is the purpose of the license]." Feb. 25, 2021 Hearing Tr. at 23.

The CCC did not introduce evidence that could reasonably rebut IPI's *force majeure* defense. Indeed, as discussed below, the evidence presented by the CCC simply fails to support a finding that IPI's inability to pay the Annual License Fee was *not* due to COVID-19.   Further, the CCC's finding that, as a matter of law, the *force majeure* clause in the CLA does not apply to the Annual License Fee is meritless.

---

[11] Although not directly argued before the Superior Court, in addition to IPI's *force majeure* defense against Enforcement Action 2020-001, the CCC's Order was arbitrary and capricious to the extent that it imposed any penalties based on IPI's failure to make these Community Benefit Fund payments since, as of the date of the CCC's Order (April 23, 2021) the CLA had been amended and IPI had no obligation to make those payments in 2018 or 2019.

   i.   *The Commission failed to present evidence that could reasonably rebut IPI's force*
        *majeure defense.*

While the CCC Order found that the CCC's Executive Director "has established by clear and
convincing evidence that the casino licensee's failure to make the required annual license fee payment
was not due to a force majeure reason."  Commission Order No. 2021-002 ¶ 10.  This finding was
arbitrary and capricious and is unsupported by the evidence.

In the CNMI, clear and convincing evidence "is that degree of proof which will produce in the
mind of the trier of fact a firm belief or conviction as to the allegation sought to be established, and
requires the existence of a fact to be highly probable."  *Commonwealth v. The Tinian Casino Control
Comm.*, 1992 WL 135873, at *6 (N. Mar. I. May 12, 1992) (quoting *Masaki v. Gen. Motors Corp.*, 780
P.2d 566, 574 (Haw. 1989)).

In finding that IPI's failure to make payment of the Annual License Fee was not due to a *force
majeure* reason, the CCC cited testimony "that the casino licensee failed to pay the annual license fee not
due to force majeure reasons" but instead because: (i) "IPI had suffered large financial losses prior to the
pandemic," (ii) "the casino licensee's auditors expressed 'going concern' issues prior to the pandemic,"
and (iii) "the then-CEO admitted to the Commission in a public meeting on July 20, 2020 that IPI has
some funding to satisfy the annual license fee."  Commission Order No. 2021-002 ¶ 9.  However, none of
the evidence offered can reasonably support a conclusion (much less by a "clear and convincing
evidence" standard) that IPI's failure to pay the Annual License Fee in August 2020 was *not due* to the
COVID-19 pandemic.

The first two reasons cited by the CCC were supported only by brief testimony from Eleuterio
Palacios, the CCC's own Audit Manager.  In testifying, Mr. Palacios read excerpts from IPI audit reports
from fiscal years 2018 and 2019, to testify that, as of fiscal year 2019: (i) IPI had a member's deficiency
of $559 million; (ii) IPI's liabilities exceeded its assets by $280 million, and (iii) during 2019, IPI
incurred a net loss of approximately $442 million.  As a result, the audit report stated that "substantial
doubt exists about [IPI's] ability to continue as a going concern."  Feb. 25, 2021 Hearing Tr. 33.  While
this testimony does provide evidence that, during fiscal year 2019, IPI was an indebted company which
realized a significant operating loss on its balance sheet, the testimony provided is irrelevant to the
question of whether IPI's failure to pay the 2020 Annual License Fee was due to the COVID-19
pandemic.

Most directly, Mr. Palacios's testimony referred to IPI's financial condition during 2018 and
2019—years in which it is undisputed that IPI paid the Annual License Fee.  The CCC's Order does not
explain how evidence regarding IPI's financial condition during years in which it *met* its financial
obligations to the CCC supports the notion that its subsequent inability to pay the 2020 Annual License

22

Fee (in the midst of a disruptive global pandemic that forced the closure of its business) was somehow not due to that pandemic.  Instead, Mr. Palacios's testimony shows simply that IPI was carrying a significant debt burden, something not uncommon for a gaming company, particularly one in the midst of financing a large-scale construction project.  Mr. Palacios offered no evidence regarding IPI's revenue or cashflow in 2018, 2019, or 2020, which is of far greater likelihood to have impacted whether IPI was able to pay annual fees.  Indeed, a more reasonable interpretation of the evidence offered by Mr. Palacios is that, despite its significant debt burden and operating loss in 2019, IPI was able to pay the Annual License Fee due to revenue that it used to pay operating expenses.  Once that revenue slowed and then stopped in early 2020 due to the global pandemic, IPI was left unable to pay its expenses, including the Annual License Fee when it came due in August 2020.

The third reason cited by the Commission, that IPI's then-CEO "admitted to the Commission in a public meeting on July 20, 2020 that IPI had some funding to satisfy the [A]nnual [L]icense [F]ee," Commission Order No. 2021-002 ¶ 9, is equally insufficient to support the CCC's finding that IPI's failure to pay was not due to the COVID-19 pandemic.  This statement is vague and indefinite to the point that its evidentiary value is nill.  Moreover, the fact that, amid the global pandemic, IPI had "some funding" in July 2020, but then found itself unable to make a payment due in August 2020 is, if anything, evidence of the Company's deteriorating financial condition during the second half of 2020, as the pandemic raged on and IPI's doors remained close.  In short, none of the evidence cited by the CCC reasonably shows that IPI's failure to pay the 2020 Annual License Fee was *not* due to the COVID-19 pandemic.  The Commission's claim that such evidence is "clear and convincing" is ill-taken, particularly in the face of the obvious economic damage done by the COVID-19 pandemic to IPI (and other businesses) during the course of 2020.

> ii.  *The Commission's finding that the force majeure clause in the CLA does not, as a matter of law, apply to the Annual License Fee is meritless.*

The Commission additionally and improperly found that the *force majeure* clause in the CLA cannot affect IPI's obligation to make payment of the Annual License Fee since, "the time for payment was set by statute, and the Lottery Commission could not amend an act of the Legislature."  Commission Order No. 2021-002 ¶ 10.  This finding is arbitrary and capricious and is unsupported by fact or law.

The CLA was a lawful agreement entered between IPI and the CNMI government, represented by the CNMI Attorney General and the Commonwealth Lottery Commission, the governmental body empowered by the CNMI legislature to award the Exclusive Casino License and to "negotiate the terms of the exclusive license before it is issued."  4 CMC § 2317(a)(1)(i)(A); *see also Enter. Life Ins. Co. v. Dept of Ins.*, 463 P.3d 845, 848 (Ariz. Ct. App. Div. 1 2020) ("[T]he degree to which an agency can exercise any power depends upon the legislature's grant of authority to the agency.").  The Commonwealth

Lottery Commission did just that by negotiating the CLA (including the *force majeure* provision) and executing that Agreement, on behalf of the Commonwealth.  The Annual License Fee is not extraneous to the CLA; it is explicitly referenced in the Agreement.  CLA § 5.  And, rather than overstepping legislative authority, as the Commission claims, the CLA incorporates Public Law 18-56, which established the Annual License Fee.  *See id.* § 1.  There is no reasonable basis for the Commission to conclude that the *force majeure* provision of the CLA does not apply to the Annual License Fee.

