1
2
3
4
5
6
7
8

Edward Manibusan (F0131)
Attorney General
J. Robert Glass, Jr. (F0523)
Chief Solicitor
Office of the Attorney General
Hon. Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP 96950-8907
Tel: (670) 237-7500
Fax: (670) 664-2349
Email: robby_glass@cnmioag.org

*Attorney for Defendant The Commonwealth of the Northern Mariana Islands*

9
10

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| **IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS; COMMONWEALTH CASINO COMMISSION, ARNOLD PALACIOS, Governor of CNMI, in his official and personal capacities; EDWARD C. DELEON GUERRERO, Chairman of CCC, in his official and personal capacities; RAFAEL S. DEMAPAN, Vice Chairman of CCC, in his official and personal capacities; MARIANO TAITANO, Commissioner of CCC, in his official and personal capacities; MARTIN MENDIOLA, Commissioner of CCC, in his official and personal capacities; RAMON M. DELA CRUZ, Commissioner of CCC, in his official and personal capacities; and ANDREW YEOM, Executive Director of CCC, in his official and personal capacities.**<br><br>**Defendants.** | **CIVIL CASE NO. 1:24-cv-00001**<br><br>**DECLARATION OF J. ROBERT GLASS, JR. IN SUPPORT OF THE COMMONWEALTH'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

I, J. ROBERT GLASS, JR., hereby declare under penalty of perjury, that:

1. I am over the age of eighteen (18) and not a party to this action.

2. I am employed as the Chief Solicitor for the Office of the Attorney General for the Commonwealth of the Northern Mariana Islands.

3. I represent the Commonwealth of the Northern Mariana Islands in this litigation.

4. I collected the attached documents in Exhibit 1 which consists of items which are relied on by the Commonwealth in its Motion to Dismiss and documents not available on Westlaw or Lexis.

5. Each document in Exhibit 1 is a true and accurate copy of the document.

6. The BVI Business Companies Act of 2014 (Revised 2020) is a true and accurate copy of the relevant portions of the Act.

Respectfully submitted: August 13, 2024

OFFICE OF THE ATTORNEY GENERAL
EDWARD MANIBUSAN
ATTORNEY GENERAL

/s/ J. Robert Glass, Jr.
J. ROBERT GLASS, JR. (F0523)
Chief Solicitor

2

# EXHIBIT 1



## BVI Financial Services Commission, Registry of Corporate Affairs
## Register of Companies Search Report

**Date of Search :**  25/07/2024
This search is accurate as at the Search Date above.

**Company Name :**  BEST SUNSHINE INTERNATIONAL LIMITED

**Company Number :**  1817378

**Foreign Character Name :**  佳曦國際有限公司

**Company Type :**  BC New Incorporation  **Date of Incorporation / Registration :**  25/03/2014

**Current Status :**

| | |
|---|---|
| Status Description: | Dissolved |
| Status Date: | 04/07/2023 |
| Current Registered Agent: | Agent Resigned from Company |
| | - |
| | - |
| Current Registered Agent Address: | - |
| | - |
| | VIRGIN ISLANDS, BRITISH |
| Current Registered Agent Phone Number: | |
| Current Registered Agent Fax Number: | |
| Current Registered Office : | Commerce House, Wickhams Cay 1 |
| | P.O. Box 3140 |
| | Road Town |
| | Tortola |
| | VG1110 |
| | VIRGIN ISLANDS, BRITISH |
| Telephone: | |
| Agent Fax: | |
| Register of Directors Filed : | Yes |
| First Registered Agent: | Vistra (BVI) Limited |
| First Registered Office: | Vistra Corporate Services Centre |
| | Wickhams Cay II |
| | Road Town |
| | Tortola |
| | VG1110 |
| | VIRGIN ISLANDS, BRITISH |

**Share/Capital Information:**

| | |
|---|---|
| Maximum Number of Shares the company is authorized to issue: | 50,000 |
| Ability to Issue Bearer Shares: | No |

**Previous Names History**

| S.No | Previous Name | Foreign Character Name | Date Range or Cease Date | |
|------|---------------|------------------------|------|------|
| | | | From | To |
| 1 | BEST SUNSHINE INTERNATIONAL LIMITED | 佳曦國際有限公司 | 25/03/2014 | |

**Transaction History**

| S.No | Date | Transaction Number | Description | Status | Eforms/Attachments |
|------|------|---------------------|-------------|--------|--------------------|
| 1 | 24/03/2014 | T140136003 | Name Reservation (10 days) | Approved | Name Reservation (10 days)<br>Attach affidavit confirming accurate translation of foreign character |
| 2 | 25/03/2014 | T140140490 | Application for Incorporation (BC) | Approved | Application for Incorporation (BC)<br>Memorandum and Articles of the Company |
| 3 | 11/04/2014 | T140187210 | Request for Certificate of Goodstanding | Approved | Request for Certificate of Goodstanding |
| 4 | 30/03/2015 | T150160616 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 5 | 21/07/2015 | T150541602 | Request for Certificate of Goodstanding | Approved | Request for Certificate of Goodstanding |
| 6 | 29/03/2016 | T160134930 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 7 | 19/12/2016 | T161187828 | Register of Members or Directors | Approved | Register of Members or Directors |
| 8 | 13/02/2017 | T170162466 | Notice of Change of Registered Office Address | Approved | Notice of Change of Registered Office Address |
| 9 | 24/05/2017 | T170795967 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 10 | 25/05/2018 | T180444442 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 11 | 26/02/2019 | T190109463 | Register of Directors - Registration of Changes | Approved | Register of Directors - Registration of Changes |
| 12 | 17/06/2019 | T190451174 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 13 | 08/07/2019 | T190496762 | Registered Agent intent to Resign | Approved | Registered Agent intent to Resign<br>Notice of intention to resign given to the company under section 93(2) |
| 14 | 31/10/2019 | T190707754 | Notice of Resignation of Registered Agent | Approved | Notice of Resignation of Registered Agent |
| 15 | 27/11/2019 | T190838380 | Appointment of Registered Agent | Approved | Appointment of Registered Agent |
| 16 | 29/01/2021 | T210060731 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 17 | 28/10/2021 | T210760901 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 18 | 01/03/2023 | T230112722 | Registered Agent intent to Resign | Approved | Registered Agent intent to Resign<br>Notice of intention to resign given to the company under section 93(2) |