> D.  The Superior Court Erred by Failing to Rule on IPI's *Force Majeure* Defense To Enforcement Actions 2020-001 and -002.

In its March 15, 2022 Order, the Superior Court noted that IPI raised a *force majeure* defense, pursuant to the CLA's *force majeure* clause and CLA Amendment No. 9, to excuse the Company's nonpayment of the 2018 and 2019 Community Benefit Fund and the 2020 Annual License Fee.[12]  Order Aff'ming Susp. at 22–23.  Despite this, the Court failed to address the merits of IPI's *force majeure* defense, even with respect to the Enforcement Actions for which it agreed those defenses were raised. The Superior Court avoided addressing IPI's *force majeure* defense by holding that "the basis for [IPI's] Exclusive Casino License suspension was made upon multiple grounds separate and distinct from its failure to [] make Community Benefit Fund payments and the Annual License Fee."  *Id.* at 23.  In other words, the Superior Court believed that it did not need to address IPI's *force majeure* defense, since the CCC could have fined and suspended IPI on the basis of the other three Enforcement Actions.

The critical flaw in this reasoning is that the CCC applied independent and distinct penalties for violations of each Enforcement Action.  By failing to rule on IPI's argument that the CCC improperly disregarded its *force majeure* defense, the Superior Court's Order cannot properly serve as a basis to affirm the penalties imposed by the CCC with respect to Enforcement Action 2020-001 and 2020-002.

First, the Commission's Order imposed distinct financial penalties for each Enforcement Action:

- Enforcement Action 2020-001 (Community Benefit Fund): $100,000.

- Enforcement Action 2020-002 (Annual License Fee): $1,500,000.

- Enforcement Action 2020-003 (cash reserves or equivalent in a CNMI or U.S. account): $1,500,000.

- Enforcement Action 2020-004 (accounts payable and required corporate certification): $2,000,000.

- Enforcement Action 2020-005 (Casino Regulatory Fee): $1,500,000.

---

[12] IPI disputes the Superior Court's narrow construction of IPI's *force majeure* defense.  However, for the sake of arguing the merits of this defense for IPI's nonpayment of the Community Benefit Fund and the CLA, IPI reserves its argument against this narrow construction to Part II.  *See infra* at 26-27.

The Superior Court lumped these penalties together, finding that the other distinct claims raised by Enforcement Actions 2020-003, -004, and -005 "ultimately served as the basis for the Casino Commission . . . ordering ***millions*** of dollars in penalties." Order Aff'ming Susp. at 25 (emphasis added). Yet, exactly how many "millions of dollars" is highly relevant and, here, turns on a determination of whether IPI's *force majeure* defense excuses its failure to make Community Benefit Fund and Annual License Fee payments, a question which the Superior Court avoided answering. Even if the penalties resulting from the other Enforcement Actions are upheld, the application of IPI's *force majeure* defense to Enforcement Actions 2020-001 and 2020-002 would reduce IPI's penalty by $1,600,000.

Second, with respect to Enforcement Action 2020-002, the CCC Order included a declaratory ruling that IPI must pay the 2020 Annual License Fee, totaling more than $15.5 million, immediately. *See* Commission Order No. 2021-002 ¶¶ 8, 11, 13. By contrast, IPI's position is that its *force majeure* defense excuses nonpayment of the 2020 Annual License Fee, and that the CCC improperly failed to recognize that the occurrence of *force majeure* events—most notably the worldwide pandemic which crippled IPI's business along with much of the economic activity in the CNMI—excused IPI's obligation to pay the 2020 Annual License Fee. The Superior Court could not properly affirm the CCC's Order with respect to this declaratory relief without addressing the applicability of IPI's *force majeure* defense.

Third, the CCC Order imposed specific conditions for lifting the suspension of IPI's exclusive casino license, with different conditions tied to each Enforcement Action. For example, in connection with Enforcement Action 2020-002, the CCC ordered the indefinite suspension of IPI's license until it pays the 2020 Annual License Fee in full. *See* Commission Order No. 2021-002 ¶ 13. Along the same lines as noted above, the Superior Court cannot properly affirm the CCC's Order that IPI's exclusive casino license shall remain suspended until it makes full payment of the 2020 Annual License Fee without addressing the Company's argument that its failure to pay those fees are excused by the *force majeure* provision in the CLA.

In sum, the Superior Court found that IPI raised a *force majeure* defense with respect to Enforcement Actions 2020-001 and 2020-002, but failed to rule on the application of that defense; this question now falls to this Court, since the penalties imposed by the CCC with respect to those two Enforcement Actions cannot by affirmed without addressing the application of IPI's *force majeure* defense. The evidence that COVID-19 constituted a *force majeure* event, as defined in the CLA, that was responsible for IPI's inability to make payment of the 2020 Annual License Fee is in plain sight and impossible to miss. Other representatives of the CNMI government, including the Governor and the Lottery Commission, have acknowledged what should be an obvious fact and, indeed, specifically changed the payment deadline for the Community Benefit Fund payments. But the CCC, alone, asserts—unsupported by any reasonable interpretation of the evidence—that IPI's inability to make its Community

Benefit Fund and Annual License Fee payments was not due to the worldwide pandemic.  Because the CCC's conclusions on these points are arbitrary and capricious and unsupported by fact or law, this Court should set aside the Commission's Order with respect to Enforcement Actions 2020-001 and 2020-002.

II.   **IPI's Assertion of a *Force Majeure* Defense Should be Applied Against Each of the Casino Commission's Enforcement Actions.**

In reviewing the Commission's Order, the Superior Court distinguished between Enforcement Actions for which it found that IPI had raised a *force majeure* defense and others for which it found that that IPI had not raised such a defense.  However, this Court should set aside this distinction and find that IPI's *force majeure* defense applies to each of the Enforcement Actions brought by the CCC.  The CLA, which defines IPI as the exclusive casino licensee, is the source of all the contractual, statutory, and regulatory obligations that form the basis for each of the CCC's Enforcement Actions.  Because IPI's *force majeure* defense was based on the same legal basis (Section 25 of the CLA) and factual basis (the COVID-19 pandemic) for each of the five Enforcement Actions, IPI's assertion of that *force majeure* defense before the Commission should be applied broadly, providing grounds to set aside the Commission's Order with respect to each of the Enforcement Actions.

As noted above, this Court reviews the CCC's agency actions under the same arbitrary and capricious standard applied by the Superior Court.  *See supra* at 17-18.

In its arguments before the Superior Court, IPI drew no distinction between the application of the *force majeure* defense to the various Enforcement Actions brought against it by the CCC.  Instead, IPI argued that, given the occurrence of a clear *force majeure* event (recognized by the CNMI government through CLA Amendment No. 9), the presence of an applicable *force majeure* provision in the CLA, IPI's assertion of a *force majeure* defense at the evidentiary hearing held before the Commission on February 25, 2021, and the CCC's failure to present evidence to rebut IPI's *force majeure* defense, *see supra* at 22-23, the CCC's Order should be set aside.