**Certificate History**

| S.No | Transaction No. | Type of Certificate | Date of Filing |
|------|-----------------|---------------------|----------------|
| 1 | T170715969 | Certificate of Incorporation (Certified) | 12/05/2017 |
| 2 | T140140490 | Certificate of Incorporation (Original) | 25/03/2014 |
| 3 | T140187210 | Certificate of Good Standing | 11/04/2014 |

| 4 | T150541402 | Certificate of Good Standing | 21/07/2015 |
| 5 | T210060731 | Certificate of Restoration | 29/01/2021 |

**DISCLAIMER:**

Although care has been taken to ensure the accuracy, completeness and reliability of the information provided through the use of this service ("the Information"), neither the Registrar of Corporate Affairs ("the Registrar") nor the Financial Services Commission ("the Commission") assumes any responsibility for the accuracy, completeness and reliability of the Information. This report does not reflect any transactions that may be submitted and not yet registered, or other changes for which the Registrar has not received notice. The user of the Information agrees that the Information is subject to change without notice, and neither the Registrar nor the Commission is responsible for any discrepancies that may result if a transaction is approved for filing after the issuance of this report. Neither the Registrar nor the Commission assumes any responsibility for the consequences of use of the Information, nor for any infringement of third party intellectual property rights which may result from its use. In no event shall the Commission or the Registrar be liable for any direct, indirect, special or incidental damage resulting from, arising out of or in connection with the use of the Information.

Case 1:24-cv-00001 Document 61-2 Filed 08/13/24 Page 7 of 31
LAW OF
VIRGIN ISLANDS
Revision Date: 1 Jan 2020
*BVI Business Companies Act*     149

(2) Where the voluntary liquidator of a company files a notice with the Official Receiver under section 209(2)—

    *(a)* the Insolvency Act applies to the liquidation of the company subject to such modifications as are appropriate; and

    *(b)* the liquidation of the company shall be deemed to have commenced on the date of the appointment of the liquidator under Division 1.

### Application by creditor, company insolvent

**211A.** (1) The Court may, on the application of a creditor of a company, appoint an eligible insolvency practitioner as liquidator of the company in place of the voluntary liquidator, if the Court is satisfied that the company is insolvent.

(2) If the Court makes an order under subsection (1), it may make such other orders as it considers necessary to give effect to the liquidation of the company.

(3) Where a liquidator is appointed under subsection (1)—

    *(a)* the Insolvency Act applies to the liquidation of the company, subject to such modifications as are appropriate; and

    *(b)* the liquidation of the company is deemed to have commenced on the date of the appointment of the liquidator under Division 1. *(Inserted by Act 5 of 2012)*

### Division 3

#### *Striking Off and Dissolution*

### Interpretation for this Division

**212.** In this Division, "Register" means the Register of Companies.

### Striking company off Register

**213.** (1) The Registrar may strike the name of a company off the Register if—

    *(a)* the company—

        (i) does not have a registered agent; or *(Inserted by Act 5 of 2012)*

        (ii) fails to file any return, notice or document required to be filed under this Act;

    *(b)* he or she is satisfied that—

        (i) the company has ceased to carry on business; or

        (ii) the company is carrying on business for which a licence, permit or authority is required under the laws of the Virgin Islands without having such licence, permit or authority;

    *(c)* the company fails to pay its annual fee or any late payment penalty by the due date; or

*(d)* the company, being a company licensed under a financial services legislation, has its licence cancelled or revoked by the Commission.

*(Amended by Act 19 of 2015)*

(2) If the Registrar is of the opinion that the company is trading or has property or that there is some other reason why the company should not be struck off the Register, he or she may, instead of striking the company from the Register, refer the company to the Commission for investigation.

(3) Before striking a company off the Register on the grounds specified in subsection (1)*(a)* or (1)*(b)*, the Registrar shall—

*(a)* send the company a notice stating that, unless the company shows cause to the contrary, it will be struck from the Register on a date specified in the notice which shall be no less than 30 days after the date of the notice; and

*(b)* publish a notice of his or her intention to strike the company off the Register in the *Gazette.*

(4) After the expiration of the time specified in the notice, unless the company has shown cause to the contrary, the Registrar may strike the name of the company off the Register.

(5) The Registrar shall publish a notice of the striking of a company from the Register in the *Gazette*.

(6) The striking of a company off the Register is effective from the date of the notice published in the *Gazette*.

(7) The striking off of a company shall not be affected by any failure on the part of the Registrar to serve a notice on the registered agent or to publish a notice in the *Gazette* under subsection (3). *(Amended by Act 26 of 2005)*

### Appeal

**214.** (1) Any person who is aggrieved by the striking of a company off the Register under section 213 may, within 90 days of the date of the notice published in the *Gazette*, appeal to the Court.

(2) Notice of an appeal to the Court under subsection (1) shall be served on the Registrar who shall be entitled to appear and be heard at the hearing of the appeal.

(3) The Registrar may, pending an appeal under subsection (1) of any person aggrieved by the striking of a company off the Register, suspend the operation of the striking off upon such terms as he or she considers appropriate, pending the determination of the appeal.

### Effect of striking off

**215.** (1) Where a company has been struck off the Register, the company and the directors, members and any liquidator or receiver thereof, may not—

*(a)* commence legal proceedings, carry on any business or in any way deal with the assets of the company;

  *(b)* defend any legal proceedings, make any claim or claim any right for, or in the name of, the company; or

  *(c)* act in any way with respect to the affairs of the company.