In its March 15, 2022 Order, the Superior Court distinguished between two sets of CCC Enforcement Actions: first, with respect to Enforcement Actions 2020-001 and 2020-002 (Community Benefit Fund and Annual License Fee nonpayment), the Superior Court found that IPI expressly raised a *force majeure* defense; however, for Enforcement Actions 2020-003, 2020-004, and 2020-005, the Superior Court found that IPI did not assert a *force majeure* defense.  With respect to this latter group, the Superior Court concluded that "[IPI]'s reliance on the doctrine of *force majeure* was limited" and held that "[IPI] offered <u>no defense</u> and did not contest any of the claims in Enforcement Actions 2020-003, 2020-004, or 2020-005, which are not related to the Annual License Fee or Community Benefit Fund monetary requirements."  Order Aff'ming Susp. at 24–25 (emphasis in original).

This distinction, however, fails to recognize that IPI's obligations, from which all of the Commission's Enforcement Actions sprout, are derived from the same root:  the exclusive casino license, awarded to IPI through the CLA.  The exclusive casino license is the basis for IPI's obligations to make Community Benefit Fund payments, and to pay the Annual License Fee and Casino Regulatory Fee.  It also provides the basis for the CCC's regulatory authority over IPI, which the Commission exercised in issuing Commission Orders 2020-003 and 2020-004 (the violation of which led to Enforcement Actions 2020-003 and 2020-004).  Indeed, the CNMI legislature has recognized the centrality of the CLA to CNMI gaming legislation and to the CCC's purpose and regulatory remit.  Section 1 to Public Law 19-24, which among other things established the Casino Regulatory Fee, identified the purpose of that law (and of future gaming legislation) as: "to enable the Commission to discharge its obligations to the people of the Commonwealth and *to uphold and fulfill the terms of the Casino License Agreement granted to the exclusive casino licensee*."  P.L. 19-24 § 1 (2015).  Viewed holistically, all of IPI's contractual, statutory, and regulatory obligations stem from IPI's status as the exclusive casino licensee pursuant to the CLA, which sets forth the terms of IPI's agreement with the CNMI government.  The *force majeure* clause contained in Section 25 of the CLA, therefore, is not limited to IPI's obligation to fulfill specific financial obligations identified within the Agreement; instead, it applies broadly, since IPI's statutory obligations affecting the "exclusive casino licensee" (such as the obligation to pay the Casino Regulatory Fee), as well as its obligation to comply with orders issued by the CCC, are all required "under [the Casino] License Agreement" since it is the CLA that establishes IPI as the exclusive casino licensee.

IPI's inability to fulfill the various obligations that form the basis for the CCC's Enforcement Actions also all derive from the same cause: IPI's complete lack of revenue after the COVID-19 pandemic forced the Company to close its operations in March 2020.  Because the legal basis and the factual grounds for IPI's *force majeure* defense were the same for each of the Enforcement Actions brought against the Company, IPI's assertion of its *force majeure* defense before the Commission should be applied broadly to each Enforcement Action brought against IPI by the Commission, including Enforcement Actions 2020-003, 2020-004, and 2020-005.  As discussed above, the CCC did not present evidence sufficient to rebut IPI's *force majeure* defense, *see supra* at 22-23, the Court should set aside the Commission's Order with respect to each of the Enforcement Actions.

### III.    IPI's Due Process Rights were Violated by the Commission's Reliance on Evidence Not Properly Admitted into the Record.

The record demonstrates that, in addition to the evidence properly admitted in this action, the CCC based its ruling on an Annual Report issued by IPI's ultimate parent company that was never part of the evidentiary record.  Based on direct statements made by multiple Commissioners shortly before they voted to issue Commission Order 2021-002, it is clear that the CCC concluded, based on the content of

this Annual Report, that IPI had access to funds sufficient to fulfill its financial obligations, but chose not to use those funds to make the payments.  This conclusion was devastating to IPI's *force majeure* defense. It was also incorrect but, because the document relied on by the Commission was never admitted into evidence, IPI did not have an opportunity to rebut the conclusion that the Commissioners improperly drew.  The CCC's improper consideration of this Annual Report in issuing Commission Order 2021-002 constituted a violation of IPI's Due Process rights; this Court should remedy that violation by setting aside the Commission's Order.

As noted, pursuant to the CNMI APA, an appellate court applies the same "arbitrary and capricious" standard as a trial court in reviewing an agency action.  *See Calvo*, 8 N. Mar. I. at 184. Moreover, appellate courts review a party's procedural due process claims *de novo*.  Constitutional claims, such as violation of a party's Due Process rights, are "inherently questions of law and are, therefore, reviewed *de novo*."  *Castro v. Castro*, 8 N. Mar. I. 218, 222 (2009); *see also In re Hafadai Beach Hotel Extension*, 4 N. Mar. I. 37, 41 (1993) ("[An appellate court's] review of a trial court's determination that procedures satisfied constitutional and statutory due process is *de novo*."); *In re Estate of Tudela*, 4 N. Mar. I. 1, 2 (1993).  Therefore, this Court reviews IPI claim that the Commission's ruling violated it Due Process rights *de novo*.

A. Due Process and Commonwealth Law Required the CCC to Base its Order Only on Materials Admitted to the Evidentiary Record.

The Due Process Clause of the Fourteenth Amendment, enshrined into CNMI law through the CNMI Constitution, provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST amend. XIV § 1; CNMI CONST. art. I § 5.  The Covenant establishing a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America further provides that section 1 of the Fourteenth Amendment "will be applicable within the Northern Mariana Islands . . . as if the Northern Mariana Islands were one of the several States."  *See* 48 U.S.C. § 1801, Sec. 501(a).

At a basic level, the Due Process Clause preserves procedural fairness by requiring that a fact finder bases its decision only on evidence that has been properly admitted into the record during a trial or evidentiary hearing.  *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("[T]he decisionmaker's conclusion must rest solely on legal rules and evidence adduced at the hearing."); *Matthews v. Eldridge*, 424 U.S. 319, 325 n. 4 (1976) (finding that Due Process at an evidentiary hearing requires "a decision resting solely on the legal rules and evidence adduced at the hearing") (citations omitted);  *Johnson v. Johnson*, 153 A.3d 318, 322 (Pa. Super. Ct. 2007 ("A trial court may not consider evidence outside of the record in making its determination. Nor may [an appellate court] uphold a trial court's order on the basis of off-the-record facts.") (citations omitted).  This constitutional right cannot be abridged even by State

statute.  *See Cleveland Bd. Of Educ. V. Loudermill*, 470 U.S. 532, 541 (1985) ("The right to due process is conferred not by legislative grace, but by constitutional guarantee").

The CNMI APA requires that findings of fact resulting from administrative hearings "shall be based exclusively on the evidence and on matters officially noticed."  *See* 1 CMC § 9109(1).  The APA also provides that, where an agency has issued an order based on proceedings that do not comport with due process or CNMI law, CNMI courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be  . . . [w]ithout observance of procedure required by law."  1 CMC § 9112(f)(2)(iv).