  (2) Notwithstanding subsection (1), where a company has been struck off the Register, the company, or a director, member, liquidator or receiver thereof, may—

  *(a)* make application for restoration of the company to the Register;

  *(b)* continue to defend proceedings that were commenced against the company prior to the date of the striking-off; and

  *(c)* continue to carry on legal proceedings that were instituted on behalf of the company prior to the date of striking-off.

  (3) The fact that a company is struck off the Register does not prevent—

  *(a)* the company from incurring liabilities; or

  *(b)* any creditor from making a claim against the company and pursuing the claim through to judgement or execution; and does not affect the liability of any of its members, directors, officers or agents.

  (4) In this section and section 217, "liquidator" means a voluntary liquidator and an Insolvency Act liquidator.

### Dissolution of company struck off the Register

  **216.** Where a company that has been struck off the Register under section 213 remains struck off continuously for a period of, 7 years it is dissolved with effect from the last day of that period. *(Amended by Act 5 of 2012)*

### Restoration of name of company to Register by Registrar

  **217.** (1) Where a company has been struck off the Register, but not dissolved, the Registrar may restore the company to the Register upon—

  *(a)* receipt of an application in the approved form;

  *(b)* the filing of a copy of its register of directors; and

  *(c)* payment of the restoration fee and all outstanding fees and penalties.
     *(Substituted by Act 11 of 2019)*

  (2) Where the company has been struck off the Register under section 213(1)*(a)*(i), or the struck off company does not have a registered agent the Registrar shall not restore the company to the Register unless—

  *(a)* he or she is satisfied that a licensed person has agreed to act as registered agent of the company; and

  *(b)* he or she is satisfied that it would be fair and reasonable for the name of the company to be restored to the Register.
     *(Amended by Act 5 of 2012)*

  (3) An application to restore a company to the Register under subsection (1) may be made by the company, or a creditor, member or liquidator of the

1  CHOI & ITO
   Attorneys At Law
2
3  CHUCK C. CHOI
   ALLISON A. ITO
4  700 Bishop Street, Suite 1107
   Honolulu, Hawaii 96813
5  Telephone: (808) 533-1877
   Facsimile: (808) 566-6900
6  E-Mail: cchoi@hibklaw.com
7  aito@hibklaw.com
8  McDONALD LAW OFFICE
9  Charles H. McDonald II (F0494)
10 2nd Floor ICC, Room 203
   Gualo Rai, Saipan, MP 96950
11 Telephone: (866) 967-7567
   E-Mail: charles@mcdonald.law
12
13 Attorneys for Imperial Pacific International, LLC,
   Debtor and Debtor-in-possession
14
15            **IN THE UNITED STATES DISTRICT COURT**
16            **FOR THE NORTHERN MARIANA ISLANDS**
17                   **BANKRUPTCY DIVISION**
18
   In re                          | Case No.  24-00002
19                                | Chapter 11
20 IMPERIAL PACIFIC
   INTERNATIONAL (CNMI), LLC,     | MOTION TO APPROVE BID PROCEDURES
21                                | FOR SALE OF SUBSTANTIALLY ALL OF THE
            Debtor and Debtor-in- | DEBTOR'S ASSETS AND RELATED RELIEF;
22          Possession.           | MEMORANDUM IN SUPPORT OF MOTION;
                                  | EXHIBIT "A"; DECLARATION OF HOWYO
23                                | CHI
24                                | Hearing Date and Time
25                                | Date:   September 19, 2024
                                  | Time:   8:30 a.m.
26                                | Judge:  Honorable Ramona V. Manglona
27
28

Imperial Pacific International (CNMI), LLC, the debtor and debtor-in-possession herein (the "Debtor") hereby moves this Court, for an order (a) approving competitive bidding and sale procedures proposed herein in connection with the sale of the Debtor's major asset; (b) scheduling an auction date of 9:00 a.m., November 19, 2024;[1] and (c) scheduling a hearing date on or about November 20, 2024, to consider final approval of the sale of the Debtor's property free and clear of liens and encumbrances to Loi Lam Sit or assignee (the "Stalking Horse Purchaser") or to a higher bidder as described herein;[2] and (d) granting related relief.

This Motion is based upon Bankruptcy Code Sections 105(a), 363 and 365 and Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure, the Memorandum in Support of Motion; Exhibit "A", the Declaration of Howyo Chi in Support of Motion filed herewith, the records and files in the case and such other and further matters as may be presented herein.

DATED: Honolulu, Hawaii, August 9, 2024.


/s/ Chuck C. Choi
CHUCK C. CHOI
ALLISON A. ITO
CHARLES H. MCDONALD II
Attorneys for Imperial Pacific International, LLC,
Debtor and debtor-in-possession

---

[1] All references to time and date herein shall be Chamorro Standard Time (ChST).

[2] Prior to the hearing on this motion, the Debtor intends to file a separate Motion for Order Authorizing Sale of Assets Free and Clear of Liens and Encumbrances and Assignment of Lease (the "Sale Motion"). The Debtor will schedule the Sale Motion for hearing on the date after the date set for the Auction herein, i.e., on November 20, 2024.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN MARIANA ISLANDS**

**BANKRUPTCY DIVISION**

| | |
|---|---|
| In re<br><br>IMPERIAL PACIFIC INTERNATIONAL<br>(CNMI), LLC,<br><br>        Debtor and Debtor-in-<br>        Possession. | Case No. 24-00002<br>(Chapter 11)<br><br>MEMORANDUM IN SUPPORT OF MOTION;<br>EXHIBIT "A" |

Imperial Pacific International (CNMI), LLC, the debtor and debtor-in-possession herein (the "Debtor") submits this Memorandum in support of its *Motion to Approve Bid Procedures for Sale of Substantially All of the Debtor's Assets and Related Relief* (the "Motion"), filed herewith.