B. <u>The CCC Commissioners' Own Statements Show that the Commission Based its Order on Evidence that was Not Properly Admitted.</u>

Here, the facts show that the CCC based its Order on consideration of a document that was never submitted or admitted into evidence, in violation of IPI's Due Process rights.  On April 22, 2021, the CCC held a meeting, at the conclusion of which it retired into executive session, voted, and issued Commission Order 2021-002.  Notably, this meeting was not an evidentiary hearing, and the CCC Chairman specifically stated that the CCC would not be debating the Order.  April 22, 2021 Hearing Tr. at 54.  Nonetheless, during the April 22 meeting, minutes before the CCC would vote to issue the Order, CCC Chairman Guerrero and Treasurer Tatiano made statements regarding a Annual Report, recently released by IPI's ultimate parent company, IPI Holdings—a document that was never admitted into evidence in this action.  The Commissioner's statements make clear that the Commission considered and based Commission Order 2021-002 on their understanding of the content of the Annual Report.

Among other things, the Annual Report, published on March 31, 2021, stated that IPI Holdings had access to an unused credit facility of $350 million from an independent third party, which IPI Holdings planned to draw upon "when necessary."  Annual Report at 6, 17.  Despite the fact that the Annual Report had not been admitted into evidence, Chairman Guerrero and Treasurer Tatiano made statements explicitly linking the content of the Annual Report to the Commission's Order, and indicating that the Commission had considered the Annual Report in evaluating IPI's *force majeure* claims and the potential penalties to be assessed against IPI.  At one point Chairman Guerrero stated:

> "We have received the audit for [IPI Holdings].  And it continues to make reference about the 500 million loan facility, and it continues to make reference that 350 million of that, IPI have access to that money to pay what it needs to pay.  Can you find out why your audit from the parent company is saying you have access to 350 million to use?  *Why are you not using this to pay your people you owe including the license fee, the regulatory fee, the orders to preserve payroll*?  I don't understand how you are diverged, falling over the cliff, and that seems to be the salvation."

April 22, 2021 Hearing Tr. at 48:9–16 (cleaned up).  Here, Chairman Guerrero indicated that he considered, based on the Annual Report, that IPI had funds available to make payments, including the

Annual License Fee and Casino Regulatory Fee, the nonpayment of which was the basis for the CCC's Enforcement Actions.

Chairman Guerrero continued, explicitly linking the content of the Annual Report to IPI's payment of potential penalties to be imposed by the CCC, and characterizing the Annual Report as stating that IPI Holding "do[es]n't know yet what the CCC will do.  And [IPI Holding is] saying 'we're ready to pay what we need to pay.'  I . . . have a hard time understanding this process, you have a humongous obligation. You have access to the money, and yet you're draining everybody to death." *Id.* at 49:13–16 (cleaned up).  Here, Chairman Guerrero again stated his conclusion that, based on the Annual Report, IPI had funds available to make payments to the CCC.

Treasurer Tatiano similarly referred to the Annual Report, stating:

"Page 17 [of the Annual Report], letter [(iii) says] 'The company will draw down the unutilized credit when necessary.'  [It] seems like IPI believes or have this perception that what's happening here it's not necessary for them to act.  And I just wonder when is the time for us to see any movement of payments for all the obligations that must be by made by IPI here locally. I just thought I'll mention that to you because it's mentioned here 350 million unutilized funds."

*Id.* at 55:19–56:1 (cleaned up).  Mr. Guerrero followed this by stating, "your auditor is telling the world you have 350 [million] ready to provide wherever you need it. But yet you're not giving to where it is needed." *Id.* at  57:2–57:6.  Both Commissioners' statements demonstrate that, based on the Annual Report, they had concluded that IPI had access to funds but was choosing not to make payment of the amounts that were the basis for the Enforcement Actions.

Shortly after these repeated discussions of the Annual Report, which had not been offered or submitted into evidence and to which IPI had not been given any opportunity to respond in an evidentiary hearing, the Commissioners briefly convened in executive session and voted unanimously to approve Commission Order 2021-002.  *Id*. at 72-73.

C.   The Commissioners' Consideration of Evidence Not Property Admitted is Grounds to Set Aside the Commission's Order and the Superior Court Erred by Failing to Do So.

As discussed above, the facts demonstrate that the Commission violated IPI's Due Process rights by considering and basing Commission Order 2021-002 on the Annual Report, which had not been entered into evidence, thereby depriving IPI of the right to rebut the facts contained in that document.  The content of the Annual Report was clearly relevant to the matters before the CCC, particularly to the application of IPI's *force majeure* defense.  The distinctions drawn by the Superior Court between this matter and other relevant case law fall flat.  Regardless of whether there are arguably sufficient other grounds on which the Commission could have based its findings, whether the Commissioners discussed the Annual Report in the context of their regulatory duties, whether the Annual Report was first referenced by an IPI officer, or whether the Commission now disclaims any reliance on the Annual Report, the record shows that the

Commissioners considered the content of the Annual Report in issuing Commission Order 2021-002. That constitutes a violation of IPI's Due Process rights, and this Court must set aside the Order.

Case law from a string of similar cases from Hawaii, involving judicial review of agency decisions, are instructive. In those cases, courts found prejudicial procedural error when agencies received and considered evidence that a party to a contested hearing did not have the opportunity to rebut. In *Town v. Land Use Commission*, 524 P.2d 84 (Haw. 1974), a Hawaii agency held several meetings to determine whether certain property could be redesignated. After a contested evidentiary hearing, the vice-chairman of the agency moved to approve the redesignation based partly on his own "field investigation of the land under question." *Id.* at 86. The appellate court reversed the agency's decision since that "investigation" was conducted without notice to the parties, who "[were] never afforded an opportunity to contest the facts" of the investigation. *Id.* at 92.

In similar circumstances, the appellate court in *Waikiki Shore, Inc. v. Zoning Bd. of Appeals*, 625 P.2d 1044 (Haw. 1981), reversed an agency's variance order. In that case, after a hearing had concluded, one of the parties sent an *ex parte* letter to the agency rebutting their opponent's arguments from the hearing, after which an agency board member stated that "[t]he letter [had] clarified a lot of questions we had in our mind." *Id.* at 1045. The agency board eventually voted to approve the variance, while also issuing "an express disclaimer that it was in any way considering the letter or view." *Id.* Nonetheless, despite the agency board's direct claim that the letter held no significance in their decision, the appellate court reversed the agency's decision, emphasizing that "the transcript [] in the record before the court" showed that the agency had considered the letter, and because letter had been delivered after the hearing concluded, "the opposing party was given no opportunity to rebut." *Id.* at 1046.

Finally, in *Korean Buddhist Dae Won Sa Temple v. Sullivan*, 953 P.2d 1315 (Haw. 1998), the director of an agency denied a Korean Buddhist temple's application for a variance after a public hearing. The director later testified that his staff proffered evidence to him that had not been formally introduced at the public hearing. *Id.* at 1325. Such evidence included "drawings in a book that related to Buddhist religion in Korea" and "testimony regarding the nature of Buddhism." *Id.* In this instance, however, the court did not reverse the agency's decision based on its finding that the evidence, while improperly admitted and unrebutted, was "wholly irrelevant to the proceedings." In so holding, the Court drew a contrast to the *Town* and *Waikiki Store* cases, where it held that prejudice was caused by the "introduction of evidence that was *relevant to the outcome-dispositive issue*." *Id.* at 1339 n. 27, 1326 ("The religious aspects of this, regardless of what they are, had no bearing on the variance.") (emphasis added).