    I.    <u>JURISDICTION AND VENUE</u>

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein is 11 U.S.C. §§ 105, 363 and 365.

    II.    <u>BANKRUPTCY AND FACTUAL BACKGROUND</u>

The Debtor is a limited liability company organized under the laws of the Commonwealth of the Northern Mariana Islands (the "Commonwealth"). Its sole member is Best Sunshine International Ltd., a British Virgin Islands corporation. Best Sunshine is owned by Imperial Pacific International Holding Ltd.

On or about August 12, 2014, the Debtor, Best Sunshine and the Commonwealth Lottery Commission entered into an exclusive casino license (the "Casino License") for the island of Saipan which required, among other things, the payment of $15 million in annual Casino License fees. The Debtor made $90 million in Casino License fee payments from 2014 to 2019.

Notwithstanding the fact that the Debtor was obligated to pay a $15 million per annum exclusive Casino License fee to the Commonwealth Treasurer, on December 4, 2015, the Commonwealth enacted Public Law 19-24 which imposed an annual "Casino Regulatory Fee" on the Debtor of $3 million due on or before October 1, 2015. The Debtor made $15 million in total Casino Regulatory Fee payments from 2015 to 2019.

The Debtor's major real estate assets are (1) its casino, which is housed in its hotel building (the "Hotel"), which in turn is situated primarily on approximately 19,204 square meters of land leased (the "Leasehold Property") from the Department of Public Land ("DPL") pursuant to Lease Agreement No. LA-15-002S; and (2) the Debtor's ownership interest in Imperial Pacific Properties, LLC, which holds a leasehold interest in eight lots adjacent to the Leasehold Property (the "IPP Interest", together the "Leased Property").

The Debtor successfully operated a casino for approximately four years, until the COVID-19 Pandemic forced its closure in March, 2020. Hotel construction ceased in 2021. Since then, the Hotel has been open to the elements and is currently in poor condition. It is estimated that the cost of completing the construction of the Hotel will be between $100 million to $150 million.

Although the Debtor has no operations, it has approximately 15 employees, approximately 10 of whom provide security services. The Debtor also has liability and workers compensation insurance.

On April 19, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief

under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. ("Bankruptcy Code") in the United States District Court for the District of the Northern Mariana Islands, bankruptcy division (the "Bankruptcy Court"). The Debtor continues to operate its business and manage its properties, affairs and assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

On May 14, 2024, the Office of the United Sates Trustee appointed the Committee consisting of Hughes Hubbard & Reed LLP, DFK Limited, and Corrado Modica. See ECF 54. On June 15, 2024, the Committee filed separate applications to employ Arentfox Schiff LLP as general bankruptcy counsel and Chambers Law LLC as local counsel for the Committee, respectively which were approved by the Bankruptcy Court. See ECF 115, 133 162 and 163.

At a final hearing held on June 27, 2024, the Bankruptcy Court approved up to $1.4 million in DIP financing from Mr. Loi Lim Sit, the proposed Stalking Horse Purchaser, on an unsecured, administrative priority basis. See ECF 173. The Debtor anticipates that this loan will provide the necessary liquidity to pay Chapter 11 administrative costs through year-end.

The Debtor and Committee have recently finalized the terms of a proposed sale of substantially all of the Debtor's assets to the Stalking Horse Purchaser, subject to Court approval and any overbids by qualified bidders. *See* attached Exhibit "A" (Asset Purchase Agreement Stalking Horse Term Sheet; the "Term Sheet").[3]

The terms of the proposed sale and auction of the Acquired Assets are summarized below:

- <u>Stalking Horse Purchaser</u>: Loi Lam Sit (or his assignee).

---

[3] Terms used herein and not otherwise defined shall have the meaning given them in the Term Sheet. The proposed Stalking Horse (purchase and sale) Agreement will be filed with the Sale Motion. The terms of the Stalking Horse Agreement will control.

- Purchase Price: $10,000,000.00, (including credit for the DIP Facility as of the closing date[4] and cure costs, with balance in cash).

- Acquired Assets: The Acquired Assets include all tangible property, accounts, machinery, equipment, inventories, tenant improvements, goodwill, software and computer programs, hardware, intellectual property, company names, product names, trade names, prepaid expenses (other than prepaid insurance) and deposits, any rights, claims or causes of action of the Debtor against third parties relating to assets, properties, losses, business or operations of any Debtor (other than those that constitute Excluded Assets), and proceeds of all the foregoing assets, including the Personal Property, Designated Contracts, Real Property Leases and the Debtor's interest in IPP.

- Excluded Assets: The following are **not** included in the sale to Stalking Horse Purchaser: (i) cash, (ii) cash equivalents (including receivables and the proceeds thereof), (iii) income tax receivables, (iv) deferred tax assets, (v) the **Casino License** and any claims related thereto, (vi) prepaid insurance, (vii) the Purchase Price and all rights of the Debtor under the Stalking Horse Agreement, (viii) all Excluded Claims, (ix) all personnel records and other books, records, and files that the Debtor is required by law, if any, to retain, (x) any claim, right or interest of any Debtor in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, (xi) any other prepaid assets or properties expressly set forth on a Schedule to be attached to the Stalking Horse Agreement, (xii) applicable federal, state, and local taxes,

---

[4] Mr. Sit has extended $550,000 in DIP Financing as of the date of this filing. By its terms, the DIP Financing matures on December 31, 2024. The Debtor is informed that Stalking Horse Purchaser is ready, willing and able to consummate the transaction much earlier if necessary.

6

and (xiii) any books and records relating to any of the foregoing rights in, to and under the Casino License or any books and records relating to patrons of the Hotel or Casino.