Here, like in *Town* and *Waikiki Shore*, the Annual Report was directly "relevant" to the decision reached by the agency. This is particularly true given IPI's *force majeure* defense; indeed, it is clear from the statements of the Commissioners that they considered the contents of the Annual Report to rebut IPI's

assertion that it was unable to comply with its financial obligations based on the occurrence of a *force majeure* event.  *See infra* at 29-30.  Indeed, even the CCC admitted, in briefing before the Superior Court, that the Annual Report could "serve as rebuttal evidence to a properly asserted *force majeure* defense."  *See* Commission Opp. Br. at 15.  Unlike the evidence discussed in *Korean Buddhist*, evidence of a company's access to capital is critical to a *force majeure* defense.  This evidence was considered by the Commission before it decided on the merits of Commission Order 2020-002 and was directly relevant to IPI's *force majeure* defense.  Even if the Commission insists that the Annual Report did not influence its ultimate determination, it was still "in the record before the court."  *See Waikiki Shore*, 625 P.2d at 1046.

The Superior Court attempted to distinguish the present matter from the holdings in *Town* and *Waikiki Shore* by finding that, in those cases the agencies relied on the improper evidence in making their decisions, while finding that here, by contrast, "the Casino Commission, in its Order, relied on admissions, stipulations, exhibits admitted into evidence, and matters officially noticed in reaching its decision and other information provided by Petitioner."  Order Aff'ming Susp. at 31.  This distinction does not hold up upon examination.  First, in both *Town* and *Waikiki Shore* the relevant agency (unsuccessfully) attempted to make the same argument that the Superior Court has adopted: that the agency did not actually rely on the improper evidence in reaching its decision.  In both those cases, however, the appellate courts rejected that argument, finding, as this Court should here, that a supposed disclaimer by the agency did not matter, and the question of whether the agency had sufficient other grounds to reach the same decision or might have reached the same decision without the improper evidence was irrelevant.  Instead, the courts agreed in each instance that the agency's receipt of evidence that a party had no opportunity to rebut was "procedurally fatal" and reversed the agency's decision.  *See, e.g., Waikiki Shore*, 25 P.2d at 1046.

Finally, the Superior Court underemphasized the prejudicial significance of the Commission's reliance of this evidence by affording special weight to the fact that "IPI had been represented by *legal counsel* . . . *throughout all stages of the Enforcement Actions*.  Order Aff'ming Susp. at 30 (emphasis in original).  But this is a red herring.  The presence of legal representation does not serve to excuse the violation of other fundamental procedural requirements.[13]  The issue here is not whether IPI had notice of the claims against it or access to representation in responding to those claims.  It is that, based on the record, the Commissioners considered and based their decision on the Annual Report, a document that was not admitted into evidence.  Indeed, the record demonstrates that the Commissioners relied upon this

---

[13] In an influential guide to the elements of a fair hearing, Judge Henry Friendly lists the right to counsel as one that provides many procedural benefits to a party.  H. Friendly, *Some Kind of Hearing*, 123 U. PENN. L. REV. 1267, 1287–1291 (1975).  However, Judge Friendly independently emphasizes the doctrine that "the administrator must confine himself to the record."  *Id.* at 127.  This procedural requirement exists alongside the right to counsel.

document to reach conclusions regarding IPI's access to funds, which is highly relevant to its *force majeure* defense; because the Annual Report was not admitted, IPI had no opportunity to correct or rebut the improper conclusions drawn by the Commissioners from this document.   This was violation of IPI's Due Process right to a decision based only on properly admitted evidence.  This Due Process violation should result in Commission Order 2021-002 being set aside.

## CONCLUSION

For the above reasons, this Court should reverse the Superior Court's judgment and set aside Commission Order 2021-002.

Respectfully submitted this 23rd day of August, 2022.

/s/  Joey P. San Nicolas
Joey P. San Nicolas (F0342)
SAN NICOLAS LAW OFFICE, LLC

Kevin T. Abikoff, Esq. (*pro hac vice*)
Daniel H. Weiner, Esq. (*pro hac vice*)
HUGHES HUBBARD & REED LLP

103444865_2

**No. 2022-SCC-0006-CIV**



E-FILED
CNMI SUPREME COURT
E-filed: Nov 07 2022 02:48PM
Clerk Review: Nov 07 2022 02:59PM
Filing ID: 68353959
Case No.: 2022-SCC-0006-CIV
NoraV Borja

# IN THE SUPREME COURT
## OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

───────────────────────────

**IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC,**

*Petitioner - Appellant,*

v.

**COMMONWEALTH CASINO COMMISSION,**

*Agency - Appellee.*

───────────────────────────

On Appeal from the Superior Court for the Commonwealth of the Northern Mariana Islands,
Civil Case No. 21-0173
The Honorable Wesley M. Bogdan

───────────────────────────────

## APPELLANT IMPERIAL PACIFIC INTERNATIONAL (CNMI) LLC'S REPLY BRIEF

───────────────────────────────

Joey P. San Nicolas, Esq.
SAN NICOLAS LAW OFFICE, LLC
2nd Floor, ICCI Bldg. (Middle Road)
P.O. Box 10001 PMB 602
Saipan, MP 96950
(670) 234-7659

Kevin T. Abikoff, Esq.
Daniel H. Weiner, Esq.
HUGHES HUBBARD & REED, LLP
1775 I St. NW
Washington, D.C. 20001
(202) 721-4600

*Counsel for Appellant Imperial Pacific International (CNMI), LLC*

103775637_6

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ...................................................................................................2

**PRELIMINARY STATEMENT** ..........................................................................................3

**ARGUMENT**.........................................................................................................................3

    I. IPI RAISED A FORCE MAJEURE DEFENSE ..................................................................3

        *A. IPI Raised a Force Majeure Defense at the Proper Time.*......................................3

        *B. IPI Satisfied the Elements of a Force Majeure Claim.* ..........................................4

            i. The Evidence Showed a Force Majeure Event Occurred. ..................................4

            ii. The Evidence Showed the Force Majeure Event Caused IPI's Failure to Perform. .......5

    II. IPI'S FORCE MAJEURE DEFENSE APPLIES TO ALL ENFORCEMENT ACTIONS ..........................5

        *A. The Lottery Commission Was Fully Authorized to Include a Force Majeure Clause in the CLA That Regulates IPI's Obligations as Exclusive Licensee.* ...............................................6

        *B. The Force Majeure Clause Should Be Applied Accord to its Plain Intent.* ..........................7

    III. THE CCC'S VIOLATED IPI'S DUE PROCESS RIGHTS BY CONSIDERING EVIDENCE OUTSIDE OF THE RECORD IN REJECTING IPI'S FORCE MAJEURE DEFENSE.............................................8

**CONCLUSION** ...................................................................................................................**10**