- Excluded Claims: The Debtor shall retain (i) any rights, claims or causes of action under Chapter 5 of the Bankruptcy Code; (ii) all claims and defenses pursuant to applicable non-bankruptcy law and Sections 105, 502, 506, 510, 524 and 551-553 of the Bankruptcy Code against any creditor regarding the amount, priority, or validity of its claim (whether prepetition or postpetition); and (iii) all causes of action, including, but not limited to, claims against the Debtor's insiders, employees, and/or agents relating to pre-confirmation and/or pre-petition conduct, including without limitation, claims for fraud, breaches of fiduciary duty or negligence.

- Deposit: $2,000,000. If and only if Stalking Horse Purchaser is the successful bidder and the sale does not close due to Stalking Horse Purchaser 's default, the Deposit will not be refunded to Stalking Horse Purchaser.

- Closing Date: Seven (7) days following entry of an order approving a sale motion. Sale transaction must close by December 31, 2024.

- Bidding Procedures:

  1. Deadline to Submit: Any bidder, other than the Stalking Horse Purchaser, must submit a Qualified Bid in writing so as to be received on or before Noon ChST 10 business days prior to Auction (the "Bid Deadline"). (The Debtor and the Committee propose the auction be 9:00 a.m. on November 19, 2024). To properly submit a Qualified Bid, a party must deliver written copies of its bid to the following parties: (i) counsel to Debtor, ; Chuck C. Choi and Allison A. Ito of Choi & Ito; 700 Bishop Street, Suite 1107, Honolulu, Hawaii 96813;

cchoi@hibklaw.com; aito@hibklaw.com and (ii) counsel to the Committee, Aram Ordubegian and Christopher K.S. Wong of ArentFox Schiff, LLP, 555 West Fifth Street, 48th Floor, Los Angeles, CA 90013; aram.ordubegian@afslaw.com, christopher.wong@afslaw.com

2. Contingencies: None allowed other than sale order.

3. Break-Up Fee: $200,000, plus return of the Deposit.

4. Minimum Overbid: $300,000 above purchase price.

5. Bidder Deposit: Bank check $2,000,000.

6. Incremental Overbids: $100,000.

7. Irrevocable Bid: Each bid must be irrevocable until five (5) business days after the Acquired Assets have been sold pursuant to the closing of the sale approved by the Bankruptcy Court in a final, non-appealable order (the "Termination Date") unless such Bid is designated as the Back-Up Bid (defined below);

8. Other requirements to qualify to bid: (i) marked up Stalking Horse Agreement; (ii) written evidence of the financial wherewithal of such bidder that the Debtor and the Committee reasonably believe provides the ability to consummate the sale and satisfy the standards to provide adequate assurance of future performance under Section 365 of the Bankruptcy Code ; (iii) affidavits or declarations establishing the bidder's good faith within the meaning of Section 363(m) of the Bankruptcy Code; and (iv) a deposit (the "Good Faith Deposit") in the form of a certified check or wire payable to the order of Debtor in the amount of not less than Two Million ($2,000,000) to be held in escrow on until the Termination Date.

9. Auction: Only if a bid that meets the requirements set forth herein (a "Qualified Bid") is received by the Bid Deadline shall an auction be conducted (the "Auction"). If necessary, the Auction shall be jointly conducted by the Debtor and the Committee shall commence on **November 19, 2024 at 9:00 a.m.**, at the United States District Court, for the Northern Mariana Islands, Bankruptcy Division in Courtroom 1671 Gualo Rai Rd., Gualo Rai, Saipan, MP 96950.

10. Auction Process: Upon conclusion of the bidding, the Auction shall be closed, and the Debtor and the Committee shall jointly (i) determine the winning bidder on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the proposed sale, and (ii) identify the highest, best, and/or otherwise financially superior offer for the Acquired Assets (the "Successful Bid" and the entity submitting such Successful Bid, the "Successful Bidder"), which highest, best and/or otherwise financially superior offer will provide the greatest amount of net value to the Estate, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid"). In the event the sale to the Successful Bidder does not close, the Debtor shall be authorized to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid and the Debtor shall be authorized, to consummate the sale with the party submitting such Back-up Bid without further notice or orders of the Bankruptcy Court.

11. No Other Qualified Bids. If no Qualified Bid other than the Stalking Horse Purchaser is received by the Bid Deadline, then (i) the Auction will not be held, (ii) the Stalking Horse Purchaser will be deemed the Successful Bidder, (iii) at the Sale

Hearing on November 20, 2024 at 8:30 a.m., the Debtor will seek Bankruptcy Court approval of and authority to consummate the proposed sale to the Stalking Horse Purchaser as contemplated by the Term Sheet.

12. Good Faith Deposit: The Good Faith Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing. Good Faith Deposit(s) of any designated Back-Up Bidder(s) shall be held by escrow until the Termination Date. Good Faith Deposits of all other parties who submitted Qualified Bids shall be returned within five (5) business days of the Auction. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtor shall be entitled to retain the Good Faith Deposit as its damages resulting from the breach or failure to perform by the Successful Bidder.

III.    LEGAL ARGUMENT

A.  THE PROPOSED BIDDING PROCEDURES ARE FAIR AND REASONABLE.

The proposed Bidding Procedures are fair and reasonable in view of, among other things, the physical condition of the Hotel and the exigent circumstances of this case. Absent entry of a bidding procedures order, the estate could lose the opportunity to obtain the highest and best available offer for the Acquired Assets, including the Hotel.

Historically, bankruptcy courts have approved bid protections similar to those proposed pursuant to the Bidding Procedures proposed here under the "business judgment rule," under which the courts defer to the actions of corporations taken in good faith and in the exercise of honest judgment. *See, e.g.*, In re 955 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992); *See S*imantob v. Claims Prosecutor LLC (In re Lahijani), 325 B.R. 282, 288-89 (B.A.P. 9th

Cir. 2005); *e.g.,* In re Castre, Inc*.,* 312. B.R, 426, 428 (Bankr. D. Colo. 2004); In re: Crowthers McCall Pattern, Inc*.,* B.R. 877, 888 (Banks. S.D.N.Y. 1990).