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Claasens v. Rota Health Ctr.*, 2018-SCC-0012, 2021 WL 3278026 (N. Mar. I. Aug. 2, 2021)................................................................................................................................4

*Kodiak 1981 Drilling P'ship v. Delhi Gas Pipeline Corp*, 736 S.W.2d 715 (Tex. App. 1987)................................................................................................................................4

*Korean Buddhist Dae Won Sa Temple v. Sullivan*, 953 P.2d 1315 (Haw. 1998) ......................................10

*Saipan Achugao Resort Members' Ass'n v. Yoon*, 2011 MP 12 ................................................................8

*Santos v. Santos*, 2001 MP 12 ....................................................................................................................3

*Town v. Land Use Comm'n*, 524 P.2d 84 (Haw. 1971) ............................................................................10

*Waikiki Shore, Inc. v. Zoning Bd. Of Appeals*, 625 P.2d 1044 (Haw. Ct. App. 1981) ..............................10

*Weitz v. Yankovsky*, 63 Cal. 2d 849 (Cal. 1966) ......................................................................................3

**Statutes and Rules**

1 CMC § 9108.................................................................................................................................4

1 CMC § 9109.................................................................................................................................4

1 CMC § 9301.................................................................................................................................7

1 CMC § 9310.................................................................................................................................7

4 CMC 2309...................................................................................................................................5

4 CMC § 2317.................................................................................................................................7

NMIAC § 175-10.1-3035...............................................................................................................4

NMI Rules of Civil Procedure ....................................................................................................3, 4

NMI Rules of Evidence..................................................................................................................4

2

## PRELIMINARY STATEMENT

After the COVID-19 pandemic forced Appellant Imperial Pacific International (CNMI), LLC ("IPI") to shutter its casino operations, abruptly and unexpectedly depriving the Company of all revenue, IPI was unable to make payment of annual licensing and regulatory fees when they came due in fall 2020. The evidence heard by Appellee Commonwealth Casino Commission ("CCC" or the "Commission"), in addition to commonly known facts that are not subject to reasonable dispute, directly supported IPI's contention that its inability to make these payments was due to the COVID-19 pandemic.  The CCC, however, issued an Order in which it found (by "clear and convincing evidence" no less) that IPI's failure to make payment "was not due to a force majeure reason."  Comm'n Ord. 2021-002 ¶ 10.  A review of the record of the CCC's April 22, 2021, meeting makes clear the reason for this counterfactual conclusion: the Commission relied on an Annual Report, recently issued by IPI's parent company, which the Commissioners (incorrectly) interpreted to mean that IPI had abundant funds available, and thus that the COVID-19 pandemic could not have been the reason for IPI's non-payment.  In doing so, the CCC violated IPI's due process rights, basing its ruling on evidence that had not been admitted in the proceeding and which IPI did not have the opportunity to refute.  Recognizing that the admissible evidence clearly supported IPI's *force majeure* defense, as well as the fundamental importance of the due process requirements at issue, this Court should aside the CCC's Order, allowing the Commission to hold a new hearing at which both parties would have an opportunity to present (and refute) evidence.[1]

## ARGUMENT

### I.  IPI Raised a Force Majeure Defense

A.  IPI Raised a Force Majeure Defense at the Proper Time.

The CCC alleges in its brief that the "NMI Rules of Civil Procedure requires [sic] parties to include any affirmative defenses in their responsive pleadings," and argues that IPI therefore waived the right to invoke a *force majeure* defense by not referencing *force majeure* in its answers to the CCC's complaints.  Appellee's Brief at 7-8.  The CCC further asserts that IPI "agreed that force majeure was

---

[1] In addition to its substantive arguments, the CCC has asked the Court to dismiss this action based on a delay in filing the docketing statement. This Court should follow the strong public policy preference in favor of deciding cases on the merits.  *See Weitz v. Yankovsky*, 63 Cal. 2d 849, 854-55 (Cal. 1966); *Santos v. Santos*, 2001 MP 12, ¶ 18 n.8.  Particularly since the matter has been fully briefed, IPI's counsel has offered an explanation for the oversight, and the issue has been corrected without prejudice to the parties or the Court, the Court should deny the CCC's Motion to Dismiss and proceed to the merits of this case.

103775637_6

inapplicable" by admitting the defense was not raised in its answers.  *Id*. at 7.  However, the CCC misstates the applicable law.

While the NMI Rules of Civil Procedure, cited by the CCC, "govern the procedure in the Superior Court of the Commonwealth of the Northern Mariana Islands," N.M.I. R. Civ. P. 1(a) nowhere do the Civil Procedure Rules state that they apply to Commonwealth agency adjudications.  Instead, the Commonwealth Administrative Procedures Act ("NMI APA") applies generally to administrative or agency procedures in "every adjudication in which a sanction may be imposed . . . ." 1 CMC § 9108(a).  No provision of the NMI APA requires a party to plead affirmative defenses in a written answer prior to the hearing; indeed, 1 CMC § 9109(i) provides that a party "is entitled [at a hearing] to present his case or defense by oral or documentary evidence . . . ."

B.  <u>IPI Satisfied the Elements of a Force Majeure Claim.</u>

Even under the definition of *force majeure* that CCC cites in its brief, i.e., that "a party must show (1) the occurrence of a force majeure event; and (2) that the event caused the failure to perform," Appellee's Brief at 7, *quoting Kodiak 1981 Drilling P'ship v. Delhi Gas Pipeline Corp*, 736 S.W.2d 715, 720 (Tex. App. 1987), IPI carried its burden of making out a *force majeure* defense.

i. *The Evidence Showed a Force Majeure Event Occurred.*

During the evidentiary hearing of February 25, 2021, counsel for IPI informed the CCC that "IPI should not be found in default for any delay in paying this license fee on account of the fact that we are in a force majeure event."  Feb. 25, 2021 Hearing Tr. 23:3-6.  To support the claim, IPI presented the Casino License Agreement ("CLA") Amendment No. 9, in which the CNMI government recognized COVID-19 as a *force majeure* event pursuant to the CLA.  This document was submitted by IPI as Exhibit 5I and admitted into evidence by stipulation, *see* Feb. 25, 2021 Hearing Tr. 3:7-17, 38:12-17.  The facts it contained—namely, that the COVID-19 pandemic impacted IPI's ability to pay fees associated with the CLA and that the *force majeure* clause of the CLA had been activated on October 8, 2020, with respect to the Community Benefit Fund—were not rebutted.

In addition, the CCC (like this Court) can take notice of facts that are considered general knowledge or which are not subject to reasonable dispute.  *See* NMI R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the Commonwealth or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Claasens v. Rota Health Ctr.*, 2018-SCC-0012, 2021 WL 3278026, at *2, n.7 (N. Mar. I. Aug. 2, 2021) ("The court is authorized to take judicial notice *sua sponte* of a fact

4

that cannot be subject to reasonable dispute."). Indeed, the rules of evidence applicable to CCC hearings are even more permissive. *See* NMIAC § 175-10.1-3035(a) ("Any relevant evidence may be admitted . . . regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in a civil action."). The CCC, due to its deep familiarity with the impact of the COVID-19 pandemic on IPI's operations, was certainly aware and could take notice of the clear and undisputable fact that IPI's operations had been closed, due to emergency orders and other requirements necessitated by the COVID-19 pandemic, for nearly a year at the time of the evidentiary hearings, as well as the facts that all tourism to Saipan had been halted due to the pandemic, and that IPI had earned no revenue since March 2020, when its doors were forced closed.