The bid protections set forth herein satisfy the "business judgment rule." The bid protections proposed herein encouraged Stalking Horse Purchaser to act as a "stalking horse," who invests time, money and effort to negotiate a binding Term Sheet despite the risks and uncertainties of the bankruptcy process.

One important component of the proposed Bidding Procedures is the "overbid" provision, pursuant to which any initial offer for the Acquired Assets must be at least $300,000.00 more than the purchase price. A minimum initial overbid is necessary both to compensate a prospective stalking horse purchaser for the risk that it assumes in foregoing a known outcome, and to ensure that there is an increase in the net proceeds received by the estate, after deducting the Break-Up Fee to be paid to the proposed Stalking Horse Purchaser in the event of a prevailing overbid. Case law supports minimum overbids that are up to 10% of the initial purchase price as fair and reasonable. *See,* In re Wintex, Inc., 158 B.R. 540, 543 (D. Mass. 1992) (observing, in the context of a 10% overbid provision, that "debtor may avoid the increased cost and complexity associated with considering additional bids unless the additional bids are high enough to justify their pursuit"); In re Tempo Technology Corp., 202 B.R. 363, 369 (D. Del. 1996) (overbid price of $1.4 million in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities). The proposed overbid here is just 2% of the Purchase Price.

In order to compensate Stalking Horse Purchaser for the substantial time, effort, expense, and risk that Stalking Horse Purchaser has incurred and will incur in conducting due diligence and negotiating, documenting, and setting a floor for the Acquired Assets, the Bidding Procedures

provide that if a sale of the Leased Property to a party other than Stalking Horse Purchaser is consummated, Buyer will be paid the Break-Up Fee of $200,000.

Topping and other termination fees are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code. *See*, Integrated Resources Inc., 147 B.R. at 659-60 ("Break-up fees are important tools to encourage bidding and to maximize the value of debtor's assets . . . . In fact, because the . . . corporation ha(s) a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.") Specifically, "[b]reak-up fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." In re 955 Fifth Ave Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotation omitted).

The proposed Break-Up Fee is necessary and provides an actual benefit to the estate. Stalking Horse Purchaser has indicated that it is a condition to the offer that the Bidding Procedures, including, without limitation, payment of the Break-Up Fee be approved by the Bankruptcy Court. Stalking Horse Purchaser's offer represents the highest (and to date only) offer for the Acquired Assets that the Debtor has received. Unless the Bidding Procedures proposed herein are approved, there is significant risk that no auction can be held at all. An auction assures the estate the opportunity to maximize value for the benefit of all constituencies.

The Debtor submits that the Bidding Procedures provide a necessary and actual benefit to the estate. The Bidding Procedures establish the parameters under which the value of these assets may be tested at a public auction. The terms and conditions of the auction will enable the Trustee to realize the maximum value of the Acquired Assets, and thus ensure that the auction is in the best interest of the estate and creditors.

The Debtor recognizes that the proposed time frame for the Auction is abbreviated, but a prolonged sale process would be detrimental to the estate and creditors in this case. The Hotel is essentially a wasting asset.  It has not been maintained in years and its structural integrity is questionable.   The Debtor has no revenues and has been forced to borrow funds to pay insurance and security.

IV.   REQUESTED RELIEF

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion: (a) Setting 9:00 a.m., November 19, 2024, as the auction date; and 10 business days before the auction date as the deadline for the submission of Qualified Bids; (b) Scheduling a further hearing at 8:30 a.m. on November 20, 2024, to confirm the sale to Buyer or higher bidder; (c) Approving the Bidding Procedures described herein, including the Break-Up Fee; and (d) Granting any other and further relief that the Bankruptcy Court deems just and proper.

DATED:  Honolulu, Hawaii, August 9, 2024.


*/s/ Chuck C. Choi*
CHUCK C. CHOI
ALLISON A. ITO
CHARLES H. MCDONALD II
Attorneys for Imperial Pacific International, LLC,
Debtor and debtor-in-possession

# EXHIBIT A

**ASSET PURCHASE AGREEMENT STALKING HORSE TERM SHEET
RE: ASSETS OF IMPERIAL PACIFIC INTERNATIONAL (CNMI) LLC**

This Asset Purchase Agreement Stalking Horse Term Sheet dated August _, 2024, is made by and between IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC ("Debtor") and Loi Lam Sit or his assignee ("Purchaser")

| | | |
|---|---|---|
| 1. | **Certain Defined Terms:** | "**Casino License**" means that certain Exclusive Casino Operator License dated August 12, 2014, by and among the Debtor, Best Sunshine International, Ltd. and the Commonwealth Lottery Commission for the island of Saipan. |
| | | "**Cure Costs**" means the cost of curing any defaults under the Designated Contracts and Real Property Leases as necessary to obtain an order of the Bankruptcy Court assigning them to the Stalking Horse Purchaser. |
| | | "**Designated Contracts**" means those executory contracts and unexpired leases to be assumed by and assigned to the Stalking Horse Purchaser. |
| | | "**DIP Facility**" means the debtor-in-possession term loan funded by Loi Lam Sit in the Seller's bankruptcy case which is pending in the United States District Court for District of the Northern Mariana Islands, Bankruptcy Division (the "**Bankruptcy Court**"). |
| | | "**IPP**" means Imperial Pacific Properties, LLC. |
| | | "**Personal Property**" means all personal property identified in Part 5 (Inventory), Part 7 (Office furniture, fixtures, and equipment; and collectibles), and Part 8 (Machinery, equipment, and vehicles) to Schedule "B" of the Debtor's Schedules and Statement of Financial Affairs, filed in the Debtor's bankruptcy case as dkt # 74, as may be amended. |
| | | "**Real Property Leases**" means all unexpired leases of real property of the Debtor, including its interest in that certain Lease Agreement LA15-002S between Seller and the Department of Public Lands for the Commonwealth of Northern Mariana Islands. |
| 2. | **Stalking Horse Purchaser ("SHP"):** | Loi Lam Sit or assignee |
| 3. | **Seller:** | The Bankruptcy Estate of the Debtor whose chapter 11 case is |

1

pending in the Bankruptcy Court as case no. 1:24-bk-0002.

| | | |
|---|---|---|
| 4. | **Transaction Structure:** | Sale free and clear of liens and encumbrances and assumption and assignment of unexpired contracts and leases under sections 363 and 365 of the Bankruptcy Code. |

5. **Purpose:** This Term Sheet is intended to be legally binding on the Parties and outlines the basic terms of the transaction, and upon mutual agreement of the Parties, can serve as the Stalking Horse Agreement, subject to overbids, to be presented to the Bankruptcy Court for approval under Sections 363(f) and 365 of the Bankruptcy Code (the "**Sale Motion**").