 *ii. The Evidence Showed the Force Majeure Event Caused IPI's Failure to Perform.*

 During that same evidentiary hearing, the Commissioners heard testimony from the CCC's Audit Manager, Eleuterio Palacios, Jr. Mr. Palacios testified that, although IPI dealt with financial concerns including high levels of debt and operating losses for at least the two years before the pandemic struck, Feb. 25, 2021 Hearing Tr. 30:5 -34:19, throughout 2018, 2019, and until March 2020, IPI continued generating revenue by conducting gaming activities, *see id*. at 36:2-11. Mr. Palacios further testified that gaming was halted in March 2020 because of the COVID-19 pandemic, *id*. at 36:12-15, and that it was this stop in gaming operations that caused IPI's financial situation to worsen, *id*. at 36:16-37:02.

 In its Order, the CCC attempted to portray Mr. Palacios's testimony as supporting its conclusion that IPI's failure to make payment in fall 2020 was *not* due to a *force majeure* event, as IPI asserted. Comm'n Ord. 2021-002 ¶ 8. But, in fact, Mr. Palacios's testimony does exactly the opposite. It is undisputed that IPI did not fail to pay the Annual License Fee until August 12, 2020, and did not fail to pay the Annual Regulatory Fee until October 1, 2020. *See* Comm'n Ord. 2021-002 ¶¶7-8, 14; 4 CMC § 2309(a). Mr. Palacios's testimony demonstrates that in 2018 and 2019—before its operations and revenue were stopped due to the COVID-19 pandemic—IPI remained capable of timely paying the licensing and regulatory fees as they came due, despite its heavy debt load and operating losses. The CCC has not even attempted to demonstrate how Mr. Palacios's testimony could fairly support its conclusion that COVID-19 (and the related forced closure of IPI's gaming operations) were *not* the cause of IPI's inability to make timely payments to the CCC and the Commonwealth in 2020. Because the conclusion in the CCC's Order was unsupported (and in fact is directly contradicted) by the evidence in the record, as well as facts that are common knowledge and not subject to reasonable dispute, its rejection of IPI's *force majeure* defense was arbitrary and capricious and not supported by fact or law.

5

## II.  IPI's Force Majeure Defense Applies to All Enforcement Actions

The CCC attempts to argue that the CLA's *force majeure* clause is applicable to contractual obligations, but is somehow inapplicable to what it describes as "statutory fees and regulatory violations." Appellee's Brief at 9-10.  However, the CCC's argument leads to an absurd result, since it would nullify a properly negotiated section of the CLA, and render meaningless the *force majeure* provision that IPI bargained for and agreed to with the CNMI government.

The CLA was entered into between IPI and the Commonwealth Lottery Commission ("Lottery Commission"), a duly authorized government agency with full authority to bind the CNMI government. *See* 1 CMC §§ 9301, 9310; 4 CMC § 2317(a)(1)(i)(A).  It was executed by the Lottery Commission as the representative of the CNMI government, as well as by the CNMI Attorney General.  CLA at 17.  By its explicit terms, the CLA sets forth the terms and obligations applicable to IPI and the CNMI government with respect to the award of the exclusive casino license to IPI.   Significantly, the CLA includes a *force majeure* clause which explicitly that's that IPI's obligations could be delayed or excused in the event of an Act of God—which, as IPI addressed in its opening brief, is defined broadly.  Appellant's Brief at 19. However, the CCC asks the Court to entirely ignore the contractual intent of the parties and the explicit terms of this agreement, and to find that this *force majeure* clause should be read out of effect.  Such an interpretation flies in the fact of the law in this jurisdiction regarding contractual interpretation and must be rejected.

A.  <u>The Lottery Commission Was Fully Authorized to Include a Force Majeure Clause in the CLA That Regulates IPI's Obligations as Exclusive Licensee.</u>

The CCC points out, correctly, that an agency's power "depends upon the legislature's grant of authority to the agency."  Appellee's Brief at 9-10 (citation omitted).  But its assertion that "no one besides the legislature" can alter when the Annual License Fee and Casino Regulatory Fee come due is incorrect for at least two reasons.  *See id*. at 10.

First, the CCC ignores 4 CMC § 2317(a)(1)(i)(A), which authorizes the Lottery Commission to "negotiate the terms of the exclusive [casino] license before it is issued," and establishes that the license "shall be subject to such conditions as the [Lottery Commission] *deems necessary to assure compliance with this chapter*, including . . . achieving the minimum initial investment requirements." (Emphasis added).  The Lottery Commission was authorized to negotiate all terms of the exclusive license that it deemed necessary to attract investment and establish gaming operations in the Commonwealth, which included a *force majeure* clause protecting the investor/licensee.  The parties understood the Lottery Commission had such authority at the time the CLA was negotiated and executed: the recitals of the CLA

6

begin with a description of the Commonwealth's investment needs, and Section 3 references the Licensing Commission's authority to enter the agreement under the provisions of P.L. 18-56 (now codified at 4 CMC § 2317(a)(1)(i)(A)).  The *force majeure* provision was part of the terms on which the CNMI awarded, and IPI agreed to accept, the exclusive casino license.  The CCC's argument that this clause has essentially no effect should give this Court pause.

Second, the CCC's argument that the license and regulatory fees must be paid by the "licensee" when due, as provided by statute, ignores the fact that these payment obligations apply to IPI *only because it is a party to the CLA*.  IPI's obligations to make license-related payments are rooted in—and exist because it is a party to—the CLA.  The CCC's claim that the statutes requiring payment of these fees by a certain date should be read entirely independently of the CLA is confused, since IPI agreement to accept the rights and responsibilities (including the attendant payment obligations) of the "licensee" was contractually subject to the terms and conditions of the CLA, including its *force majeure* provision.

B.   The Force Majeure Clause Should Be Applied Accord to its Plain Intent.

The CCC next argues that, despite the terms of the CLA's *force majeure* clause, the parties actually intended to make IPI responsible for the Casino Regulatory Fee and Annual License Fee *even in the occurrence of a force majeure event.*  Appellee's Brief at 11-12.  The CCC's position flies in the face of the plain meaning of the CLA and should be rejected.  Moreover, even if the Court concludes that the *force majeure* provision does not ultimately excuse IPI's payment obligations, it certainly does—again, by its plain terms—excuse a delay in making payment due a *force majeure* event.

In giving effect to the intentions of contracting parties, courts look to the "plain language of contract terms."  *Saipan Achugao Resort Members' Ass'n v. Yoon*, 2011 MP 12, ¶ 15 (citation omitted).  Here, the plain language of the *force majeure* clause of the CLA provides that IPI shall not "be in default for any failure or delay in the performance due under this License Agreement" if an Act of God or other *force majeure* even occurs.  CLA ¶ 25.  In response to such an occurrence, this clause excuses IPI's inability to "perform" under the CLA, that is, to make payments or fulfil other obligations that are required due to its status as licensee.  The Court should reject the CCC's claim that the parties did not mean for this provision to do what its plain language suggests: excuse IPI's performance of its payment obligations in the event of a *force majeure* event.