6. **Acquired Assets:** Substantially all of the assets of the Debtors (collectively, the "**Acquired Assets**"), other than the Excluded Assets, to be transferred free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code. The Acquired Assets include all tangible property, accounts, machinery, equipment, inventories, tenant improvements, goodwill, software and computer programs, hardware, intellectual property, company names, product names, trade names, prepaid expenses (other than prepaid insurance) and deposits, any rights, claims or causes of action of the Debtor against third parties relating to assets, properties, losses, business or operations of any Debtor (other than those that constitute Excluded Assets), and proceeds of all the foregoing assets, including the Personal Property, Designated Contracts, Real Property Leases and the Debtor's interest in IPP.

7. **Excluded Assets:** Except to the extent specifically identified above as an Acquired Asset, the following are not included in the Acquired Assets and are not being sold to the Stalking Horse Purchaser (collectively, the "**Excluded Assets**"): (i) cash, (ii) cash equivalents (including receivables and the proceeds thereof), (iii) income tax receivables, (iv) deferred tax assets, (v) the Casino License and any claims related thereto, (vi) prepaid insurance, (vii) the Purchase Price and all rights of the Debtor under the Stalking Horse Agreement, (viii) any rights, claims or causes of action under Chapter 5 of the Bankruptcy Code, (ix) all personnel records and other books, records, and files that the Debtor is required by law, if any, to retain, (x) any claim, right or interest of any Debtor in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, including (xi) any other prepaid assets or properties expressly set forth on a Schedule to be attached to the Stalking Horse

2

Agreement, (xii) applicable federal, state, and local taxes, (xiii) any books and records relating to any of the foregoing rights in, to and under the Casino License or any books and records relating to patrons of the Hotel or Casino; and (ix) (a) any rights, claims or causes of action under Chapter 5 of the Bankruptcy Code; (b) all claims and defenses pursuant to applicable non-bankruptcy law and Sections 105, 502, 506, 510, 524 and 551-553 of the Bankruptcy Code against any creditor regarding the amount, priority, or validity of its claim (whether pre-petition or post-petition); and (c) all causes of action, including, but not limited to, claims against the Debtor's insiders, employees, and/or agents relating to pre-confirmation and/or pre-petition conduct, including without limitation, claims for fraud, breaches of fiduciary duty or negligence.

8. **Purchase Price:** The purchase price for the purchase, sale, assignment and conveyance of the Debtor's right, title and interest in, to and under the Acquired Assets (as defined below), free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code, shall be $10,000,000 consisting of:

    (a) Credit for the DIP Facility;
    (b) Cure Costs: the payment of Cure Costs relating to the Designated Contracts/Real Property Leases on terms ordered by the Bankruptcy Court or negotiated by SHP and the contract counterparties; and
    (c) Cash: Balance of the Purchase Price shall be paid in cash at closing.

9. **Closing:** Unless otherwise agreed to by written mutual consent of the Parties, the closing of the transactions contemplated by this Term Sheet (the "Closing") shall occur within seven (7) days following entry of an order approving the Sale Motion.

10. **Good Faith Deposit:** SHP shall deposit as earnest money in escrow the sum of Two Million and 00/100 Dollars ($2,000,000.00) in cash (such sum, together with any interest thereon, being hereinafter collectively referred to and held as the "**Deposit**"), with Pacific American Title Insurance Company or Security Title. (being herein sometimes referred to as the "**Title Company**") which shall hold the balance of the Deposit and make delivery of the Deposit to the party entitled thereto under the terms hereof. The Deposit will be non-refundable, if the SHP is the successful bidder, and the sale does not close due to SHP's default.

| | |
|---|---|
| **11. <u>Assumed Liabilities</u>:** | SHP shall, effective as of the closing date, assume those liabilities and obligations arising from events occurring on or after the closing date under any Designated Contracts or Real Property Leases.  SHP shall also be responsible for payment of Cure Costs. |
| **12. <u>Excluded Liabilities</u>:** | SHP shall not assume or be deemed to have assumed any liabilities of the Debtor other than the Assumed Liabilities, including, without limitation, any liabilities associated with the Excluded Assets and specifically including, without limitation, any other existing indebtedness or encumbrances, any federal, state, or local tax liabilities, and any obligations pursuant to employee-related liabilities, in each case to be assumed, if at all, only in SHP's sole discretion by a signed writing and court order. |
| **13. <u>Bidding Procedures</u>:** | Deadline to submit bids shall be no later than 10 business days prior to "Auction."  Copies of a written bid shall be provided to the Debtor and Committee, care of counsel. |
| | Minimum Overbid shall be $300,000 above the purchase price with incremental overbids of not less than $100,000 |
| **14. <u>Requirement of Bankruptcy Court Approval and Subject to Overbids</u>.** | If the Bankruptcy Court does not approve the Sale Motion or the bidding procedures setting forth the terms by which the Acquired Assets will be auctioned (the "**Bid Procedures**"), then the terms of this Term Sheet are null and void, and the Parties will have no obligation to complete the proposed sale or perform any other obligations set forth in this Term Sheet. |
| **15. <u>Breakup Fee</u>:** | In consideration of the significant costs and efforts to be expended and risks assumed by SHP in negotiating the transaction described in this Term Sheet, the Stalking Horse Agreement will provide for a break-up fee payable by the Seller to SHP in the amount of $200,000 (the "**Breakup Fee**") in the event the Stalking Horse Agreement is terminated as a result of either (i) an Event of Default by a Debtor under the DIP Facility, or (ii) a breach by a Debtor of a material term of, or failure to timely satisfy a condition to closing that is a Debtor's obligation under, the Stalking Horse Agreement; provided that, if SHP, in its sole discretion, elects to seek specific performance of the Stalking Horse Agreement, then SHP shall not be entitled to the Breakup Fee or Expense Reimbursement. The Breakup Fee and Expense Reimbursement shall constitute administrative expense claims pursuant to section 503(b) of the Bankruptcy Code. |
| | If the Stalking Horse Agreement is terminated because of a superior bid, then the Breakup Fee shall be payable from the |