Assuming, *arguendo*, that the Court accepts the CCC's tortured argument that the *force majeure* clause was not intended to excuse payment obligations (despite the presence of language excusing

"failure" in "performance due") based on a *force majeure* event, the presence of such an event still clearly excuses a delay in performance.

Finally, the CCC's assertion that all future payments accrued as of the date that IPI entered into the CLA, *see* Appellee's Brief at 12, is totally unsupported and, if allowed to stand, would render the *force majeure* clause meaningless and absurd.  No party to a contract would negotiate for a term excusing performance in the event of an Act of God, while at the same time making performance obligatory regardless of future events.  Because it would render the *force majeure* provision in the CLA meaningless and fly in the face of the plain language of the agreement, this Court should reject the CCC's attempts to retroactively rewrite the *force majeure* provision of the CLA.

### III.  The CCC's Violated IPI's Due Process Rights by Considering Evidence Outside of the Record in Rejecting IPI's Force Majeure Defense

Like the Superior Court, the CCC fails to squarely engage with or address the due process violations that occurred when the CCC considered evidence outside of the record in issuing Commission Order 2021-002.

As an initial matter, the CCC's argument that discussions of IPI's finances are a mandated and routine part of CCC public meetings, Appellee's Brief at 14, sidesteps the issue.  The problem is not that CCC Commissioners discussed IPI's finances at a meeting.  Instead, the violation occurred when the Commissioners considered information, not admitted as evidence, regarding IPI's finances in their adjudication of the Enforcement Actions, without giving IPI the chance to contest that evidence or provide its own evidence in rebuttal.

The CCC argues that it had sufficient evidence in the record that IPI "violated applicable Commonwealth law, the CLA, and applicable regulations" to support the findings in Commission Order 2021-002, Appellee's Brief at 13, suggesting there is no need to even consider whether CCC relied on evidence outside the record in reaching its findings.  This logic flies in the face of case law and disregards IPI's due process rights.  It also ignores the primary argument IPI made in its opening brief to this Court: due to the utter lack of evidence supporting the CCC's position that a *force majeure* event was *not* responsible for IPI's failure to timely make the payments that came due in fall 2020, coupled with the clear statements of CCC Commissioners demonstrating they interpreted the improperly-considered Annual Report to rebut IPI's "assertion that it was unable to comply with its financial obligations based on the occurrence of a force majeure event," Appellant's Brief at 31-32, it is clear that the Commissioners did, in fact, rely on this Report in rejecting IPI's *force majeure* defense.

8

As discussed above, admissible evidence supported IPI's argument that COVID-19 was the cause of IPI's failure to pay the licensing and regulatory fees that came due in fall 2020. *Supra* at I(B)(ii).  It is not disputed that IPI's casino operations and revenue stream were shut down in March 2020, or that IPI, though laboring for years under heavy debt obligations, only failed to timely make payment of these licensing and regulatory fees in fall 2020—after the onset of the COVID-19 pandemic worsened the company's finances.  There is no evidence in the record on which the CCC could reasonably have based a conclusion that IPI's failure to pay was not due to a *force majeure* event.

But CCC Chairman Guerrero's on-the-record statements regarding the (unadmitted) Annual Report of IPI's parent company make clear the basis for the Commission's rejection of IPI's *force majeure* defense.  In fact, Chairman Guerrero appears to have imagined that Annual Report constituted a sort of message from IPI, inviting the CCC to determine the penalties it would require IPI to pay:

> "We have received the audit for the corporate [parent].  And it continues to make reference about the [$]500 million loan facility, and it continues to make reference that [$]350 million of that is [for] IPI [to] have access to that money to pay what it needs to pay [to the CCC]. . . . [In the report] [y]ou made reference a lot about the potential fines from CCC.  And, uh, it just – [as if IPI is saying] -- it's ready to pay, uh, although they don't know yet what CCC will do.  And you're saying "We're ready to pay what we need to pay."

Apr. 22, 2021 Hearing Tr. 48:1-6, 49:8-13.  Chairman Guerrero seems to have been so far convinced that the IPI had funds at its disposal that he viewed the Enforcement Actions as a necessary tool to force IPI's hand:

> "And your auditor is telling the world you have 350 [million] ready to provide whenever you need it.  But yet you're not giving it to where it is needed. . . .So hopefully you're taking us seriously on these matters because, uh, it appears that the board is not taking this matter seriously."

Ex. G. at 57:2-6, 58:4-6 (crosstalk omitted).

While the CCC argues there is "nothing in the [CCC's] Order that supports IPI's argument that the [CCC] relied upon evidence outside the record to support its findings," Appellee's Brief at 13, this proves nothing.  Indeed, it would be odd for the CCC to record in writing that it had based its decision on evidence outside the record.  Instead, the utter lack of evidence on which the CCC could have reasonably concluded that IPI's failure to pay were not due to the COVID-19 pandemic, coupled with the statements in the record that clearly show that the CCC interpreted the Annual Report to refute IPI's argument that it was unable to make these payments, provides the evidence necessary to demonstrate that the CCC improperly relied on this evidence in reaching its decision.  As the cases cited by IPI in its opening brief

illustrate, this Court should look beyond the agency's assertions about the basis of its decision and review the transcript of the agency hearing for "clear and unequivocal statement[s]" that illustrate the views being taken by agency officials and the basis for those views.  *See Waikiki Shore, Inc. v. Zoning Bd. Of Appeals*, 625 P.2d 1044, 1045-46 (Haw. Ct. App. 1981).  The unadmitted evidence that the CCC considered, *sua sponte*, was highly relevant to IPI's defense, and the lack of an opportunity to rebut that information severely prejudiced IPI's case.  *Compare Town v. Land Use Comm'n*, 524 P.2d 84, 91-92 (Haw. 1971) (information gathered *ex parte* by the agency and used in proceedings constituted prejudicial error) *with Korean Buddhist Dae Won Sa Temple v. Sullivan*, 953 P.2d 1315, 1339-40, 1340 n.27 (Haw. 1998) (agency director's review of evidence outside the record violated the Hawaiian APA, but the information considered was not relevant to the agency decision and the error was harmless).  This Court should follow the well-reasoned appellate decisions from Hawaii in concluding that where hearing transcripts demonstrate that an administrative agency considered relevant evidence outside the record, and the opposing party had no opportunity to respond, the agency decision should be set aside on due process grounds.

## CONCLUSION

For the above reasons, this Court should reverse the Superior Court's judgment and set aside Commission Order 2020-002.

Respectfully submitted this 7th day of November, 2022.

/s/  Joey P. San Nicolas
Joey P. San Nicolas (F0342)
SAN NICOLAS LAW OFFICE, LLC

Kevin T. Abikoff, Esq. (*pro hac vice*)
Daniel H. Weiner, Esq. (*pro hac vice*)
HUGHES HUBBARD & REED LLP

103775637_6