proceeds of an alternative transaction whereby the assets contemplated to be sold to SHP are, instead, sold to a third party. For the avoidance of doubt, in no event shall SHP be entitled to the Breakup Fee due to (i) its breach of its obligations under this Term Sheet; or (ii) where the Bid Procedures are not approved by the Bankruptcy Court.

**16. No Other Expenses:**

It is expressly understood by SHP that the Breakup Fee is the only source of recovery for expenses it incurs in connections with the transaction contemplated in this Term Sheet. All expenses, including, but not limited to, the Parties' out-of-pocket expenses, legal fees, and costs incurred in connection with the negotiation and consummation of the Term Sheet will be borne by each Party.

**17. Conditions:**

Stalking Horse Purchaser's and Debtor's obligations to consummate the transaction shall be subject to the following conditions:
• No injunctions;
• Material accuracy of representations and warranties;
• No termination of any of the Real Property Leases or Designation Contracts
• Entry of an Order of the Court approving the Stalking Horse Purchaser as the highest bidder for the Acquired Assets pursuant to sections 363 and 365, including a finding the Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code.

**18. Specific Performance:**

Because the exact nature and extent of damages resulting from a breach of the Stalking Horse Agreement are uncertain at the time of entering into the Stalking Horse Agreement, and because such a breach would result in damages that would be difficult to determine with certainty, it is understood that money damages would not be a sufficient remedy and the parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach.

**19. As Is, Where Is:**

The Stalking Horse Purchaser is acquiring the Acquired Assets at the closing "as is, where is" and, except as otherwise expressly provided in the Stalking Horse Agreement, the Debtor is making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets.

**20. Termination:**

The Definitive Agreement may be terminated as follows:
• Mutual consent of Seller and Purchaser;

> • Material breach of a representation or covenant by Seller or Purchaser which is not cured within thirty (30) days following notice of such breach; or
> • The Closing has not taken place on or prior to December 31, 2024 or such later date as Seller may agree upon.

21. **<u>Governing Law</u>:** This Term Sheet will be governed by and construed under the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and, where appropriate, the laws of the Commonwealth of the Northern Mariana Islands, notwithstanding any conflict of or choice of laws principles.

22. **<u>Dispute Resolution</u>:** All disputes arising out of or in connection with this Term Sheet will fall within the exclusive jurisdiction of the Bankruptcy Court.

23. **<u>Modification</u>:** Once accepted, this Term Sheet will not be changed, modified, amended, or discharged except by an instrument in writing signed by authorized representatives of each Party specifically referencing this Term Sheet. No delay or failure by any Party in the exercise of any right granted under this Term Sheet or available at law or equity will be construed as a waiver of such right. All waivers must be in writing and will in no way impair the rights of the Parties in any other respect or at any other time.

By: Imperial Pacific International (CNMI), LLC

By: _____
    Howyo Chi, Its Manager
              "Seller"

By: _____
    Loi Lam Sit
              "Stalking Horse Purchaser"

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN MARIANA ISLANDS**

**BANKRUPTCY DIVISION**

| | |
|---|---|
| In re<br><br>IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC,<br><br>        Debtor and Debtor-in-Possession. | Case No. 24-00002<br>(Chapter 11)<br><br>DECLARATION OF HOWYO CHI |

I. HOWYO CHI, hereby declare as follows:

1.      I have personal knowledge of facts stated in this Declaration and if called as a witness in this action, I could and would testify to all matters set forth herein of my own knowledge.

2.      I am the duly appointed manager of Imperial Pacific International (CNMI), LLC ("Debtor"), the above-named Debtor, and submit this Declaration in support of the Memorandum in Support of the *Motion to Approve Bid Procedures for Sale of Substantially All of the Debtor's Assets and Related Relief* (the "Motion") filed herewith. Terms used in this Declaration that are not defined shall have the meanings given them in the Motion.

3.      The statements in the Motion are true and correct to the best of my information and belief and reflect my understanding and knowledge of the matters and issues regarding this Chapter 11 case.

4.      Attached to the Motion as Exhibit "A" is a true and correct copy of the proposed Term Sheet with the Stalking Horse Purchaser.

5.      The Stalking Horse Purchaser is the only party that has made an offer to acquire the Hotel and related assets. I understand that the proposed Bid Procedure, including Break-Up

Fee constitute material inducements for the Stalking Horse Purchaser to serve as the "stalking horse" bidder for the Acquired Assets.

6.     Under the circumstances of this case, a prolonged sale process would be detrimental to the estate due to the condition of the Hotel and the lack of revenue.  I believe that the proposed Bid Procedures are in the best interest of the estate.

I declare under penalty of perjury under the laws of the Territory of the Commonwealth and the United States that the foregoing is true and correct.

Executed this 10th day of August 2024, Saipan, Northern Marianas.


/s/ *Howyo Chi*
HOWYO CHI

2